**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

COMMODITY FUTURES TRADING
COMMISSION,

               Plaintiff,

      v.

EOX HOLDINGS LLC and ANDREW
GIZIENSKI,

               Defendants.

Case No.: 4:19-cv-02901

Hon. Sim Lake

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'**
**SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     Nature and Stage of Proceeding ........................................................................ 1

II.    Issues to Be Ruled Upon ................................................................................... 2

III.   Standard of Review ........................................................................................... 2

IV.    Summary of the Argument. ............................................................................... 3

V.     Response to Defendants' Statement of Facts .................................................... 3

VI.    Defendants' Motion for Summary Judgment on Counts I and II Should Be Denied.  5

   A.   Defendants Breached a Duty of Confidentiality. ............................................. 5

   B.   The CFTC Properly Disclosed Instances of Defendants' Violations .............. 9

   C.   The CFTC Does Not Contend it is Illegal to Broker for Multiple Traders. .... 11

   D.   The CFTC Did Not Charge Defendants with Frontrunning ............................ 12

   E.   Defendants Took the Other Side of Customer Orders Without Consent. ........ 12

   F.   Though Damages Are Not a Required Element, Defendants' Fraud Did Cause Customers to Suffer Losses. ............................................................................. 14

VII.   EOX Is Not Entitled to Partial Summary Judgment on Count III. ................. 17

   A.   EOX's IB Business Exceeded the Gross Aggregate Revenue Threshold. ...... 18

   B.   Regulation 1.35 Was In Effect Throughout the Relevant Period .................... 21

VIII.  EOX Is Not Entitled to Summary Judgment on Count IV ............................ 22

IX.    Conclusion ....................................................................................................... 24

## TABLE OF AUTHORITIES

### Cases

*Bustos v. Martini Club Inc.*, 599 F.3d 458 (5th Cir. 2010).............................................................. 2

*Celotex v. Catrett*, 477 U.S. 317 (1986) ...................................................................................... 2

*CFTC v. EOX Holdings LLC*, 405 F. Supp. 3d 697 (S.D. Tex. 2019)................................... 12, 13

*CFTC v. Southern Trust Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018)....................................... 14

*Clark v. America's Favorite Chicken Co.*, 110 F.3d 295 (5th Cir. 1997)...................................... 4

*Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010) .................. 13

*In re Hinsley*, 201 F.3d 638 (5th Cir. 2000).................................................................................. 4

*Mutual Concepts, Inc. v. First National Bank of Omaha*, 2010 WL 11583298, at *12 (S.D. Tex. Sept. 24, 2010) ......................................................................................................................... 4

*Samsung Elecs. Am. Inc., v. Yang Kun Chung*, 321 F.R.D. 250 (N.D. Tex. 2017) .................... 10

*Strum v. Ross*, 11 F.Supp.2d 942 (S.D. Tex. 1998) ...................................................................... 4

*U.S. v. Sanchez-Villalobos*, 412 F.3d 572 (5th Cir. 2005)......................................................... 22

*United States v. Dial*, 757 F.2d 163 (7th Cir. 1985) .................................................................. 15

### Statutes

7 U.S.C. § 9(1) ............................................................................................................................. 14

### Other Authorities

156 Cong. Rec. S3348 (daily ed. May 6, 2010) (statement of Sen. Cantwell)............................ 15

*CFTC Release* 8252-20 "CFTC Fines Houston, Chicago, and London-Based Introducing Brokers for Net Capital Deficiencies." ................................................................................................. 19

### Rules

Fed. R. Civ. P. 56(c) ...................................................................................................................... 2

Fed. R. Civ. P. 56(c)(1)(A) ............................................................................................................ 3

### Regulations

17 C.F.R. § 155.4 ......................................................................................................................... 14

17 C.F.R. § 155.4(b)(1)............................................................................................................ 1, 14

17 C.F.R. § 155.4(b)(2)....................................................................................... 5, 7, 12, 13, 14

17 C.F.R. § 180.1 ......................................................................................................................... 14

17 C.F.R. §1.35 .............................................................................................................................. 3

Defendants' Second Motion for Summary Judgment should fare no better with this Court than Defendants' first motion for summary judgment. In fact, Defendants rely on many of the same arguments, and much of the same evidence, this Court has already considered and rejected. Perhaps the most novel aspect of Defendants' Second Motion for Summary Judgment is how thoroughly it avoids addressing the applicable law. Defendants somehow manage not to cite, quote, or address a central regulation they are charged with violating, 17 C.F.R. §155.4(b)(1) which required Defendants not to disclose confidential information. Defendants also rely on financial reports that materially misrepresent the amount of revenue obtained by brokers working on EOX's behalf.  Other bizarre aspects of Defendants' Second Motion include citations to a non-existent rule, a veiled threat regarding what evidence the CFTC should be able to introduce, and the public disclosure of confidential settlement discussions in order to gain an advantage in litigation. These errors are manifest and manifold.  They are the hallmarks of a party without a valid defense in fact, or in law. The Court should deny Defendants' Second Motion for Summary Judgment, and enter summary judgment in favor of the CFTC.

## I.      Nature and Stage of Proceeding

In its four-count Complaint, the CFTC charges that Defendants EOX Holdings, LLC ("EOX") and Andrew Gizienski ("Gizienski," and together "Defendants") violated the Commodity Exchange Act (the "Act") and accompanying Regulations.  Specifically, the CFTC alleges Defendants violated the Act when Gizienski, a broker at EOX, disclosed EOX customer order information to his preferred customer and traded against EOX customers without their consent.  The Complaint also alleges recordkeeping and supervision violations against EOX.

Discovery is closed.  The CFTC filed a motion for summary judgment on all counts of the Complaint, and Defendants filed this second partial motion for summary judgment.

