Exhibit 5

12 CFR Part 345

Banks, banking, Community development, Credit, Investments, Reporting and recordkeeping requirements.

**Department of the Treasury**

*Office of the Comptroller of the Currency*

**12 CFR Chapter I**

For the reasons discussed in the preamble, 12 CFR parts 25 and 195 are amended as follows:

**PART 25—COMMUNITY REINVESTMENT ACT AND INTERSTATE DEPOSIT PRODUCTION REGULATIONS**

■ 1. The authority citation for part 25 continues to read as follows:

**Authority:** 12 U.S.C. 21, 22, 26, 27, 30, 36, 93a, 161, 215, 215a, 481, 1814, 1816, 1828(c), 1835a, 2901 through 2908, and 3101 through 3111.

■ 2. Revise § 25.12(u)(1) to read as follows:

**§ 25.12   Definitions.**

\*   \*   \*   \*   \*

(u) *Small bank*—(1) *Definition. Small bank* means a bank that, as of December 31 of either of the prior two calendar years, had assets of less than $1.186 billion. *Intermediate small bank* means a small bank with assets of at least $296 million as of December 31 of both of the prior two calendar years and less than $1.186 billion as of December 31 of either of the prior two calendar years.

\*   \*   \*   \*   \*

**PART 195—COMMUNITY REINVESTMENT**

■ 3. The authority citation for part 195 continues to read as follows:

**Authority:** 12 U.S.C. 1462a, 1463, 1464, 1814, 1816, 1828(c), 2901 through 2908, and 5412(b)(2)(B).

■ 4. Revise § 195.12(u)(1) to read as follows:

**§ 195.12   Definitions.**

\*   \*   \*   \*   \*

(u) *Small savings association*—(1) *Definition. Small savings association* means a savings association that, as of December 31 of either of the prior two calendar years, had assets of less than $1.186 billion. *Intermediate small savings association* means a small savings association with assets of at least $296 million as of December 31 of both of the prior two calendar years and less than $1.186 billion as of December

31 of either of the prior two calendar years.

\*   \*   \*   \*   \*

**Federal Reserve System**

**12 CFR Chapter II**

For the reasons set forth in the preamble, the Board of Governors of the Federal Reserve System amends part 228 of chapter II of title 12 of the Code of Federal Regulations as follows:

**PART 228—COMMUNITY REINVESTMENT (REGULATION BB)**

■ 5. The authority citation for part 228 continues to read as follows:

**Authority:** 12 U.S.C. 321, 325, 1828(c), 1842, 1843, 1844, and 2901 *et seq.*

■ 6. Revise § 228.12(u)(1) to read as follows:

**§ 228.12**

\*   \*   \*   \*   \*

(u) *Small bank*—(1) *Definition. Small bank* means a bank that, as of December 31 of either of the prior two calendar years, had assets of less than $1.186 billion. *Intermediate small bank* means a small bank with assets of at least $296 million as of December 31 of both of the prior two calendar years and less than $1.186 billion as of December 31 of either of the prior two calendar years.

\*   \*   \*   \*   \*

**Federal Deposit Insurance Corporation**

**12 CFR Chapter III**

*Authority and Issuance*

For the reasons set forth in the preamble, the Board of Directors of the Federal Deposit Insurance Corporation amends part 345 of chapter III of title 12 of the Code of Federal Regulations to read as follows:

**PART 345—COMMUNITY REINVESTMENT**

■ 7. The authority citation for part 345 continues to read as follows:

**Authority:** 12 U.S.C. 1814–1817, 1819–1820, 1828, 1831u and 2901–2907, 3103–3104, and 3108(a).

■ 8. Revise § 345.12(u)(1) to read as follows:

**§ 345.12   Definitions.**

\*   \*   \*   \*   \*

(u) *Small bank*—(1) *Definition. Small bank* means a bank that, as of December 31 of either of the prior two calendar years, had assets of less than $1.186 billion. *Intermediate small bank* means a small bank with assets of at least $296 million as of December 31 of both of the prior two calendar years and less than

$1.186 billion as of December 31 of either of the prior two calendar years.

\*   \*   \*   \*   \*

Dated: December 13, 2012.

**Daniel P. Stipano,**

*Acting Chief Counsel.*

By order of the Board of Governors of the Federal Reserve System, acting through the Secretary of the Board under delegated authority, December 17, 2012.

**Robert deV. Frierson,**

*Secretary of the Board.*

By order of the Board of Directors.

Dated at Washington, DC, this 6th day of December, 2012.

Federal Deposit Insurance Corporation.

**Valerie J. Best,**

*Assistant Executive Secretary.*

[FR Doc. 2012–30775 Filed 12–20–12; 8:45 am]

**BILLING CODE 4810–33–P; 6210–01–P; 6714–01–P**

**COMMODITY FUTURES TRADING COMMISSION**

**17 CFR Part 1**

**RIN 3038–AD53**

**Adaptation of Regulations To Incorporate Swaps—Records of Transactions**

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Final rules.

**SUMMARY:** The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act" or "DFA") established a comprehensive new statutory framework for swaps and security-based swaps. The Dodd-Frank Act repeals some sections of the Commodity Exchange Act ("CEA" or "Act"), amends others, and adds a number of new provisions. The DFA also requires the Commodity Futures Trading Commission ("CFTC" or "Commission") to promulgate a number of rules to implement the new framework. The Commission has proposed and finalized numerous rules to satisfy its obligations under the DFA. This final rulemaking makes certain conforming amendments to recordkeeping provisions of regulations 1.31 and 1.35(a) to integrate these regulations more fully with the new framework created by the Dodd-Frank Act.[1] This final rulemaking requires futures commission merchants ("FCMs"), certain introducing brokers ("IBs"), retail foreign exchange dealers ("RFEDs") and certain other registrants

[1] All Commission regulations are in Chapter I of Title 17 of the CFR.

that are members of designated contract markets ("DCMs") or swap execution facilities ("SEFs") to record all oral communications provided or received concerning quotes, solicitations, bids, offers, instructions, trading, and prices, that lead to the execution of a transaction in a commodity interest, whether communicated by telephone, voicemail, mobile device, or other digital or electronic media, and to keep those records for one year. This final rule also requires FCMs, IBs, RFEDs, and all members of a DCM or SEF to record and keep all written communications provided or received concerning quotes, solicitations, bids, offers, instructions, trading, and prices, that lead to the execution of a transaction in a commodity interest or related cash or forward transactions, whether communicated by telephone, voicemail, facsimile, instant messaging, chat rooms, electronic mail, mobile device, or other digital or electronic media, and to keep those written records for five years.

**DATES:** *Effective date:* This final rule will become effective on February 19, 2013. *Compliance date:* Each affected entity must comply with the oral communications recordkeeping requirement in regulation 1.35(a)(1) (17 CFR 1.35(a)(1)) no later than December 21, 2013.

**FOR FURTHER INFORMATION CONTACT:**
Katherine Driscoll, Associate Director, 202–418–5544, *kdriscoll@cftc.gov,* Elizabeth Miller, Attorney-Advisor, 202–418–5450, *emiller@cftc.gov,* Division of Swap Dealer and Intermediary Oversight; Peter A. Kals, Special Counsel, 202–418–5466, *pkals@cftc.gov,* Division of Clearing and Risk; David E. Aron, Counsel, 202–418–6621, *daron@cftc.gov,* Office of General Counsel; Alexis Hall-Bugg, Attorney-Advisor, 202–418–6711, *ahallbugg@cftc.gov,* Division of Market Oversight, Commodity Futures Trading Commission, Three Lafayette Centre, 1151 21st Street NW., Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

**I. Introduction**

*A. The Dodd-Frank Act*

On July 21, 2010, President Obama signed the Dodd-Frank Act into law.[2] Title VII of the Dodd-Frank Act[3] ("Title VII") amended the CEA[4] to establish a comprehensive new regulatory framework for swaps and security-based swaps. The legislation was enacted, among other reasons, to reduce risk, increase transparency, and promote market integrity within the financial system by, among other things: (1) Providing for the registration and comprehensive regulation of swap dealers ("SDs"), security-based swap dealers, major swap participants ("MSPs"), and major security-based swap participants; (2) imposing clearing and trade execution requirements on swaps and security-based swaps, subject to certain exceptions; (3) creating rigorous recordkeeping and real-time reporting regimes; and (4) enhancing the rulemaking and enforcement authorities of the Commission with respect to, among others, all registered entities and intermediaries subject to the Commission's oversight.

*B. Proposed Changes to Regulation 1.35(a)—Records of Transactions*

On June 7, 2011, the Commission published in the **Federal Register** a notice of proposed rulemaking (the "Proposal") to apply its regulations, regarding the activities of intermediaries and other DCM members to the swaps activities of those persons, in conformance with the Dodd-Frank Act.[5] The Proposal provided for a 60-day public comment period, which ended on August 8, 2011. The Proposal proposed to conform the existing recordkeeping requirements of regulation 1.35(a) to the recordkeeping requirements for SDs and MSPs, under what was then proposed regulation 23.202(a)(1) and (b)(1),[6] so that FCMs, IBs, RFEDs, and DCM and SEF members would be required to record all oral and written communications provided or received concerning quotes, offers, instructions, trading, and prices, that lead to the execution of transactions in a

commodity interest[7] or cash commodity, whether communicated by telephone, voicemail, facsimile, instant messaging, chat rooms, electronic mail, mobile device, or other digital or electronic media. To be consistent with what was then proposed regulation 23.202(a) and (b), the Proposal would have amended regulation 1.35(a) by requiring that each record be maintained in a separate electronic file identifiable by transaction and counterparty. On November 2, 2012, the Commission published in the **Federal Register** the Final Adaptation Rule.[8] The Final Adaptation Rule promulgated the vast majority of the amendments that the Proposal had introduced. In the Final Adaptation Rule, the Commission stated that it would address in a separate release certain of the proposed changes to regulation 1.35 (*i.e.,* those enumerated above) and related amendments to regulation 1.31.[9]

In response to the amendments to regulation 1.35(a) in the Proposal, the Commission received 35 comment letters from a variety of institutions, including DCMs, agricultural trade associations, and agricultural cooperatives.[10] The Commission has

---

[2] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (2010). The text of the Dodd-Frank Act is available at *http://www.cftc.gov/LawRegulation/OTCDERIVATIVES/index.htm.*

[3] Pursuant to section 701 of the Dodd-Frank Act, Title VII may be cited as the "Wall Street Transparency and Accountability Act of 2010."

[4] 7 U.S.C. 1 *et seq.* (2006).

[5] Adaptation of Regulations to Incorporate Swaps, 76 FR 33066 (June 7, 2011) ("the Proposal").

[6] *See* the Proposal, 76 FR at 33067; Reporting, Recordkeeping, and Daily Trading Records Requirements for Swap Dealers and Major Swap Participants, 76 FR 76666, 76675 (Dec. 9, 2010) [Proposed regulation 23.202(a)(1) would have required "[e]ach swap dealer and major swap participant [to] make and keep pre-execution trade information, including, at a minimum, records of all oral and written communications provided or received concerning quotes, solicitations, bids, offers, instructions, trading, and prices, that lead to the execution of a swap, whether communicated by telephone, voicemail, facsimile, instant messaging, chat rooms, electronic mail, mobile device or other digital or electronic media"].

[7] The term "commodity interest" means: (1) any contract for the purchase or sale of a commodity for future delivery; (2) any contract, agreement or transaction subject to Commission regulation under section 4c or 19 of the Act; (3) any contract, agreement or transaction subject to Commission jurisdiction under section 2(c)(2) of the Act; and (4) any swap as defined in the Act, by the Commission, or jointly by the Commission and the Securities and Exchange Commission. *See* Adaptation of Regulations to Incorporate Swaps, 77 FR 66288, 66319 (Nov. 2, 2012) ("Final Adaptation Rule") (to be codified at 17 CFR 1.3(yy)).

[8] Final Adaptation Rule, 77 FR 66288.

[9] *See id.,* 77 FR at 66288, 66296 n. 59, 66297 n. 63, and 66299 n. 72.

[10] Commenters included: Agribusiness Council of Indiana; American Cotton Shippers Association ("ACSA"); Amcot; American Feed Industry Association ("AFIA"); American Gas Association; American Petroleum Institute; Barclays Capital ("Barclays"); Mr. Chris Barnard; Commodity Markets Council ("CMC"); Compliant Phones ("Compliant"); Electric Power Supply Association ("EPSA"); Electric Utility Trade Association (National Rural Electric Cooperative Association, American Public Power Association, Large Public Power Council, and Edison Electric Institute) ("ETA"); Encana; Falmouth Farm Supply; The Fertilizer Institute; Futures Industry Association("FIA"); Grain and Feed Association of Illinois; Kansas City Board of Trade ("KCBT"); CME Group ("CME"); Henderson & Lyman; IntercontinentalExchange, Inc. ("ICE"); Land O'Lakes, Inc.; Minneapolis Grain Exchange ("MGEX"); Minnesota Grain and Feed Association; National Grain and Feed Association ("NGFA"); National Introducing Brokers Association ("NIBA"); National Council of Farmer Cooperatives ("NCFC"); National Futures Association ("NFA"); Natural Gas Supply Association; Ohio Agribusiness Association; Oklahoma Grain and Feed Association; Rocky Mountain Agribusiness Association ("RMAA"); South Dakota Grain & Feed Association; and Working Group of Commercial Energy Firms

determined to adopt the Proposal's amendments to regulation 1.35(a), with certain modifications, discussed below, which address the comments the Commission received. In addition, as part of this final rulemaking, the Commission is making certain related modifications to the record retention periods set forth in regulation 1.31. Finally, the final amendments to regulations 1.31 and 1.35(a) are consistent with the Commission's final rules concerning recordkeeping requirements for SDs and MSPs (regulations 23.202(a) and (b) and 23.203(b)(2)).[11]

## II. Oral Communications and Other Recordkeeping Changes in the Proposal; Comments Received

Under the Proposal, FCMs, IBs, RFEDs, and DCM and SEF members [12] would be required to record all oral and written communications provided or received concerning quotes, solicitations, bids, offers, instructions, trading, and prices that lead to the execution of a transaction in a commodity interest or cash commodity, whether communicated by telephone, voicemail, facsimile, instant messaging, chat rooms, electronic mail, mobile device, or other digital or electronic media. Comments to these proposed amendments to regulation 1.35(a) primarily focused on: oral recordkeeping generally; the portion of the proposed provisions that would have required all DCM and SEF members, including commercial end-users and non-intermediaries, to keep records of their cash commodity transactions; and the proposed requirement that each record be maintained in a separately identifiable electronic file identifiable by transaction and counterparty ("tagging").

("Commercial Energy Working Group"). Comments are available in the comment file on *www.cftc.gov*. In the Final Adaptation Rule, the Commission addressed those comments unrelated to the proposed changes to regulation 1.35(a) concerning records of oral and written communications. *See* Final Adaptation Rule, 77 FR 66288.

[11] *See* Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures Commission Merchant and Introducing Broker Conflicts of Interest Rules; and Chief Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants, 77 FR 20128 (Apr. 3, 2012) ("SD and MSP Recordkeeping Final Rule") (adopting for SDs and MSPs reporting and recordkeeping standards now found in 17 CFR 23.201–23.203).

[12] A "member" is an individual, association, partnership, corporation, or trust—(i) owning or holding membership in, or admitted to membership representation on, a registered entity; or (ii) having trading privileges on a registered entity. *See* Final Adaptation Rule, 77 FR at 66316 (to be codified at 17 CFR 1.3(q)).

