Exhibit 6

# COMMODITY FUTURES TRADING COMMISSION

**17 CFR Part 180**

**RIN Number 3038–AD27**

**Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation**

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Final rules.

**SUMMARY:** The Commodity Futures Trading Commission (''CFTC'' or ''Commission'') is adopting final rules pursuant to section 753 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (''Dodd-Frank Act''), to implement amended subsections (c)(1) and (c)(3) of section 6 of the Commodity Exchange Act (''CEA''). These rules broadly prohibit fraud and manipulation in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity.

**DATES:** *Effective Date:* These final Rules will become effective August 15, 2011.

**FOR FURTHER INFORMATION CONTACT:** David Meister, Director, Division of Enforcement, 202–418–5624, or Mark D. Higgins, Counsel, Office of the General Counsel, 202–418–5864, *mhiggins@cftc.gov,* Commodity Futures Trading Commission, Three Lafayette Centre, 1151 21st Street, NW., Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

## I. Background

On July 21, 2010, President Obama signed the Dodd-Frank Act into law. Title VII of the Dodd-Frank Act amended the CEA to establish a comprehensive new regulatory framework for swaps and security-based swaps. The legislation was enacted to reduce risk, increase transparency, and promote market integrity within the financial system by, among other things: (1) Providing for the registration and comprehensive regulation of swap dealers and major swap participants; (2) imposing clearing and trade execution requirements on standardized derivative products; (3) creating robust recordkeeping and real-time reporting regimes; and (4) enhancing the Commission's rulemaking and enforcement authority with respect to, among others, all registered entities and intermediaries.

In the wake of the financial crisis of 2008, Congress adopted section 753 of the Dodd-Frank Act, which provided the Commission with additional and broad authority to prohibit fraud and manipulation. In the following paragraphs, the Commission summarizes Dodd-Frank Act section 753's amendments to CEA section 6(c).

New section 6(c)(1), the full text of which is provided in Section III below, broadly prohibits the use or employment of, or an attempt to use or employ, any ''manipulative or deceptive device or contrivance'' in contravention of such rules and regulations as the Commission ''shall promulgate no later than 1 year after the date of enactment'' of the Dodd-Frank Act.

As discussed below, final Rule 180.1 implements the provisions of CEA section 6(c)(1) by prohibiting, among other things, manipulative and deceptive devices, i.e., fraud and fraud-based manipulative devices and contrivances employed intentionally or recklessly, regardless of whether the conduct in question was intended to create or did create an artificial price. This final Rule will help promote the integrity of the markets, and protect market participants.

Section 6(c)(1)(A), a ''Special Provision for Manipulation by False Reporting,'' extends the Commission's prohibition against unlawful manipulation to include ''delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.'' [1] Importantly, section 6(c)(1)(C) provides a ''Good Faith Mistakes'' exception to this prohibition such that ''[m]istakenly transmitting, in good faith, false or misleading or inaccurate information to a price reporting service would not be sufficient to violate subsection (c)(1)(A).''

Section 6(c)(2) prohibits the making of ''any false or misleading statement of a material fact to the Commission. * * *'' A prohibition regarding false statements to the Commission was previously included in section 6(c). Dodd-Frank Act section 753 expands the prohibition against false statements made in registration applications or reports filed with the Commission to include any statement of material fact made to the Commission in any context.

---

[1] Section 9(a)(2) of the CEA, 7 U.S.C. 13(a)(2), also expressly prohibits false reporting.

CEA section 6(c)(3), the full text of which is provided in Section III below, makes it unlawful to ''manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity.'' Final Rule 180.2 codifies section 6(c)(3).

Section 753 of the Dodd-Frank Act also amends prior CEA section 6(c) to provide, in cases of manipulation or attempted manipulation in violation of sections 6(c) or 9(a)(2), for a civil penalty of up to the greater of $1,000,000 or triple the monetary gain to the person for each such violation; and restitution to customers of damages proximately caused by violations of the person. For other violations, section 6(c)(10)(C) provides for a civil penalty of not more than an amount equal to the greater of $140,000 or triple the monetary gain for each such violation.

Finally, section 753 of the Dodd-Frank Act provides that the above-summarized amendments to CEA section 6(c) ''shall take effect on the date on which the final rule promulgated by the Commodity Futures Trading Commission pursuant to this Act takes effect.'' The final Rules will take effect 30 days after publication in the **Federal Register.**

## II. The Rulemaking Proceeding Under CEA Section 6(c)

This rulemaking proceeding [2] began with the issuance of a Notice of Proposed Rulemaking (''NOPR'') on October 26, 2010, which was published in the **Federal Register** on November 3, 2010.[3] Pursuant to CEA section 6(c),[4] as amended by section 753 of the Dodd-Frank Act, the Commission proposed to add a new Part 180 to Title 17 of the Code of Federal Regulations. In the NOPR, the Commission solicited comments on all aspects of proposed Part 180. Twenty-seven parties filed comments, representing a variety of interested parties, including a member of the United States Congress, a law professor, economists, industry members and trade associations, energy news and price reporting organizations, designated contract markets

---

[2] Rulemaking documents are available at: (*http://www.cftc.gov/LawRegulation/DoddFrankAct/Rulemakings/23_DFManipulation/index.htm*).

[3] Prohibition of Market Manipulation, 75 FR 67657 (Nov. 3, 2010).

[4] Section 753 of the Dodd-Frank Act directed the Commission to promulgate implementing rules and regulations by not later than one year after the date of enactment of the Dodd-Frank Act.

(exchanges), a government-sponsored enterprise, and members of the public.[5]

Upon careful review and consideration of the entire record in this rulemaking and based on its extensive market regulation experience, the Commission has determined that it is appropriate and in the public interest to adopt the final Rules, which among other things, define for the public the statutory prohibition under CEA section 6(c)(1) against using or employing "any manipulative or deceptive device or contrivance" in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity. Consistent with section 6(c)(1), the final Rule 180.1 prohibits, among other things, fraud and fraud-based manipulative schemes, employed intentionally or recklessly (as discussed below), regardless of whether the conduct in question was intended to or did create an artificial price. Final Rules 180.1 and 180.2 will help to promote the integrity of the markets, and protect market participants.

After carefully reviewing the entire rulemaking record, the Commission finds it unnecessary to change the wording of the proposed regulatory text, except in one respect: Adding "inaccurate" to section 180.1(a)(4) ("* * * no violation of this subsection shall exist where the person mistakenly transmits, in good faith, false or misleading or inaccurate information to a price reporting service."). This change is necessary to ensure symmetry between final Rule 180.1 and CEA section 6(c)(1)(C). However, based on the public comments, the Commission has determined to provide clarification and interpretive guidance in this Preamble to final Rules 180.1 and 180.2.

The Commission's statutory and legal basis for promulgating the final Rules, their purpose, and the Commission's responses to comments filed in this rulemaking, are discussed below.

### III. Statutory Basis for the Final Rules

CEA section 6(c)(1), entitled "Prohibition Against Manipulation," is the statutory basis for final Rule 180.1, and provides that:

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after the date of enactment of the [Dodd-Frank Act], provided no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect.

CEA section 6(c)(3), entitled "Other Manipulation," provides that:

[I]t shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity.

CEA section 6(c)(3) and the Commission's general rulemaking authority pursuant to CEA section 8a(5) provide the statutory basis for final Rule 180.2.

Commenters are overwhelmingly supportive of the Commission's efforts to implement clear and fair rules designed to protect market participants and promote the integrity of the markets. In the following sections, the Commission summarizes and responds to the comments received in this rulemaking.

### IV. Discussion of CEA Section 6(c)(1) and Final Rule 180.1

#### A. Overview

The language of CEA section 6(c)(1), particularly the operative phrase "manipulative or deceptive device or contrivance," is virtually identical to the terms used in section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act").[6] The Supreme Court has interpreted these words to "clearly connot[e] intentional misconduct."[7] The Court has also stated that the statute was "designed as a catchall clause to prevent fraudulent practices."[8]

Based on the language in Exchange Act section 10(b), the Securities and Exchange Commission ("SEC") promulgated SEC Rule 10b–5, which makes it unlawful for any person:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.[9]

Given the similarities between CEA section 6(c)(1) and Exchange Act section 10(b), the Commission deems it appropriate and in the public interest to model final Rule 180.1 on SEC Rule 10b–5.[10] To account for the differences between the securities markets and the derivatives markets, the Commission will be guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b–5.[11] Such extensive judicial review serves as an important benefit to the Commission and provides the public with increased certainty because the terms of Exchange Act Section 10(b) and SEC Rule 10b–5 have withstood challenges to their constitutionality in both civil and criminal matters.[12]

---

[5] Attachment A contains a list of the 27 parties who submitted comments related to this rulemaking.

[6] 15 U.S.C. 78j(b). Differences between the wording of Exchange Act Section 10(b) and CEA section 6(c)(1) include, but are not limited to, the express prohibition of the "attempt to use" any "manipulative or deceptive device or contrivance" in CEA section 6(c)(1), and the absence of a "purchase or sale" requirement in CEA section 6(c)(1). The Commission understands that under SEC Rule 10b–5 a plaintiff is not required to prove that money was actually invested in a specific security. *See, e.g., SEC* v. *Zandford,* 535 U.S. 813, 819–21 (2002).

[7] *Ernst & Ernst* v. *Hochfelder,* 425 U.S. 185, 201 (1976).

[8] *Chiarella* v. *United States,* 445 U.S. 222, 226 (1980), *citing Hochfelder,* 425 U.S. at 202, 206.

[9] 17 CFR 240.10b–5.

[10] *See, e.g., Morissette* v. *United States,* 342 U.S. 246, 263 (1952) (noting that where Congress borrows terms of art it "presumably knows and adopts the cluster of ideas that were attached to each borrowed word"); *Nat'l Treasury Employees Union* v. *Chertoff,* 452 F.3d 839, 857 (DC Cir. 2006) (stating that "[t]here is a presumption that Congress uses the same term consistently in different statutes").

[11] Further, by modeling final Rule 180.1 on SEC Rule 10b–5, the Commission takes an important step toward harmonization of regulation of the commodities, commodities futures, swaps and securities markets given that new CEA section 6(c)(1) and Exchange Act Section 10(b) include virtually identical prohibitions against "any manipulative or deceptive device or contrivance."