## II.    Issues to Be Ruled Upon

With respect to Counts I and II, the issues to be ruled upon are: (1) whether Defendants owed their customers a duty of confidentiality because of law, rule, agreement, and understanding, and if so whether the CFTC presented evidence that Defendants breached that duty by disclosing customer orders; (2) whether Defendants were prohibited from taking the other side of customer orders without consent, and if so, whether the CFTC presented evidence that Defendants traded against customers without consent; and (3) whether the CFTC can succeed on its claims even without proof of damages, and if not, whether the CFTC presented evidence that Defendants' violations damaged EOX customers.

With respect to Count III, recordkeeping violations, the issues to be ruled upon are: (1) whether the CFTC presented evidence that EOX and its affiliates generated more than five million dollars in introducing broker revenue for the three years preceding the Relevant Period; and (2) whether EOX was required to abide by Regulations 1.35(a)'s effective date.

With respect to Count IV, the issue to be ruled upon is whether the CFTC presented evidence that EOX failed to satisfy its supervisory obligations under the Regulations during and after the Relevant Period.

## III.    Standard of Review.

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c); *see Bustos v. Martini Club Inc*., 599 F.3d 458, 468 (5th Cir. 2010).

## IV.     Summary of the Argument.

Defendants' motion with respect to Counts I and II should be denied because the CFTC has presented overwhelming evidence that Defendants broke the law when they disclosed confidential customer information to a third party.  Defendants also broke the law when Gizienski traded against EOX customers without prior consent.  And though it is not a required element of the CFTC's charges, the CFTC has offered undisputed evidence that EOX customers lost money, and Defendants made money due to Defendants' violations.

EOX's motion with respect to Count III should be denied because it was required to record and maintain oral pre-trade communications under 17 C.F.R. §1.35 as early as February 19, 2013, the effective date of the Regulation.  EOX's gross brokerage revenue exceeded the $5 million threshold in the Regulation.  And EOX's motion with respect to Count IV must be denied because of the laws of space and time. Any actions EOX purportedly took in 2015 to "revamp" its compliance program could not possibly have prevented supervision violations that took place earlier in 2013 and 2014.

## V.      Response to Defendants' Statement of Facts

Although Defendants label all facts on pages 3 to 14 of their Second Summary Judgment Motion as "Undisputed," Defendants fail to cite even admissible evidence, much less undisputed evidence, in the record for each fact.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Indeed, many of the "undisputed facts" in Defendants' Motion have no record citation at all.  It is therefore unnecessary for the CFTC to respond fact by fact, but the CFTC responds and objects to two affidavits submitted by Defendants.

To begin, Defendants rely heavily on the affidavit of EOX's CEO, Javier Loya.  Loya's affidavit is inadmissible because (1) it offers conclusions of law, (2) lacks foundation, and (3) is otherwise conclusory and self-serving.  First, Loya's affidavit asserts that "EOX and Mr.

Gizienski acted as dual agents," "Brokerage Service Agreements provisions permit[] the disclosure of information," and "the NFA 2014 Audit Report . . . confirms . . . EOX's exemption in 2014 from the recording requirement of Regulation 1.35" (¶¶7, 10, 12.)  These are legal conclusions to questions presently before the Court and therefore inadmissible conclusions of law that should be stricken.  *See, e.g., Mutual Concepts, Inc. v. First National Bank of Omaha*, 2010 WL 11583298, at *12 (S.D. Tex. Sept. 24, 2010) ("The Fifth Circuit has stated that unsupported allegations of affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment"); *Clark v. America's Favorite Chicken Co*., 110 F.3d 295, 297 (5th Cir. 1997) ("[u]nsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment"). Moreover, to the extent these assertions claim a factual basis, those facts are disputed as discussed more fully below.

Second, without laying any foundation to establish whether or how Loya is qualified to offer testimony on "industry standard," Loya's affidavit asserts that the Brokerage Services Agreements executed between EOX and its customers "represent the standard custom and practice of the energy brokerage business and industry."  (¶¶10, 11.)  The assertions are improper, self-serving and should be disregarded.  *Strum v. Ross,* 11 F.Supp.2d 942, 946 (S.D. Tex. 1998) (the court denied summary judgment because the defendants "erroneously relie[d] exclusively on . . . self-serving affidavits"). Similarly, to the extent these assertions regarding the standard practice of the energy brokerage business and industry claim a factual basis, those facts are disputed as discussed more fully below.

Third, Loya's affidavit should be disregarded entirely because it is conclusory and self-serving.  *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000) ("A party's self-serving and

unsupported statement that she lacked the requisite intent is not sufficient to defeat summary judgment where the evidence otherwise supports a finding of fraud.").

Also, Defendants rely upon the very same Declaration of Steven Valji this Court already rejected as incapable of "eliminating issues of material fact about specific transactions alleged in the Plaintiff's Complaint." (ECF 74, p. 15.) The declaration should once again be rejected.

## VI.    Defendants' Motion for Summary Judgment on Counts I and II Should Be Denied.

Counts I and II are supported by overwhelming and undisputed evidence that Gizienski misused his customers' confidential block trading orders and information and that he traded against his customers without their consent. Each of Defendants' six arguments with respect to these counts falls far short of the standard for summary judgment, and should be rejected.

### A.  Defendants Breached a Duty of Confidentiality.

Defendants' contention that there is "no evidence of any duty of confidentiality" is easily disproven by law, rule, agreement, and understanding. First, the law: 17 C.F.R. § 155.4(b)(2) states that no introducing broker (like EOX) or affiliated person (like Gizienski) shall "[d]isclose that an order of another person is being held by the introducing broker or any of its affiliated persons, unless such disclosure is *necessary to the effective execution of such order*." (emphasis added). Here, the CFTC alleges—and the undisputed evidence clearly establishes—that Gizienski routinely disclosed EOX customer order information to favored customer Jason Vaccaro ("Vaccaro"), and that he did so not in an attempt to execute EOX customer orders, but rather to provide "market color" to Vaccaro in order to help him trade profitably. CFTC Statements of Fact (ECF 152) at ¶¶ 116, 118; Gizienski Inv. Test., Ex. 5 to CFTC SOF (ECF 152-6) at 132:17-19 ("Q: Why tell Vaccaro that Elsik and Adam are also at 1, at a price level? A: I'm just giving him market color . . . ."); Gizienski RFA Resp., Ex. 38 to CFTC SOF (ECF 152-39) at ¶ 46 (Q: "Admit that you did not disclose the identity or bid/trade activity of the EOX

customer 'elsik' . . . for the purpose of executing a trade for 'elsik.'"  A: "Admitted, subject to

the qualification that the information provided was market color . . . .").  The law expressly

forbids those disclosures.  Frankly, it is astounding that Defendants would argue that there is "no

evidence" that they were required keep customer orders confidential when the law very

obviously imposes a duty of confidentiality.  Defendants completely ignore 17 C.F.R.