### A. Proposed Requirements To Record Oral Communications and Keep Them in Separate Electronic Files Identifiable by Transaction and Counterparty

#### 1. Comments on Oral Recordkeeping Generally

Commenters asserted that the proposed requirement for FCMs, IBs, RFEDs, and DCM and SEF members to record oral communications that lead to the execution of a commodity interest or cash commodity transaction was too costly, impossible to satisfy, overly broad, and/or unnecessary. ACSA, AFIA, Amcot, EPSA, ICE, and Land O'Lakes commented that these proposed amendments were broad and ambiguous.[13] AFIA, CME, EPSA, MGEX, and the Commercial Energy Working Group argued that the phrases "concerning quotes, solicitations, bids" and "lead to the execution of" were vague and could encompass a great number of communications. Amcot asserted that the overbreadth of the proposed amendment would be burdensome for agricultural DCM members given that there are a variety of settings, including grower meetings and on-site visits, where a DCM member could have a discussion with an agricultural producer that leads to a cash commodity or commodity interest transaction. Land O'Lakes was unsure whether face-to-face conversations would have to be recorded under the proposed requirement. ICE inquired as to whether a general conversation about markets would be subject to the proposed recording requirement if a transaction occurred later in the day. AFIA stated that the risk of an incorrect interpretation would fall on local grain producers.

Regarding application of the proposed requirement to telephone conversations, Land O'Lakes and MGEX each argued that a DCM member might not know in advance of a telephone call whether that call would lead to a transaction. MGEX believed that this fact would require a DCM member to record all conversations, which they argued would be impossible. Land O'Lakes asserted that complying with the proposed requirement could involve massive amounts of recording, thereby deterring open communication between a DCM member and one of its agricultural producers. The Commercial Energy Working Group commented that proposed regulation 1.35(a) was too broad in that it could require DCM members to record communications of attorneys and other "middle office"

[13] FIA made a similar argument regarding the application of the amendment to FCMs.

personnel, and not just the communications of traders who are directly involved in executing a transaction. CMC argued that the Commission has substantially underestimated the considerable costs and limited benefits associated with the recordkeeping requirements for DCM and SEF members. CME does not believe firms can comply with the proposed oral recordkeeping requirements with respect to mobile telephones because, they stated, mobile telephone recording technology is not well developed in the United States.

Regarding whether an oral communications recordkeeping requirement is necessary, NCFC stated that the proposed requirement to record oral communications is not necessary to achieve the Commission's stated goal of protecting customers from abusive sales practices. CMC asserted that current regulation 1.35(a)'s requirement to maintain written records of commodity interest and cash commodity transactions suffices to prevent market abuses. Amcot stated that the Commission failed to demonstrate the inadequacy of its existing regulations. Henderson & Lyman, NFA, and NIBA stated that the oral recordkeeping requirement is unnecessary because NFA already requires certain FCMs and IBs with a history of sales practice abuses to record calls made by their associated persons. Henderson & Lyman stated that the NFA rule and NFA's related guidance concerning communications are sufficient and cost-effective.

NIBA commented that all IBs, or at the very least small IBs, should be exempt from the proposed amendments to regulation 1.35(a) because the burden on such small entities would be too great. Henderson & Lyman similarly commented that the proposed regulation would favor large IBs over small IBs. Neither NIBA nor Henderson & Lyman, however, offered a definition of "small IB" or provided any quantitative or qualitative thresholds. Henderson & Lyman stated that it is unnecessary to have an oral recording requirement for IBs because most IBs solicit customers electronically rather than over the telephone. Henderson & Lyman also stated that the focus on IBs was misplaced since misleading communications come from marketing firms rather than from IBs. NIBA further stated that the proposed amendment would be ineffective in compelling IBs to record their calls since those who refuse to do so will find a way to circumvent the regulation.

Falmouth Farm Supply had several concerns with the proposed

amendment, asserting that a grain business-DCM member recording its telephone conversations with a farmer-supplier would amount to an invasion of privacy and that grain producers do not need the Commission's protection. CMC and ICE stated that it would be redundant for a DCM or SEF member to comply with proposed regulation 1.35(a) because the DCM or SEF member will have to engage an FCM clearing agent for each transaction, and the FCM would have to comply with the regulation.

## 2. Comments on the Proposed ''Tagging'' Requirement

CME, Barclays, Henderson & Lyman, NGFA, and NIBA stated that it would be burdensome to comply with the proposed requirement to maintain records as separate electronic files identifiable by counterparty and transaction.[14] FIA commented that the ''separate electronic file requirement'' is open-ended and, on its face, impossible to achieve.[15] CME stated that potentially relevant conversations could span several days and that it would be difficult to link conversations to transactions. Therefore, CME commented, FCMs and IBs should only be required to record and identify conversations immediately preceding an order. FIA stated that a customer may decide to enter an order with an FCM at any time, even if that was not the original purpose of the call. According to FIA, this aspect of the futures business means that an FCM would have to record all of its telephone calls to comply with proposed regulation 1.35(a) and this would be difficult if not impossible. Moreover, FIA stated that compliance would be impossible because one could argue that any conversation pertains to a particular transaction. Like CME, Barclays stated that the tagging requirement is vague, potentially requiring an FCM to tag every communication that could ever lead to a transaction. Barclays stated that it would be particularly challenging to tag a telephone call when the firm is telephoned by a counterparty; when parties discuss a transaction that the firm did not originally anticipate; or when multiple transactions are discussed during a particular call. According to Barclays, there is no technology to automatically tag communications, so the firm would have to manually tag over 2.4 billion

electronic communications it sends and receives every year. Barclays also stated that it is not aware of any commercially available technology that would allow entities to tag their telephone recordings by transactions and counterparty. Other commenters expressed similar concern regarding the reliability and availability of technological solutions for the proposed tagging requirement. The Commercial Energy Working Group stated that, in lieu of an accurate and commercially available software solution, manual identification and retrieval of oral records would require as many as three to five analysts and one to two additional technical support personnel to support transactions for a small or modest-sized end-user commodity business and that the total cost to a commodity business is likely to be in excess of $1 million annually.

According to Barclays, an FCM should be permitted to maintain records in any manner so long as it is able to respond to Commission inquiries in a timely and comprehensive fashion. The Commercial Energy Working Group commented that a firm should only have to identify communications as pertaining to a particular transaction if the Commission requests that information. Moreover, the Commercial Energy Working Group stated that it is unlikely that the Commission will request such information, so DCM members should not have a general obligation to tag conversations.[16] The Commercial Energy Working Group urged the Commission to allow market participants to make their records searchable by transaction at the time the Commission requests the records rather than require that all records be maintained on a transaction-by-transaction basis in real-time.

MGEX sought clarification as to whether the requirement in proposed regulation 1.35(a) to maintain ''each transaction record in a separate electronic file identifiable by transaction and counterparty'' requires a file to be kept for each counterparty and for each transaction or whether it suffices to keep one transaction file that is indexed by counterparty and transaction. MGEX also stated that it would be duplicative for a firm to keep records of both written and oral communications if they contained substantially the same content.

## 3. Commenters' Suggested Revisions to the Oral Communications Requirement

Commenters made suggestions about how the Commission should revise the

Proposal to limit the burden. NGFA suggested that if the Commission adopts the proposed oral recordkeeping requirement, it should give FCMs and IBs a generous compliance timetable and flexible implementation options, particularly for smaller firms. CME, FIA, and MGEX asserted that firms should only be required ''reasonably'' to comply with oral recordkeeping requirements. MGEX suggested that a DCM member should only be required reasonably to link a conversation to an executed transaction. Barclays highlighted that the United Kingdom Financial Services Authority (''FSA'') adopted a reasonableness standard for compliance with its mobile telephone conversation recording requirement.[17] CME stated that a reasonableness standard is necessary because of limited technology, particularly a lack of reliable search mechanisms. According to CME, one way a firm should be able to comply would be by having a policy prohibiting the use of mobile telephones to solicit or accept orders. CME commented that the Commission fails to provide evidence that the Proposal would be less effective with such a ''reasonableness'' standard than without it. CME stated that only firm-provided landline and mobile telephones should be covered by the rule as that would make the proposal consistent with foreign regulatory regimes. ETA stated that the Commission fails to justify aligning its recordkeeping requirements with those of other countries. CMC commented that the Proposal's reference to the fact that 80% of large U.K. financial services firms were already recording their traders' telephone calls prior to the FSA's enactment of its voice recordkeeping requirement is irrelevant to the burden that the Proposal would impose on agricultural enterprises who are DCM members trading for their own accounts and not on behalf of customers. FIA sought confirmation that an FCM, IB, or other DCM or SEF member can satisfy the recordkeeping requirements under regulation 1.35(a) by relying on record retention performed by a DCM or SEF.

---

[14] NGFA's letter was supported by the other Grain and Feed Associations, the Agribusiness Associations, Land O' Lakes, and NCFC.

[15] ACSA generally supported FIA's comment letter.

[16] API generally supported the Commercial Energy Working Group's comment letter.

[17] In November 2011, the FSA rule requiring taping of mobile telephones became effective. Under the rule, a firm is required, ''to take reasonable steps to record relevant conversations, and keep a copy of relevant electronic communications, made with, sent from or received on equipment: (1) Provided by the firm to an employee or contractor; or (2) the use of which by an employee or contractor has been sanctioned or permitted by the firm.'' *See* Financial Services Authority, Conduct of Business Sourcebook, Section 11.8 Recording telephone conversations and electronic communications (June 2012, Release 126, 11.8.2).

NFA recognized that audio recordings have been very useful to the Commission in enforcement proceedings and stated that only those firms that choose to record calls should have to maintain their recordings. Acknowledging that some FCMs currently record their telephone calls, FIA commented that, to the extent they do, recording is limited to dedicated order desks and only required to be stored for no more than a few days or weeks. FIA and MGEX asserted that the technology available to comply with the Proposal was ''uncertain at best'' and, therefore, the Proposal should be considered further in the context of available technology and then re-proposed in a separate release.

EPSA suggested that a separate rulemaking should be published to address changes to regulation 1.35(a) to give affected parties reasonable notice. Amcot, Henderson & Lyman, and ICE asserted that the Commission has not considered existing state and federal wiretapping law and privacy laws in proposing these new requirements.

*B. Proposed Requirement for All Members of a DCM or SEF To Record Oral and Written Communications Leading to the Execution of Cash Commodity Transactions*

Three DCMs joined various agricultural and energy sector trade organizations in opposing the Commission's proposed requirement to keep oral communications, and existing requirement to keep written communications, regarding cash market transactions on members of a DCM or SEF who are non-financial entities and commercial end-users, and who do not have customers.[18] These commenters pointed out that including a DCM member's cash transactions would require compliance by hundreds, if not thousands, of agricultural and energy firms, including many who do not have customers and do not themselves enter into futures or swaps.[19] EPSA and the Commercial Energy Working Group stated that many of the affected entities in the energy sector would be small entities that likely are unaware of the Proposal. Commenters asserted that the requirement amounted to unauthorized

regulation of the cash market, which they asserted has always been carved out of the Commission's jurisdiction.[20] Commenters also stated that the Dodd-Frank Act did not intend for the Commission to subject cash commodity transactions to new recordkeeping requirements.[21]

The Grain and Feed Association of Illinois, the Oklahoma Grain and Feed Association, NCFC, and NGFA opposed the proposed revisions on the grounds that the employees of a grain elevator that is a DCM member would have to record calls and preserve emails with farmer producers from whom they buy grain for cash and, thus, hundreds of employees of grain storage and processing facilities would be significantly burdened. As a result, these commenters stated, a grain elevator that is a DCM member would be disadvantaged as compared to a grain elevator that is not a DCM member as the non-member would not be burdened by the compliance costs associated with proposed regulation 1.35(a). KCBT asserted that this creates a discriminatory regulatory structure. According to ICE, this outcome would deter firms from hedging commercial risk on a DCM or SEF, thereby defeating the Dodd-Frank Act's transparency objectives. NGFA and its affiliates argued that burdening facilities owned by companies that are DCM members with the new rules would create a bifurcation of the cash grain marketplace into facilities required to comply with new recordkeeping requirements and facilities owned and operated by companies who are not DCM members and, therefore, not required to comply. KCBT stated that their rules (and the rules of other DCMs) require that operators of registered delivery warehouses be members, further stating that the regulatory disincentives created by the application of proposed regulation 1.35(a) to all DCM member cash transactions could affect not only DCM expertise, but deliverable supplies and convergence. According to KCBT, should DCM commercial members operating delivery warehouses decide to withdraw from membership because of proposed regulation 1.35(a), deliverable supplies would be negatively impacted and there

would be fewer deliverable supplies to foster convergence at delivery.

Amcot stated that neither it nor its members should be subject to the proposed amendments because they do not transact with the public. Similarly, the Commercial Energy Working Group commented that end-users (*i.e.*, DCM or SEF members trading for themselves) should not have to comply with proposed regulation 1.35(a) because they do not trade for customers and, therefore, pose minimal systemic risk. EPSA stated that regulation 1.35(a) was never intended to burden end-users.

Several commenters objected to the Commission's regulation of records of cash commodity transactions. KCBT stated that it did not believe the Commission ever intended for regulation 1.35(a) to apply to cash and cash forward transactions outside of those directly relating to a regulated futures or swaps transaction. KCBT further stated that it has always interpreted regulation 1.35(a) to cover only those transactions for which a DCM member is acting as an agent for a customer. Thus, according to KCBT, the only DCM members (who were not otherwise FCMs or IBs) who would be required to comply would be floor brokers (''FBs''); DCM members who trade for themselves would not be covered. KCBT stated that it has also understood the ''related cash transactions'' referenced by regulation 1.35(a) to refer only to those transactions involving an exchange of a futures transaction for a physical commodity.

The Commercial Energy Working Group asserted that, under the proposed amendments to regulation 1.35(a), many of the entities that transact on ICE, for example, would now be required to maintain records pursuant to Commission rules without consideration of whether the market users handle customer orders, which would be a departure from the past for members of contract markets that are not FCMs, IBs, or present on a trading floor. As a general matter, FIA argued that these proposed amendments to regulation 1.35(a) are not necessary to implement the Dodd-Frank Act and, therefore, they run counter to the guiding principles set out in President Obama's January 2011 Executive Order 13563, Improving Rulemaking and Regulatory Review.

ACSA, CMC, FIA, Henderson & Lyman, ICE, NFA, and NIBA stated that the proposed amendments were inconsistent with the Commission's proposed recordkeeping requirements for SDs and MSPs because they would require FCMs, RFEDs, IBs, and members

---

[18] Commenters included ACSA, the Agribusiness Associations, Amcot, CMC, Falmouth Farm Supply, the Grain and Feed Associations, Land O'Lakes, NCFC, AGA, API, EPSA, ETA, the Commercial Energy Working Group, ICE, KCBT, TFI, and MGEX.

[19] In related commentary, the Commercial Energy Working Group asked the Commission to clarify that the definition of ''member'' in the final rule covers only those people holding equity interests in a DCM that permit such holder to submit orders directly on the DCM's floor (or an electronic equivalent).

[20] Commenters included Agribusiness Council of Indiana; Agribusiness Association of Ohio; EPSA; Grain and Feed Association of Illinois; KCBT; Land O'Lakes; Minnesota Grain and Feed Association; NCFC; NGFA; Oklahoma Grain and Feed Association; RMAA; and the Commercial Energy Working Group.

[21] Commenters included Amcot; CME; EPSA; FIA; and NCFC.

of a DCM or SEF to record voice communications regardless of any other recordkeeping requirement that captures the same information.