[12] *See, e.g., United States* v. *Persky,* 520 F.2d 283, 287 (2d Cir. 1975) (rejecting criminal defendant's argument that Exchange Act section 10(b) and SEC Rule 10b–5 are unconstitutionally vague); *SEC* v. *Pirate Investor LLC,* 580 F.3d 233, 254 (4th Cir. 2009) (upholding civil judgment and finding that "[a]ppellants' reliance on any ambiguity in the [section 10(b)] phrase 'in connection with' as a reason to employ the canon of constitutional avoidance fails in light of the statute's purpose— providing a flexible regime for addressing new, perhaps unforeseen, types of fraud"), *cert. denied,* 130 S. Ct. 3506, 2010 U.S. LEXIS 5345 (2010). The Federal Energy Regulatory Commission and the Federal Trade Commission have relied upon a statutory framework largely identical to Exchange Act section 10(b) when promulgating rules similar to SEC Rule 10b–5. In so doing, both agencies have stated their intent to be guided by securities law precedent, as appropriate to their unique regulatory missions. FERC, *Prohibition of Energy Market Manipulation,* 71 FR 4244, 4250 (Jan. 26, 2006) (FERC final anti-manipulation rule); FTC, *Prohibitions on Market Manipulation,* 74 FR 40686, 40688–89 (Aug. 12, 2009) (FTC final anti-manipulation rule).

Final Rule 180.1 prohibits fraud and fraud-based manipulations, and attempts: (1) By any person (2) acting intentionally or recklessly (3) in connection with (4) any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity (as defined in the CEA). CEA section 6(c)(1) and final Rule 180.1, like Exchange Act section 10(b) and SEC Rule 10b–5 upon which they are modeled, focus on conduct involving manipulation or deception.[13]

In the following paragraphs, the Commission addresses the comments that pertain to final Rule 180.1 in the following categories: (1) Scope of application of the final Rule; (2) disclosure implications of the final Rule; (3) operation of the provision prohibiting material misstatements and omissions; (4) statutory exception for good faith mistakes; (5) required scienter for a violation of the final Rule; (6) scope of the phrase ''in connection with''; and (7) penalty, procedure, effect on automated trading systems, and a proposal to define manipulation.[14]

*B. The Scope of the Application of Final Rule 180.1*

1. Comments

The Commission received several comments on the scope of the application of proposed Rule 180.1. United States Senator Carl Levin (''Senator Levin''), Chairman of the Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, believes that the CFTC and SEC should harmonize their regulatory structures for combating disruptive and manipulative activities.[15]

Better Markets, a non-profit public interest advocacy organization, states that the proposed Rules are critical to implementing the important expansion of the Commission's enforcement capability so that the transparent and reliable marketplace envisioned by the Dodd-Frank Act can be realized.[16] Similarly, the Council of Institutional Investors (''Council'') supports proposed Rule 180.1 and believes that it will help promote the integrity of the price discovery process and fair dealing between market participants. The Council believes that, if accompanied by robust enforcement, the proposed Rule would promote investor confidence in the markets and contribute to the overall safety and soundness of the financial system.[17] Likewise, the Petroleum Marketers Association of America (''PMAA'') believes that proposed Rules 180.1 and 180.2 will effectively implement the statutory and Congressional directive to clearly delineate and prevent impermissible conduct by market participants.[18]

University of Maryland School of Law Professor Michael Greenberger (''Professor Greenberger'') believes that proposed Rule 180.1 reflects an effective anti-manipulation rule mandated by section 753 of the Dodd-Frank Act. Professor Greenberger further believes that the Commission correctly asserts that proposed Rule 180.1 be given a broad, remedial reading similar to SEC Rule 10b–5.[19]

The CME Group, Inc. (''CME Group'') and the Commodity Markets Council (''CMC'') believe that proposed Rules 180.1 and 180.2 are vague and fail to provide market participants with sufficient notice of whether contemplated trading practices run afoul of a prohibition.[20] Further, CME Group and CMC believe that proposed Rule 180.1 is susceptible to constitutional challenge under the Due Process Clause.[21]

The Futures Industry Association (''FIA''), International Swaps and Derivatives Association, Inc. (''ISDA''), and the Securities Industry and Financial Markets Association (''SIFMA'') (together, ''the Associations'') believe that the Commission should clarify the scope of the proposed regulation, the Commission's existing anti-manipulation authority under CEA section 9(a)(2), and its anti-fraud authority under CEA section 4b.[22] The Associations urge the Commission to remove from all subparts of the proposed Rule language that prohibits an ''attempt'' to manipulate and to clarify that the requirements for attempted manipulation remain consistent with current law under CEA section 6(c).[23] The Managed Funds Association (''MFA'') believes that the Commission should interpret CEA section 6(c)(1) merely to clarify and refine the Commission's authority over swaps, and not to create any new antifraud authority or to create any new duties or obligations.[24]

The American Petroleum Institute (''API'') together with the National Petrochemical and Refiners Association (''NPRA''), and the Coalition of Physical Energy Companies (''COPE'') state that Congress intended the scope of section 753 of the Dodd-Frank Act to address only actual fraudulent manipulation of the commodities markets.[25] Absent a manipulative effect on the market, API and NPRA believe that there should be no liability under proposed Rule 180.1.[26] Further, API and NPRA state that the Commission should require proof that a party's deceptive or fraudulent conduct caused market conditions to deviate materially from the conditions that would have existed but for that conduct.[27] Similarly, the Derivatives and Futures Law Committee of the Business Law Section of the American Bar Association (''ABA Derivatives Committee'') states that any Commission rules under CEA section 6(c)(1) should expressly target intentional or extremely reckless deceitful conduct specifically intended to cause artificial prices by corrupting or disabling the integrity of market price-setting processes and mechanisms rather than by a general anti-fraud rule patterned on SEC Rule 10b–5.[28] The ABA Derivatives Committee believes that mere unfairness or impermissible overreaching without deception does not violate section 10(b) or SEC Rule 10b–5 thereunder.[29]

---

[13] *Santa Fe Industries* v. *Green,* 430 U.S. 462, 473–76 (1977); *Dirks* v. *SEC,* 463 U.S. 646, 667 n. 27 (1983) (concluding that ''to constitute a violation of Rule 10b–5, there must be fraud''); *Chiarella* v. *United States,* 445 U.S. 222, 234–35 (1980) (stating that Exchange Act ''section 10(b) is aptly described as a catchall provision, but what it catches must be fraud''); *Ernst & Ernst* v. *Hochfelder,* 425 U.S. 185, 199 (1976) (rejecting argument for imposition of negligence standard that ''simply ignore[d] the use of the words 'manipulative,' 'device,' and 'contrivance'—terms that make unmistakable a congressional intent to proscribe a type of conduct quite different from negligence. Use of the word 'manipulative' is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities'') (internal citations omitted).

[14] The extent to which securities law precedent should apply is an issue that commenters often linked to more specific comments pertaining to the interpretation of the statute and proposed rule text. As such, the Commission considers commenters' views about securities law precedent in the specific contexts in which they arise.

[15] Senator Levin Comment Letter at pages 3–4.

[16] Better Markets Comment Letter at page 1.

[17] Council Comment Letter at pages 1–2.

[18] PMAA Comment Letter at page 1.

[19] Professor Greenberger Comment Letter at page 2.

[20] CME Group Comment Letter at pages 2–3; CMC Comment Letter at page 2.

[21] CME Group at page 3; CMC at page 2.

[22] Associations Comment Letter at page 9.

[23] Associations at page 8.

[24] MFA Comment Letter at pages 6–7.

[25] API and NPRA Comment Letter at page 3; COPE Comment Letter at page 2.

[26] API and NPRA at pages 2, 9, and 24.

[27] API and NPRA at page 10.

[28] ABA Derivatives Committee Comment Letter at pages 5 and 11–13. According to the ABA Derivatives Committee, ''[a] rule that does not require evidence of a specific intent to cause artificial market prices as an element of a violation would result in a dangerously vague rule * * * [which] could expose participants to the threat of arbitrary and unfair enforcement.'' *Id.* at page 12.

[29] ABA Derivatives Committee at page 6.

Freddie Mac recommends that the Commission strengthen the protection of customers by clarifying that CEA section 6(c), as amended by section 753 of the Dodd-Frank Act and implemented by proposed Rule 180.1, expressly prohibits ''front running'' and similar misuse of customer information by swap dealers as a form of fraud-based manipulation.[30]

2. Commission Determination

Upon review of the entire rulemaking record, the Commission determines that final Rule 180.1 is in the public interest and provides fair, reasonable, and adequate notice of the prohibited conduct. With respect to comments claiming that final Rule 180.1 is susceptible to a due process constitutional challenge because it purportedly does not give market participants fair notice of the prohibited conduct, the Commission notes that final Rule 180.1 is modeled on SEC Rule 10b–5, which has been subjected to extensive judicial review and has withstood constitutional challenges, including those based on a fair notice argument.[31]

In response to comments requesting clarification regarding the relationship among final Rule 180.1 and existing CEA sections 4b and 9(a)(2), the Commission notes that section 753(a) of the Dodd-Frank Act makes clear that nothing in new CEA section 6(c)(1) ''shall affect, or be construed to affect, the applicability of section 9(a)(2).'' Likewise, the Commission finds nothing in CEA section 6(c)(1) or final Rule 180.1 that affects, or should be construed to affect, the applicability of CEA section 4b.[32] Section 6(c)(1) and final Rule 180.1 augment the Commission's existing authority to prohibit fraud and manipulation.

The Commission declines to adopt the request of one commenter to remove language from proposed Rules 180.1 and 180.2 that make it a violation to ''attempt'' to engage in manipulation.[33] The Commission is controlled by the language of CEA section 6(c)(1), which specifically directs the Commission to prohibit the ''attempt[ed]'' use or employment of any manipulative or deceptive devices or contrivances.[34]

The Commission declines to adopt the request of certain commenters to interpret CEA section 6(c)(1) as merely extending the Commission's existing anti-fraud and anti-manipulation authority to cover swaps. Such an interpretation would be inconsistent with the language of CEA section 6(c)(1), as amended by section 753 of the Dodd-Frank Act, under which Congress granted the Commission broad new authority to prohibit ''any manipulative or deceptive device or contrivance'' in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity.

The Commission intends to interpret and apply CEA section 6(c)(1) and final Rule 180.1 ''not technically and restrictively, but flexibly to effectuate its remedial purposes.''[35] Comments that the Commission's use of the word ''commodity'' in proposed Rule 180.1 ''indicates that the rule will apply to virtually every commercial transaction in the economy'' are misplaced.[36] The final Rule requires a fraud or manipulation, or attempted fraud or manipulation, and that the fraud or manipulation or attempted fraud or manipulation, be ''in connection with'' any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity. The ''in connection with'' requirement is discussed in subsection G. below. And although CEA section 6(c)(1) and final Rule 180.1 give the Commission broad enforcement authority to prohibit fraud and manipulation in connection with a contract of sale for any commodity in interstate commerce, the Commission expects to exercise its authority under 6(c)(1) to cover transactions related to the futures or swaps markets, or prices of commodities in interstate commerce, or where the fraud or manipulation has the potential to affect cash commodity, futures, or swaps markets or participants in these markets.[37] This application of the final Rule respects the jurisdiction that Congress conferred upon the Commission and fulfills its core mission and the purposes of the Act to protect market participants and promote market integrity.