§ 155.4(b)(2) and offer no explanation for why they are exempt from the duty of confidentiality

it imposes.

Next, Defendants' duty of confidentiality is established by rule, specifically by ICE

Futures U.S. ("IFUS") Rule 4.02(i), which imposes a duty of confidentiality unless one of three

enumerated exceptions applies:

> "[I]t shall be a violation of the Rules for any Person to . . . [d]isclose or divulge
> the buy or sell order of another Person except (1) in furtherance of executing the
> order, (2) at the request of an authorized representative of the CFTC or (3)
> pursuant to sub-paragraph (k) of this Rule regarding certain pre-execution
> communications."

IFUS Rule 4.02(i) (Ex. 1).

The first two exceptions to IFUS Rule 4.02(i) obviously do not apply—Gizienski

disclosed customer orders to Vaccaro to give him "market color," not to further the execution of

the orders, and no authorized representative of the CFTC asked Gizienski to make these

disclosures.  The third exception—for pre-execution communications as set forth in IFUS Rule

4.02(k)—does not apply either.  That exception would apply (and the order could be disclosed)

only if the communication was "between two market participants for the purpose of discerning

interest in the execution of a Transaction."  IFUS Rule 4.02(k)(1).  Gizienski's disclosures do not

fit within this exception because he was not communicating with Vaccaro to discern his interest

in transacting.  Further, the exception applies only where the communication is intended to

assure a market participant "that another market participant will take the opposite side of an

6

order."  IFUS Rule 4.02(k)(2).  Again, that was not the purpose of Gizienski's disclosures.

Finally, the exception requires that the customer have "previously consented to such

communications being made on its behalf."  IFUS Rule 4.02(k)(1)(A).  No EOX customer

consented to Gizienski disclosing its order to Vaccaro.  CFTC Statements of Fact (ECF 152) at

¶¶ 94-95.  The pre-execution communications exception does not apply and IFUS Rule 4.02(i)

prohibited Gizienski's disclosures.

Defendants fail to address IFUS Rule 4.02(i) in any way, much as they ignore Regulation

17 C.F.R. §155.4.  Defendants make a cursory attempt to address the pre-execution

communication exception in IFUS Rule 4.02(k), but in doing so they demonstrate that they do

not have even a basic understanding of IFUS rules.[1]  They make the misguided claim that "all

[the rule] prohibits is disclosure of 'pre-trade communications.'"  Def. Mem. (ECF 160.1) at 17.

But they have it backwards: IFUS Rule 4.02(i) prohibits *all* disclosures of others' orders *except*

pre-trade communications that meet the exacting requirements of IFUS Rule 4.02(k).  And

Defendants do not even attempt to explain how they meet each of the requirements of Rule

4.02(k).  Therefore, Defendants' duty of confidentiality is imposed by rule.

Defendants' duty of confidentiality is also imposed by agreement—EOX's broker

services agreements with its customers.[2]  Contrary to Defendants' assertions, *none* of EOX's

brokerage services agreements allowed EOX brokers to disclose customer order information and

intentions to Vaccaro in order to provide him valuable market color.

---

[1] Defendants repeatedly cite to nonexistent IFUS "Rule 4.7(k)," Def. Mem. (ECF 160.1) at 4, 17, but
presumably they are trying to describe IFUS Rule 4.02(k).

[2] Defendants baldly assert that customers who did not have broker services agreements with EOX have no
confidentiality restrictions.  That is emphatically untrue.  Customers without broker services agreements
are protected by law (17 C.F.R. § 155.4(b)(2)), rule (IFUS Rule 4.02(i)), and understanding.

Defendants' analysis of the brokerage services agreements is astonishingly off-base.  For example, EOX's agreement with PSEG states, in relevant part:

**6. Confidentiality**
6.1 All information and data provided to [EOX] by [PSEG] or created by [EOX] for [PSEG] under this Agreement, including Transaction information such as price, quantity and dates, shall become and remain confidential information of [PSEG].  [EOX] and its personnel shall keep all such confidential information strictly confidential and shall not disclose or use such confidential information for the benefit of [EOX] or any other third parties except to a Third Party as defined herein . . .

PSEG Brokerage Services Agreement, Ex. 61 to CFTC SOF (ECF 152-62).  The PSEG agreement awkwardly defines "Third Party" as follows: "[EOX] may arrange for (a) the sale of Products by [PSEG] to a third party ("Third Party") or (b) the purchase by [PSEG] of Products from a Third Party . . ." *Id.* at § 1.1.  Under this definition, Vaccaro was not a "Third Party" because he was not selling to or buying from PSEG in the instances when Gizienski disclosed PSEG's information.  CFTC Statements of Fact (ECF 152) at ¶¶ 96, 98, 103, 106.  Therefore, the agreement prohibited Defendants from sharing PSEG's information with him.