*C. Relationship Between Regulations 1.31 and 1.35(a)*

Amcot stated that it would be burdensome for its farmer-owned cotton marketing cooperative members to retain recordings of telephone calls for five years as the Commission proposed. CME commented that conversations should only be retained for six months after the execution of a transaction. FIA commented that the Commission failed to provide a justification for requiring that a swap record be maintained for the life of the swap plus five years. In contrast to other commenters, Mr. Chris Barnard asserted that all records should be kept indefinitely and scanned after two years, arguing that there is no technological or practical reason to limit the record retention period. Mr. Barnard specifically commented that records of voice communications also should be kept indefinitely. To support the asserted usefulness of such records, Mr. Barnard cited a 2009 IOSCO report stating that telephone records could benefit enforcement investigations.[22]

**III. Final Rules**

The markets subject to the jurisdiction of the Commission have undergone a significant transformation over the last few decades, and particularly in the last few years. Technological advances have contributed to a tremendous growth in trading volume as well as the number and type of market participants, including significant numbers of retail customers that invest in the commodity markets through a variety of means. Markets are also more interconnected than ever before, with order flow distributed across multiple trading centers. These changes require the Commission to adapt, and these final rules are part of that adaptation.

The overarching purpose of the Commission's final rules is to promote market integrity and protect customers. Requiring the recording and retention of oral communications will serve as a disincentive for covered entities to make fraudulent or misleading communications to their customers over the telephone and could serve as a meaningful deterrent against violations such as trading ahead of customer orders by providing a record of the time that a customer's telephone order is received. When the perspectives of the commenters are combined with the

Commission's own experiences regulating the markets subject to its jurisdiction, a common theme emerges: The collection of and access to searchable records, both oral and written, are indispensable tools the Commission needs to ensure market integrity and protect customers. Currently, many of the market participants that will be subject to the final rules have such records by way of their business needs or other regulatory requirements. Some commenters have urged the Commission to rely on currently available information and not require more. While existing information aids the Commission in discharging its regulatory responsibility, the Commission believes current recordkeeping, particularly in the area of oral recordkeeping, is limited, to varying degrees, in availability, scope and effectiveness.

The final rules will significantly advance the Commission's efforts to detect and deter abusive, disruptive, fraudulent and manipulative acts and practices that seriously harm market integrity and customers. In addition, the information that will be required as a result of this rulemaking will benefit the Commission in its market analysis efforts, such as investigating and preparing market reconstructions and understanding causes of unusual market activity. Further, the requirement that records be kept current and readily available facilitates the timely pursuit of potential violations, which can be important in seeking to freeze and recover any profits received from illegal activity.

Notwithstanding the important policy and practical reasons for the final rules, the Commission shares many of the commenters' concerns regarding costs and the availability of relevant technology. Therefore, as discussed below, the Commission is adopting alternatives to the Proposal where doing so would achieve the Commission's objectives and the benefits of promoting market integrity and protecting customers albeit at lower cost. The Commission is also significantly extending the amount of time entities have to come into compliance with the final rule requiring the recording of oral communications. In so doing, the entities subject to this rulemaking are afforded the same amount of time as SDs and MSPs to come into compliance with analogous requirements in regulations 23.202(a)(1) and (b)(1).

Regarding oral communications, in response to commenters' concerns that the scope of the new requirement was too broad, the new requirement to record oral communications will be

limited to those oral communications that lead to a transaction in a commodity interest. As proposed, the oral communications recordkeeping requirement would have applied to commodity interest and cash commodity transactions. In response to comments asserting that the cost of implementing and maintaining an oral communication recording system would be overly burdensome for small entities and the commercial end-user, non-intermediary members of a DCM or SEF, the Commission has determined to exclude from the new requirement to record oral communications: Small IBs[23]; the oral communications of an FB who is a member of a DCM or SEF that do not lead to the purchase or sale for any person other than the FB of any commodity for future delivery, security futures product, swap, or commodity option authorized under section 4c of the Act; and certain members of a DCM or SEF, including floor traders ("FTs"),[24] commodity pool operators

---

[23] Final regulation 1.35(a) excludes from the oral communications recordkeeping requirement any IB that has generated, over the preceding three years, $5 million or less in aggregate gross revenues from its activities as an IB ("Small IB"). All other IBs with aggregate gross revenue exceeding $5 million will be referred to as "non-Small IBs." The Commission has previously determined this to be an appropriate definition of a small IB. In connection with regulation 1.71 (Conflicts of Interest Policies and Procedures by Futures Commission Merchants and Introducing Brokers), the Commission provided a separate regulatory standard for small IBs, based on this definition, to lessen the compliance burden imposed by the conflicts of interest requirements on such firms. *See* SD and MSP Recordkeeping Final Rule, 77 FR at 20148. In that rule, the Commission found that "Section 4d(c) of the Act mandates the establishment of 'appropriate informational partitions' within FCMs and IBs, and all such firms are bound by that statutory requirement," and it concluded that "the size of an IB plays a significant role in determining the appropriateness of such partitions." *Id.* at 70149. Applying this new standard for IBs to the instant final rulemaking, the Commission estimates that with respect to IBs, limiting the scope of final regulation 1.35(a) to IBs that are not small excludes more than 95% of IBs from the regulation 1.35 oral communications recordkeeping requirement adopted in this release. Thus, at present, the Commission expects that no more than approximately 75 IBs will be subject to the final oral recordkeeping requirements of regulation 1.35.

[24] The Commission notes that certain FTs, although excluded from the oral communications requirement in regulation 1.35(a), will be required to record their oral communications concerning swap transactions and their related cash and forward transactions, pursuant to regulation 23.202(a)(1) and (b)(1). Pursuant to regulation 23.200(i), a related cash or forward transaction means a purchase or sale for immediate or deferred physical shipment or delivery of an asset related to a swap where the swap and the related cash or forward transaction are used to hedge, mitigate the risk of, or offset one another. *See* SD and MSP Recordkeeping Final Rule, 77 FR at 20202. The recently finalized definition of SD (regulation 1.3(ggg)(iv)(H)) requires certain FTs who deal in swaps to comply with regulation 23.202, as well as

---

[22] *http://www.iosco.org/news/pdf/ IOSCONEWS137.pdf.*

("CPOs"), SDs, MSPs,[25] and members that are not registered or required to be registered with the Commission in any capacity. As proposed, the oral communications recording requirement would have applied to FCMs, RFEDs, all IBs and all members of a DCM or SEF. These exclusions are based on the Commission's experience that such entities are either unlikely to or prohibited from having a customer interface or an effect on market integrity. For example, while a Small IB takes customer orders, they generally do not execute those orders, meaning that they lack a direct market interface that could affect market integrity. Further, as defined herein, a Small IB is unlikely to generate the volume of market activity that the Commission would expect could affect the integrity of the markets. Conversely, where an FT could affect market integrity, they are prohibited from accepting customer funds and are therefore excluded by the limiting principle of customer protection.

While seeking to mitigate the costs of compliance for smaller entities without compromising the Commission's objectives, the Commission is not exempting Small IBs and other excluded participants from the requirement to keep written records of covered information, for example, given or received by telephone. For example, if a Small IB receives a customer's order over the telephone, then the Small IB would not be required to record the telephone call under the new provision in regulation 1.35(a), but the Small IB would be required to keep a written record of the order under both the existing requirement in regulation 1.35(a) to keep and maintain records of "all orders (filled, unfilled, or cancelled)" and the new requirement in regulation 1.35(a) to keep records of "instructions" to place orders. Therefore, although this rulemaking's definition of Small IB will exclude most IBs from the requirement to record oral communications, the Commission believes it can continue to promote

market integrity and protect customers because the same IBs will continue to be required to keep written records under regulation 1.35(a). In addition, because many of an IB's oral communications leading to a commodity interest transaction are conducted with FCMs, those oral communications would be recorded by the FCM.

The Commission has also considered whether FBs should be treated similarly to IBs in drawing a distinction between large and small entities.[26] The Commission does not believe any similar distinction is warranted. As Congress recognized by creating separate categories of registrants, FBs and IBs perform different functions. While both receive orders, an FB executes orders,[27] and an IB transmits orders for execution.[28] Because FBs execute orders and can direct the manner of the same without an intermediary, they can have a significant impact on the integrity of the market.[29] When an IB solicits or receives order information from a customer through an oral communication, it then will often communicate that information either to an FCM or FB. Under the regulation as adopted, the FCM or FB would have to record the oral communication with the IB. By contrast, an FB may have covered

communications with a customer who is not itself subject to a recording requirement. The need for recording oral communications with FBs has been independently recognized by several DCMs.[30] DCM rules requiring FBs to record oral communications do not make distinctions based on an FB's size.

To address commenter concerns that the proposed rule would capture the oral communications of certain members of DCMs who currently are registered as FBs, but are solely trading for their own accounts, *i.e.*, acting as FTs.,[31] the Commission has determined to limit an FB's obligation to record its oral communications under regulation 1.35(a) to those oral communications that lead to the purchase or sale for any person other than the FB of any commodity for future delivery, security futures product, swap, or commodity option authorized under section 4c of the CEA. In this way, a registered FB operating as an FT (*i.e.*, not handling customer orders) will be treated the same as an FT under the final rules.[32]

In determining the applicability of the final rules to another group of market participants that are DCM members, commodity trading advisors ("CTAs"), the Commission has considered measures to again tailor the oral communications recordkeeping requirements for CTAs to mitigate the costs of compliance while achieving the twin objectives of promoting market integrity and protecting customers. The Commission has reduced the impact on CTAs by: Limiting the oral communications recordkeeping requirement to commodity interest transactions (*i.e.*, not adopting the

---

certain other regulations in part 23, notwithstanding the fact that such FTs are not required to register as SDs. *See* 17 CFR 1.3(ggg)(iv)(H), as finalized by the Commission in Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant," 77 FR 30596 (May 23, 2012).

[25] As noted above, SDs and MSPs are subject to the oral communications recording requirement in Part 23. *See* SD and MSP Recordkeeping Final Rule, 77 FR at 20148 (to be codified at 17 CFR 23.202(a)(1) and (b)(1)). SDs and MSPs that are also registered in a capacity covered by the oral communications recording requirement in regulation 1.35(a) would be subject to the recording requirements in both rules.

[26] Regarding FBs, KCBT stated that, "it has always understood 1.35(a) to apply to members of DCMs * * * in order to capture and monitor the activities of DCM members * * * dealing with customers as agent for such transactions, namely registered FBs."

[27] An FB generally is defined in section 1a(22)(A) of the CEA, 7 U.S.C. 1a(22)(A), as: Any person—(— (i) who, in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, shall purchase or sell for any other person—(I) any commodity for future delivery, security futures product, or swap; or (II) any commodity option authorized under section 4c of the CEA; or (ii) who is registered with the Commission as an FB.

[28] An IB generally is defined in section 1a(31)(A) of the CEA, 7 U.S.C. 1a(31)(A), as: Any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant) (i) who—(I) is engaged in soliciting or in accepting orders for—(aa) the purchase or sale of any commodity for future delivery, security futures product, or swap; (bb) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i); (cc) any commodity option authorized under section 4c; or (dd) any leverage transaction authorized under section 19; and (II) does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or (ii) who is registered with the Commission as an IB. *See* 7 U.S.C. 1a(31)(B).

[29] *See, e.g., In re DiPlacido,* [2007–2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970 at 62,484 (CFTC Nov. 5, 2008), *summary affirmance,* 364 Fed. Appx. 657 (2d Cir. 2009), *cert. denied,* 130 S.Ct. 1883 (2010) (records of FB's oral communications with customer admitted as evidence in case concerning manipulation of price of NYMEX electricity futures contracts).

[30] For instance, CME Rule 536.G, Telephone Recordings, states:

Unless specifically exempted by the Market Regulation Department or designated Exchange staff, all headset communications must be voice recorded by the member or member firm authorized to use the headset and all such recordings must be maintained for a minimum of 10 business days following the day on which the recording is made. Members and member firms are permitted to utilize their own recording devices, provided that the devices meet reasonable standards with respect to quality and reliability. Alternatively, members and member firms may utilize an Exchange administered voice recording system for a fee.

CME Rulebook, Chapter 5 Trading Qualifications and Practices, Rule 536 Recordkeeping Requirements for Pit, Globex, and Negotiated Trades.

[31] An FT generally is defined in section 1a(23)(A) of the CEA, 7 U.S.C. 1a(23)(A), as: Any person—(i) who, in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, purchases or sells solely for such person's own account—(I) any commodity for future delivery, security futures product, or swap; or (II) any commodity option authorized under section 4c of the CEA; or (ii) who is registered with the Commission as an FT.

[32] *See* 17 CFR 3.4(a).

proposal to include cash commodity transactions); reducing the record retention period for all records of oral communications from 5 years to 1 year; permitting covered persons to contract with other Commission registrants to retain the required records (provided that the records retained by the contractor registrant are the same records, thus allowing covered persons to avoid retaining the same records as other Commission registrants); and removing the tagging requirement.[33]

The Commission understands that currently available technology for recording oral communications may not be immediately accessible or may involve a material cost outlay for an affected entity. However, the Commission also anticipates that as the availability of this technology increases over time, the costs to use such technology will decline accordingly. Accordingly, to further conform regulation 1.35(a) with the final recordkeeping rule for SDs and MSPs,[34] and in response to commenter request for a flexible compliance timetable, the Commission is adopting a [November 28, 2013] compliance date and regulation 1.35(a)(4)(i) pursuant to which the Commission may, in its discretion, establish an alternative compliance schedule for the requirement to record oral communications under regulation 1.35(a)(1). Under new regulation 1.35(a)(4)(i), compliance with the requirement to record oral communications would be found to be technologically or economically impracticable for an affected entity that seeks, in good faith, to comply with the requirement. Pursuant to new regulation 1.35(a)(4)(iii), the Commission delegates to the Director of the Division of Swap Dealer and Intermediary Oversight the authority to exercise the Commission's

discretion under regulation 1.35(a)(4)(i). The purpose of new regulation 1.35(a)(4) is to facilitate the ability of the Commission to provide a technologically practicable compliance schedule for an affected entity that seeks to comply in good faith with the oral communications recordkeeping requirements of regulation 1.35(a)(1). In order to obtain relief under new regulation 1.35(a)(4), an affected entity must submit a request to the Commission. An affected entity submitting a request for relief must specify the basis in fact supporting its claim that compliance with the oral communications recordkeeping requirement under regulation 1.35(a)(1) would be technologically or economically impracticable. Such a request may include a recitation of the specific costs and technical obstacles particular to the entity seeking relief and the efforts the entity intends to make in order to ensure compliance according to an alternative compliance schedule. Relief granted under regulation 1.35(a)(4) shall not cause an affected entity to be out of compliance or deemed in violation of any recordkeeping requirements. Such requests for an alternative compliance schedule shall be acted upon within 30 days from the time such a request is received. If not acted upon within the 30-day period, such request will be deemed approved.

Regarding comments that the proposed amendments to regulation 1.35(a) were inconsistent with the Commission's proposed recordkeeping requirements for SDs and MSPs because they would require FCMs, RFEDs, IBs, and members of a DCM or SEF to record voice communications regardless of any other recordkeeping requirement that captures the same information, the Commission addressed these comments in the final recordkeeping rules for SDs and MSPs, clarifying that, to the extent pre-execution trade information does not include information communicated by telephone, an SD or MSP is under no obligation to create recordings of its telephone conversations. If, however, any of this pre-execution trade information is communicated by telephone, the SD or MSP must record such communications.[35] This clarification is consistent with the requirements under the revision to regulation 1.35 requiring that all oral communications be recorded regardless of whether an audit trail can be established with other types of records. In response to commenter inquiry about

whether face-to-face communications would have to be recorded under the final rule, the Commission does not intend for the final rule to require the recording of face-to-face conversations that do not occur over electronic, digital or other media.