The foregoing should not be interpreted, however, to mean that a violation of final Rule 180.1 necessarily requires proof of a market or price effect, as some commenters' recommend. It does not.[38] A market or price effect may well be indicia of the use or employment of a manipulative or deceptive device or contrivance; nonetheless, a violation of final Rule 180.1 may exist in the absence of any market or price effect.[39]

In response to comments requesting that ''front-running'' and similar misuse of customer information be considered a form of fraud-based manipulation under final Rule 180.1, the Commission declines to adopt any per se rule in this regard, but clarifies that final Rule 180.1 reaches all manner of fraud and manipulation within the scope of the statute it implements, CEA section 6(c)(1).

C. The Disclosure Implications of Final Rule 180.1

1. Comments

Some commenters express concern regarding whether proposed Rule 180.1

---

[30] Freddie Mac Comment Letter at pages 1–5.

[31] The fair notice argument has been repeatedly rejected in the SEC Rule 10b–5 context in a wide variety of fact patterns. *See, e.g., United States* v. *Carpenter,* 791 F.2d 1024 (2d Cir. 1986), *aff'g in part and rev'g in part United States* v. *Winans,* 612 F. Supp. 827, 848 (S.D.N.Y. 1985); *United States* v. *Newman,* 664 F.2d 12, 18–19 (2d Cir. 1981), *aff'd after remand,* 722 F.2d 729 (2d Cir.), *cert. denied,* 464 U.S. 863 (1983); *United States* v. *Chiarella,* 588 F.2d 1358, 1369 (2d Cir. 1978); *United States* v. *Brown,* 555 F.2d 336, 339–40 (2d Cir. 1977); *United States* v. *Persky,* 520 F.2d 283, 286–88 (2d Cir. 1975); *SEC* v. *Shapiro,* 494 F.2d 1301, 1308 (2d Cir. 1974).

[32] Section 4b of the CEA, 7 U.S.C. 6b, prohibits, for example, a person from defrauding another person in connection with the making of commodity futures contracts for or on behalf of that other person. *Clayton Brokerage Co.* v. *CFTC,* 794 F.2d 573, 578 (11th Cir. 1986). Thus, a broker's misrepresentations to his customer about risk may subject the broker to liability under CEA section 4b. *Id.*

[33] Associations at page 8.

[34] The Commission understands that courts interpreting the statutory phrase ''any manipulative or deceptive device'' as it is used in Section 10(b) of the Exchange Act have deemed it broad enough to encompass an attempt. *See, e.g., SEC* v. *Martino,* 255 F. Supp. 2d 268, 287 (S.D.N.Y. 2003) (''[A]n attempted manipulation is as actionable as a successful one'').

[35] *See, e.g., Zandford,* 535 U.S. at 819 (where a statute has a remedial purpose such as the prevention of fraud, the statute should be construed ''not technically and restrictively, but flexibly to effectuate its remedial purposes'') (internal quotation marks and citations omitted). *See also R&W Technical Servs., Ltd.* v. *CFTC,* 205 F.3d 165, 173 (5th Cir. 2000) (In 1974, Congress gave the CFTC ''even greater enforcement powers in part because of the fear that unscrupulous individuals were encouraging amateurs to trade in the commodities markets through fraudulent advertising. Remedial statutes are to be construed liberally, and in an era of increasing individual participation in commodities markets, the need for such protection has not lessened'').

[36] API and NPRA at page 3.

[37] By way of non-exclusive example, if an entity employed a deceptive device to sell precious metals to customers as a way for the customers to speculate on the value of such commodities, or if an entity employed a deceptive device to sell an agricultural commodity to persons seeking to hedge price risk in that commodity, depending on the facts and circumstances, the Commission would exercise its authority against the entity under Section 6(c)(1) and final Rule 180.1.

[38] In interpreting Exchange Act section 10(b) and SEC Rule 10b–5, the Supreme Court has recognized that the interest in preserving the integrity of the securities markets was one of the purposes animating Exchange Act section 10(b), but rejected the notion that section 10(b) is limited to serving that objective alone. *See Superintendent of Ins. of N.Y.* v. *Bankers Life & Casualty Co.,* 404 U.S. 6, 11–13 (1971).

[39] *Id.*

would impose new disclosure obligations on commodities market participants.[40] According to the Associations, MFA, CME Group, CMC, COPE, and the Working Group of Commercial Energy Firms ("CEF"), futures, options, swaps, and physical commodity markets are different from securities markets, which have extensive disclosure obligations, and nothing in the CEA mandates disclosure of market conditions or facts pertaining to the markets for commodities.[41]

The Associations, CEF, and MFA state that proposed Rule 180.1 should not impose any new duties of disclosure, inquiry or diligence between two sophisticated parties to a bilateral transaction.[42] Likewise, the ABA Derivatives Committee believes the Commission should make clear that the anti-manipulation rule under section 6(c)(l) does not create any new duties of inquiry, diligence or disclosure to parties to futures, options, swaps or cash commodity transactions.[43] The ABA Derivatives Committee, the Associations, and MFA urge the Commission to make it explicit that any final Rule will be violated only if a party violates a pre-existing duty arising under contract, common law, or some other non-CEA source.[44]

API and NPRA urge the Commission to state explicitly that silence, pure omissions (omissions that do not relate to explicit representations), and "no comment" statements are not actionable. They also contend that "[t]here should be no affirmative duty to convey information to a counterparty in the nature of the reporting and information requirements as under securities law."[45] Similarly, API and NPRA recommend that the Commission confirm that there is no duty to update statements that were truthful at the time that they were made.[46] CME Group states that the duty to correct inaccurate statements should be limited to circumstances where a futures market participant realizes a statement was incorrect when the statement was made.[47]

The Associations seek clarification that proposed Rule 180.1 will not impede the ability of market participants to take positions and trade on the basis of nonpublic information that they obtain legitimately (*i.e.,* not through the breach of a pre-existing duty to keep such information confidential or through another party's similar breach of a pre-existing duty).[48] CME Group further states that the Commission should not adopt a "misappropriation" theory of "insider trading"—that is, where one misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information.[49] The ABA Derivatives Committee recommends the Commission make clear that securities law doctrines such as the prohibition on insider trading and the "fraud-on-the-market" theory do not apply under the final Rule.[50]

The West Virginia Oil Marketers & Grocers Association ("OMEGA") states that trading based on inside information should be prohibited.[51]

Responding to other commenters that the CFTC should not incorporate the standards and case law under SEC Rule 10b–5, Professor Greenberger states that the anti-manipulation rules and regulations are not bound by the legal frameworks of the two markets. Professor Greenberger states that the focal point of these anti-manipulation rules is to maintain market integrity, which is a common goal shared by both the securities and futures markets.[52]

PMAA believes that the Commission, in relying on SEC Rule 10b–5, is cognizant of and more than capable of advancing its distinct regulatory responsibilities in ensuring a transparent marketplace free from manipulation.[53] PMAA believes that proposed Rule 180.1 will effectively implement the statutory and Congressional directive to clearly delineate and prevent impermissible conduct by market participants.[54]

2. Commission Determination

As a general matter, the Commission does not believe that final Rule 180.1, or the statute it implements, are problematic or will create uncertainty as to the existence of disclosure obligations when applied to the markets the Commission regulates. This is not to say that commenters did not raise valid concerns about how securities law precedent will be applied in the commodities markets with respect to disclosure obligations. The Commission believes that Congress addressed these concerns, however, by enacting CEA section 6(c)(1), which provides that "no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect." To be clear, the Commission is not, by this rulemaking, imposing any new affirmative duties of inquiry, diligence, or disclosure.[55]

Further, it is not a violation of final Rule 180.1 to withhold information that a market participant lawfully possesses about market conditions. The failure to disclose such market information prior to entering into a transaction, either in an anonymous market setting or in bilateral negotiations, will not, by itself, constitute a violation of final Rule 180.1. Therefore, the Commission clarifies that silence, absent a pre-existing duty to disclose, is not deceptive within the meaning of final Rule 180.1.[56] Similarly, the Commission interprets "no comment" statements as

---

[40] *See, e.g.,* Associations at pages 1–5; MFA at pages 2–4; CME Group at pages 2–3; CMC at page 2. The Associations assert, for example, that unlike the securities antifraud laws and rules, which are designed primarily for investor protection, the antifraud provisions in the futures markets are focused in large part, although not exclusively, on protections against manipulation. Associations at page 4.

[41] *See, e.g.,* Associations at pages 1–5; MFA at pages 2–5; CME Group at pages 2–3; CMC at page 2; COPE at page 3; CEF Comment Letter at pages 3 and 8.

[42] Associations at page 4; CEF at page 8; MFA at pages 2 and 4.

[43] ABA Derivatives Committee at page 15.

[44] ABA Derivatives Committee at page 15; Associations at pages 4–5; MFA at pages 4–5.

[45] API and NPRA at page 19.

[46] API and NPRA at page 24.

[47] CME Group at page 8.

[48] Associations at page 5.

[49] CME Group at pages 4–5.

[50] ABA Derivatives Committee at pages 8–9 (stating that the fraud-on-the-market theory "establishes a rebuttable *presumption* in private rights of action under Exchange Act Section 10(b) and SEC Rule 10b-5 that in an efficient market for a security a plaintiff can be held to have relied on a defendant's fraudulent misrepresentation or omission in connection with the purchase or sale of a security—even if the plaintiff was not aware of the misrepresentation or omission—by virtue of the plaintiff's reliance on the fact that a security's price reflects the fraudulent misrepresentation and omission") (citations omitted) (emphasis in original).

[51] OMEGA Comment Letter at page 3; *accord* Mr. Peter Carini Comment Letter at page 3; Pen Fern Oil Co., Inc. Comment Letter at page 3; Scullin Oil Co. Comment Letter at page 3.

[52] Professor Greenberger at pages 2–4. Professor Greenberger further states that the influx of capital from retail investors to the commodity markets through Exchange Traded Funds has changed the dynamics of the futures markets. *Id.*

[53] PMAA at page 1.

[54] PMAA at page 2.

[55] The derivatives markets are not, however, *caveat emptor* markets. The CEA has many provisions designed to protect market participants through disclosure requirements applicable to Commission registrants. *See, e.g.,* 17 CFR part 155 (risk disclosure obligations); 17 CFR 4.20–27 (duties and disclosure obligations on Commodity Pool Operators). Depending on the facts and circumstances, violation of such duties could constitute a violation of the final Rule.

[56] *Cf. Basic Inc.* v. *Levinson,* 485 U.S. 224, 239 n. 17 (1988) ("Silence, absent a duty to disclose, is not misleading under [SEC] Rule 10b–5").

"generally the functional equivalent of silence."[57]

The Commission received comments regarding hedging or speculating (*i.e.*, trading) on the basis of material nonpublic information.[58] These comments use the label "insider trading," which can mean different things in different contexts. The Commission recognizes that unlike securities markets, derivatives markets have long operated in a way that allows for market participants to trade on the basis of lawfully obtained material nonpublic information. This final Rule does not prohibit trading on the basis of material nonpublic information except as provided in the following paragraph or otherwise prohibited by law.[59] Further, the Commission reiterates that the final Rule does not create an affirmative duty of disclosure (except, as provided by section 6(c)(1), "as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect").