Similarly, Geosol and Constellation's agreements prohibit EOX from disclosing "any information" EOX learned about its customers' purchase or sale activities except that EOX could "communicat[e] information to potential Product(s) buyers or sellers which is *necessary or appropriate* to perform" brokerage services.  Geosol Brokerage Services Agreement, Ex. 60 to CFTC SOF (ECF 152-61) at § 5 (emphasis added).  Again, Vaccaro was not a potential buyer or seller in the instances at issue, nor was it "necessary or appropriate" to share the customers' information with him.  (Elsik Dep. (Ex. 2) at 63:2-20).  Rather, Vaccaro shared Geosol's information with Vaccaro simply to provide him with "market color."  CFTC Statements of Fact (ECF 152) at ¶¶ 104, 115, 116.  Likewise, DTE's agreement prohibited EOX from sharing DTE's information except that EOX could "perform such services as are *necessary* to facilitate

consummation of the [transaction] directly between the Third Party and [DTE]."  DTE

Brokerage Services Agreement, Ex. 59 to CFTC SOF (ECF 152-60) at § 3 (emphasis added).

Again, passing DTE's confidential information to Vaccaro was not "necessary" in order to

consummate trades between DTE and other counterparties.  CFTC Statements of Fact (ECF 152)

at ¶¶ 97, 107-109, 112, 117.  In fact, on at least one occasion Gizienski's disclosure of DTE's

information to Vaccaro actually *prevented* DTE from consummating a trade because Vaccaro

asked EOX to "fill me first" and EOX complied by executing Vaccaro's trade rather than DTE's

trade.  CFTC Statements of Fact (ECF 152) at ¶¶ 107-09.

Finally, the duty of confidentiality was imposed by understanding.  Every witness in this

case—including Gizienski—understood that EOX owed a duty of confidentiality to its

customers.  Gizienski was forthcoming in testimony about the existence of the duty of

confidentiality, saying "You can't give up that information.  There is a confidentiality agreement

between the broker and the trader, and . . . you know . . . no information I receive from one client

goes to another. . . .  I mean that's industry policy . . ."  Answer (ECF 77) at ¶ 28.  Additionally,

other EOX brokers testified that they understood they were required to keep customer order

information confidential.  CFTC Statements of Fact (ECF 152) at ¶ 92.  And EOX customers

testified that they expected that EOX would not disclose their order information.  *Id.* at ¶ 94.

Contrary to Defendants' arguments, the undisputed evidence establishes that Defendants

*did owe a duty of confidentiality* to their customers and they *did breach that duty* by sharing

customer order information with Vaccaro.

### B.  The CFTC Properly Disclosed Instances of Defendants' Violations.

In its interrogatory responses, the CFTC identified by Bates number the instant message

conversations in which Gizienski disclosed material, nonpublic information about other EOX

customers to Vaccaro.  This was more than adequate to comply with its discovery obligations,

and the CFTC should not be barred from arguing that those disclosures constituted violations. *See, e.g., Samsung Elecs. Am. Inc., v. Yang Kun Chung*, 321 F.R.D. 250, 282 (N.D. Tex. 2017) (Rule 33(d) generally requires an answering party to point to specific documents by name or bates number).

In their second set of interrogatories, Defendants' asked the CFTC to identify instances in which Gizienski disclosed confidential customer information to Vaccaro, seeking the date, the customer whose information was disclosed, the communication method, and the content of the communication.  Defs' Second Set of Interrogatories (Def. Ex. 12) at ¶ 3.[3]  The CFTC responded by identifying the Bates numbers of 20 instant message conversations between Gizienski and Vaccaro.  *Id.*  Those conversations were dated, and obviously the method of communication was instant message, so Defendants can have no legitimate quarrel with the CFTC's response to those specific questions.

The answers to Defendants' other questions—the identity of the customer whose information was disclosed and the content of the disclosure—could be readily determined from the messages.  In fact, Gizienski would be in the best position to identify instances when he was passing customer information to Vaccaro.  In these circumstances—where "the answer to an interrogatory may be determined by examining . . . a party's business records" and "the burden of deriving or ascertaining the answer will be substantially the same for either party"—Rule 33(d) grants a party like the CFTC the option of answering an interrogatory by identifying records.  Fed. R. Civ. P. 33(d).

---

[3] Defendants also complain about the CFTC's response to a similar interrogatory they issued in their third set of interrogatories.  Defs' Third Set of Interrogatories (Def. Ex. 13) at ¶ 4.  But those interrogatories were beyond the limit of 25 interrogatories imposed by Rule 33(a)(1), and in any event the CFTC responded by accurately stating that the information sought—which information disclosed by Gizienski to Vaccaro—was more readily accessible to Defendants than to the CFTC.  *Id.*

Defendants' description of this interrogatory response as an "ambush" is divorced from reality.  An example makes this clear.  One message the CFTC identified is EOX-0059200-0059219.  On page EOX-0059204, Gizienski wrote that he had a "bid for 500," Vaccaro responded "who is it," and Gizienski replied "al, peter, exelon."  CFTC Statements of Fact (ECF 152) at ¶ 97; 9/11/2013 Gizienski IM with Vaccaro, Ex. 44 to CFTC SOF (ECF 152-45).  It would have been obvious to Defendants—and to anyone else—that those customers' bids and identities was exactly the type of customer information the CFTC alleged that Gizienski disclosed.  And Gizienski is in the best position of anyone to determine who he meant when he said "al, peter, exelon."

Though Defendants filed two unsuccessful motions to compel relating to other supposed deficiencies with the CFTC's discovery responses, they did not move to compel on this issue.  Presumably, that is because they suffered no prejudice because Gizienski could easily identify the portions of his own instant message conversations in which he was conveying customer information to Vaccaro.  The CFTC properly disclosed the information requested under Rule 33(d), and should be allowed to proceed with its claims.