2. Written Communications

Regarding written communications, the Commission has decided to adopt the proposed amendment to regulation 1.35(a) to clarify that the existing requirement to keep written records applies to electronic written communications such as emails and instant messages, as proposed. The Commission considered comments asserting that: The requirement to keep ''electronic communications'' should not extend to members of a DCM or SEF that do not handle customer orders; regulation 1.35(a) has never required DCM members to keep records of their electronic communications relating to their cash commodity transactions; and storing records of electronic communications would be overly burdensome for these members. In response, the Commission notes that the record retention requirements of existing regulation 1.35, as confirmed by the Commission's Division of Market Oversight in 2009, include all electronic forms of communication (emails, instant messages, and any other form of communication created or transmitted electronically).[36] Thus, contrary to commenter assertions, the recordkeeping obligations of regulation 1.35 currently require that all DCM members keep electronic

---

[33] The Commission considered drawing a revenues-based threshold for CTAs. However, given that CTAs do not have a capital requirement it is not possible for the Commission to readily determine the sizes of all registered CTAs and, therefore, the Commission would not be able measure the impact that such a threshold would have on CTAs. The Commission also considered, as an alternative, limiting the types of oral communications that a CTA must record in a similar manner to the way in which it has limited the types of oral communications that an FB must record to brokering communications. However, the Commission has determined that such a limitation is not a reasonable alternative to having all CTAs who are members of a DCM or SEF record all oral communications that lead to the execution of a commodity interest transaction. Indeed, the limitation for FBs is appropriate for FBs, and not for other registration categories, given the current regulatory regime for FBs and FTs discussed above.

[34] See 17 CFR 23.206, as adopted by the Commission in SD and MSP Recordkeeping Final Rule.

[35] See SD and MSP Recordkeeping Final Rule, 77 FR at 20130.

[36] See U.S. Commodity Futures Trading Commission, Division of Market Oversight, Advisory for Futures Commission Merchants, Introducing Brokers, and Members of a Contract Market over Compliance with Recordkeeping Requirements, Feb. 5, 2009, (*http://www.cftc.gov/ucm/groups/public/@industryoversight/documents/file/recordkeepingdmoadvisory0209.pdf*) (footnotes omitted):

The Division of Market Oversight (''Division'') has become aware that there is an industry misunderstanding of the record retention requirements of Regulations 1.35 and 1.31 as it relates to electronically conveyed records. The Division is issuing this Advisory to address any industry misunderstanding of the Commission's recordkeeping requirements applicable to futures commission merchants (''FCMs''), introducing brokers (''IBs''), and members of a designated contract market (''members''). With the increased reliance in the futures industry on electronic media and the use of personal electronic devices and communications technology to facilitate the execution of transactions for both open outcry and electronic trading, the Division is issuing this Advisory to correct any misunderstandings and to make certain that the individuals and entities subject to the Commission's recordkeeping requirements maintain all electronic forms of communications, including email, instant messages, and any other form of communication created or transmitted electronically for all trading.

communications. Therefore, the relevant portion of the proposed new language (now being adopted by the Commission) "all * * * written communications * * * whether communicated by * * * instant messaging, chat rooms, electronic email, mobile device, or other digital or electronic media" does not impose any new requirements on DCM members. Instead, the new language clarifies the existing requirement for DCM members to maintain electronic communications by enumerating the forms of communications that the Commission intends to be covered by the rule. In addition, as explained above, the final language relating to written communications is consistent with the final recordkeeping rule for SDs and MSPs.[37]

The Commission also has decided to change the proposed language in regulation 1.35(a) which would have required an entity to keep records of "all transactions related to its business of dealing in commodity interests and cash commodities" to "all transactions related to its business of dealing in commodity interests [38] and related cash and forward transactions." This is different than existing regulation 1.35, which states "commodity futures, retail forex transactions, commodity options and cash commodities (including currencies)." [39] The final rule defines "related cash or forward transaction" as a purchase or sale for immediate or deferred physical shipment or delivery of an asset related to a commodity interest where the commodity interest transaction and the related cash or forward transaction are used to hedge, mitigate the risk of, or offset one another.[40] Because a forward is a type of cash transaction already covered by existing regulation 1.35, amending regulation 1.35 to apply to related forward transactions does not constitute

an expansion of the scope of existing regulation 1.35.[41]

To reflect these changes, the Commission also is changing the proposed revision to the title of regulation 1.35 from "Records of Commodity Interest and Cash Commodity Transactions" to "Records of Commodity Interest and Related Cash or Forward Transactions."

In response to comments that the requirement to keep transaction records in separate files identifiable by transaction and counterparty is overbroad, overly burdensome, costly, and/or impossible to achieve, the Commission is modifying the Proposal to remove the requirement that each transaction be maintained as a separate electronic file. Instead, the final rule will require that such records be kept in a form and manner identifiable and searchable by transaction. This should be less burdensome than the Proposal because it will allow those required to comply to maintain searchable databases of the required records without the added cost and time needed to compile the required records into individual electronic files. It also is consistent with the final recordkeeping rule for SDs and MSPs under regulation 23.202.[42] As the Commission noted in the final release for that rulemaking, regulation 23.202 does not require the raw data to be tagged with transaction and counterparty identifiers so long as the recordkeeper can readily access and identify records pertaining to a transaction or counterparty by running a search of the raw data.[43] Covered entities will be able to comply with this obligation by using any of a number of different solutions available, including commercially available products capable of conducting speech analytics on recordings from both landlines and mobile calls.

FIA requested guidance on whether an FCM, IB, or other DCM or SEF member can satisfy the recordkeeping

requirements under regulation 1.35(a) by relying on record retention performed by a DCM or SEF,[44] and other commenters similarly requested guidance on whether a covered participant can rely on another Commission registrant's records to satisfy its recordkeeping obligations. While complying with the final rule is the responsibility of the covered participant and the covered participant will be liable for failure to comply, depending on the type of record and arrangements made for access, covered persons may reasonably rely on a DCM, SEF or other Commission registrant to maintain certain records on their behalf. For example, a member of a DCM or SEF can rely on electronic order routing or order execution systems of FCMs, DCMs, or SEFs to record the audit trail information it enters into the system in accordance with Commission requirements, if the covered person arranges to get access to such records in order to satisfy requirements under the regulation. Reliance on another person, however, will not relieve a covered person of responsibility for compliance with the regulation. Reliance on a third party is only appropriate where the records maintained by the third party duplicate the information required to be kept by the regulation. For example, if an FCM records its telephone calls with a covered IB, the IB need not separately record the same calls if the IB and FCM agree that the FCM will maintain the record and provide access to the IB. By contrast, if a covered IB receives a customer order by telephone and then calls it into the FCM, the covered IB must record its telephone call with the customer, while the FCM records the call between the IB and FCM. For other types of records, like instant messages and emails, it is unlikely that covered persons will be able to rely on recordkeeping by a third party because the third party recipient will not have a complete record of the distribution of the message by the sender.

The Commission has considered commenter requests to adopt best efforts approach to compliance, and require only the recording of conversations on firm-provided mobile telephones, not personal devices. The Commission declines these requests and reiterates that any conversation the content of

---

[37] See SD and MSP Recordkeeping Final Rule, 77 FR at 20202–03 (17 CFR 23.202(a)(1) and (b)(1)).

[38] "Commodity interest" includes commodity futures, retail forex, commodity options, and swaps. See Final Adaptation Rule, 77 FR at 66319 (to be codified at 17 CFR 1.3(yy)).

[39] 17 CFR 1.35(a). Regulation 1.35(a) has included transactions in "cash commodities" since as early as 1964:

Each futures commission merchant and each member of a contract market shall keep full, complete, and systematic records, together with all pertinent data and memoranda, of all transactions relating to his business of dealing in commodity futures and cash commodities * * *

17 CFR 1.35(a) (1964).

[40] This definition of "related cash or forward transaction" mirrors the definition of the same term as it applies to swap transactions for purposes of certain of an SD's or MSP's recordkeeping obligations under Part 23 of the Commission's regulations. See SD and MSP Recordkeeping Final Rule, 77 FR at 20202.

[41] The Commission's glossary includes this definition of "forward contract":

A cash transaction common in many industries, including commodity merchandising, in which a commercial buyer and seller agree upon delivery of a specified quality and quantity of goods at a specified future date. Terms may be more "personalized" than is the case with standardized futures contracts (i.e., delivery time and amount are as determined between seller and buyer). A price may be agreed upon in advance, or there may be agreement that the price will be determined at the time of delivery.

See CFTC Glossary, A Guide to the Language of the Futures Industry, at http://www.cftc.gov/ ConsumerProtection/EducationCenter/ CFTCGlossary/glossary_f.html.

[42] See SD and MSP Recordkeeping Final Rule, 77 FR at 20130.

[43] Id.

[44] FIA stated:

We interpret the Commission's statement to mean that, to the extent a DCM or SEF records the relevant conversations of orders transmitted for execution by telephone, a Commission registrant that transmits such orders may rely on the DCM or SEF and is not required to record such conversations and maintain such records separately.

which is described under the regulation must be recorded, regardless of whether it occurs on a firm-provided or personal phone.[45] It would be contrary to the objectives of ensuring market integrity and customer protection to allow circumvention of the rule simply by communicating on a personal device lacking recording capability. To be clear, covered persons must ensure that covered communications do not occur on personal phones that lack recording capability. And while the Commission is not adopting any explicit safe harbors, as a matter of course, the Commission considers good faith compliance with policies and procedures reasonably designed to comply with the oral communications recording rule as a mitigating factor when exercising its discretion in enforcement actions for violation of the rule.

Regarding comments about the existing NFA requirement that NFA member firms with more than a certain percentage of disciplined associated persons must record all conversations that they have with existing and potential customers for two years, the Commission believes that the NFA rule has been effective at protecting the markets and the public. However, as discussed throughout, the Commission does not view its final recording requirement solely as a customer protection rule. The amendments adopted by this release are also a means to protect the integrity of the markets by aiding the Commission in detecting and deterring market abuse, including manipulation and false reporting.[46]

The Commission disagrees with commenters who stated that compliance with the new recording requirement would be illegal in certain jurisdictions.[47] Federal law does not prohibit a person from recording a telephone call where the person recording the call is a party to the call or one of the parties to the call has given prior consent to being recorded.[48] While state laws differ regarding the ability to record customer telephone conversations, the difference exists in the type of consent required to be given before recording can occur. For example, some states require the consent of one party to the call and others require the consent of all parties to the call.[49] Consent can be explicit or implied. A customer will have provided consent if, after being notified that the call is being recorded, he or she continues with the call.[50] Therefore, a covered participant will in all circumstances be able to comply with this final recording rule without violating any other state or federal laws by informing the other parties to the call that the call is being recorded.[51]

Commenters also focused on the relationship between the proposed changes to regulation 1.35(a) and the existing record retention obligations of regulation 1.31 (Books and records; keeping and inspection). Under regulation 1.31, all books and records required to be kept under the Act or by

the Commission's regulations must be kept for five years from the date thereof and be readily accessible during the first two years of the five-year period. Given the proposed amendment to regulation 1.35(a) to include a requirement to record all oral communications leading to the execution of a commodity interest or cash commodity transaction and that all such recordings be retained pursuant to regulation 1.31, records of oral communications kept pursuant to proposed regulation 1.35(a) would have had to be kept for five years.[52] Concerning the relationship between regulations 1.31 and 1.35(a), the Commission has determined to adopt a retention period of one year for all records of oral communications that lead to the execution of a transaction in a commodity interest. This modification responds to comments stating that the proposed retention period of five years for records of oral communications was too long. This also is consistent with the final provision for SD and MSP oral communications under new regulation 23.203(b)(2).[53] In addition, the Commission believes that the one-year retention period for records of oral communications will enable it to adequately execute its enforcement responsibilities under the Act and these regulations, while minimizing the storage costs imposed on affected entities.

In specific response to Amcot's concern that the five-year retention period for oral communications would have been too burdensome to its farming cooperative members, the Commission notes that, due to the adopted revisions to regulation 1.35(a), discussed above, the requirement to record oral communications likely will not apply to a significant portion, if any, of Amcot's members.[54] With respect to Encana's request for clarification concerning the applicability of regulation 1.31 to

---

[45] Significant technological advancements in recent years, particularly with respect to the cost of capturing and retaining copies of electronic material, including telephone communications, have made the prospect of establishing recordkeeping requirements for digital and electronic communications more economically feasible and systemically prudent. Evidence of these trends was examined in March 2008 by the FSA, which studied the issue of mandating the recording and retention of voice conversations and electronic communications. The FSA issued a Policy Statement detailing its findings and ultimately implemented rules relating to the recording and retention of such communications, including a recent determination that all financial service firms will be required to record any relevant communication by employees on their work cell phones. Similar rules that mandate recording of certain voice and/or telephone conversations have been promulgated by the Hong Kong Securities and Futures Commission and by the Autorité des Marchés Financiers in France and have been recommended by the International Organization of Securities Commissions (IOSCO). FSA, ''Policy Statement: Telephone Recording: recording of voice conversations and electronic communications'' (March 2008).

[46] Recorded telephone conversations have been used in a number of the Commission's enforcement cases as evidence of market abuse. See, e.g., DiPlacido v. CFTC, 364 Fed.Appx. 657 (2d Cir. 2009); In re Barclays PLC, CFTC Docket No. 12–25

(June 27, 2012); CFTC v. Optiver US LLC, 2012 WL 1632613 (S.D.N.Y. Apr. 19, 2012).

[47] Commenters included Henderson & Lyman; Amcot; and ICE.

[48] See 18 U.S.C. 2511(2)(d) (Interception and disclosure of wire, oral, or electronic communications prohibited) (''It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.'')

[49] For example, under New York state law, only one of the parties to the conversation must consent. See NY CLS Penal § 250.00. Under California and Illinois state laws, all parties to the conversation must consent to the recording. See Cal. Pen. Code § 632; 720 ILCS 5/14–1.

[50] See, e.g., Griggs-Ryan v. Smith, 904 F.2d 112,118 (1st Cir. 1990) (call recipient, previously warned that all incoming calls were being recorded, impliedly consented to interception); Kearney v. Salomon Smith Barney, Inc., 45 Cal.Rptr.3d 730, 749 (Cal. 2006) (business that adequately advises all parties to a telephone call, at the outset of the conversation, of its intent to record the call would not violate the statute prohibiting the recording of telephone conversations without the consent of all parties).

[51] Moreover, if a state law were to conflict with the recording requirement in regulation 1.35(a), such a law would be preempted by regulation 1.35(a).

[52] See 17 CFR 1.31

[53] See SD and MSP Recordkeeping Final Rule, 77 FR at 20204 (Apr. 3, 2012) (''Provided, however, that records of oral communications communicated by telephone, voicemail, mobile device, or other digital or electronic media pursuant to § 23.202(a)(1) and (b)(1) shall be kept for a period of one year.'').

[54] The obligation to record oral communications under final regulation 1.35(a)(1) will not apply to (i) oral communications that lead solely to the execution of a related cash or forward transaction; (ii) oral communications by an FB that do not lead to the purchase or sale for any other person of any commodity for future delivery, security futures product, swap, or commodity option authorized under section 4c of the Commodity Exchange Act; (iii) an IB that has generated over the preceding three years $5 million or less in aggregate gross revenues from its activities as an IB; (iv) an FT; (v) a CPO; (vi) an SD; (vii) an MSP; or (viii) a DCM or SEF member that is not registered or required to be registered with the Commission in any capacity.

commercial end-users, regulation 1.31 applies to all records required to be kept by the Act or the Commission's regulations, such as records required to be kept under regulations 1.35, 18.05 and 23.202. Therefore, Encana's request is better addressed in particular response to those other recordkeeping requirements than in a discussion of how those records should be kept. In response to CME's comment that although the Commission suggests that the retention period for swaps applies only to SDs and MSPs, as addressed in proposed regulation 23.203(b), the proposed amendment to regulation 1.31 is ambiguous in that it could be read to apply to all entities, the Commission clarifies that the final provision in regulation 1.31 regarding the retention period for records of swap transactions is triggered by the type of record and not the entity that is required to keep the record. Therefore, although regulation 23.203(b) only applies to SDs and MSPs with regard to their swap transactions, the final corresponding provision in regulation 1.31 applies to anyone who is required by the Act or by Commission regulations to keep records of swap or related cash or forward transactions.