Depending on the facts and circumstances, a person who engages in deceptive or manipulative conduct in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, for example by trading on the basis of material nonpublic information in breach of a pre-existing duty (established by another law or rule, or agreement, understanding, or some other source), or by trading on the basis of material nonpublic information that was obtained through fraud or deception, may be in violation of final Rule 180.1. The Commission believes that this application of the final Rule would be consistent with our responsibility to protect market participants and promote market integrity and with our statement in the NOPR that section 6(c)(1) is a broad catch-all provision, reaching any manipulative or deceptive device or contrivance."[60]

The Commission declines to adopt comments recommending outright rejection of the potential application of the "fraud-on-the-market" theory under final Rule 180.1.[61] The "fraud-on-the-market" theory includes a presumption of reliance, which is a required element in private rights of action arising under SEC Rule 10b–5. Unlike a private litigant, however, the government is not required to prove reliance in an enforcement action under SEC Rule 10b–5 just as it is not required to demonstrate harm to investors.[62] Consistent with judicial interpretations of Exchange Act section 10(b) and SEC Rule 10b–5, the Commission does not interpret the final Rule as requiring a showing of reliance or harm to market participants in a government action brought under CEA section 6(c)(1) and final Rule 180.1. At the same time, we decline to opine on the required elements of a private right of action under CEA section 6(c)(1) and final Rule 180.1 as it is beyond the purview of this rulemaking.

*D. The Operation of the Provision Prohibiting Material Misstatements and Omissions*

1. Comments

COPE states that inclusion of the words "attempt to make" any untrue or misleading statement of a material fact in proposed Rule 180.1(a)(2) is vague and confusing. COPE requests that the Commission clarify proposed Rule 180.1(a)(2) to state that the proscribed acts must be done with the intent to deceive, manipulate, or defraud.[63]

API and NPRA believe that the Commission should clarify that only statements and acts pertaining to transactions in futures, swaps, or commodities markets underlying futures or swaps may give rise to liability under proposed Rule 180.1.[64] API and NPRA also believe that the Commission should exercise its discretion to exclude "partial omissions" from any final Rule.[65]

Mr. Chris Barnard ("Barnard") believes the proposed rules should apply to both positive misconduct and misconduct by omission given the ongoing nature of the rights and obligations that may be created in a swap agreement.[66]

2. Commission Determination

The Commission declines to adopt comments recommending deletion of the phrase "or attempt to make" in final Rule subsection 180.1(a)(2). This phrase captures situations where a person attempts to employ a manipulative device or artifice to defraud. For example, when a supervisor attempts to have a subordinate make a fraudulent material misstatement or omission but that subordinate rebuffs the supervisor, the phrase "or attempt to make" would operate to reach the supervisor's attempted fraud.

The Commission declines to modify the proposed Rule in response to comments requesting that only statements and acts pertaining to "transactions" in futures, swaps, or commodities markets underlying futures or swaps may give rise to liability under proposed Rule 180.1.[67] Rather, CEA section 6(c)(1) prohibits manipulative or deceptive devices or contrivances in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity.[68] The Commission also declines to make modifications in response to comments recommending that the Commission exercise its discretion to exclude "partial omissions" from the final Rule.[69] Fraud-by-partial-omission or half-truths could violate final Rule 180.1 if the facts and circumstances of a particular case so warrant. Finally, the Commission declines to impose any restriction on final Rule 180.1(a)(2) to misstatements or omissions that distort or, in the case of an attempted violation of 180.1(a)(2), are likely to distort market conditions. Such a restriction would be tantamount to requiring a price or market effect for a violation of final Rule 180.1. As stated above, the Commission rejects any such requirement for a violation of final Rule 180.1 because the statute it implements, CEA section 6(c)(1), imposes no such requirement.

*E. The Statutory Exception for Good Faith Mistakes*

1. Comments

When considering the application of final Rule 180.1(a)(2), several commenters asked the Commission to extend CEA section 6(c)(1)(C)'s provision for "Good Faith Mistakes" in the mistaken transmission of "false or misleading or inaccurate information to a price reporting service" to other

---

[57] *Id.* (internal quotation marks and citation omitted).
[58] *See, e.g.,* Associations at page 5; MFA at page 5.
[59] *See, e.g.,* Dodd-Frank Act section 746, amending CEA section 4c(a) (7 U.S.C. 6c(a)).
[60] 75 FR at 67658.
[61] In the securities context, "the 'fraud-on-the-market' presumption helps investors who cannot demonstrate that they, themselves, relied on fraud that reached the market." *Stoneridge In* v. *Partners, LLC* v. *Scientific-Atlanta, Inc.,* 552 U.S. 148, 171 (2008).
[62] *See, e.g., Berko* v. *SEC,* 316 F.2d 137, 143 (2d Cir. 1963) (finding reliance and injury to private shareholders "legally irrelevant" to the SEC's Exchange Act section 10(b) and SEC Rule 10b–5 claim); *see also United States* v. *Haddy,* 134 F.3d 542 (3d Cir. 1998) (concluding that securities laws did not require proof of reliance in an Exchange Act section 10(b) action brought by government).
[63] COPE at page 5.
[64] API and NPRA at page 11.
[65] API and NPRA at page 23.
[66] Barnard Comment Letter at page 2.
[67] API and NPRA at page 11.
[68] *See* discussion in subsection G below.
[69] API and NPRA at page 23.

violations under CEA section 6(c)(1) and proposed Rule 180.1. API and NPRA request that the good faith exception be expanded to cover "all public statements or reports by a market participant or other communications covered by the proposed rule."[70] Platts seeks extension of CEA section 6(c)(1)(C)'s good faith mistakes exception to proposed Rules 180.1 and 180.2, and Argus Media, Inc. ("Argus") asks the Commission to extend CEA section 6(c)(1)(C) to CEA section 9(a)(2).[71]

2. Commission Determination

In crafting CEA section 6(c)(1)(C), Congress could have extended the exception for good faith mistakes to all of CEA sections 6(c) and 9(a)(2) but did not do so. Following the plain text of CEA section 6(c)(1)(C), the Commission limited the good faith exception in final Rule 180.1 to the mistaken transmission of false or misleading or inaccurate information to a price reporting service. The Commission also makes clear that the scienter requirement of final Rule 180.1, final Rule 180.2, and CEA section 9(a)(2) functions to ensure that good-faith mistakes or negligence will not constitute a violation of the final Rules under any circumstance. Thus, a person lacking the requisite scienter cannot be found to have engaged in a manipulative or deceptive device or contrivance within the meaning of CEA section 6(c)(1).

*F. The Required Scienter for a Violation of Final Rule 180.1*

1. Comments

Several commenters asked the Commission to clarify the standard of scienter under proposed Rule 180.1.

Senator Levin recommends that the Commission shift the burden of proof with respect to intent to market participants, which would require them to show that their conduct was not manipulative.[72]

API and NPRA state that the Commission should clarify that scienter may not be premised on the collective knowledge of an entire company, but instead must be based on the knowledge of the person participating in the deceptive or fraudulent conduct.[73]

The ABA Derivatives Committee, CEF, MFA, API and NPRA disagree with the Commission's proposal to adopt recklessness as the scienter requirement, believing instead that the language of the statute supports a specific intent standard.[74] In the alternative, API and NPRA, CMC, Edison Electric Institute ("EEI"), MFA, and the Associations propose a standard of "extreme recklessness."[75] Additionally, commenter COPE states that the Commission should make clear that the type of recklessness contemplated is not recklessness in a tort sense, but rather a business activity that diverges so greatly from rational market behavior as to indicate a fraudulent intent.[76]

The ABA Derivatives Committee requests that in cases alleging manipulation under final Rule 180.1, the Commission must show a specific intent to cause an artificial price to satisfy the scienter requirement.[77]

CEF requests that if a recklessness standard is adopted, it should not extend to violations arising under CEA section 9(a)(2).[78] In addition, CEF suggests that the Commission confirm that it will not adopt a scienter requirement "that creates an implied presumption that sophisticated traders understand and are aware of the effects of their actions taken in the normal course of business on other commodity or securities markets."[79]

PMAA supports and encourages the Commission to adopt "recklessness" as the level of scienter, particularly when evaluating issues relating to algorithmic market manipulation.[80] According to PMAA, the Commission's adoption of a "recklessness" standard in CEA section 4c(a)(7) and proposed Rules 180.1 and 180.2 should impose enhanced duties of diligence on those using or employing automated trading systems.[81]

Mr. Clarence Townsend ("Townsend") believes the standard of scienter should be strengthened to "reckless manipulation."[82]

Professor Greenberger states that section 6(c)(1) lowers the standard of manipulation from "knowingly" to "reckless."[83] Professor Greenberger states that CEA section 6(c)(1) was designed to empower the Commission with "the same anti-manipulation standard employed by the [SEC] for more than 75 years, which has been upheld and defined in many court cases, including the Supreme Court."[84]

The Air Transport Association ("ATA") believes that the scienter standard should enable the Commission to police and punish a broader array of potentially manipulative conduct than is reachable under the CEA section 9(a)(2) anti-manipulation provision.[85]

2. Commission Determination

Upon consideration of all the comments in this rulemaking record, the Commission clarifies that a showing of recklessness is, at a minimum, necessary to prove the scienter element of final Rule 180.1.[86] Consistent with long-standing precedent under the commodities and securities laws, the Commission defines recklessness as an act or omission that "departs so far from the standards of ordinary care that it is very difficult to believe the actor was not aware of what he or she was doing."[87] Proof of knowledge, however, is not required.[88] Certain commenter requests for a scienter standard of "specific intent" would unduly limit the scope of final Rule 180.1. Likewise,

---

[70] API and NPRA at page 25.

[71] Platts Comment Letter at pages 4–6; Argus Comment Letter at pages 1 and 5–6.

[72] Senator Levin at page 4.

[73] API and NPRA at page 18.

[74] ABA Derivatives Committee at pages 11–13; CEF at page 5; MFA at pages 6–7; API and NPRA at pages 12–16. API and NPRA also believe that a recklessness standard may be appropriate in the highly regulated securities context with its fiduciary duties and strict disclosure requirements, but a recklessness standard in this context would increase the costs of complying with a market manipulation rule and deter market participants from disclosing relevant information that helps markets to function more efficiently.

[75] API and NPRA at page 17; CMC at page 2; EEI Comment Letter at page 4; MFA at page 6; Associations at pages 2 and 6–9.

[76] COPE at page 7.

[77] ABA Derivatives Committee at pages 11–15.

[78] CEF at page 7.

[79] CEF at page 7. Rather, CEF believes that the CFTC should evaluate alleged manipulation on a case-by-case basis, taking into consideration the facts and circumstances of each case.

[80] PMAA at page 2.

[81] PMAA at page 2.

[82] Townsend Comment Letter at page 1.

[83] Professor Greenberger at page 2.