**C.  The CFTC Does Not Contend it is Illegal to Broker for Multiple Traders.**

It should be clear by now that Counts I and II charge Defendants with (1) trading against EOX customers on the basis of the customers' material, non-public information in breach of a duty owed to the customers; and (2) disclosing EOX customer order information to Vaccaro in breach of a duty of confidentiality.  Complaint (ECF 1) at ¶¶ 78, 83.  The CFTC does not allege, and has never alleged, that Defendants violated the law merely by *brokering block trades* for multiple customers.  Therefore, section A.3 of Defendants' summary judgment brief—which argues that there is no conflict of interest in brokering both sides of a block trade—is a red herring and can be safely ignored.  Def. Mem. (ECF 160.1) at 18-19.  And a ruling against

Defendants in this case will not "destroy the block brokerage business," as Defendants breathlessly contend. *Id.* at 19. Rather, such a ruling would only confirm what the law clearly says: block trade *brokers* must not *trade* against their customers without consent and must not disclose confidential customer information unnecessarily.

### D.  The CFTC Did Not Charge Defendants with Frontrunning.

The CFTC does not charge Defendants with frontrunning. Therefore, the Court can disregard Defendants argument that they did not frontrun. Def. Mem. (ECF 160.1) at 19-20.

### E.  Defendants Took the Other Side of Customer Orders Without Consent.

Defendants' motion for summary judgment with respect to taking the other side of customer orders without consent should be denied because Defendants' violation is established by undisputed evidence. 17 C.F.R. § 155.4(b)(2) states that no introducing broker (EOX) or any of its affiliated persons (Gizienski) shall "knowingly take, directly or indirectly, the other side of any order of another person revealed to the introducing broker or any of its affiliated persons by reason of their relationship to such other person, except with such other person's prior consent . . . ." Gizienski admits that he regularly executed discretionary trades against EOX customers without their consent through the Gizienski Trading Account.

Defendants offer an array of half-formed arguments in support of their motion. All should be rejected. First, Defendants "persist in their argument" that Regulation 155.4(b)(2) applies only to principals. Def. Mem. (ECF 160.1) at 20. This Court already rejected this argument because "Defendants fail[ed] to cite any authority supporting their contentions that Regulation 155.4(b)(2) applies only to principals." *CFTC v. EOX Holdings LLC*, 405 F. Supp. 3d 697, 718 (S.D. Tex. 2019). Defendants do no better this time around—they rest only on their previously-rejected argument, offering no authority or legitimate reason for the Court to reconsider. Def. Mem. (ECF 160.1) at 20.

Second, Defendants raise the spectre that a ruling against them would have "grave consequences" for the investment community.  Not so.  To comply with 17 C.F.R. § 155.4(b)(2) is simple.  Brokers must either (A) refrain from exercising discretion to make trades against their own customers, or (B) disclose to their customers that they will be taking the other side of the trade.  This rule provides protection to traders at little or no cost to honest brokers, and it is what the law requires.

Third, Defendants seek to misapply a dual agency principle in a context where it has no bearing.  For several reasons, dual agency law does not apply to Defendants secretly taking the other side of EOX customer trades.  To start, a dual agent's knowledge is not imputed in cases of fraud, and the CFTC's charges in this case sound in fraud.  *CFTC v. EOX Holdings LLC*, 405 F. Supp. 3d at 712.  Next, for a broker to legally take the other side of his customer's trade, the law requires the customer's *consent*, not just its *knowledge*.  17 C.F.R. § 155.4(b)(2). So even if Gizienski's *knowledge* that he was taking the other side of the trade were imputed to EOX's customers, their *consent* to that arrangement is not imputed.  Finally, Texas law does not give a dual agent license to use a principal's confidential information, or share it with the other principal.  In *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 924 (Tex. 2010), the court held only that a principal could not claim ignorance of escrow irregularities that its escrow agent (a dual agent) knew of.  The court did not say that a dual agent was somehow immune from liability for *misusing* information it learned from one principal to benefit another principal.  If, for example, an escrow agent misused one principal's bank account information to divert money to a second principal, it would be absurd for the escrow agent to claim protection under the law of dual agency.  But that is exactly what Defendants are trying to do—they posit

that they could freely use other customers' confidential information to benefit Vaccaro just because they happened to be acting as a dual agent.

Fourth, Defendants argue that it is somehow inconsistent to *require* brokers to tell customers when they intend to take the opposite side of a trade while also *prohibiting* brokers from disclosing a customer's order information.  But this is no Catch-22.  A broker could quite easily disclose that it is taking the other side of a customer's trade without passing one customer's order information to others in the market.  In fact, that is what the law unambiguously requires.  *See* 17 C.F.R. § 155.4(b)(1) (requiring that brokers keep customer orders confidential); 17 C.F.R. § 155.4(b)(2) (requiring that brokers obtain consent before trading opposite a customer).

Defendants' motion for summary judgment with respect to Gizienski taking the other side of customer orders should be denied.

### F.  Though Damages Are Not a Required Element, Defendants' Fraud Did Cause Customers to Suffer Losses.

Damages are not a required element under any of the statutes or regulations that the CFTC charges.  None of 7 U.S.C. § 9(1), 17 C.F.R. § 180.1, nor 17 C.F.R. § 155.4 requires that the CFTC prove damages in order to succeed on its claims.  *See CFTC v. Southern Trust Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018) (elements of liability for 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 are "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality").  Therefore, as Defendants' all but admit in their motion,[4] the CFTC need not allege nor prove customer loss or damage in order to prevail.

---

[4] Defendants appear to recognize that securities laws on which 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 were modeled do not require damages.  Defendants suggest that it was "unwise" for Congress to apply doctrines of securities law to the futures and options market.  But that is what Congress intended to do in adopting the 7 U.S.C. § 9(1):

In any event, there are damages here.  Defendants deliberately caused their customers to trade at inferior prices opposite the Gizienski Trading Account, causing the customers to suffer losses so Vaccaro could obtain instant, riskless profits.  As explained in the CFTC's motion for summary judgment (ECF 151 at 24-28), Gizienski did this by quoting prices that were inferior to the best prices he knew to be available in the market.  When a customer agreed to transact at the inferior price, Gizienski used the Gizienski Trading Account to trade with the EOX customer at that inferior price and simultaneously exited that position at a superior market price, collecting the price differential as profits to Vaccaro.  There can be absolutely no doubt that this actually happened on at least 11 occasions—the instant messages and trading records demonstrate it quite clearly.  CFTC MSJ Mem. (ECF 151) at 25-26; CFTC Statements of Fact (ECF 152) at ¶¶ 70-82.