## IV. Administrative Compliance

### A. Paperwork Reduction Act

Regulation 1.35(a) is being amended to provide that certain Commission registrants be required to record and keep records of their oral communications that lead to the execution of a commodity interest transaction and their written communications that lead to the execution of a commodity interest or related cash or forward transaction, similar to the requirement that SDs and MSPs keep records of their oral and written communications that lead to the execution of swaps and related cash or forward transactions. Only the oral communications recordkeeping amendments impose new information recordkeeping requirements. These new requirements constitute a collection of information within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[55] Under the PRA, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it has been approved by the Office of Management and Budget ("OMB") and displays a currently valid control number.[56] This rulemaking contains new collections of information, which amend the existing collection of

information set forth in the "Adaptation of Regulations to Incorporate Swaps" final rule,[57] OMB Control Number 3038–0090, to add a new oral communication recordkeeping requirement that was not made part of the earlier Final Adaptation Rule. The Commission has submitted the Proposal containing the oral communication recordkeeping requirements that have been separately addressed in this release,[58] this final rule release, and supporting documentation to OMB for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. Responses to these information collections will be mandatory.

With respect to all of the Commission's collections, the Commission will protect proprietary information according to the Freedom of Information Act and 17 CFR part 145, "Commission Records and Information." In addition, section 8(a)(1) of the Act strictly prohibits the Commission, unless specifically authorized by the Act, from making public "data and information that would separately disclose the business transactions or market positions of any person and trade secrets or names of customers." The Commission also is required to protect certain information contained in a government system of records according to the Privacy Act of 1974, 5 U.S.C. 552a.

### 1. Information To Be Provided by Reporting Entities/Persons

a. Amendments to Regulation 1.35 (Records of Commodity Interest and Related Cash or Forward Transactions)

i. Obligation To Develop and Maintain Recordkeeping Policies and Controls

The final amendments to regulation 1.35(a) that require recordkeeping related to oral communications will require that each FCM, non-Small IB, RFED, and DCM or SEF member that is registered or required to be registered with the Commission in any capacity, except if registered as an FT, CPO, SD, or MSP, retain all oral communications provided or received concerning quotes, solicitations, bids, offers, instructions, trading, and prices, that lead to the execution of a commodity interest transaction, whether communicated by telephone, voicemail, facsimile, instant

messaging, chat rooms, electronic mail, mobile device or other digital or electronic media. The final amendments to regulation 1.35(a) will also apply to FBs who are members of a DCM or SEF. However, FBs will only be required to record oral communications that lead to the purchase or sale for any person other than the FB of any commodity for future delivery, security futures product, swap, or commodity option authorized under section 4c of the Act.

In the Proposal, the Commission anticipated that the aforementioned registrants may incur certain one-time start-up costs in connection with establishing a system to record oral communications. The Commission estimated that the cost of procuring systems to record these oral communications would be $55,000 for an average large entity that does not already have such systems in place, and estimated procurement costs of $10,000 for each small firm that does not already have such systems in place. Following publication of the Proposal, the Commission researched these costs further. As discussed below in the Cost-Benefit Considerations, the Commission now estimates that the cost for establishing a system to record oral communications on mobile phones using a cloud-based solution would be $90 per phone line and that the cost for establishing a system to record oral communications on a landline using a cloud-based solution would be $50 per phone line. The Commission estimates further that a small entity required to comply will have 10 phone lines and that a large entity required to comply will have 1,000 phone lines. Thus, to figure out the initial cost of establishing a system for recording oral communications, an entity will have to multiply the number of phone lines by the cost per line ($50 per landline and $90 per mobile phone). The Commission estimates each entity to have 50% landlines and 50% mobile phone lines. Therefore, the initial cost for a small firm (10 phone lines) to establish a system for recording oral communications would be (5 × $50) + (5 × $90) or $700, and the initial cost for a large firm (1,000 phone lines) would be (500 × $50) + (500 × $90) or $70,000. For purposes of the PRA, the Commission has chosen to use an average initial cost of $35,000.

Also in the Proposal, the Commission estimated the burden hours associated with these start-up costs to be 135 hours for any entity that does not already have a system in place. According to research referenced in the previous paragraph, the Commission now estimates that an entity will not have to spend any time

---

[55] 44 U.S.C. 3501 et seq.

[56] *Id.*

[57] On November 2, 2012, the Commission published in the **Federal Register** the Final Adaptation Rule. The Final Adaptation Rule promulgated the vast majority of the amendments that the Proposal had introduced. However, in the Final Adaptation Rule, the Commission stated that it would address in a separate release certain of the proposed changes to regulation 1.35 (*i.e.,* the oral communication recordkeeping requirements).

[58] *See* 76 FR 33066, June 7, 2011.

setting up a cloud-based solution for recording oral communications on a mobile phone or landline because the entity will merely have to contract for services from an outside vendor. However, an entity will spend an estimated range of 1 to 10 hours arranging the services of an outside vendor. If the entity chooses to negotiate the vendor's contract, the burden hours will be towards the higher end of the range.

The Commission also estimated in the Proposal that one employee from each affected entity would have to devote one hour per trading day to ensure the operation of the system to record oral communications. Pursuant to the research referred to above, the Commission estimates that employees of those entities who will be required to record oral communications will not have to spend any time each day to ensure the operation of the system because the Commission expects that outside vendors would maintain the system.

### ii. Comments Received

As indicated earlier in this rule, in the Final Adaptation Rule, the Commission stated that it would address in a separate release certain of the proposed changes to regulation 1.35 and related amendments to regulation 1.31.[59] In response to the amendments to regulation 1.35(a) in the Proposal, the Commission received 35 comment letters from a variety of institutions, including DCMs, agricultural trade associations, and agricultural cooperatives.[60] The Commission has determined to adopt the Proposal's amendments to regulation 1.35(a), with certain modifications, discussed above, in order to address the comments the Commission received. In addition, as part of this final rulemaking, the Commission is making certain related modifications to the record retention periods set forth in regulation 1.31. The final rules provide for a retention period of one year for all records of oral communications that lead to the execution of a transaction in a commodity interest. This modification responds to comments stating that the proposed retention period of five years for records of oral communications was too long. This also is consistent with the final provision for SD and MSP oral communications under new regulation 23.203(b)(2).[61] Moreover, in light of

comments stating, among other things, that it would be overly burdensome for Small IBs and DCM members that do not have customers to comply with the oral communications recordkeeping requirement, the Commission decided to exclude these market participants from the oral recordkeeping amendments to regulation 1.35(a).

### B. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") requires that agencies consider whether the rules they propose will have a significant economic impact on a substantial number of small entities[62] and, if so, provide a regulatory flexibility analysis respecting the impact.[63] The Commission is adopting a substantive rule change to regulation 1.35(a). This substantive change would affect FCMs, certain IBs,[64] RFEDs, and any member of a DCM or SEF who is registered or required to be registered with the Commission in any capacity other than as an FT, CPO, SD, or MSP by requiring them to keep records of all oral communications leading to the execution of a commodity interest transaction.

### 1. FCMs and RFEDs

The Commission has previously determined that registered FCMs and RFEDs are not small entities for purposes of the RFA.[65] Accordingly, the Chairman, on behalf of the Commission, hereby certifies pursuant to 5 U.S.C. 605(b) that the final rules will not have a significant economic impact on a substantial number of small entities with respect to these entities.

### 2. IBs

Regulation 1.35(a) may have a significant economic impact on IBs with annual receipts between $5 million and

$7 million. The Commission provided an initial regulatory flexibility analysis in its proposed rulemaking for all IBs, regardless of their size, as the proposed rulemaking did not exclude any IBs from the application of the requirement to keep records of all oral communications.[66]

As discussed above, this final rule will involve substantive changes to regulation 1.35(a), by requiring, among others, non-Small IBs to record all oral communications that lead to the execution of a commodity interest transaction. As indicated above, the Commission provided an initial regulatory flexibility analysis for IBs in the Proposal, as required by 5 U.S.C. 603, because the oral recordkeeping requirement under regulation 1.35(a), as proposed, may have had a significant economic impact on a substantial number of small IBs.[67]

The Commission has never previously determined that IBs, as a registrant category, are not "small entities" for the purposes of the RFA. Instead, historically, the Commission has evaluated within the context of a particular regulatory proposal whether all or some affected IBs would be considered to be small entities and, if they are considered small entities, the economic impact on them of the particular regulation. Accordingly, the Commission offers, pursuant to 5 U.S.C. 604, the following final regulatory flexibility analysis.

### a. A Statement of the Need for, and Objectives of, the Rule

The primary objective of final regulation 1.35(a) is to increase market integrity by requiring IBs with greater than $5 million in total aggregate gross revenues over the preceding three years to keep records of all oral communications leading to the execution of a commodity interest transaction. This rule is necessary for several reasons. First, it will protect the integrity of the market as a whole by aiding the Commission in detecting and deterring market abuse, including manipulation and false reporting. Additionally, it will make enforcement investigations more efficient by preserving critical evidence that otherwise may be lost to memory lapses

---

[59] *See* supra section I.B.

[60] Comments are available in the comment file on *www.cftc.gov*.

[61] *See* SD and MSP Recordkeeping Final Rule, 77 FR at 20204 ("Provided, however, that records of

oral communications communicated by telephone, voicemail, mobile device, or other digital or electronic media pursuant to § 23.202(a)(1) and (b)(1) shall be kept for a period of one year.").

[62] The Small Business Administration (SBA) identifies (by North American Industry Classification System codes) a small business size standard of $7 million or less in annual receipts for Subsector 523—Securities, Commodity Contracts, and Other Financial Investments and Related Activities. 13 CFR Ch. 1, § 121.201.

[63] 5 U.S.C. 601 et seq.

[64] *See* note 2323, *supra*, for discussion of definition of Small IB.

[65] *See* Policy Statement and Establishment of Definitions of "Small Entities" for Purposes of the Regulatory Flexibility Act, 47 FR 18618, 18619 (Apr. 30, 1982) (DCMs, FCMs, and large traders) ("RFA Small Entities Definitions"); Opting Out of Segregation, 66 FR 20740, 20743 (Apr. 25, 2001) (ECPs); Regulation of Off-Exchange Retail Foreign Exchange Transactions and Intermediaries, 75 FR 55410, 55416 (Sept. 19, 2010) (RFEDs) ("Retail Forex Final Rule"); and Position Limits for Futures and Swaps; Final Rule and Interim Final Rule, 76 FR 71626, 71680 (Nov. 18, 2011) (SEFs).

[66] *See* the Proposal, 76 FR at 33079. To the extent that small IBs were affected by the proposed rules, the Commission conducted an initial regulatory flexibility analysis. These final rules exclude Small IBs, as defined above. The final rules have therefore significantly reduced the number of IBs affected by regulation 1.35(a). However, to the extent that certain small IBs, for purposes of RFA, may be affected by these rules, the Commission is conducting a final regulatory flexibility analysis.

[67] *See* the Proposal, 76 FR at 33079–80.

and inconsistent recollections. This, in turn, is expected to increase the success of enforcement actions, which will benefit customers, regulated entities, and the markets as a whole.[68] Moreover, it also will protect customers from abusive sales practices, protect registrants from the risks associated with transactional disputes, and allow registrants to follow-up more effectively on customer complaints of abuses by their associated persons. Finally, final regulation 1.35(a) provides regulatory parity of futures and swaps markets because the requirements of final regulation 1.35(a) are consistent with recently finalized regulations requiring SDs and MSPs to keep records of all oral communications leading to the execution of a swap transaction or a related cash or forward transaction.[69]

b. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

i. Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis

Comments on the proposed amendments to regulation 1.35(a) primarily focused on the implications of the proposed oral recordkeeping and tagging requirements and, in particular, on the portion of the Proposal requiring all DCM and SEF members, including commercial end-users and non-intermediaries, to keep records of their cash commodity transactions. One theme of the comments was that the proposed oral communications recordkeeping and tagging requirements were overly burdensome.[70] Commenters were also concerned that the proposed separate electronic file requirement was open-ended, seemingly impossible to

achieve,[71] and overly burdensome. Commenters also explained that it could be difficult to link conversations occurring over several days,[72] and could require the recording of all conversations[73] because a call might begin unrelated to a covered transaction but eventually lead to a covered transaction. Commenters sought a reasonableness standard regarding oral recordkeeping and a limitation to exclude oral communications on mobile telephones and argued that the new oral communications recordkeeping requirement would be illegal in certain jurisdictions. Commenters also requested that the proposal to record and store oral communications should be reviewed in the context of available technology.

ii. Agency Assessment of Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis

The Commission carefully considered the comments, determined that a number of concerns and requested alternatives had merit and, as a result, made a number of adjustments in response. In response to commenters' concerns that the proposed amendments were overly burdensome to non-intermediaries' cash agricultural and energy transactions, the Commission has limited not only the oral recordkeeping requirements of regulation 1.35(a) to commodity interest transactions, but also the existing written recordkeeping requirements therein to commodity interest and related cash and forward transactions.

Some commenters expressed concerns that the proposed revisions to regulation 1.35(a) would be unduly burdensome for small entities and DCM and SEF members who are commercial end-users and non-intermediaries. In response, the Commission has excluded Small IBs (those IBs with less than $5 million in total aggregate gross revenues over the preceding three years) from the application of the rules and certain DCM and SEF members from the scope of the new requirement to record oral communications, namely FTs, CPOs, SDs, and MSPs that would have been obligated to comply by virtue of their status as a DCM or SEF member.

Commenters also expressed the view that the requirement to keep transaction records in separate files identifiable by transaction and counterparty is overbroad, overly burdensome, costly, and/or impossible to achieve. In

response, the Commission has removed the requirement that each transaction be maintained as a separate electronic file. In response to a request that covered persons be able to rely on another Commission registrant's records to satisfy their recordkeeping obligations, the Commission provided for such reliance in the final rules, to be applicable only when the records being kept are identical.

The Commission declined to amend the Proposal in response to certain comments. Although commenters sought a reasonableness standard regarding oral recordkeeping and a limitation to exclude oral communications on mobile telephones, the Commission determined to retain the provisions of the Proposal that any covered communication must be recorded, whether it occurs on a firm-provided or personal device.[74]

The Commission also has determined not to amend the Proposal in response to commenters stating that compliance with the new oral communications recordkeeping requirement would be illegal in certain jurisdictions. It is not a violation of federal law to record a telephone call where the person recording the call is a party to the call or one of the parties to the call has given prior consent to being recorded.[75] While state laws differ regarding the ability to record customer telephone conversations, the difference is in the type of consent to recording required. Therefore, the most a covered participant will have to do to comply with the final oral communications recording rule without violating any other state or federal laws is to obtain the prior consent of the other parties to the call to record the conversation. The Commission also notes that DCM rules currently require all floor personnel who wear headsets to record their conversations, so there is only an incremental burden to the entities already subject to those rules, such as FBs.

iii. Changes Made in the Proposed Rule as a Result of Such Comments

• In response to comments, the Commission incorporated the following modifications to the Proposal into final regulation 1.35(a): Reduced the scope of the obligation to record oral

---

[68] In promulgating its own telephone recording rule, the Financial Services Authority issued guidance stating the following benefits: "(i) Recorded communication may increase the probability of successful enforcement; (ii) this reduces the expected value to be gained from committing market abuse; and (iii) this, in principle, leads to increased market confidence and greater price efficiency." *See* Financial Services Authority, "Policy Statement: Telephone Recording: Recording of voice conversations and electronic communications" (Mar. 2008).