[84] Professor Greenberger at page 2 (internal quotation marks and citation omitted). Professor Greenberger states that the Commission correctly proposes that judicial precedent interpreting and applying Exchange Act Section 10(b) and SEC Rule 10b–5 in the context of the securities markets should guide application of the scienter standard relevant to proposed Rule 180.1 given that proposed Rule 180.1 is modeled on SEC Rule 10b–5. *Id.* In Professor Greenberger's view, such judicial precedent "will provide regulatory certainty and will not disrupt the market function." *Id.*

[85] ATA Comment Letter at page 4.

[86] *See, e.g., SEC* v. *U.S. Envtl., Inc.,* 155 F.3d 107, 111 (2d Cir. 1998) (finding allegation of reckless participation in a market manipulation sufficient to state a claim of violation of Exchange Act section 10(b)).

[87] *Drexel Burnham Lambert Inc.* v. *CFTC,* 850 F.2d 742, 748 (DC Cir. 1988); *see also Sundstrand Corp.* v. *Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied,* 434 U.S. 875 (1977) (holding that recklessness under SEC Rule 10b–5 means "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it") (internal quotation marks and citation omitted); *SEC* v. *Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093–94 (9th Cir. 2010) ("scienter [under SEC Rule 10b–5] requires either deliberate recklessness or conscious recklessness, and [ ] it includes a subjective inquiry turning on the defendant's actual state of mind") (internal quotation marks and citations omitted).

[88] *See, e.g. Hollinger*, v. *Titan Capital Corp.*, 914 F.2d 1564, 1568–96 (9th Cir. 1990) (en banc), *cert. denied*, 111 S. Ct. 1621 (1991).

in response to comments calling for a bifurcated approach to scienter under 6(c)(1) and final Rule 180.1, that is, specific intent to effect a price or price trend that does not reflect legitimate forces of supply and demand for non-fraud based manipulations, and "extreme recklessness" in fraud-based manipulations, the Commission states, as it did in the NOPR, that it will be guided, but not controlled by, judicial precedent interpreting and applying scienter under Exchange Act section 10(b) and SEC Rule 10b–5.[89] At the same time, the Commission makes clear that final Rule 180.1 does not reach inadvertent mistakes or negligence. Final Rule 180.1 will not affect market participants engaged in legitimate market activity undertaken in good faith.[90] Under final Rule 180.1, the plaintiff bears the burden of proving the violation by a preponderance of the evidence.[91]

With respect to comments requesting clarification that scienter may not be premised on the collective knowledge of an entire company, the Commission notes that there is disagreement among the circuits on the collective knowledge theory—that is, the courts disagree on whether the conduct of one corporate agent can be aggregated with another corporate agent's state of mind in holding a corporation liable for fraud.[92]

The judicial decisions on the applicability of the collective knowledge theory under Exchange Act section 10(b) involve only private securities litigation; the Commission is unaware of any judicial decision applying the so-called collective knowledge theory under Exchange Act section 10(b) where the government is the plaintiff. Further, the Supreme Court has not spoken to the issue under Exchange Act section 10(b) or any other similar fraud-based prohibition.

Given that the collective knowledge theory of alleging and proving scienter against corporate defendants is permissible in certain circuits, and because the Commission finds the policy rationale underlying the theory to be in the public interest (*i.e.,* that it creates incentives for the corporate entity to create and maintain effective internal communications and controls to prevent wrongful and harmful conduct), the Commission declines to adopt comments requesting that the Commission foreclose the collective knowledge theory in any case. Rather, the Commission intends to follow the law of the various circuits and, in all cases, consider the totality of the facts and circumstances of a particular case before deciding whether enforcement action is appropriate and in the public interest.

*G. The Scope of the Phrase "In Connection With"*

1. Comments

In response to the NOPR, Better Markets requested the Commission interpret the "in connection with" language of Proposed Rule 180.1 broadly to include not only the transaction giving rise to a swap agreement, but also all of the continuing performance obligations under such agreement.[93]

CME Group states that the Commission should interpret the "in connection with" standard to require a "nexus" between transactions (or offers to transact) subject to CFTC jurisdiction and prohibited fraudulent or deceptive conduct.[94] CEF expressed concern that a broad interpretation of the phrase "in connection with" may result in conflicting or duplicative regulation with other agencies, including the Federal Energy Regulatory Commission ("FERC"), SEC, Federal Trade Commission ("FTC") and the Public Utility Commission of Texas.[95]

Senator Levin believes the Commission should employ its new authority under CEA section 6(c) to prevent manipulative and disruptive activities even where the impacts may only be felt in other markets—including markets regulated by the SEC.[96] Senator Levin expresses concern that, as currently drafted, the proposed rules may not allow the CFTC to effectively regulate market activity that is intended to or actually does artificially change prices in another market or product.[97]

2. Commission Determination

Upon careful consideration of the entire rulemaking record, the Commission finds it unnecessary to alter the text of final Rule 180.1. The Commission interprets the words "in connection with" broadly, not technically or restrictively. Section 6(c)(1) and final Rule 180.1 reach all manipulative or deceptive conduct in connection with the purchase, sale, solicitation, execution, pendency, or termination of any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity. Accordingly, final Rule 180.1 covers conduct including, but not limited to, all of the payment and other obligations arising under a swap.

While broad, the elasticity of the "in connection with" language is not limitless. In this regard, the Commission finds the Supreme Court's decision in *Zandford* interpreting SEC Rule 10b–5's "in connection with" language particularly instructive.[98] In its opinion, the Court gave the following example to

---

[89] 75 FR at 67659.

[90] Consistent with the Supreme Court's interpretation of Exchange Act section 10(b) in *Ernst & Ernst* v. *Hochfelder,* 425 U.S. 185, 206 (1976), the Commission finds no indication in CEA section 6(c)(1) that Congress intended anyone to be made liable for a violation of final Rule 180.1 unless he or she acted other than in good faith.

[91] *See, e.g., Herman & Maclean* v. *Huddleston,* 459 U.S. 375, 387–90 (1983), *citing SEC* v. *C. M. Joiner Leasing Corp.,* 320 U.S. 344, 355 (1943).

[92] *Compare, e.g., United States* v. *Bank of New England, N.A.,* 821 F.2d 844, 856 (1st Cir. 1987) (holding in a corporate criminal liability action arising under the Currency Transaction Reporting Act, that "[c]orporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation * * * [and the] corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual who then would have comprehended its full import"); *City of Monroe Employees Retirement System* v. *Bridgestone Corp.,* 387 F.3d 468, 690 (6th Cir. 2004) (finding that plaintiffs adequately pleaded securities fraud claims against a corporate defendant even though the complaint failed to allege that the corporate agent whose scienter was imputed to the corporation "played any role in drafting, reviewing, or approving" the allegedly false representations or "that he was, as a matter of practice, or by job description, typically involved in the creation of such documents"); *with Nordstrom Inc.* v. *Chubb & Son Inc.,* 54 F. 3d 1424, 1435 (9th Cir. 1995) ("there is no case law supporting an independent 'collective scienter' theory," *i.e.,* the theory "that a corporation's scienter could be different from that of an individual director or officer"); *Southland Sec. Corp.* v. *INSpire Ins. Solutions Inc.,* 365 F.3d 353, 364–65 (5th Cir. 2004) (quoting *In re Apple Computer Inc.,* 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002)) ("'A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter * * * at the time he or she makes the statement' * * * [T]he required state of mind must actually exist in the individual making the misrepresentation and may not simply be imputed to that individual on general principles of agency"), *cited with approval in Makor Issues & Rights, Ltd.* v. *Tellabs Inc.,* 513 F.3d 702, 708 (7th Cir. 2008); *United States* v. *Sci. Applications Int'l Corp.,* 626 F.3d 1257, 1274–75 (DC Cir. 2010) (holding a "collective knowledge" jury instruction inconsistent with the scienter requirement under the False Claims Act and expressing doubt, in *dicta,* regarding the use of "collective knowledge" to establish corporate scienter in non-FCA cases).

[93] Better Markets at page 2. Better Markets notes that the SEC employed the language in connection with the "offer, purchase or sale" of any security-based swap, and also targeted a specific characteristic of swaps—the ongoing payments or deliveries between the parties throughout the life of the security-based swap in accordance with their rights and obligations.

[94] CME Group at pages 9–10.

[95] CEF at pages 3–4.

[96] Senator Levin at pages 5–6.

[97] Senator Levin at pages 5–6.

[98] *SEC* v. *Zandford,* 535 U.S. 813 (2002).

highlight the limits of SEC Rule 10b–5 applicability:

> If * * * a broker embezzles cash from a client's account or takes advantage of the fiduciary relationship to induce his client into a fraudulent real estate transaction, then the fraud would not include the requisite connection to a purchase or sale of securities. Likewise if the broker told his client he was stealing the client's assets, that breach of fiduciary duty might be in connection with a sale of securities, but it would not involve a deceptive device or fraud.[99]

The Commission intends to be guided by this and other precedent interpreting the words ''in connection with'' in the securities context.[100]

As to comments regarding cross-market manipulation, the Commission intends to apply final Rule 180.1 to the fullest extent allowed by law when determining whether conduct in one market is ''in connection with'' an activity or product subject to the jurisdiction of the Commission. Further, where the Commission's jurisdiction is not exclusive,[101] the Commission will, to the extent practicable and consistent with its longstanding practice, coordinate its enforcement efforts with other federal or state law enforcement authorities.

*H. Penalty, Procedure, Effect on Automated Trading Systems, and a Proposal To Define Manipulation*

1. Comments

With regard to the penalty for violating final Rule 180.1, API and NPRA state that if the Commission chooses to promulgate a catch-all anti-fraud rule without regard to whether the conduct had a manipulative purpose or effect (a proposal that API and NPRA submit would exceed the Commission's authority), then the Commission should clarify that the enhanced sanctions in section 753 of the Dodd-Frank Act apply only to cases of manipulation or attempted manipulation, and not to every alleged violation of the rule.[102] CEF seeks clarification that, in a case of a false reporting violation under CEA section 6(c)(1)(A), the Commission is not permitted to impose a penalty of an amount equal to the greater of $1 million or treble damages pursuant to CEA section 6(c)(10)(C)(ii).[103]

On the subject of implementation, API and NPRA ask that any final rule adopt a 180-day effective date to enable the industry to design and implement comprehensive compliance programs.[104] EEI and CEF recommend that the CFTC implement its new authority in a cooperative manner with FERC and further recommend that it hold a workshop, before the final Rule is issued, on a variety of subjects related to interpretation and application of the final Rule.[105] Professor Greenberger believes that the Commission correctly states in the NOPR that market participants should already have constructed and implemented procedures to guard against their employees' and agents' attempts at manipulation. As such, Professor Greenberger believes that there should not be any additional cost to the existing market participants.[106]

On the issue of use or employment of algorithmic or automated trading systems, the PMAA requests that the Commission establish standards governing the use of algorithmic trading technology by requiring internal controls such as logs and specific notification protocols, directed to the trading entity, when significant code modification of its algorithm takes place, including interpretation by the algorithm of digitized news and social networking sources.[107]

Finally, the Brattle Group economists state that the Commission should adopt its proposed definition of manipulation: ''Manipulation is engaging in anomalous price-making behavior intended to alter a price in order to profit in affected price-taking transactions.''[108] The Brattle Group economists contend that manipulation thus defined can be interpreted as a form of fraud whereby anomalous behavior (non-economic, stand-alone transactions for the actor) injects false or misleading information into a market and consequently impairs its integrity.[109]

2. Commission Determination

With respect to penalties, the Commission will follow CEA section 6(c)(10)(C)(ii), which states that the Commission may assess ''in any case of manipulation or attempted manipulation in violation of [CEA section 6(c)] or section 9(a)(2), a civil penalty of not more than an amount equal to the greater of—(I) $1,000,000; or (II) triple the monetary gain to the person for each such violation.'' CEF's request that the penalties for manipulation not apply to violations of CEA section 6(c)(1)(A) is declined because such an outcome would conflict with the plain language of the statute. False or misleading or inaccurate reporting is a type of unlawful manipulation specifically prohibited by CEA section 6(c)(1)(A). Accordingly, where section 6(c)(1)(A) applies, the Commission may assess a penalty of an amount equal to the greater of $1 million or treble damages under CEA section 6(c)(10)(C)(ii) for each such violation.