Put simply, this is fraud.  When a broker "solicit[s] his customers to participate in block order, [he] implicitly represent[s] to them that he would try to get the best possible price."  *United States v. Dial*, 757 F.2d 163, 168 (7th Cir. 1985).  Intentionally giving customers inferior prices is fraud.  *Id.*  Gizienski knew this.  He admitted that EOX customers trusted him to "find the best price."  CFTC Statements of Fact (ECF 152) at ¶ 83.  But Gizienski did not try to find his customers the best price.  Instead, he convinced his customers to pay more than the market price so that he could secretly insert the Gizienski Trading Account into the deal to obtain

> "The language in this amendment is patterned after the law that the SEC uses to go after fraud and manipulation; that there can be no manipulative devices or contrivances . . . This legislation tracks the Securities Act in part because Federal case law is clear that when the Congress uses language identical to that used in another statute, Congress intended for the courts and the Commission to interpret the new authority in a similar manner, and Congress has made sure that its intention is clear."

156 Cong. Rec. S3348 (daily ed. May 6, 2010) (statement of Sen. Cantwell), Ex. H to CFTC MSJ (ECF 151-9).  Following Congress's intention, the CFTC expressly modeled Regulation 180.1 on SEC Rule 10b-5, noting that "the Commission will be guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5."  76 Fed. Reg. 135 at 41399 (Ex. 6).  It is not the Court's place to overrule the statutory language and Congressional intent.

instant, riskless profits for Vaccaro (and commissions for himself).  After he successfully

defrauded his customers, he boasted to Vaccaro, telling him that his other customers were

"stupid."  CFTC Statements of Fact (ECF 152) at ¶ 80.  Another EOX broker who saw what

Gizienski had done believed his actions were "illegal and immoral."  CFTC Statements of Fact

(ECF 152) at ¶ 73.  But now Defendants have the gall to argue that those inferior prices were

"fair and reasonable,"[5] citing to testimony from customers who *did not know that they had been*

*defrauded because Gizienski did not tell them what he was doing*.[6]  It was neither fair nor

reasonable for Gizienski to secretly overcharge other customers in order to enrich Vaccaro and

himself.

Defendants falsely suggest that the CFTC admitted it has no proof that EOX customers

suffered losses.  This is simply not true.  The CFTC disclosed its damages calculation to EOX in

an interrogatory response,[7] and the trading records demonstrating damages are ironclad.

Defendants appear to be hung up on an (accurate) statement by the CFTC earlier in discovery

that "the amounts that [Defendants'] victims were damaged by are unknown, and given the

nature of the conduct, may not be susceptible of calculation."  ECF 117 at 3.  That statement

was, and still is, true for the *total* damages Defendants caused.  The CFTC cannot, for example,

precisely calculate the damages that EOX customers suffered in the form of missed trading

---

[5] Defendants offer no authority indicating that prices inferior to those prices Gizienski knew to be available could be "fair and reasonable" under IFUS Rule 4.07(a)(iii).  In any event, it does not matter—the CFTC charges Defendants with violating federal law, not IFUS rules.  Defendants already settled IFUS charges that they violated IFUS rules.  IFUS Disciplinary Notice (Ex. 7).

[6] Gizienski testified that "there is no way" for a customer to learn whether its broker had actually provided the best price.  Gizienski Inv. Test., Ex. 5 to CFTC SOF (ECF 152-6) at 85:24-86:12.

[7] Defendants inexplicably complain that a CFTC attorney drafted the interrogatory response containing the Commission's damages calculation.  It is standard practice for attorneys to draft discovery responses to be verified by the client.  Besides, the CFTC relies on trading records, not its own discovery response, to prove up damages.

opportunities and inferior prices when Gizienski disclosed their order information to Vaccaro.[8]
And the CFTC cannot precisely calculate the total damages suffered by EOX customers for *all
107 occasions* when Gizienski traded opposite EOX customers without their consent, because it
is not presently feasible for the CFTC to determine the true market price known to Gizienski at
the time of each of those trades.  But the CFTC *can* precisely calculate damages for the 11
instances in which Gizienski traded opposite a customer at an inferior price and then *immediately*
exited the position at a superior price.  CFTC Statements of Fact (ECF 152) at ¶¶ 70-72.  For
those trades, the damage suffered by the EOX customer is the quantity of energy traded
multiplied by the difference between the inferior price Gizienski gave the customer and the
superior price[9] that Gizienski simultaneously gave Vaccaro.  *Id.*  These were losses to EOX
customers and corresponding illegitimate profits to Vaccaro.

The CFTC can prove damages, even though it need not do so to prevail on Counts I and
II, so Gizienski's motion should be denied.[10]

## VII.   EOX Is Not Entitled to Partial Summary Judgment on Count III.

Count III of the Complaint alleges that EOX violated its recordkeeping obligations from
the Relevant Period to the present in two ways: (1) failing to prepare and maintain written order
tickets, and (2) failing to maintain certain written and oral pre-trade communications.  Complaint

---

[8] The CFTC can calculate the damages from Gizienski's tipping in one instance.  On that occasion,
Gizienski disclosed that DTE was trying to sell a particular derivative for $4.50 per MWh, and Vaccaro
told Gizienski to "fill me first."  CFTC Statements of Fact (ECF 152) at ¶ 107.  EOX did fill Vaccaro's
order first, selling at $4.50.  *Id.*  Thereafter, DTE was not able to sell for nearly another hour, and it had to
sell at a lower price of $3.00 per MWh, costing it $3,600.  CFTC Statements of Fact (ECF 152) at ¶ 109.

[9] In these 11 instances, Gizienski's trade at the superior price on behalf of Vaccaro conclusively
establishes that he knew the superior prices were available when he transacted at inferior prices for his
other customers.