[69] *See* SD and MSP Recordkeeping Final Rule, 77 FR at 20203–04 (to be codified at 17 CFR 23.202(a)(1) and (b)(1)).

[70] *See, e.g.,* comments from Amcot (overbreadthover breadth would be burdensome for agricultural DCM members) and NIBA (at the very least, small IBs should be exempt from the proposed amendments to 1.35(a) because the burden on such small entities would be too great).

[71] *See* comment from FIA.

[72] *See* comment from CME.

[73] *See id.*

[74] As discussed in more detail above, significant technological advancements in recent years, particularly with respect to the cost of capturing and retaining copies of electronic material, including telephone communications, have made the prospect of establishing recordkeeping requirements for digital and electronic communications more economically feasible and systemically prudent.

[75] *See* 18 U.S.C. 2511(2)(d).

communications as proposed by limiting it to commodity interest transactions; reduced the retention period for records of oral communications leading to a commodity interest transaction from five years to one; reduced the scope of persons required to record oral communications from FCMs, RFEDs, IBs and all members of a DCM or SEF to FCMs, RFEDs, IBs with total aggregate gross revenues of at least $5 million over the preceding three years, and any member of a DCM or SEF registered or required to be registered with the Commission in any capacity, other than FTs, CPOs, SDs, and MSPs (although SDs and MSPs are required to comply with regulations 23.202(a)(1) and (b)(1) which require recordkeeping of certain oral communications, among other requirements); eliminated the tagging requirement; and allowed for covered persons to rely on the records of another Commission registrant, where appropriate (since reliance will not be appropriate in all circumstances as discussed in section III above) in complying with their recording obligations, while confirming that the covered person will be liable for any violation of the regulation.

iv. Response to ETA Comment Letter

Among other things, the Proposal stated that, except for the proposed revision to regulation 1.35(a) requiring IBs to maintain records of voice communications, the Proposal would not have a significant economic effect on a substantial number of small entities. The Proposal included a Regulatory Flexibility Analysis with respect to the proposed requirement that IBs maintain such records. That analysis concluded with the determination to treat equally all Commission registrants transacting on behalf of customers with respect to keeping records of oral communications.

The ETA commented that the Proposal failed to reflect that the vast majority of the ETA's constituents, electrical utilities that the ETA believes would be affected by the Proposal, are "small entities" and, therefore, that an analysis under the RFA was required. The ETA's comment letter did not specify which proposed provisions in the instant rulemaking would affect its members or into which affected entity category or categories its members could fall. Notably, the RFA does not obligate the Commission to analyze the indirect effects on persons not subject to the rule itself. As the Commission understands, those electrical utilities that may be small entities will not be FCMs, RFEDs, IBs with annual receipts of over $5

million, or members of a DCM or SEF transacting business with customers. Rather, they most likely will be end-users of the transactions conducted, the recorded rather than the recorders. As such, there will be no direct, significant economic impact on these electric utilities. Rather, the impact will be imposed on the entities through which they may effect transactions.

c. A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate Is Available

An IB generally [76] is defined in CEA section 1a(31)(A) as follows:

Any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant)—
(i) Who—
(I) Is engaged in soliciting or in accepting orders for—
(aa) The purchase or sale of any commodity for future delivery, security futures product, or swap;
(bb) Any agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i);
(cc) Any commodity option authorized under section 4c; or
(dd) Any leverage transaction authorized under section 19; and
(II) Does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or

(ii) Who is registered with the Commission as an introducing broker.[77]

As the Commission stated in the initial Regulatory Flexibility Analysis, there are an estimated 1,500 IBs registered with the Commission at any given time. As of June 30, 2012, there were 1,431 registered IBs.[78] The Commission stated in the Proposal's Regulatory Flexibility Analysis that a large percentage of registered IBs are "guaranteed" IBs,[79] many of which may be small entities.[80] However, the Commission estimates that limiting, with respect to IBs, the scope of final

regulation 1.35(a) to non-Small IBs excludes more than 95% of registered IBs from regulation 1.35's oral communications recordkeeping requirement. Thus, the Commission expects that no more than approximately 75 registered IBs will be subject to the final oral recordkeeping requirements of regulation 1.35(a) at any one time.

d. A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

Regulation 1.35(a), as amended, will require, among others, non-Small IBs to record all oral communications that lead to the execution of a commodity interest transaction.[81] The regulation is primarily a recordkeeping requirement, which will obligate covered IBs that do not already do so to record their oral communications [82] or the oral communications of their traders and sales forces. The final rules provide for a retention period of one year for all records of oral communications that lead to the execution of a transaction in a commodity interest. This modification responds to comments stating that the proposed retention period of five years for records of oral communications was too long. This also is consistent with the final provision for SD and MSP oral communications under new regulation 23.203(b)(2).

---

[76] CEA section 1a(31)(B), 7 U.S.C. 1a(31)(B), grants the Commission the authority to further define the term IB.

[77] 7 U.S.C. 1a(31)(A).

[78] Source: NFA.

[79] A guaranteed IB ("GIB") is an IB that "does not have to maintain a partic[ul]ar level of net capital but, instead, is guaranteed by a particular FCM/RFED and is generally required to introduce all its business to that FCM/RFED." Independent IBs "must maintain adjusted net capital of at least $45,000 but may introduce business to any registered FCM/RFED." NFA, What is the difference between an independent IB and a guaranteed IB?, available at *http://www.nfa.futures.org/nfa-faqs/registration_faqs/requirements-for-FCM-IB-applicants/what-is-difference-between-IIB-and-GIB.html* last visited Sept. 28, 2012.

[80] According to the NFA, as of June 30, 2012, there were 832 registered GIBs.

[81] The Proposal had required recording of oral communications that lead to the execution of a commodity interest and cash commodity transaction. *See* the Proposal, 77 FR at 33091.

[82] Covered market participants will be allowed to arrange with third parties, including DCMs, SEFs, and FCMs, to have access to the DCMs', SEFs', or other Commission registrants' records and, to the extent the records are duplicative of what would be required ofby the covered entity under the rule, may rely on such records to satisfy their own recordkeeping obligations. The Commission notesNote, however, that this does not relieve the covered participant from liability for compliance failures.

e. A Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities Was Rejected

In connection with adopting the final rules, the Commission considered, as alternatives, establishing different compliance or reporting requirements that take into account the resources available to smaller entities, exempting smaller entities from coverage of the disclosure requirements, and clarifying, consolidating, or simplifying disclosure for small entities. In response to comments that the proposed oral communications recordkeeping requirement would be overly burdensome for small IBs, the Commission dramatically scaled back the scope of regulation 1.35(a) as it applies to oral recordkeeping by IBs, reducing by well more than half the number of IBs expected to be subject to the requirement. The Commission further reduced the impact on IBs by limiting the oral communications recordkeeping requirement to commodity interest transactions from the proposed commodity interest and cash commodity transactions.

Although commenters sought a reasonableness standard regarding oral recordkeeping and a limitation to exclude oral communications on mobile telephones, the Commission has retained the provisions of the Proposal that any covered communication must be recorded, whether it occurs on a firm-provided or personal device.[83] The Commission is, however, ameliorating the impact thereof by stating that it will consider good faith compliance with policies and procedures reasonably designed to comply with the oral communications recording requirement as a mitigating factor when exercising its discretion for violations of the requirement.

## C. Consideration of Costs and Benefits

Section 15(a) of the CEA requires the Commission to consider the costs and benefits of its actions before promulgating a regulation under the CEA or issuing certain orders. Section 15(a) further specifies that the costs and benefits shall be evaluated in light of the following five broad areas of market and public concern: (1) Protection of market participants and the public; (2) efficiency, competitiveness and financial integrity of futures markets; (3) price discovery; (4) sound risk management practices; and (5) other public interest considerations. The Commission considers the costs and benefits resulting from its discretionary determinations with respect to the section 15(a) factors.

### 1. Background

The markets subject to the jurisdiction of the Commission have undergone a significant transformation over the last few decades, and particularly in the last few years. Technological advances have contributed to a tremendous growth in trading volume in swaps as well as other derivatives, including futures, as well as the number and type of market participants. Among other notable changes, today's derivative markets include significant numbers of retail customers that invest in the commodity markets through a variety of means. Markets are also more interconnected than ever before, with order flow distributed across multiple trading centers. With this interconnectivity comes not only positive efficiencies, but also the potential for cross-market manipulation that can be difficult to detect and prove without ready access to information evincing the intent of those engaged in market activity. In addition, the Commission notes that requiring the recording and retention of oral communications will serve as a disincentive for covered entities to make fraudulent or misleading communications to their customers over the telephone and could serve as a meaningful deterrent against violations such as trading ahead of customer orders by providing a record of the time that a customer's telephone order is received.

In July 2010, Congress passed the Dodd-Frank Act which, among other things, establishes a comprehensive regime for the regulation of swaps. The Dodd-Frank Act brings swaps under the Commission's jurisdiction and obligates the Commission to adopt new regulations related to registration and regulation of SDs and MSPs, trade execution and clearing requirements,

and swap data recordkeeping and real time reporting. In section 731 of the Dodd-Frank Act, Congress added CEA section 4s to require the registration and regulation of SDs and MSPs by the Commission, including the establishment of requirements for SDs and MSPs to keep records of swap transactions.[84]

In response to Congress' act of requiring that SDs and MSPs keep daily trading records of their swaps, including records of communications made by telephone,[85] and to be consistent with the oral communications recordkeeping requirement for SDs and MSPs in connection with their swap and related cash and forward transactions,[86] the Commission is exercising its discretion to amend its regulations to require FCMs, RFEDs, non-Small IBs (*i.e.*, IBs that have generated more than $5 million in aggregate gross revenues over the preceding three years)[87] and members of a DCM or SEF who are registered or required to register with the Commission in any capacity other than FTs, CPOs, SDs, and MSPs to record all oral communications that lead to the execution of a transaction in a commodity interest. FBs that are members of a DCM or SEF are required to record all oral communications that lead to the purchase or sale for any person other than the FB of any commodity for future delivery, security futures product, swap, or commodity option authorized under section 4c of the Act. In this way, the Commission is affording the other markets subject to its jurisdiction the same market integrity and customer protections that Congress afforded the swaps markets in the Dodd-Frank Act. The Commission recognizes that these benefits are not without cost, and has carefully considered both benefits and costs in light of the considerations provided in CEA section 15(a) and, where appropriate, adopted alternatives to the Proposal that would achieve similar benefits as proposed, but at a lower cost.

### 2. Summary of the Final Rule

Prior to this amendment, regulation 1.35(a) specified which parties are required to keep written records related to commodity futures, commodity options, and cash commodities, and what information they are required to record. The requirements of regulation 1.35(a) applied to FCMs, RFEDs, IBs, and DCM members.

---

[83] As discussed in more detail above, significant technological advancements in recent years, particularly with respect to the cost of capturing and retaining copies of electronic material, including telephone communications, have made the prospect of establishing recordkeeping requirements for digital and electronic communications more economically feasible and systemically prudent.

[84] 76 FR 33066.

[85] *See* 7 U.S.C. 6s(g)(1).

[86] *See* SD and MSP Recordkeeping Final Rule, 77 FR at 20203–04 (Regulation 23.202(a)(1) and (b)(1)).

[87] *See* note 2323, *supra*, for discussion of definition of Small IB.

As discussed above, the Commission is adopting a provision requiring certain entities to record all oral communications leading to the execution of a transaction in a commodity interest. Unlike existing regulation 1.35(a), this new provision will apply to FCMs, RFEDs, non-Small IBs, and DCM and SEF members that are registered or required to be registered with the Commission in any capacity other than as an FT, CPO, SD or MSP.

As described above, the Commission considered adopting an exclusion for certain FBs similar to the exclusion for Small IBs, but determined to not adopt such an exclusion, in part, because FBs are parties to oral communications relating to the means or methods by which a trade is executed. However, the Commission did determine to limit the application of the rule to FBs so that an FB will only be required to record their oral communications that lead to the purchase or sale by any person other than the FB of any commodity for future delivery, security futures product, swap, or commodity option authorized under section 4c of the CEA. This provision of the final rule addressed commenter concerns that the Proposal inappropriately captured the oral communications of certain members of DCMs who currently are registered as FBs, but are solely trading for their own accounts, *i.e.,* acting as FTs. In addition, in response to comments regarding implementation challenges associated with oral recordkeeping requirements for SDs and MSPs, the Commission is extending the implementation deadline to provide these entities with approximately one year to comply following the publication of the final rule.[88] This change provides entities subject to regulation 1.35(a) with the same amount of implementation time as was made available to SDs and MSPs.[89] The Commission believes that an extended period for implementation is warranted in order to ensure that entities subject to this rule have adequate time to address the implementation challenges noted by SIFMA, as discussed below.

3. Benefits

By this action, the Commission improves its ability to ensure the

integrity of all the markets subject to its jurisdiction and that customers are similarly protected, whether they be engaged in a swap with an SD, or a futures transaction with an FCM.

As stated above, the markets subject to the jurisdiction of the Commission have undergone a significant transformation over the last few decades, and particularly in the last few years. Technological advances have contributed to a tremendous growth in trading volume as well as the number and type of market participants, including significant numbers of retail customers that invest in the commodity markets through a variety of means. Markets are also more interconnected than ever before, with order flow distributed across multiple trading centers. This interconnectivity yields important benefits but also presents increased risk, including the potential for cross-market manipulation where an action in one market is purposefully orchestrated to yield a desired outcome in another market. Therefore, to ensure that the integrity of the markets and customers are similarly protected across all markets subject to the Commission's jurisdiction, the Commission must have similar access to information regardless of whether the market participant is registered, for example, as an SD or an FCM.

• As the Commission explained when adopting similar transactional level recordkeeping requirements for SDs and MSPs, the Commission believes these recordkeeping requirements will protect market participants and promote the integrity of the markets by ensuring the existence of an audit trail that includes relevant oral communications. A strong audit trail, among other things: Provides a basis for efficiently resolving transactional disputes; acts as a disincentive to engage in unduly risky, injurious, or illegal conduct in that the conduct will be traceable; and in the event such conduct does occur, provides a mechanism for policing such conduct, both internally as part of a firm's compliance efforts and externally by regulators enforcing applicable laws and regulations.

With respect to the latter-noted benefit—enforcing applicable laws and regulations—oral records have proven to be no less, and in some cases perhaps more, valuable than written records alone.[90]

By requiring records of all communications leading to a transaction in a commodity interest, the public benefits and the financial integrity of the markets is protected because

additional documentation enhances the Commission's ability to detect and enforce rule violations, including manipulation and fraud. In particular, records of oral communications related to such transactions provide a record of the facts and circumstances that give rise to a violation that can be used in enforcement proceedings to redress the same. Effective enforcement of the Commission's regulations, particularly those prohibiting fraud and manipulation, protects market participants and the public and promotes the integrity of the markets subject to the Commission's jurisdiction.

Notwithstanding the important, practical benefits of the final rules, the Commission has considered commenters' concerns regarding costs and product availability.

4. Costs

The public comments related to changes to regulation 1.35(a) can be broken down into roughly four general categories: Concerns about the costs of compliance to firms,[91] concerns about the feasibility of complying with the requirements of the regulation,[92] concerns about market participants choosing to exit the market or of a market bifurcation,[93] and privacy concerns.[94]

Commenters cited a broad range of compliance costs associated with setting up and maintaining systems to record and tag oral communications. One commenter that is a recording technology provider stated that it would cost in the range of $50/month to record a landline phone or $90/month to record a mobile phone with minimal

---

[88] *See* letter from SIFMA dated August 10, 2012, Re: Request for No-Action Relief: Recordkeeping Requirements under the Internal Business Conduct Rules. Available at: [XXXX].