The Commission declines to adopt comments recommending that it conduct further technical conferences on this rulemaking. The Commission has provided notice and opportunity to comment and has met with numerous groups to discuss this rulemaking.[110] Further, as noted above, there is extensive case law interpreting SEC Rule 10b–5 upon which final Rule 180.1 is modeled.[111]

The Commission declines to adopt comments requesting heightened supervision of algorithmic and automated trading systems as beyond the scope of this rulemaking. Nevertheless, as a general matter, a supervisory failure may be one of the facts and circumstances that the Commission considers in determining whether a violation of the final Rule exists.

The Commission declines to adopt comments proposing a new economics-based definition of manipulation. Instead, as stated above, all relevant

---

[99] *Id.* at 825 n. 4. The holding of *Zandford* is consistent with judicial interpretations of the phrase ''in or in connection with'' in the anti-fraud provisions of the CEA, particularly section 4b(a), which prohibits any person from defrauding another person ''in or in connection with'' a commodity futures transaction. For example, in *R & W Tech. Servs. Ltd.*, v. *CFTC*, 205 F.3d 165 (5th Cir. 2000), *cert. denied,* 531 U.S. 817 (2000), the Fifth Circuit, in affirming the liability of a defendant for defrauding another person, refused to construe ''in or in connection with'' and 4b(a) narrowly. *Id.* at 171–74. Rather, the court endorsed the Commission's position that fraud in the sale of investment advice will be ''in connection with'' the sale of a commodities futures contract ''if the fraud relates to'' the risk of trading and the primary purpose of the advice is to execute trades. *Id.* at 172–73. As a general matter, the Supreme Court has stated that anti-fraud and anti-manipulation provisions of the CEA are to be construed broadly. *See, e.g., CFTC* v. *Schor,* 478 U.S. 833, 836 (1986) (''The CEA broadly prohibits fraudulent and manipulative conduct in connection with commodity futures transactions.'').

[100] *Zandford,* 535 U.S. 813 (2002); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit,* 547 U.S. 71, 85 (2006) (holding that the ''in connection with'' language of SEC Rule 10b–5 requires a nexus between fraudulent conduct and a securities transaction).

[101] 7 U.S.C. 2(a)(1)(A).

[102] API and NPRA at pages 10–11.
[103] CEF at page 8.
[104] API and NPRA at page 27.
[105] EEI at pages 2–4; CEF at pages 4–5.
[106] Greenberger at page 4.
[107] PMAA at pages 1–2.
[108] Brattle Group economists Comment Letter at page 6.

[109] Brattle Group economists at pages 6–7.
[110] A list of all external meetings held on Dodd-Frank Act section 753 is available at: *http://www.cftc.gov/LawRegulation/DoddFrankAct/ExternalMeetings/index.htm.*
[111] Similarly, the Commission has ample experience enforcing the predecessor provisions of final Rule 180.2.

facts and circumstances must be considered in determining whether a violation of final Rule 180.1 exists.

## V. Discussion of CEA Section 6(c)(3) and Final Rule 180.2

The Commission proposed Rule 180.2 under its general rulemaking authority, CEA section 8a(5) and its statutory authority to prohibit manipulation under new CEA section 6(c)(3). Proposed Rule 180.2 mirrors the text of new CEA section 6(c)(3), by stating that "[i]t shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." In the NOPR, the Commission proposed to continue "interpreting the prohibition on price manipulation and attempted price manipulation to encompass every effort to improperly influence the price of a swap, commodity, or commodity futures contract." [112]

### A. Comments

The CME Group believes that the Commission should employ a bright-line test under final Rule 180.2 that distinguishes prohibited manipulative conduct from legitimate competitive trading activities. To that end, CME Group urges the Commission to clarify what factors or types of activity the Commission considers to be "intended to interfere with the legitimate forces of supply and demand." [113] The CME Group believes the Commission's statement in the NOPR that "an illegal effect on price can often be conclusively presumed from the nature of the conduct in question and other factual circumstances not requiring expert economic analysis" [114] is tantamount to a "we-know-it-when-we-see-it-approach" that impermissibly collapses the third and fourth elements of the traditional framework for manipulation outlined in Cox. [115]

COPE and EEI believe that the provisions in proposed Rule 180.1 are the same as proposed Rule 180.2 and thus the latter should be deleted. [116] EEI recommends that if the Commission chooses not to delete proposed Rule 180.2, it should carve this section out of the current rulemaking initiative and issue a separate and more detailed NOPR for public comment. [117]

EEI requests that the Commission affirm in regulatory text that the scienter requirement for proposed Rule 180.2 is specific intent under the Commission's four-prong test. [118] This four-part test is described in subsection B below. Likewise, the Associations believe that the Commission should not use CEA section 6(c)(3) as a mechanism to lower the specific intent standard traditionally required in manipulation cases. Instead, the Commission should issue clarifying guidance that conforms to the traditional framework of enforcement, including the theory of liability set forth in the *Di Placido* matter. [119]

With respect to the scope of application of proposed Rule 180.2, CMC recommends the Commission clarify that CEA section 6(c)(3) does not confer any additional enforcement authority beyond the holding in the *Di Placido* matter. [120]

CMC and MFA recommend that the Commission make clear that proposed Rule 180.2 does not create a presumption that a price is artificial merely because one or more isolated transactions are deemed uneconomic without proof of a specific intent to move prices. [121] The Associations and MFA believe that the Commission's statement in the NOPR "that prices [are] affected by a factor not consistent with normal forces of supply and demand will often follow inescapably from proof of the actions of the alleged manipulator" is an overly aggressive reading of judicial precedent like *Di Placido*. [122] MFA believes that the Commission should not create a "conclusive presumption" that a price is artificial without proof of specific intent to move prices. [123]

Professor Greenberger states that although the Commission has already interpreted the "prohibition on price manipulation and attempted price manipulation to encompass every effort to influence the price of a swap, commodity, or commodity futures contract that is intended to interfere with the legitimate forces of supply and demand in the marketplace," it is important to reaffirm the relevance of that legal interpretation. [124] Professor Greenberger believes that Commission precedent supports the position that illegal effect on price can often be conclusively presumed from the nature of the conduct in question and other factual circumstances not requiring expert economic analysis. [125]

ATA believes that the Commission should consider whether its complete reliance on past precedent in interpreting manipulation under proposed Rule 180.2 needlessly narrows the potential reach of the amended anti-manipulation provision of section 6(c)(3), anchoring its interpretation to a past standard that has proven remarkably difficult to enforce. [126] ATA notes that section 6(c)(3) as amended is broader than both its prior version and section 9(a)(2) by its inclusion of the word "indirectly," making it unlawful to indirectly manipulate or attempt to manipulate prices. [127]

### B. Commission Determination

In response to the comments received regarding this matter, the Commission reiterates that, in applying final Rule 180.2, it will be guided by the traditional four-part test for manipulation that has developed in case law arising under 6(c) and 9(a)(2): (1) That the accused had the ability to influence market prices; (2) that the accused specifically intended to create or effect a price or price trend that does not reflect legitimate forces of supply and demand; [128] (3) that artificial prices existed; and (4) that the accused caused the artificial prices. [129]

The Commission reaffirms the requirement under final Rule 180.2 that a person must act with the requisite specific intent. In other words, recklessness will not suffice under final Rule 180.2 as it will under final Rule 180.1. The Commission finds this level of intent necessary to ensure that legitimate conduct is not captured by final Rule 180.2, which covers non-fraud based manipulation. Given the

---

[112] 75 FR at 67658.

[113] CME Group at page 11. CME Group states that the Commission also should clarify how to determine whether a price has been affected by illegitimate factors. CME Group at pages 11–12.

[114] 75 FR at 67660–61.

[115] *In the Matter of Cox,* [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) P 23,786 at 34,060–61 (CFTC July 15, 1987).

[116] COPE at pages 6–7; EEI at page 6.

[117] EEI at page 6.

[118] EEI at page 7.

[119] Associations at page 10 referring to *In re Di Placido,* 2008 WL 4831204 (CFTC 2008), *affd in pertinent part, Di Placido* v. *CFTC,* 364 Fed Appx. 657, 2009 WL 3326624 (2d Cir. 2009), *cert. denied,* 130 S. Ct. 1883 (Mar. 22, 2010).

[120] CMC at pages 2–3.

[121] CMC at pages 2–3; MFA at pages 7–8.

[122] Associations at page 11; MFA at pages 7–8.

[123] MFA at pages 7–8.

[124] Professor Greenberger at page 4.

[125] Professor Greenberger at page 4.

[126] ATA at page 1.

[127] ATA at page 4.

[128] *In re Indiana Farm Bureau Cooperative Assn., Inc.,* [1982–1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796 (CFTC Dec. 17, 1982), *citing Volkart Bros., Inc.* v. *Freeman,* 311 F.2d 52 (5th Cir. 1962); *In re Hohenberg Bros. Co.,* [1975–1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271 (CFTC Feb. 18, 1977).

[129] *In re Cox* [1986–1987 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 23,786, 1987 CFTC LEXIS 325, at *9, 1987 WL 106879, at *3 (CFTC July 15, 1987). In cases of attempted manipulation under section 9(a)(2), the CFTC is required to show: (1) An intent to affect the market price; and (2) some overt act in furtherance of that intent. *See In re Hohenberg Bros. Co.,* ¶ 20,271 at 21,477.

differences in scope of application between the final Rules, the Commission declines requests to consolidate them.