[10] Defendants footnote three includes some vague threat regarding the Commission's reliance on the
evidence that it developed in discovery.  The Court should give no weight to the bizarre, legally-baseless
and offensive arguments made in this footnote.

(ECF 1) at ¶ 91.  The Defendants' Motion addresses only a discrete portion of this Count: EOX's failure to maintain certain oral pre-trade communications from August 2013 through 2014.  EOX does not seek summary judgment as to the CFTC's charges that it failed to prepare and maintain written order tickets or that it failed to maintain certain written pre-trade communications.

Defendants make two arguments to suggest that their recordkeeping violations for pre-trade oral communication should be limited: first, they argue that they were not required to maintain oral communications until 2015 because they did not meet the gross aggregate revenue threshold to trigger the requirement, and second they claim that they were not required to abide by Regulations 1.35(a)'s February 19, 2013 effective date.  Both arguments are meritless.

### A.  EOX's IB Business Exceeded the Gross Aggregate Revenue Threshold.

Regulation 1.35(a), in relevant part, provides that the requirement to record oral communications does not apply to an Introducing Broker ("IB") "that has generated over the preceding three years $5 million or less in aggregate gross revenues from its activities as an introducing broker."  EOX argues that it was not required to record oral communications because its aggregate gross revenue from introducing broker activities for the three years preceding the Relevant Period is less than five million dollars.  To make this argument, EOX conceals from the Court—much like it previously concealed from the National Futures Association—the brokerage revenues earned by affiliates who use EOX's Introducing Broker registration.

To understand the fallacy of EOX's position, a basic explanation of EOX's convoluted corporate structure is needed.  EOX is a wholly-owned subsidiary of OTC Global Holdings. Answer (ECF 77) at ¶ 12.  In October 2012, EOX entered into an Intercompany Services Agreement ("Intercompany Agreement") with 15 other companies that are also wholly owned by OTC Global Holdings (the "Affiliates") to broker energy commodity derivatives.  Intercompany Agreement, Ex. 2 to CFTC SOF (ECF 152-3).  One of the Affiliates is Choice Power LP, the

entity that employed Gizienski as a broker.  Gizienski's First Employment Agreement, Ex. 3 to CFTC SOF (ECF 152-4); Gizienski's Second Employment Agreement, Ex. 4 to CFTC SOF (ECF 152-5).  Only EOX was registered as an IB, and none of the Affiliates were registered.

Pursuant to the Intercompany Agreement, when brokers employed by Affiliates (like Gizienski) performed brokerage services involving futures contracts (like brokering block trades in the energy market), they were "acting exclusively on behalf of EOX in their capacities as Associated Persons of EOX."  Intercompany Agreement, Ex. 2 to CFTC SOF (ECF 152-3).  This arrangement allows brokers like Gizienski to associate with EOX's IB registration by clarifying that they acted on behalf of EOX.

When it came time to account for the brokers' commissions and revenue, though, EOX took the position that all of the brokerage revenue belonged to the Affiliates and none belonged to EOX.  This purports to leave EOX in the strange—but potentially advantageous—position of having *little or no brokerage revenue* even though 15 Affiliates and scores of brokers relied on its registration and "act[ed] exclusively on EOX's behalf."  This is the disconnect that EOX seeks to exploit in arguing that it had aggregate gross revenues of less than $5 million for the three-year period leading up to the Relevant Period.  The exhibits EOX relies upon—its certified financial statements and 1-FR-IBs—all exclude brokerage revenue attributed to the Affiliates.[11]

Incredibly, EOX excludes even Gizienski's brokerage revenue from the calculation.  If successful, EOX's position would lead to an absurd result in which an individual broker's own brokerage revenue does not count towards the revenue threshold that would require that same

---

[11] The Court should also be aware that in September 2020, EOX and two of its affiliates entered into settlements with the CFTC to resolve charges that their financial reports to regulators were prepared incorrectly and were materially misleading. *See CFTC Release* 8252-20 "CFTC Fines Houston, Chicago, and London-Based Introducing Brokers for Net Capital Deficiencies." While the errors identified in connection with that matter are not relevant to the instant matter, the Court should weigh the evidence with these facts in mind.

broker's oral communications to be recorded.  Obviously that cannot be the law, or else any IB could successfully evade the oral communications recordkeeping requirement simply by claiming its revenue belonged to some other "affiliate" company.

When the Affiliates' brokerage revenue is considered, it is apparent that EOX was far above the $5 million threshold.  In discovery, EOX agreed to produce revenue information for only two of the affiliates—Choice Power, which was Gizienski's employer, and Choice Natural Gas.  Even considering only those two Affiliates, the aggregate gross revenue for the three years preceding the beginning of the Relevant Period—August 1, 2010 through July 31, 2013—was $16,261,776.54. (Ex. 3 Aggregate Gross Revenue) (EOX-2050548.)  And, for January through December 2013, EOX's aggregate gross revenue for just those two affiliates was $19,762,087.76, thus EOX exceeded the threshold throughout 2014 too.  *Id*.  For this reason alone, EOX's argument fails and its motion for partial summary judgment on Count III should be denied.

Nevertheless, EOX relies upon its Form 1FR-IB to argue that it was under the gross aggregate revenue threshold until 2015.  The Form 1FR-IB, however, does not require IBs to report their aggregate gross revenue from IB activity.  Instead, it merely requires an IB to report its net capital position, or more simply, the cash it has on hand.  Thus, the evidence EOX relies upon does nothing to support its argument and should be disregarded.  And in any event, the Form 1FR-IBs exclude Affiliate revenue (including revenue obtained by Gizienski himself).