[89] *See* Letter from the Division of Swap Dealer and Intermediary Oversight of the CFTC to SIFMA, dated Oct. 29, 2012, CFTC Letter No. 12–29. Available at: *http://www.cftc.gov/ucm/groups/public/@lrlettergeneral/documents/letter/12–29.pdf.*

[90] *See* note 4646, *supra.*

[91] *See, e.g.,* FIA; NFA; ICE, Inc.; Hunton and Williams, LLP; National Grain and Feed Association, Land O' Lakes; Minneapolis Grain Exchange, Inc.; CME Group; Commodity Markets Council; Barclay's Capital; Amcot; Grain and Feed Association of Illinois; Agribusiness Council of Indiana; Minnesota Grain and Feed Association; Agribusiness Association of Iowa; American Petroleum Institute; Ohio AgriBusiness Association; American Feed Industry Association; South Dakota Grain and Feed Association; Natural Gas Supply Association; Commodity Markets Council; Natural Gas Supply Association; the Fertilizer Institute; Kansas City Board of Trade; Oklahoma Grain and Feed Association; Electric Power Supply Association; Henderson & Lyman; Rocky Mountain Agribusiness Association; American Cotton Shippers Association.

[92] *See, e.g.,* Land O'Lakes; Minneapolis Grain Exchange, Inc.; CME Group; Commodity Markets Council.

[93] *See, e.g.,* National Grain and Feed Association; Grain and Feed Association of Illinois; Agribusiness Council of Indiana; Minnesota Grain and Feed Association; Agribusiness Association of Iowa; Ohio AgriBusiness Association; American Feed Industry Association; Kansas City Board of Trade.

[94] *See, e.g.,* Virginia Nobbe; American Feed Industry Association; Henderson and Lyman.

fixed setup costs. They also stated that market participants may be able to negotiate more favorable rates if they are able to sign longer contracts, or if they have a large number of phones and/or landlines that need to be recorded. While other commenters did not provide per line estimates, they did provide aggregate cost estimates that are significantly higher than those cited above.[95]

The Commission has considered that the requirement to record and maintain records of oral communications that lead to the execution of commodity interest transactions will create additional costs for market participants subject to the requirements. Those costs include set-up costs to implement voice recording technology on both landlines and mobile phones, recurring costs (such as a monthly fee per user or per phone line to record), and the costs incurred by data storage. Commenters estimate that for participants using a so-called "cloud-based solution," the monthly fees would be approximately $90/month/phone for mobile phones, and approximately $50/month/line for landlines. The setup costs, in each case, are estimated to be roughly one month's subscription fees or less.[96] Commenters estimate that data storage costs are likely to be approximately $13/month/line.[97]

According to commenters, internal recording solutions (i.e., "non-cloud-based solutions") typically entail more significant implementation costs, though those costs are likely to vary widely based on existing technology, and particularly on any existing recording capabilities, that an entity already has. The Commission does not have adequate data to estimate the number of entities that already have recording capabilities, or the extent to which such capabilities are deployed in parts of the organization that would be impacted by the oral recordkeeping requirements in regulation 1.35.

SIFMA, in response to the final oral recordkeeping requirements for SDs and MSPs, noted implementation challenges related to recording calls made on both landlines and cell phones, recording calls outside the U.S., and the ability to search and retrieve records of calls, and requested additional time to address those challenges.[98]

The Commission, mindful of the fact that the entities subject to this rule will likely face some of the same implementation challenges, is providing the same amount of time for entities subject to regulation 1.35(a) to comply as was afforded to SDs and MSPs to comply with regulations 23.202(a)(1) and (b)(1). In addition, 1.35(a)(4)(i) permits entities seeking to comply in good faith with the oral communications recordkeeping requirements of regulation 1.35(a)(1) to submit a request for relief if compliance is technologically or economically impracticable for an affected entity prior to the compliance deadline. The Commission anticipates that the additional time for implementation will benefit entities subject to this rule by providing more time to address the challenges noted by SIFMA. Moreover, it will create opportunities for entities that are subject to this rule to benefit from solutions developed by vendors serving SDs and MSPs.

The Proposal included an additional requirement that transaction records be kept in separate electronic files identifiable by transaction and counterparty.[99] In response to

comments, the Commission is not adopting that requirement, such that firms are not required to keep records in separate electronic files. Instead, firms are only required to identify and retrieve relevant records upon Commission request. Therefore, the cost associated with "tagging" of oral communication records has been eliminated. Relevant entities, however, will need to be able to search and select records related to a particular transaction or counterparty when the Commission requests them. The Commission expects that this may be done in one of two ways. Market participants may use an electronic means of scanning records by key word or they may identify key words and concepts in records manually by listening to the recordings. In either case, participants must be able to identify and retrieve records if they are required to do so by the Commission.

If, when recordings are requested by the Commission, an entity chooses to assign or hire personnel to listen to recordings and identify those being requested, the costs will vary significantly depending on the number and length of oral communications that must be reviewed. These variables will, in turn, be influenced by a host of other factors, including: the number of transactions or counterparties for which relevant recordings must be identified; the length of time across which specified traders were active or specified trades were likely discussed, or the specified counterparties were in contact with the entity from whom the recordings are requested; the number of oral communications that specified traders or counterparties made during the period that may be in question; and the average length of each call. The Commission estimates that in such cases, an entity might dedicate personnel to spend as little as 50 hours reviewing recordings, or as much as 5,000 hours reviewing recordings. The average wage for a compliance specialist is $155.96 per hour and therefore the cost for manual review, if an entity chooses that option when the

---

[95] For example, FIA cited expenditures on the part of several of its members of between $300,000–$600,000 to upgrade and maintain their landline phones in order to record conversations and estimated expenditures of anywhere from $160,000 to $2.5 million to record conversations on mobile phones depending on firm size. Further, FIA cited a fee of $500,000 to purchase licenses for "word spotting" software to search and retrieve these oral records. The Commercial Energy Working Group stated that this compliance with the amended regulation 1.35 could cause costs to firms to "increase exponentially" (they cited an "unidentified investment bank" in the UK that spent $4.2 million each year to monitor its Blackberry phones in response to a similar Financial Services Authority mandate).

[96] Compliant Phones.

[97] Id.

[98] See SD and MSP Recordkeeping Final Rule, 77 FR 20128. Based on SIFMA's representations, the Commission determined that relief from certain oral recordkeeping requirements for SDs and MSPs is warranted to address the issues presented, and granted no-action relief to SDs and MSPs until March 31, 2013.

Among other things, SIFMA stated that implementing systems to record landline conversations will require upgrades to data retention infrastructure, testing that must occur on nights and weekends, and overcoming difficulties obtaining products and services. Further, they stated that mobile phone recording technology has "not achieved the levels of stability, performance and scalability that would be considered for commercial grade products." They stated that shipping delays, testing and troubleshooting challenges due to different time zones, legal requirements, and "an apparent lack of recording capabilities" in certain countries and uncertainty about what transactions may be subject to the requirements would delay efforts to implement solutions in foreign offices. And last, they asserted that limitations related to caller identification technology and associated metadata would prevent SDs and MSPs from rapidly implementing solutions that would enable them to search and retrieve calls related to specific counterparties or transactions.

[99] With respect to the proposed requirement that entities proactively identify which communications relate to specific traders, trades, and counterparties and then "tag" them as such, comments expressed concerns regarding the reliability of technological

solutions. For instance, the FIA writes, "We understand that two software providers, NICE Actimize and Nexidia, offer so-called 'word spotting' programs" but that they believe that these programs "are not foolproof and may identify less than 50 percent of potentially relevant conversations." The Commercial Energy Working Group stated that in lieu of an accurate software solution, manual identification and retrieval of oral records would require "as many as 3–5 analysts and 1–2 additional technical support personnel to support transactions" for "a small or modest-sized end-user commodity business" and that "the total cost to a commodity business is likely to be in excess of $1 million annually."

Commission requests records, could range from $7,800 to $780,000.[100]

Alternatively, the Commission is aware that vendors that provide recording services are also capable of providing speech analytic search capabilities for a set fee. For example, one vendor estimated this cost at $40 to $80 per user per month.[101] According to commenters, other entities may choose to acquire speech analytics services that can be housed internally rather than on the vendor's servers. Another vendor stated that the costs would depend on the number of hours sent through the speech analytics device and that initial deployment costs would likely range from $160,000 to $1,500,000 for the largest organizations with ongoing annual fees that are approximately 18% of the initial cost ($29,000—$270,000 per year). Alternatively, small entities can implement a desktop solution with the same analytics capabilities. The initial license costs approximately $25,000 per user and 18% ongoing maintenance fees ($4,500 per year per user).[102] Another vendor estimated that setup costs, including relevant licenses, would range from $450,000 for a small entity to $4,000,000 for a large entity, and that annual maintenance costs would range from $80,000 to $800,000.[103] These numbers assume that entities do not yet have speech analytics services being used in other parts of the company's operations that could be expanded to include the oral records required under this rule. However, the Commission understands that some of the largest financial entities may already be customers of companies that provide speech analytics services. As a consequence, the costs for those entities may be less than if they were implementing speech analytics services de novo.

In response to the Proposal, some commenters expressed concern that the imposition of more stringent recordkeeping requirements on DCM members could prompt a bifurcation in the markets for certain services because of the compliance cost advantage that

market participants who are not DCM members enjoy.[104] They suggested that entities that are DCM members might stop offering services that make them subject to the regulation 1.35 requirements.[105]

In the Proposal, the Commission proposed to include FCMs, RFEDs, IBs, and all DCM and SEF members under the oral recordkeeping requirement and also proposed that such recordkeeping requirements would apply to all transactions in commodity interests and cash commodities. However, in the final rule, the Commission amended regulation 1.35(a) such that Small IBs and members of DCMs and SEFs who are not otherwise registered or required to be registered with the Commission in any capacity, as well as those members registered as FTs, CPOs, SDs, and MSPs, are not subject to the oral communication recordkeeping requirements under regulation 1.35(a). The limiting principle for the determination of which classes of registrants must comply with the final rule are, as discussed further above, transactions by entities that could affect both market integrity and customer protection.

Finally, some commenters expressed concern that if employees of a regulated entity use personal phones (either landline or mobile) for business purposes, calls on those lines must be recorded. Commenters stated privacy concerns with the same. However, simple solutions to protect employee privacy do exist. For example, depending on the policies of the firm, it is possible for certain phone numbers to be excluded from recording.[106] Alternatively, the company could institute a policy that employees are not to conduct personal business on recorded lines.

In addition, amendments in this final rule will require SEF members to comply with regulation 1.35, and it is likely that some of those members will not have been subject to regulation 1.35(a) previously. In addition to the

costs related to oral communications recordkeeping, mentioned above, the Commission estimates that SEF members that are newly subject to regulation 1.35(a) will spend additional time each day compiling and maintaining transaction records. The Commission estimates that the cost of that additional time is $236,000 to $393,000 per entity per year.[107]

Also, the amendments in this final rule will require FCMs, RFEDs, IBs, and members of DCMs to comply with the regulation 1.35(a) recordkeeping requirements for any swap transactions into which they enter. The Commission estimates that such entities will spend an additional 0.5 hours per swap capturing and maintaining the records required under regulation 1.35(a), and therefore estimates that the per-swap cost will be $83.00.[108]

### 4. Consideration of Alternatives

As compared to the Proposal, the Commission has limited the range of entities that are subject to the oral recordkeeping requirement, narrowing it to entities that could affect market integrity and customer protection by way of their function as intermediaries for other parties. The Commission also has limited the range of transactions that are subject to the requirement from commodity interest and cash commodity transactions to commodity interest transactions. Limiting the range of entities that must record and keep oral communications reduces the number of entities that must bear the costs of creating and maintaining records required by regulation 1.35(a). In particular, by excluding from the new regulation 1.35(a) oral communications recordkeeping provisions Small IBs and DCM or SEF members that are registered as FTs or CPOs, or SDs or MSPs (as SDs and MSPs are covered by regulations 23.202(a)(1) and (b)(1)), or neither registered nor required to be registered with the Commission in any capacity, certain entities such as agricultural cooperatives, energy end-users and other smaller entities that may transact on DCMs and SEFs on their own behalf, but not on behalf of customers, avoid mandatory recordkeeping costs.

---

[100] The average wage for a compliance specialist is $155.96 [($58,303 per year)/(2,000 hours per year) * 5.35 = $155.96]. For the purposes of the Cost Benefit Considerations section, the Commission has used wage estimates that are taken from the SIFMA "Report on Management and Professional Earnings in the Securities Industry 2011" because industry participants are likely to be more familiar with them. Hourly costs are calculated assuming 2,000 hours per year and a multiplier of 5.35 to account for overhead and bonuses. All totals calculated on the basis of cost estimates are rounded to two significant digits.

[101] *See* Compliant Phones communication.
[102] *See* Nexidia communication.
[103] *See* NICE communication.

[104] Several commenters submitted a form letter addressing this point. Entities submitting this letter, with minor modifications in some cases, include: National Grain and Feed Association, Grain and Feed Association of Illinois, Agribusiness Council of Indiana, Minnesota Grain and Feed Association, Agribusiness Association of Iowa, Ohio AgriBusiness Association, South Dakota Grain and Feed Association, Kansas City Board of Trade, and Oklahoma Grain and Feed Association.

[105] For instance, the Kansas City Board of Trade writes that the operators of delivery warehouses are often required to be DCM members and that the added expense of compliance with regulation 1.35 could cause firms to withdraw from the business of providing warehousing services, thereby decreasing market competitiveness.

[106] *See* Compliant Phones communication.

[107] This is estimated to take 6–10 hours per day (assuming 252 days per year) of the time of an office services supervisor. The average wage for an office services supervisor is $155.96 [($58,303 per year)/(2,000 hours per year) * 5.35 = $155.96]. $155.95*6*252 = 235,812.31. $155.95*10*252 = 393,020.52.

[108] This estimates 0.5 hours of time from an office services supervisor. The average salary for an office services supervisor is $165.25/hour [($61,776 per year)/(2,000 hours per year) * 5.35 = $165.25 per hour]. $165.25*0.5 = $82.63.

As noted above, new regulation 1.35 will not require entities to keep records in separate electronic files. Instead, the amendments as adopted require only that subject entities be able to identify which records relate to specific parties or transactions when requested to do so by the Commission. Such requests are infrequent for any one market participant, and therefore the costs of complying with them will be far less than what would have been the case under the proposed rule.

As described above, the Commission considered alternatives to compliance, including various safe harbors, but determined not to adopt them. For example, the Commission has considered, but declines to adopt, recommendations that it include a ''reasonableness'' standard because such a standard could result in market participants documenting policies and procedures but failing to vigorously monitor for compliance with the same. The Commission also declines to adopt this recommendation as inconsistent with the requirements applicable to SDs and MSPs under Part 23 of the Commission's regulations. Rather, the Commission determines that it would be more appropriate to consider good faith compliance with policies and procedures reasonably designed to comply with the oral communications recording rule as a mitigating factor when exercising its enforcement discretion with respect to violations of the rule.

5. Consideration of Section 15(a) Factors

(1) a. Protection of Market Participants and the Public

The oral recordkeeping requirement in regulation 1.35(a) will protect market participants and the public by ensuring the existence of an audit trail that includes relevant oral communications. A strong audit trail, among other things, provides a basis for resolving transactional disputes; acts as a disincentive to engage in unduly risky, injurious or illegal conduct in that the conduct will be traceable; and in the event such conduct does occur, provides a mechanism for policing such conduct, both internally as part of a firm's compliance efforts and externally by regulators enforcing applicable laws and regulations.