The Commission declines requests to limit the application of final Rule 180.2 to the circumstances set forth in the commenters' analysis of particular cases, including the *Di Placido* matter. Likewise, the Commission's statement in the NOPR that an artificial price may be ''conclusively presumed'' under certain facts and circumstances does not mean that an artificial price may be conclusively presumed in *all* cases. For example, where, as in *Di Placido,* a trader violates bids and offers in order to influence the volume-weighted average settlement price, an artificial price will be a ''reasonably probable consequence'' of the trader's intentional misconduct. Moreover, the Commission in the proposed Rule did not say that an artificial price will be conclusively presumed in the absence of any evidence, only that ''extensive economic analysis *may* not be necessary'' to prove that an artificial price existed.[130] To be clear, in some cases the conclusion that prices were affected by a factor not consistent with normal forces of supply and demand will require economic analysis, but in other cases, such a showing may, as the Commission stated in the proposed Rule, ''follow inescapably from proof of the actions of the alleged manipulator.'' [131] This is unsurprising given the fact and circumstance specific nature of manipulation cases. Accordingly, the Commission is not, as some commenters state, collapsing the third and fourth elements of the traditional four-part test for manipulation under section 6(c)(3) and final Rule 180.2.

The Commission interprets the terms ''directly or indirectly'' as describing the level of involvement necessary to establish a violation of final Rule 180.2. In this context, the Commission interprets ''indirectly'' to include the circumstance where a person uses a third party (*e.g.,* an executing broker) to execute trades designed to manipulate, so it will be no defense that the person did not himself execute the transaction.

Notwithstanding the fact that final Rule 180.2 mirrors the text of CEA section 6(c)(3), the Commission deems it appropriate and in the public interest to promulgate this rule and, in so doing, provide the above clarifications to the manner in which the Commission interprets and intends to apply final Rule 180.2.

## V. Administrative Compliance and Cost-Benefit Considerations

CEA section 15(a) [132] requires the Commission to consider the costs and benefits of its actions before promulgating a regulation under the CEA. By its terms, CEA section 15(a) does not require the Commission to quantify the costs and benefits of a rule or to determine whether the benefits of the regulation outweigh its costs; rather, it requires the Commission to ''consider'' the costs and benefits of its actions. CEA section 15(a) further specifies that the costs and benefits shall be evaluated in light of five broad areas of market and public concern: (1) Protection of market participants and the public; (2) efficiency, competitiveness and financial integrity of futures markets; (3) price discovery; (4) sound risk management practices; and (5) other public interest considerations. The Commission may in its discretion give greater weight to any one of the five enumerated areas and could in its discretion determine that, notwithstanding its costs, a particular rule is necessary or appropriate to protect the public interest or to effectuate any of the provisions or accomplish any of the purposes of the CEA.

In the NOPR, the Commission stated that the proposed rules would enhance the authority of the Commission to ensure fair and equitable markets, and that market participants and the public will substantially benefit from such enhanced prevention and deterrence of manipulation. With respect to costs, the Commission also stated that participants in the markets should already have policies and procedures in place to ensure that their employees, affiliates and agents will refrain from attempting to manipulate the markets. The Commission invited public comment on its cost-benefit considerations.[133] Below, we summarize and respond to those comments.[134] Both in the response to comments and in the preamble, we address the areas of market and public concern for consideration of costs and benefits under CEA section 15(a).

API and NPRA commented that the potentially significant compliance costs and legal uncertainty must be weighed against the limited benefits of the proposed rules. Specifically, API and NPRA believe that it is problematic to expand the scope of the Commission's enforcement authority to cover routine cash market transactions in all areas of the economy, as it would potentially create inconsistencies with existing statutory and common law standards and would place a tremendous burden on the Commission's resources.[135] Further, API and NPRA comment that the risk of inconsistent standards with federal and state enforcement authorities may exacerbate market participants' regulatory and compliance risk and burden.[136] API and NPRA also believe that a recklessness standard under Section 753 would increase the costs of complying with a market manipulation rule and deter market participants from engaging in legitimate business activities and disclosing relevant information that helps markets to function more efficiently as price discovery venues.[137] API and NPRA contend that where market participants seek to comply with an omissions rule by disclosing more information, companies will have an incentive to exercise great caution to ensure that no affirmative statement may be subjectively considered misleading through any omission.[138]

MFA is concerned that ambiguity with respect to legal standards would increase transaction costs and chill legitimate trading practices, in turn decreasing market depth and liquidity.[139] The Associations state that no new duties of disclosure, inquiry, or diligence should be imposed between two sophisticated parties to a bilateral transaction. Any such new duties may discourage legitimate trading activities, increase transaction costs, and, as a result, reduce liquidity and market depth.[140] CME and Argus make similar comments as to the potential effects on markets as a whole, but do not express their concerns in terms of costs. The CME comments that the Commission must provide greater clarity as to the scope of prohibited conduct to maintain and promote fair and efficient markets and to protect market liquidity, price discovery, and the risk management functions of futures markets.[141] Argus states that absent clarification from the Commission, the proposed rules may unnecessarily chill the voluntary submission of transaction related data by market participants to compilers of price indices which, in turn, hinders the Dodd-Frank Act's goal of market transparency.[142] CEF comments that

---

[130] 75 FR at 67660 (emphasis added).
[131] 75 FR at 67660.

[132] 7 U.S.C. 19(a).
[133] 75 FR at 67661.
[134] *See* note 2 for access to public comment file.

[135] API and NPRA at pages 4 and 8.
[136] API and NPRA at page 8.
[137] API and NPRA at pages 12–17.
[138] API and NPRA at page 22.
[139] MFA at pages 3–4.
[140] Associations at pages 1 and 4.
[141] CME at page 3.
[142] Argus at page 1.

market participants will face substantially more uncertainty with respect to their activities in energy markets and significant costs in attempting to comply with multiple regulatory regimes, thereby likely reducing participation in energy markets.[143] CEF also comments that jurisdictional overlap of agencies will result in increased litigation costs, depletion of scarce resources, and uncertainty for both the Commission and market participants.[144] CEF states the false reporting provision will place a heavy burden on all market participants as they attempt to comply with the new reporting requirements proposed by the Commission pursuant to the Act.[145]

In contrast, Barnard believes the implementation costs of the proposed rules should be minimal.[146] Professor Greenberger believes that the Commission correctly states that market participants should already have constructed and implemented procedures to guard against their employees' and agents' attempts at market manipulation. As such, Professor Greenberger believes that there should not be any additional costs to existing market participants.[147]

The Commission has carefully considered the concerns expressed by some of the commenters that the final Rules could substantially increase costs on market participants, reduce market liquidity or chill legitimate market activity. However, commenters provide no quantification of the potential costs or reliable data as a basis for conclusions that substantial costs will be incurred as a result of the final Rules. Furthermore, commenters have not shown how such rules have negatively impacted comparable markets that trade comparable instruments and operate under comparable anti-manipulation rules.

Specifically, regarding the comments received by API, NPRA, MFA, CME, Argus, and the Associations as to how the new rules may directly increase transaction costs, reduce market liquidity and depth, and hinder risk management functions of markets subject to the Commission's jurisdiction, the Commission notes that final Rule 180.1 is modeled on SEC Rule 10b–5. Many derivatives products in securities markets are traded on national securities exchanges under SEC regulation (*e.g.,* equity options, stock index options, and stock index exchange-traded funds ("ETFs")) and are therefore subject to the SEC anti-manipulation rule.

Many of these SEC-regulated derivatives products exhibit high and growing volumes, narrow bid-ask spreads, and high levels of market depth. SEC-regulated stock index ETFs and stock-index options are economically similar to CFTC-regulated stock index futures and options on those futures and, like these CFTC-regulated derivatives, serve primarily as risk-shifting instruments rather than instruments for capital formation. Any argument that the SEC's anti-fraud and anti-manipulation regime has negatively affected the growth of SEC-regulated derivatives lacks a basis in fact and contradicts the generally accepted purpose of the SEC's anti-fraud and anti-manipulation rules, which is to protect investors and to promote market integrity.[148] Moreover, the FERC also promulgated a rule modeled on SEC Rule 10b–5 for FERC-jurisdictional markets in natural gas and electricity following the enactment of the Energy Policy Act of 2005. The FTC promulgated a comparable prohibition for petroleum markets. In the absence of any facts that anti-fraud and anti-manipulation rules negatively affect markets, the Commission does not find such assertions persuasive.

As to the concerns of API and NPRA regarding increased costs from the Commission's purported expansion of its authority to cover a plethora of routine cash market transactions in all areas of the economy, with respect to the scope of final Rule 180.1, as discussed above, the Commission intends to exercise its authority under 6(c)(1) to cover transactions related to the futures or swaps markets, or prices of commodities in interstate commerce, or where the fraud or manipulation has the potential to affect cash commodities, futures, or swaps markets or participants in these markets. Thus, concerns about purported increased costs are misplaced in that they rest on an incorrect assumption about the scope of the Commission's expanded authority.

In response to comments from CEF, the Commission re-iterates that the final Rules do not contain any requirement to create, retain, submit, or disclose any information. The final Rules impose no recordkeeping or related data retention or disclosure requirements on any person, including small businesses. Given that the final Rules impose no affirmative duties, it is unlikely that the final Rules will impose any additional ongoing costs beyond the existing costs associated with ensuring that behavior and statements are not fraudulent or manipulative. In that regard, the Commission believes that it will not be necessary for firms that currently have adequate compliance programs to hire additional staff or significantly upgrade their systems to comply with the new Rules. Firms may incur some one-time costs such as costs associated with training traders and staff in the new Rules.

The Commission believes the comments from API, NPRA, and CEF regarding increased costs pertaining to compliance, litigation, and uncertainty with respect to inconsistent standards with other regulatory agencies are misplaced. To the contrary, the Commission believes that market participants and the public will benefit from enhanced regulatory certainty that will arise from the Commission's adoption of an anti-manipulation rule that is more harmonized with existing anti-manipulation rules of the SEC, FERC, and FTC.

In the NOPR, the Commission stated, and re-iterates here, that with respect to benefits, the proposed rules would enhance the authority of the Commission to ensure fair and equitable markets. The Commission stated, *inter alia,* that market participants and the public will benefit substantially from enhanced prevention and deterrence of manipulation. In light of public considerations under CEA section 15(a) in promulgating this rule, the Commission concludes that market participants and the public will benefit substantially from increased protection through the prevention and deterrence of fraud and manipulation. The final Rules will help ensure the efficiency, competitiveness, and financial integrity of derivatives markets. Markets free from fraud and manipulation function better as venues for price discovery and risk management.