Equally problematic, EOX relies upon financial statements that also exclude the IB revenue generated from its Affiliates.  EOX asks this Court to endorse the notion that it can simultaneously benefit from enabling its Affiliates to broker futures pursuant to EOX's IB registration but avoid accountability for the revenue generated therefrom.  According to EOX's

argument, the IB revenue generated from its Affiliates would not count as brokerage revenue of EOX or *any other* IB.  And, it is undisputed that Affiliate revenue exceeds the five-million-dollar threshold.  CFTC Statements of Fact (ECF 152, Ex. 65.)  The argument is misleading, at best.

Finally, EOX attempts to bolster its argument by pointing to the NFA's note that EOX was not required to record oral communications in 2014.  The NFA's note was, of course, premised upon the incomplete financial records provided to it by EOX.  Unsurprisingly, when NFA became aware of EOX's method of calculating gross revenue it reversed course and instructed them to correct it: "We will expect EOX to recognize all business being done under the EOX umbrella on the financial statements.  This would include commissions receivable, Commissions payables and any revenues generated by EOX APs." (Ex. 4) (Email from NFA to EOX dated June 2, 2020.)  That EOX for a time succeeded in tricking NFA about its true brokerage revenue is no reason to allow the company to commit the same wrong again here.  EOX's attempts at avoiding its regulatory obligations are futile and this Court should deny partial summary judgment.

**B.  Regulation 1.35 Was In Effect Throughout the Relevant Period.**

EOX next argues that the duration of its recordkeeping violations should be limited because it was not required to abide by the Regulation's effective date.  It is undisputed that Regulation 1.35's oral communications recordkeeping requirement went into effect on February 19, 2013—six months *before* the beginning of the Relevant Period.  76 Fed. Reg. 75523 at 75524 (Ex. 5) (listing an effective date of February 19, 2013).  It is also undisputed that the Regulation directed affected entities to be in full compliance with the Regulation by December 21, 2013.  *Id.* (listing a compliance date of December 21, 2013).  EOX argues that it was not required to abide by the Regulation's effective date and was only required to maintain oral communications *after* December 21, 2013.  EOX's argument must fail because it would render meaningless the

Regulation's effective date of February 19, 2013.  *See U.S. v. Sanchez-Villalobos*, 412 F.3d 572, 576 (5th Cir. 2005) ("[I]t is a basic rule of statutory construction that one provision of a statute should not be interpreted in a manner that renders other sections of the same statute inconsistent, meaningless, or superfluous." (quotation and citation omitted)).

The separate dates for effectiveness and compliance in the Regulation provide a "safe harbor" for market participants who could not comply by the effective date.  So long as market participants complied by the later compliance date, they would not be penalized for failing to meet the earlier effective date.  But if a market participant failed to comply even by the later compliance date, it would be liable for the entire period that the regulation was in effect.

It is undisputed that EOX failed to come into compliance with the Regulation before December 21, 2013.  CFTC Statements of Fact (ECF 152, Ex.67, Tabs 2, 13, 19-22.)  As a result, EOX's violations of the Regulation date back to the effective date.  If they did not, there would be no meaning and no purpose to having *both* an effective date and compliance date.  Indeed, under EOX's interpretation, the effective date would be superfluous.  As a result, EOX's recordkeeping violations are not limited, and EOX is not entitled to partial summary judgment on Count III.

## VIII.   EOX Is Not Entitled to Summary Judgment on Count IV

Count IV of the Complaint alleges that EOX failed to diligently supervise its employees, and thus violated Regulation 166.3, "by, among other things: (i) failing to establish, implement, and enforce policies or procedures to detect or prevent Gizienski's misuse of confidential customer information; (ii) failing to review Gizienski's discretionary trading, his communications with Customer A, or the brokerage services he provided to Customer A; and (iii) failing to establish, implement, or enforce policies or procedures governing its brokers'

handling of customer orders, the preparation and retention of required records, and the protection of confidential customer information." Complaint (ECF 1) at ¶95.

Defendants' Motion for Summary Judgment does not address the three enumerated failures, and for that reason alone the Motion should be denied.  Instead of addressing the CFTC's allegations relating to its failure to supervise Gizienski, EOX offers a red herring:  it argues that because it hired a compliance professional in 2015 to "revamp" its compliance program, it did not violate Regulation 166.3 in 2013 and 2014.  Of course, EOX's subsequent hiring of a compliance professional has no bearing on whether EOX violated 166.3 during the earlier Relevant Period.[12]

To the extent EOX intends to argue that its supervision failures were remedied in 2015, the record conclusively refutes such an assertion.  It is undisputed that EOX continues to ignore its own recordkeeping policies and procedures.  Specifically, EOX admits that after conducting a "reasonable inquiry" it simply does not know if it is following its own recordkeeping policy to maintain records in accordance with the Act and Regulations.  CFTC Statements of Fact (ECF 152, Ex. 27, RFA Response Nos. 4 and 6.)  EOX's failure to follow its recordkeeping policies is further evidenced by the fact that it was unable to produce its written order tickets upon demand to the CFTC.  CFTC Statements of Fact (ECF 152, Ex. 27, EOX RFA Response No. 7, RFP Response 6.)  The fact that EOX has drafted policies and procedures is meaningless if it does not actually follow them:  the existence of policies on paper does not amount to a compliance program.  Even EOX's red herring argument fails and thus summary judgment should be denied.

---

[12] And EOX admits it did not maintain records, pursuant to its own policies, during the Relevant Period. (CFTC Statements of Fact (ECF 152, Ex. 27, RFA Response No. 7.)

## IX.   Conclusion

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment.

Dated: April 19, 2021

Respectfully submitted by:

s/ Candice Haan
Candice Haan (admitted *pro hac vice*)
Douglas Snodgrass (admitted *pro hac vice*)
Joseph Konizeski (admitted *pro hac vice*)

COMMODITY FUTURES TRADING COMMISSION
525 W. Monroe Street, Suite 1100
Chicago, IL 60661
Telephone:   (312) 596-0700
Facsimile:   (312) 596-0714
E-mail:      chaan@cftc.gov
             dsnodgrass@cftc.gov
             jkonizeski@cftc.gov
*Attorneys for the Plaintiff*

24