(2) b. Efficiency, Competitiveness, and Financial Integrity of Futures Markets

Requiring records of all oral communications leading to a transaction in a commodity interest promotes the efficiency, competitiveness and financial integrity of the markets by increasing the Commission's ability to detect and prosecute violations of the Act and the Commission's rules related to fraud, manipulation and other disruptive trade practices.

(3) c. Price Discovery

Neither the Commission nor commenters have identified consequences for price discovery that are expected to result from this rule.

(4) d. Sound Risk Management Practices

The Commission believes that proper recordkeeping—though likely to require initial investment in recordkeeping and other back office systems—is essential to risk management because it facilitates an entity's awareness of its transactions, positions, trading activity, internal operations, and any complaints made against it, among other things. Such awareness supports sound internal risk management policies and procedures ensuring that decision-makers within affected entities are fully informed about the entity's activities and can take steps to mitigate and address significant risks faced by the firm. When individual market participants engage in sound risk management practices the entire market benefits. Accordingly, the Commission believes that this final rule, notwithstanding the potential costs identified above, will promote the public interest in sound risk management.

(5) e. Other Public Interest Considerations

The Commission has not identified any other public interest considerations that could be impacted by the oral communications recordkeeping rule under regulation 1.35(a).

List of Subjects in 17 CFR Part 1

Agricultural commodity, Agriculture, Brokers, Committees, Commodity futures, Conflicts of interest, Consumer protection, Definitions, Designated contract markets, Directors, Major swap participants, Minimum financial requirements for intermediaries, Reporting and recordkeeping requirements, Swap dealers, Swaps.

For the reasons stated in the preamble, under the authority of 7 U.S.C. 1 et seq., the Commodity Futures Trading Commission hereby amends Chapter I of Title 17 of the Code of Federal Regulations as set forth below:

## PART 1—GENERAL REGULATIONS UNDER THE COMMODITY EXCHANGE ACT

■ 1. The authority citation for part 1 continues to read as follows:

**Authority:** 7 U.S.C. 1a, 2, 2a, 5, 6, 6a, 6b, 6c, 6d, 6e, 6f, 6g, 6h, 6i, 6k, 6l, 6m, 6n, 6o, 6p, 6r, 6s, 7, 7a–1, 7a–2, 7b, 7b–3, 8, 9, 10a, 12, 12a, 12c, 13a, 13a–1, 16, 16a, 19, 21, 23, and 24, as amended by Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111–203, 124 Stat. 1376 (2010).

■ 2. Amend § 1.31 by revising paragraph (a)(1) to read as follows:

### § 1.31 Books and records; keeping and inspection.

(a)(1) All books and records required to be kept by the Act or by these regulations shall be kept in their original form (for paper records) or native file format (for electronic records) for a period of five years from the date thereof and shall be readily accessible during the first 2 years of the 5-year period; *Provided, however,* That records of any swap or related cash or forward transaction shall be kept until the termination, maturity, expiration, transfer, assignment, or novation date of the transaction and for a period of five years after such date. Records of oral communications kept pursuant to §§ 1.35(a) and 23.202(a)(1) and (b)(1) of this chapter shall be kept for a period of one year. All such books and records shall be open to inspection by any representative of the Commission, or the United States Department of Justice. For purposes of this section, native file format means an electronic file that exists in the format in which it was originally created.

* * * * *

■ 3. Amend § 1.35 by revising the section heading and paragraph (a) to read as follows:

### § 1.35 Records of commodity interest and related cash or forward transactions.

(a) *Futures commission merchants, retail foreign exchange dealers, introducing brokers, and members of designated contract markets or swap execution facilities.* (1) Each futures commission merchant, retail foreign exchange dealer, introducing broker, and member of a designated contract market or swap execution facility shall keep full, complete, and systematic records, which include all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity interests and related cash or forward transactions. Included among such records shall be all orders (filled, unfilled, or canceled), trading cards, signature cards, street books, journals, ledgers, canceled checks, copies of confirmations, copies of statements of purchase and sale, and all other records, which have been prepared in the course of its business of dealing in commodity

interests and related cash or forward transactions. Among such records each member of a designated contract market or swap execution facility must retain and produce for inspection are all documents on which trade information is originally recorded, whether or not such documents must be prepared pursuant to the rules or regulations of either the Commission, the designated contract market or the swap execution facility. For purposes of this section, such documents are referred to as ''original source documents.'' Such records shall be kept in a form and manner identifiable and searchable by transaction. Also included among the records required to be kept by this paragraph are all oral and written communications provided or received concerning quotes, solicitations, bids, offers, instructions, trading, and prices that lead to the execution of a transaction in a commodity interest and related cash or forward transactions, whether communicated by telephone, voicemail, facsimile, instant messaging, chat rooms, electronic mail, mobile device, or other digital or electronic media; *provided, however,* the requirement in this paragraph (a)(1) to record oral communications shall not apply to:

(i) Oral communications that lead solely to the execution of a related cash or forward transaction;

(ii) Oral communications provided or received by a floor broker that do not lead to the purchase or sale for any person other than the floor broker of any commodity for future delivery, security futures product, swap, or commodity option authorized under section 4c of the Commodity Exchange Act;

(iii) An introducing broker that has generated over the preceding three years $5 million or less in aggregate gross revenues from its activities as an introducing broker;

(iv) A floor trader;

(v) A commodity pool operator;

(vi) A swap dealer;

(vii) A major swap participant; or

(viii) A member of a designated contract market or swap execution facility that is not registered or required to be registered with the Commission in any capacity.

(2) For purposes of paragraph (a)(1) of this section, ''related cash or forward transaction'' means a purchase or sale for immediate or deferred physical shipment or delivery of an asset related to a commodity interest transaction where the commodity interest transaction and the related cash or forward transaction are used to hedge, mitigate the risk of, or offset one another.

(3) Each futures commission merchant, retail foreign exchange dealer, introducing broker, and member of a designated contract market or swap execution facility shall retain the records required to be kept by this section in accordance with the requirements of § 1.31, and produce them for inspection and furnish true and correct information and reports as to the contents or the meaning thereof, when and as requested by an authorized representative of the Commission or the United States Department of Justice.

(4)(i) The Commission may in its discretion establish an alternative compliance schedule for the requirement to record oral communications under paragraph (a)(1) of this section that is found to be technologically or economically impracticable for an affected entity that seeks, in good faith, to comply with the requirement to record oral communications under paragraph (a)(1) of this section within a reasonable time period beyond the date on which compliance by such affected entity is otherwise required.

(ii) A request for an alternative compliance schedule under paragraph (a)(4)(i) of this section shall be acted upon within 30 days from the time such a request is received, or it shall be deemed approved.

(iii) The Commission hereby delegates to the Director of the Division of Swap Dealer and Intermediary Oversight or such other employee or employees as the Director may designate from time to time, the authority to exercise the discretion. Notwithstanding such delegation, in any case in which a Commission employee delegated authority under this paragraph believes it appropriate, he or she may submit to the Commission for its consideration the question of whether an alternative compliance schedule should be established. The delegation of authority in this paragraph shall not prohibit the Commission, at its election, from exercising the authority set forth in paragraph (a)(4)(i) of this section.

(iv) Relief granted under paragraph (a)(4)(i) of this section shall not cause an affected entity to be out of compliance or deemed in violation of any recordkeeping requirements.

\* \* \* \* \*

Issued in Washington, DC, on December 17, 2012, by the Commission.

**Sauntia S. Warfield,**
*Assistant Secretary of the Commission.*

**Note:** The following appendices will not appear in the Code of Federal Regulations.

## Appendices to Adaptation of Regulations To Incorporate Swaps— Commission Voting Summary and Statements of Commissioners

### Appendix 1—Commission Voting Summary

On this matter, Chairman Gensler and Commissioners Sommers, Chilton, O'Malia and Wetjen voted in the affirmative; no Commissioner voted in the negative.

### Appendix 2—Statement of Chairman Gary Gensler

I support the final rule to amend 1.31 and 1.35(a) of the Commodity Futures Trading Commission's (CFTC) regulations to conform them to recordkeeping requirements for swap dealers and major swap participants. The rule enhances the Commission's enforcement program for the futures market to promote market integrity and protect customers.

These conforming amendments integrate the CFTC's regulations with the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), which expanded the scope of the Commodity Exchange Act to include swaps.

As proposed, the rule would have required members of a designated contract market (DCM) or swap execution facility (SEF) to record all oral communications that lead to the execution of a transaction in a cash commodity. The Commission received numerous comments about the effect of such a requirement on members of the agricultural community that trade in cash commodities and are not required to be registered with the Commission other than, in some cases, as floor traders.

In consideration of comments, the Commission adopted modifications that preserve the rule's purpose without adversely affecting the agricultural community. Only those oral communications that lead to a transaction in a commodity interest (i.e. a commodity futures contract, commodity option contract, foreign exchange contract, or swap) will have to be recorded. Furthermore, only FCMs, certain introducing brokers (IBs), retail foreign exchange dealers (RFEDs), and those members of a DCM or SEF who are registered or required to be registered with the Commission (except for floor traders, commodity pool operators, swap dealers, major swap participants, and floor brokers who trade for themselves) will have to record oral communications.

Market participants that must comply will be required to record communications relating to: Quotes, solicitations, bids, offers, instructions, trading, and prices that lead to the execution of a transaction in a commodity interest. Methods of communication that fall under the rule include telephone, voicemail, facsimile, instant messaging, electronic mail, mobile device, or other digital or electronic media. Thus, the rulemaking also clarifies that the existing requirement under regulation 1.35(a) to keep written records applies to electronic written communications, such as emails and instant messages. Records of oral communications must be kept for one year.

The rule will make enforcement investigations more efficient by preserving

critical evidence that otherwise may be lost to memory lapses and inconsistent recollections. The Commission will have access to evidence of fraud and market manipulation, which is expected to increase the success of enforcement actions for the benefit customers, market participants and the markets. Moreover, it also will protect customers from abusive sales practices, lower the risk of transactional disputes and allow registrants to follow-up more effectively on customer complaints.

[FR Doc. 2012–30691 Filed 12–20–12; 8:45 am]

**BILLING CODE 6351–01–P**

---

## NATIONAL MEDIATION BOARD

### 29 CFR Part 1206

[Docket No. C–7034]

RIN 3140–ZA01

### Representation Procedures and Rulemaking Authority

**AGENCY:** National Mediation Board.
**ACTION:** Final rule.

---

**SUMMARY:** In response to amendments to the Railway Labor Act in the Federal Aviation Administration Modernization Reform Act of 2012, the National Mediation Board amends its existing regulations pertaining to representation elections, run-off elections, and rulemaking to reflect changes in statutory language.

**DATES:** The final rule is effective December 21, 2012.

**FOR FURTHER INFORMATION CONTACT:** Mary Johnson, General Counsel, National Mediation Board, 202–692–5050, infoline@nmb.gov.

**SUPPLEMENTARY INFORMATION:**

### I. Background

On February 14, 2012, the Federal Aviation Administration and Modernization and Reform Act of 2012, Public Law 112–0095 (FAA Reauthorization) was signed into law. The FAA Reauthorization contained, inter alia, several amendments to the Railway Labor Act (RLA or Act). The changes contained in these amendments require changes to the National Mediation Board's (NMB or Board) existing Rules relating to run-off elections, showing of interest requirements, and rulemaking. On May 15, 2012, the NMB published a Notice of Proposed Rulemaking (NPRM) in the **Federal Register** inviting public comments for 60 days on a proposal to revise those rules to comply with the statutory language. The Board invited commenters to address the specific amendments along with any other matters they consider relevant to the

changes wrought by the amended statutory language. In the NPRM, the Board also indicated its particular interest in receiving comments regarding the effect of the amendments on the Board's policies and practices with respect to representation disputes in mergers. The NPRM also stated that the NMB may incorporate any comments in a Final Rule in this proceeding. On June 7, 2012, the Board issued a correction to the text of the proposed rules. On June 19, 2012, the Board held an open public hearing to solicit the views of interested parties on the NPRM.

### II. Notice and Comment Period

In response to the NPRM, the NMB received ten submissions during the official comment period from trade and professional associations, labor unions, and members of Congress. Additionally, the NMB received written and oral comments from seven labor organizations that participated in the June 19, 2012 open public hearing. The NMB has carefully considered all of the comments and analyses of the proposed changes and the impact of the amended statutory language on its merger procedures set forth in the Board's Representation Manual (Manual).

The overwhelming majority of the substantive comments addressed the applicability of the amended statutory language providing that a showing of interest of not less than 50 percent is required to support an "application requesting that an organization or individual be certified as the representative of any craft or class of employees," to representation disputes in mergers. The preamble will focus on the Board's response to the arguments raised in these comments.

### III. Summary of Comments

The major comments received and the Board's responses to those comments are as follows. The Board notes that it is required to respond to significant comments and, therefore, has not addressed every issue raised in the comments. *See, e.g., Portland Cement Ass'n* v. *Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973) ("[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern.").[1]

---

[1] There were no comments related to the proposed rules amending the Board's rulemaking procedures. In addition, there was only one comment related to the run-off elections procedures under Proposed Rule 1206.1. Right to Work objects to Rule 1206.1(c), arguing that new hires should be permitted to vote in run-off elections. The language of 1206.1(c) remains unchanged from the current

### A. Showing of Interest

The showing of interest requirements applicable in mergers are set forth in the Board's Manual.[2] Manual Section 19.1 defines a merger as "a consolidation, merger, purchase, lease, operating contract, acquisition of control, or similar transaction of two or more business entity." The courts have long recognized that the NMB, under Section 2, Ninth, has the authority to resolve representation disputes arising from a merger involving a carrier or carriers covered by the RLA. *Air Line Employees Ass'n, Int'l* v. *Republic Airlines, Inc.*, 798 F.2d 967 (7th Cir. 1986). An organization or individual initiates this process by filing an application supported by evidence of representation or a showing of interest. If, after an investigation, the NMB determines that a single transportation system exists, the Board will proceed to resolve the representation of the craft or class on the merged carrier. The Board's current policy in mergers requires that "[i]ncumbent organizations or individuals on the affected carrier(s) must submit evidence of representation or a showing of interest from at least thirty-five (35) percent of the employees in the craft or class." Manual Section 19.601. The Manual further states that the "rules regarding percentage of valid authorizations in NMB Rule 1206.2 (29 CFR 1206.2) and bar rules in NMB Rule 1206.4 (29 CFR 1206.4) do not apply to applications" in merger situations. Manual Section 19.6.

In the oral and written statements received at the June 19, 2012 public meeting and in written comments submitted pursuant to the NPRM, commenters including the Transportation Trades Department, AFL–CIO (TTD), Brotherhood of Locomotive Engineers and Trainmen (BLET), International Association of Machinists and Aerospace Workers (IAM), Association of Flight Attendants—CWA (AFA), Transportation Workers Union of America (TWU), and the International Brotherhood of Teamsters (IBT) state that neither the plain language of Section 2, Twelfth nor the legislative history indicate that Congress intended the 50 percent showing of interest requirement should apply to mergers.

---

rule. The Board has a long-standing policy of only including employees who were eligible in the initial election in the run-off election and will not change that in this Final Rule.

[2] The Manual is an internal statement of agency policy and not a compilation of regularly promulgated regulations having the force and effect of law. *Hawaiian Airlines* v. *NMB*, 107 L.R.R.M. 3322 (D. Haw. 1979), *aff'd without op.* 659 F.2d 1088 (9th Cir. 1981).