*A. Paperwork Reduction Act*

As discussed above, the provisions of Commission Regulations Part 180 would not result in new recordkeeping

---

[143] CEF at pages 2–3.
[144] CEF at page 4.
[145] CEF at page 7.
[146] Barnard at page 2.
[147] Professor Greenberger at page 4.
[148] *See, e.g., Chemical Bank* v. *Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir. 1984) ("The purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting * * *.") (Friendly, J.); *Laird* v. *Integrated Res.,* 897 F.2d 826, 831 at n.10 (5th Cir. 1990), *quoting* 3 Fletcher Cyclopedia of Corporations, section 900.3 (perm. ed. 1986) ("The general purpose and intent of the broad anti-fraud provisions of Section 10(b) and Rule 10b–5 is to protect investors, to prevent inequitable and unfair practices and to insure fairness in securities transactions generally * * *").

requirements within the meaning of the Paperwork Reduction Act of 1995.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act [149] requires that agencies consider whether the rules they propose will have a significant economic impact on a substantial number of small entities and, if so, provide a regulatory flexibility analysis respecting such impact.[150] The final Rules will not have a significant economic impact on a substantial number of small entities. As explained above, legitimate market participants should already have procedures in place to prevent their employees and agents from manipulating the markets. The Chairman, on behalf of the Commission, hereby certifies, pursuant to 5 U.S.C. 605(b), that the final Rules will not have a significant impact on a substantial number of small entities.

*C. Effective Date*

API and NPRA ask the Commission to adopt a 180-day delay in the effective date of the final Rules to enable the industry to design and implement comprehensive compliance programs.[151] The Commission declines this request. A 180-day delayed effective date would unduly limit the Agency's responsibility to protect market participants and promote the integrity of the markets. Rather, consistent with Dodd-Frank Act section 753(d) and Administrative Procedure Act section 553(d), 5 U.S.C. 553(d), the final Rules will take effect 30 days after they are published in the **Federal Register.**

**List of Subjects in 17 CFR Part 180**

Commodity futures.

**Authority and Issuance**

For the reasons stated in the preamble, the Commodity Futures Trading Commission adds a new 17 CFR Part 180 as set forth below:

**PART 180—PROHIBITION AGAINST MANIPULATION**

Sec.
180.1   Prohibition on the employment, or attempted employment, of manipulative and deceptive devices.
180.2   Prohibition on price manipulation.

**Authority:** 7 U.S.C. 6c(a), 9, 12(a)(5) and 15, as amended by Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111–203, 124 Stat. 1376 (2010); 5 U.S.C. 552 and 552(b), unless otherwise noted.

---

[149] 5 U.S.C. 601.
[150] *Id.*
[151] API and NPRA at page 27.

**§ 180.1   Prohibition on the employment, or attempted employment, of manipulative and deceptive devices.**

(a) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,

(4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate. Notwithstanding the foregoing, no violation of this subsection shall exist where the person mistakenly transmits, in good faith, false or misleading or inaccurate information to a price reporting service.

(b) Nothing in this section shall be construed to require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect.

(c) Nothing in this section shall affect, or be construed to affect, the applicability of Commodity Exchange Act section 9(a)(2).

**§ 180.2   Prohibition on price manipulation.**

It shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity.

Issued in Washington, DC, on July 7, 2011, by the Commission.

**David A. Stawick,**
*Secretary of the Commission.*

**Appendices to Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices; Prohibition on Price Manipulation—Commission Voting Summary and Statements of Commissioners**

**Note:** The following appendices will not appear in the Code of Federal Regulations.

**Appendix 1—Commission Voting Summary**

On this matter, Chairman Gensler and Commissioners Dunn, Sommers, O'Malia and Chilton voted in the affirmative; no Commissioner voted in the negative.

**Appendix 2—Statement of Chairman Gary Gensler**

I support the final rulemaking to enhance the Commission's ability to protect against manipulation. Effective regulation requires an effective enforcement program. The Dodd-Frank Act enhances the Commission's enforcement authorities in the futures markets and expands them to the swaps markets. This rule implements new Dodd-Frank authorities to police against fraud and fraud-based manipulative schemes, based upon similar authority that the Securities and Exchange Commission, Federal Energy Regulatory Commission and Federal Trade Commission have for securities and certain energy commodities.

In the past, the CFTC had the ability to prosecute manipulation, but to prevail, it had to prove the specific intent of the accused to create an artificial price. Under the new law and one of the rules before us today, the Commission's anti-manipulation reach is extended to prohibit the reckless use of fraud-based manipulative schemes. This closes a significant gap, as it will broaden the types of cases we can pursue and improve the chances of prevailing over wrongdoers.

The rule also implements the Dodd-Frank Act's price-based manipulation authority to police against corners and squeezes. These new authorities expand the CFTC's arsenal of enforcement tools and strengthen the Commission's ability to effectively deal with threats to market integrity. We will use these tools to be a more effective cop on the beat, to promote market integrity and to protect market participants.

I thank Senator Maria Cantwell for her work to secure this important authority for the CFTC. As Senator Cantwell explained in proposing that this authority be included in the Commodity Exchange Act, ''It is a strong and clear legal standard that allows regulators to successfully go after reckless and manipulative behavior.''

**Attachment A**

Parties filing comments:
Air Transport Association (ATA)

American Bar Association, Derivatives and Futures Law Committee, Business Law Section (ABA Derivatives Committee)
American Petroleum Institute (API) and National Petrochemical and Refiners Association (NPRA)
Argus Media, Inc. (Argus)
Barnard, Chris (Barnard)
Better Markets
Brattle Group Economists (Brattle Group)
Carini, Peter*
CME Group, Inc. (CME Group)
Coalition of Physical Energy Companies (COPE)
Commodity Markets Council (CMC)
Council of Institutional Investors (Council)
Edison Electric Institute (EEI)
Freddie Mac
Futures Industry Association, International Swaps and Derivatives Association, Inc. (ISDA) and Securities Industry and Financial Markets Association (SIFMA) (together, the Associations)
Managed Funds Association (MFA)
Pen Fern Oil Co., Inc.*
Petroleum Marketers Association of America (PMAA)
Platts
Scullin Oil Co.*
Townsend, Clarence (Townsend)
U.S. Senator Carl Levin (Senator Levin)
University of Maryland School of Law, Professor Michael Greenberger (Professor Greenberger)
Weir, Bix
West Virginia Oil Marketers & Grocers Association (OMEGA)*
Working Group of Commercial Energy Firms (CEF)
Zwack, Joseph

\* Denotes commenters filing identical comments which were consolidated.

[FR Doc. 2011–17549 Filed 7–13–11; 8:45 am]
**BILLING CODE 6351–01–P**

---

## DEPARTMENT OF THE INTERIOR

### Office of Surface Mining Reclamation and Enforcement

### 30 CFR Part 948

[WV–117–FOR; OSM–2011–0006]

### West Virginia Regulatory Program

**AGENCY:** Office of Surface Mining Reclamation and Enforcement (OSM), Interior.
**ACTION:** Interim rule; effective date.

**SUMMARY:** On June 29, 2011, OSM published an interim rule approving a program amendment submitted by the West Virginia Department of Environmental Protection (WVDEP). The interim rule provided an opportunity for public comment and gave the comment due date and tentative hearing date. The summary and preamble to the interim rule specified that it was effective upon publication; however, the **DATES** section of the rule failed to list an effective date. This final rule corrects that omission by providing an effective date.

**DATES:** The interim final rule published at 76 FR 37996 is effective July 14, 2011.

**ADDRESSES:** You may submit comments on the interim rule WV–117–FOR (76 FR 37996; June 29, 2011) by any of the following two methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* The rule has been assigned Docket ID OSM–2011–0006. If you would like to submit comments through the Federal eRulemaking Portal, go to *http://www.regulations.gov* and follow the instructions.

• *Mail/Hand Delivery:* Mr. Roger W. Calhoun, Director, Charleston Field Office, Office of Surface Mining Reclamation and Enforcement, 1027 Virginia Street, East, Charleston, West Virginia 25301.

**FOR FURTHER INFORMATION CONTACT:** Mr. Roger W. Calhoun, Director, Charleston Field Office, *Telephone:* (304) 347–7158. *E-mail: chfo@osmre.gov.*

**SUPPLEMENTARY INFORMATION:** On June 29, 2011, we published an interim rule with request for comments at 76 FR 37996. The interim rule announced receipt of a proposed amendment to the West Virginia permanent regulatory program under the Surface Mining Control and Reclamation Act of 1977. On May 2, 2011, the WVDEP submitted a program amendment to OSM that included both statutory and regulatory revisions. West Virginia submitted proposed permit fee revisions to the Code of West Virginia as authorized by House Bill 2955 that passed during the State's regular 2011 legislative session. In addition, West Virginia amended its Code of State Regulations (CSR) to provide for the establishment of a minimum incremental bonding rate as authorized by Senate Bill 121. The changes, due to the passage of House Bill 2995, will increase the filing fee for the State's surface mining permit to $3,500 and establish various fees for other permitting actions. Senate Bill 121 authorizes regulatory revisions which includes, among other things, the establishment of a minimum incremental bonding rate of $10,000 per increment at CSR 38–2–11.4.a.2. Because the West Virginia revisions have an effective date of June 16, 2011, we approved the permit fees and the minimum incremental bonding rate on an interim basis. Our regulations at 30 CFR 732.17(h)(12) state that ''[a]ll decisions approving or not approving program amendments must be published in the **Federal Register** and will be effective upon publication unless the notice specifies a different effective date.'' Because our approval was published on June 29, 2011, and the notice did not specify a different effective date, for purposes of the West Virginia Regulatory Program, we consider the State's provisions approved effective June 29, 2011. Please see the **Federal Register** document published at 76 FR 37996 on June 29, 2011, for more details.

### List of Subjects in 30 CFR Part 948

Intergovernmental relations, Surface mining, Underground mining.

Dated: July 5, 2011.

**Michael K. Robinson,**
*Acting Regional Director, Appalachian Region.*

[FR Doc. 2011–17336 Filed 7–13–11; 8:45 am]
**BILLING CODE 4310–05–P**

---

## POSTAL SERVICE

### 39 CFR Part 111

### Group E Post Office Box Service

**AGENCY:** Postal Service™.
**ACTION:** Final rule.

**SUMMARY:** The Postal Service™ is revising the *Mailing Standards of the United States Postal Service,* Domestic Mail Manual (DMM®) 508.4.6 to clarify eligibility, simplify the standards, and facilitate uniform administration for Group E (free) Post Office™ (PO) box service.

**DATES:** *Effective Date:* September 6, 2011.

**FOR FURTHER INFORMATION CONTACT:** Laurence Welling at 202–268–7792, Ken Hollies at 202–268–3083, or Richard Daigle at 202–268–6392.

**SUPPLEMENTARY INFORMATION:** On November 24, 2010, the Postal Service published a **Federal Register** proposed rule (75 FR 71642–71643) to clarify eligibility, simplify the standards, and facilitate uniform administration for Group E (free) PO Box™ service. The Postal Service received several comments in response to this proposed rule that are summarized later in this notice.

Group E PO Box service is provided free, with restrictions, to customers whose physical addresses are not eligible for *any* form of USPS carrier delivery service. This service is consistent with the USPS responsibility to provide universal mail delivery. This final rule simplifies and clarifies some of the language related to administering Group E PO Box service.

For this final rule, the Postal Service removes the descriptive term, ''business