United States District Court
Southern District of Texas
**ENTERED**
September 30, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-19-2901 |
| EOX HOLDINGS L.L.C., and ANDREW GIZIENSKI, | § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

This action is brought by plaintiff, the Commodity Futures Trading Commission ("CFTC" or "Plaintiff"), against defendants, EOX Holdings L.L.C. ("EOX") and Andrew Gizienski ("Gizienski") (collectively, "Defendants"), for violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-27f, and the Regulations promulgated thereunder, 17 C.F.R. parts 1-190, from August of 2013 through May of 2014 ("Relevant Period"). Pending before the court are Defendants' Motion to Amend Revised Docket Control Order to Grant Them Leave to File Amended Answer Adding Affirmative Defenses ("Defendants' Motion to Amend") (Docket Entry No. 121); Plaintiff's Motion for Summary Judgment ("Plaintiff's MSJ") (Docket Entry No. 150); Defendants' Motion for Summary Judgment on Counts I & II, and for Partial Summary Judgment on Counts III & IV ("Defendants' MSJ") (Docket Entry No. 160); and Defendants' Motion to Strike

-1-

Improper Declarations Submitted by Plaintiff in Support of Its Motion for Summary Judgment ("Defendants' Motion to Strike") (Docket Entry No. 171).  For the reasons stated below Defendants' Motion to Amend will be granted;  Plaintiff's Motion for Summary Judgment will be denied; Defendants' Motion for Summary Judgment will be granted in part and denied in part; and Defendants' Motion to Strike will be granted in part and denied in part.

## I.   **Undisputed Facts and Procedural Background**

### A.   **Undisputed Facts**

Plaintiff is a federal agency "charged by Congress with the administration and enforcement of the [CEA] and the Regulations promulgated thereunder."[1]

Defendant EOX is a wholly owned subsidiary of OTC Global Holdings LP ("OTC Global"), an inter-dealer broker in over-the-counter energy commodities, that has been registered with the CFTC as an Introducing Broker ("IB") since August 7, 2009.  EOX executes block futures and options trades on behalf of OTC Global's affiliate companies, and has done so since October of 2012.[2]

---

[1] Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief ("Plaintiff's Complaint"), Docket Entry No. 1, p. 3 ¶ 11.  Page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

[2] Plaintiff's Statement of Facts In Support of Its Motion for Summary Judgment ("Plaintiff's SOF"), Docket Entry No. 152, p. 1
(continued...)

Futures contracts are agreements to purchase or sell a commodity for delivery or cash settlement in the future at a specified price.[3]   A block trade is a transaction that meets or exceeds an exchange-determined minimum threshold quantity of futures or options contracts, is privately negotiated, and is executed away from the open outcry or electronic markets.[4]

At all times during the Relevant Period EOX brokers reported their block trades to the Intercontinental Exchange, i.e., ICE Futures U.S. ("IFUS"), which is "a board of trade designated as a contract market, and self-regulatory organization."[5]  With respect to the futures and options contracts at issue in Plaintiff's Complaint, IFUS required block trades to be reported to the exchange within fifteen (15) minutes from the time of execution. Block trades made outside of normal trading hours were required to be reported to the exchange no later than five (5) minutes before the open of the next trading session for that particular contract.[6]

---

[2](...continued)
¶¶ 1-2; Defendants' Counterstatements of Facts on Plaintiff's Motion for Summary Judgment ("Defendants' Counter SOF"), Docket Entry No. 168, pp. 1-2 ¶¶ 1-2.

[3]Defendants' Counter SOF, Docket Entry No. 168, p. 4 ¶ 10.

[4]Id. ¶¶ 11-12.  See also Answer, Docket Entry No. 77, p. 4 ¶ 18.

[5]Plaintiff's Complaint, Docket Entry No. 1, p. 4 ¶ 14.  See also Defendants' Counter SOF, Docket Entry No. 168, p. 3 ¶ 7.

[6]Defendants' Counter SOF, Docket Entry No. 168, p. 5 ¶ 14.

On October 15, 2012, EOX entered into an Intercompany Services Agreement ("ISA") with fifteen affiliates, including Choice Power LP ("Choice Power").  Pursuant to the ISA all of OTC Global's individual brokers engaging in futures transactions within the United States are registered with the CFTC as Affiliated Persons ("AP") of EOX.[7]  The ISA states that

> when AP's perform brokerage services involving futures contracts, they are acting exclusively on behalf of EOX in their capacities as [APs] of EOX.  The Affiliates and EOX agree that when AP's perform brokerage services involving transactions in contracts other than futures, they are acting on behalf of the relevant Affiliates.[8]

Gizienski was employed by EOX affiliate Choice Power as a broker, and was registered with the CFTC as an AP of EOX from February 1, 2013, to January 1, 2019.[9]

EOX charged commissions to customers for block trades that it brokered.[10]  EOX paid Gizienski 50-55% of the commission it received for block trades that he brokered.[11]

Jason Vaccaro ("Vaccaro") was an energy trader who owned and operated his own trading firm, AC Power Financial ("AC Power").[12]

---

[7]Id. at 3-4 ¶¶ 3-4.

[8]Id. at 3 ¶ 5 (quoting ISA, Exhibit 2 to Plaintiff's MSJ, Docket Entry No. 152-3, ¶ 1).

[9]Id. ¶¶ 6-8.

[10]Plaintiff's SOF, Docket Entry No. 152, p. 3, ¶ 16; Defendants' Counter SOF, Docket Entry No. 168, p. 5 ¶ 16.

[11]Plaintiff's SOF, Docket Entry No. 152, p. 3 ¶ 17; Defendants' Counter SOF, Docket Entry No. 168, p. 6 ¶ 17.

[12]Plaintiff's SOF, Docket Entry No. 152, p. 3 ¶ 18 (citing
(continued...)

From 2012 through May of 2014, Vaccaro retained EOX to broker block trades for AC Power, and Gizienski served as his primary broker.[13] Vaccaro and Gizienski also had a personal relationship that included travel and entertainment.[14]

On April 25, 2013, Vaccaro executed an Additional Account Request pursuant to which he asked FCStone, LLC ("FCS"), the Futures Commission Merchant ("FCM") with which he worked, to establish an additional sub-account for AC Power, for the purpose of adding an additional trader, Gizienski.[15] On the same day, i.e., April 25, 2013, Vaccaro also executed a Managed Account Authorization providing Gizienski power of attorney to act as his agent to buy and sell commodity futures contracts, commodity

---

[12](...continued)
Videotaped Deposition of Jason Vaccaro ("Vaccaro Deposition"), p. 141:7-9, Exhibit 10 to Plaintiff's MSJ, Docket Entry No. 152-11, p. 4; Defendants' Counter SOF, Docket Entry No. 168, p. 6 ¶ 18.

[13]Defendants' Counter SOF, Docket Entry No. 168 p. 6 ¶ 19 (citing Vaccaro Deposition, p. 141:10-17, Docket Entry No. 152-11, p. 4). See also Plaintiff's SOF, Docket Entry No. 152, p. 3 ¶ 19 (citing Vaccaro Deposition, p. 141:15-21, Docket Entry No. 152-11, p. 4).

[14]Plaintiff's SOF, Docket Entry No. 152, p. 3 ¶ 20 (citing Excerpts of the Investigative Testimony of Andrew Gizienski ("Gizienski Investigative Testimony"), p. 33:3-8, Exhibit 5 to Plaintiff's MSJ, Docket Entry No. 152-6, p. 10; and Deposition of Andrew Gizienski ("Gizienski Deposition"), pp. 92:8-94:15, Exhibit 6 to Plaintiff's MSJ, Docket Entry No. 152-7, pp. 13-15); Defendants' Counter SOF, Docket Entry No. 168, pp. 6-7 ¶ 20.

[15]Plaintiff's SOF, Docket Entry No. 152, p. 4 ¶ 41 (citing Vaccaro Deposition, p. 158:1-22, Docket Entry No. 152-11, p. 12). See also Additional Account Request, Exhibit 21 to Plaintiff's MSJ, Docket Entry No. 152-22, p. 2).

options contracts, and cash commodities through FCS.[16]  FCS approved Vaccaro's request for an additional account on May 1, 2013.[17]  EOX paid the expenses associated with establishing and maintaining the Managed Account.[18]

Gizienski started using the Managed Account to make trades for AC Power in August of 2013, and continued to use it for that purpose until May of 2014 when Vaccaro directed him to stop.[19]

Gizienski exercised discretionary authority over the Managed Account, which allowed him (1) to execute trades for AC Power without speaking to Vaccaro about the specific trade, and (2) to determine the quantity, price, and timing of trades.[20]

---

[16]Plaintiff's SOF, Docket Entry No. 152, p. 7 ¶ 42 (citing Vaccaro Deposition, p. 158:23-159:19, Docket Entry No. 152-11, pp. 12-13).  See also Managed Account Authorization, Exhibit 21 to Plaintiff's MSJ, Docket Entry No. 152-22, p. 3.

[17]Additional Account Request, Exhibit 21 to Plaintiff's MSJ, Docket Entry No. 152-22, p. 2 ("Internal Approval" signature line).

[18]Plaintiff's SOF, Docket Entry No. 152, p. 7 ¶ 43 (citing June 2, 2013, Gizienski Email, Exhibit 22 to Plaintiff's MSJ, Docket Entry No. 152-23); Defendants' Counter SOF, Docket Entry No. 168, p. 16 ¶ 43.

[19]Plaintiff's SOF, Docket Entry No. 152, p. 7 ¶ 44 (citing Vaccaro Deposition, p. 142:13-16, Docket Entry No. 152-11, p. 6); Defendants' Counter SOF, Docket Entry No. 168, pp. 16-17 ¶ 43.

[20]Plaintiff's SOF, Docket Entry No. 152, pp. 8-9 ¶¶ 54, 58 (citing Gizienski Investigative Testimony, pp. 39:2-5, and 60:4-9, Exhibit 5 to Plaintiff's MSJ, Docket Entry No. 152-6, pp. 11 and 17; and Gizienski Deposition, pp. 102:20-104:2, 181:9-182:9), Exhibit 6 to Plaintiff's MSJ, Docket Entry No. 152-7, pp. 20-22, 25-26); Defendants' Counter SOF, Docket Entry No. 168, pp. 26 and 29 ¶¶ 54, 58.

In order to establish the Managed Account that Gizienski used to trade for AC Power, EOX's CEO, Javier Loya ("Loya"), waived a company policy that prohibited brokers from exercising discretion over customer accounts.[21]   EOX's Vice-President, Michael Nemer ("Nemer"), was responsible for working with FCS to set up the Managed Account,[22] and for daily monitoring of the Managed Account.[23]

EOX did not provide Gizienski any training expressly directed to exercising discretionary authority over the Managed Account.[24]

Neither EOX nor Gizienski disclosed to their other customers that Gizienski was exercising discretionary authority to execute

---

[21]Plaintiff's SOF, Docket Entry No. 152, p. 6 ¶ 39 (citing Answer, Docket Entry No. 77, p. 2 ¶ 4); Defendants' Counter SOF, Docket Entry No. 168, p. 14 ¶ 39.

[22]Plaintiff's SOF, Docket Entry No. 152, p. 6 ¶¶ 40-41 (citing Videoconference Deposition of Michael Nemer ("Nemer Deposition"), pp. 13:24-14:2, 25:16-27:13, Exhibit 11 to Plaintiff's MSJ, Docket Entry No. 152-12, pp. 7-9); Defendants' Counter SOF, Docket Entry No. 168, pp. 14-15 ¶¶ 40-41 (citing Supplemental Declaration of Javier Loya in Support of Defendants' Opposition to Plaintiff's MSJ ("Loya Supplemental Declaration"), Exhibit 1 to Defendants' Counter SOF, Docket Entry No. 168-2, p. 6 ¶ 22).

[23]Plaintiff's SOF, Docket Entry No. 152, p. 7 ¶ 47 (citing Nemer Deposition, pp. 31:22-32:3, Exhibit 11 to Plaintiff's MSJ, Docket Entry No. 152-12, pp. 12-13; Deposition of Javier Loya ("Loya Deposition"), p. 136:11-138:24, Exhibit 24 to Plaintiff's MSJ, Docket Entry No. 152-25, pp. 22-24); Defendants' Counter SOF, Docket Entry No. 168, pp. 14-15 ¶¶ 40 (citing Loya Supplemental Declaration, Exhibit 1 to Defendants' Counter SOF, Docket Entry No. 168-2, p. 6 ¶ 22 (asserting that Nemer was responsible for monitoring the account daily).

[24]Plaintiff's SOF, Docket Entry No. 152, pp. 7 ¶ 45 and 29 ¶ 148 (citing Gizienski Deposition, pp. 118:23-119:15, Docket Entry No. 152-7, pp. 23-24; Nemer Deposition, p. 31:11-14, Docket Entry No. 152-12, p. 12); Defendants' Counter SOF, Docket Entry No. 168, pp. 17 ¶ 45 and 94-95 ¶ 148).

trades for AC Power in the same markets that he was brokering for EOX's other customers.[25]

Neither EOX nor Gizienski obtained consent from customers to represent them as their broker in trades for which Gizienski, in exercising discretionary authority over the Managed Account, took the opposite side of their orders.[26]

Gizienski's customers did not know that while acting as their broker he exercised discretionary authority over the Managed Account to execute trades for AC Power in the same markets that he brokered for his other customers.[27]

---

[25]Plaintiff's SOF, Docket Entry No. 152, pp. 8 ¶ 49 and 10 ¶¶ 63-64 (citing inter alia Gizienski Investigative Testimony, pp. 59:15-60:13, Exhibit 5 to Plaintiff's MSJ, Docket Entry No. 152-6, pp. 16-17); Defendants' Counter SOF, Docket Entry No. 168, pp. 19-21 ¶ 49.

[26]Plaintiff's SOF, Docket Entry No. 152, pp. 8 ¶ 50 and 10 ¶¶ 62 and 65 (citing Defendant EOX Holding LLC's Responses to Plaintiff CFTC's First Set of Requests for Admissions ("EOX's Responses to Plaintiff's RFAs"), Exhibit 27 to Plaintiff's MSJ, Docket Entry No. 152-28, p. 10 ¶ 37); Defendants' Counter SOF, Docket Entry No. 168, p. 22 ¶ 50.

[27]Plaintiff's SOF, Docket Entry No. 152, pp. 8 ¶ 51 and 10 ¶ 64 (citing Deposition of Peter Grimes ("Grimes Deposition"), p. 96:12-21, Exhibit 7 to Plaintiff's MSJ, Docket Entry No. 152-8, p. 5; Videoconference Deposition of Alexander N. Elsik ("Elsik Deposition"), p. 69:11-18, Exhibit 25 to Plaintiff's MSJ, Docket Entry No. 152-26, p. 5; and Gizienski Deposition, pp. 182:13-183:16, Exhibit 6 to Plaintiff's MSJ, Docket Entry No. 152-7, pp. 25-26); Defendants' Counter SOF, Docket Entry No. 168, pp. 23-24 ¶ 51 (asserting that "Plaintiff[] cites three depositions for this statements, which supply no evidence about any customer other than those three," but failing to offer evidence of any customer who knew that Gizienski was using the Managed Account to trade for AC Power while acting as their broker in the same market).

Gizienski understood that when EOX's customers asked him for a quote or a market for a block trade order, the customers trusted him to "find the best price."[28]

Gizienski's customers expected him to provide them the best prices known to him for the products he was brokering, but there was no easy way for his customers to know whether he actually provided them with the best price.[29]

Other EOX brokers working in block trade energy markets understood that they had a duty to execute trades for customers at the best price available and known to the broker.[30]

EOX created trade confirmation documents for the Managed Account, some of which identify Gizienski as both broker and

---

[28]Plaintiff's SOF, Docket Entry No. 152, p. 16 ¶ 83 (citing Gizienski Investigative Testimony, pp. 84:23-85:4, Exhibit 5 to Plaintiff's MSJ, Docket Entry No. 152-6, pp. 22-23; Defendants' Counter SOF, Docket Entry No. 168, p. 52 ¶ 83.

[29]Plaintiff's SOF, Docket Entry No. 152, p. 17 ¶¶ 84-85 (citing Gizienski Investigative Testimony, pp. 85:24-86:12, Exhibit 5 to Plaintiff's MSJ, Docket Entry No. 152-6, pp. 23-24; Gizienski Deposition, p. 32:21-23, Exhibit 6 to Plaintiff's MSJ, Docket Entry No. 152-7, p. 8; and Deposition of Michael Derrett ("Derrett Deposition"), pp. 31:19-33:23, Exhibit 28 to Plaintiff's MSJ, Docket Entry No. 152-29, pp. 9-11; Defendants' Counter SOF, Docket Entry No. 168, p. 53 ¶¶ 84-85 (admits that Gizienski so testified but disputes testimony's accuracy and dispute's Plaintiff's interpretation of "best price").

[30]Plaintiff's SOF, Docket Entry No. 152, p. 17 ¶ 86 (citing Derrett Deposition, pp. 33:3-23, Exhibit 28 to Plaintiff's MSJ, Docket Entry No. 152-29, p. 11; Deposition of John Klosek ("Klosek Deposition"), pp. 37:15-39:1, 41:4-17, Exhibit 37 to Plaintiff's MSJ, Docket Entry No. 152-38, pp. 6-9).

trader.[31]   Each trade confirmation document that identifies Gizienski as both broker and trader states:

> Disclaimer: EOX Holdings, LLC acted solely as the broker for (Choice Natural Gas LP) for the transaction.  The Counterparties themselves determined the terms and conditions of the transaction.  EOX Holdings LLC is advising you of the above, as broker only.[32]

Gizienski disclosed to Vaccaro non-public information relating to the identities, positions, orders, and trading interests of EOX customers, not for the purpose of executing trades for other EOX customers but to "giv[e Vaccaro] market color."[33]

EOX's customers did not all have brokerage services agreements ("BSAs"); EOX's practice was to execute a BSA if requested by a customer.  EOX did not communicate to its brokers which customers had brokerage services agreements and which did not.[34]

---

[31]Plaintiff's SOF, Docket Entry No. 152, p. 10 ¶ 66 (citing Gizienski Block Trade Confirmations, Exhibit No. 29 to Plaintiff's MSJ, Docket Entry No. 152-30); Defendants' Counter SOF, Docket Entry No. 168, p. 35 ¶ 66 (admitting that "[t]he confirms show that [these] transaction[s were] on behalf of "AC Power dba EOX Holdings LLC as agent for" and arguing that "EOX Holdings was acting solely as broker/agent for AC Power, not as trader").

[32]Plaintiff's SOF, Docket Entry No. 152, p. 11 ¶ 68 (citing Gizienski Block Trade Confirmations, Exhibit No. 29 to Plaintiff's MSJ, Docket Entry No. 152-30); Defendants' Counter SOF, Docket Entry No. 168, p. 36 ¶ 68.

[33]Plaintiff's SOF, Docket Entry No. 152, p. 24, ¶ 118 (quoting Gizienski Investigative Testimony, p. 132:19, and citing id. at 132:17-134:2, Exhibit 5 to Plaintiff's MSJ, Docket Entry No. 152-6, pp. 26-28; and Gizienski Response to RFA, Exhibit 38 to Plaintiff's MSJ, Docket Entry No. 152-39, pp. 8 ¶ 21, 11 ¶ 32, 14 ¶ 46, 16 ¶ 56, 18 ¶ 68); Defendants' Counter SOF, Docket Entry No. 168, p. 84 ¶ 118.

[34]Plaintiff's SOF, Docket Entry No. 152, p. 24 ¶ 120 (citing Defendant EOX Holdings LLC's Responses to Plaintiff CFTC's First
(continued...)

In May of 2014, Vaccaro instructed Gizienski to stop using the Managed Account to execute trades for AC Power.[35]

## B.   Procedural Background

Plaintiff initiated this action on September 28, 2018, by filing Plaintiff's Complaint in the Southern District of New York alleging that Defendants violated the CEA and Regulations promulgated thereunder when between August of 2013 and May of 2014, Gizienski, an AP at EOX, disclosed EOX customers' confidential block trading orders and information to Vaccaro, and, exercising discretionary authority over the Managed Account, used that information to trade against his other customers without their prior consent (Counts I and II).   Plaintiff also alleged that EOX failed to properly maintain certain records (Count III), and failed to properly supervise Gizienski (Count IV).

On July 31, 2019, the Southern District of New York entered an Order pursuant to 28 U.S.C. § 1404(a) granting defendants' motion to transfer the action to this court (Docket Entry No. 52).

_____

[34](...continued)
Set of Interrogatories ("EOX's Responses to Interrogatories"), Exhibit 23 to Plaintiff's MSJ, Docket Entry No. 152-24, p. 6 No. 11; and Loya Deposition, pp. 198:21-200:10, Exhibit 24 to Plaintiff's MSJ, Docket Entry No. 152-25, pp. 30-32); Defendants' Counter SOF, Docket Entry No. 168, p. 84 ¶ 120.

[35]Plaintiff's SOF, Docket Entry No. 152, p. 24 ¶ 125 (citing Vaccaro Deposition, p. 146:3-10, Exhibit 10 to Plaintiff's MSJ, Docket Entry No. 152-11, p. 9; Defendants' Counter SOF, Docket Entry No. 168, p. 87 ¶ 125.

On September 9, 2019, the court entered a Memorandum Opinion and Order (Docket Entry No. 74) denying Defendants' Motion to Dismiss and for Summary Judgment on Counts I and II of the Plaintiff's Complaint.

On March 21, 2021, the court entered a Memorandum Opinion and Order (Docket Entry No. 159) granting Defendants' Motion to Amend the Revised Docket Control Order and for Leave to File Summary Judgment Motion on Counts I and II, and for Partial Summary Judgment on Counts III and IV.

## II. __Defendants' Motion to Amend__

Defendants' motion to amend, which was filed on October 8, 2020, seeks leave to add two affirmative defenses to Counts I and II of the Complaint: (1) failure of due process notice under the Fifth Amendment as applied; and (2) violation of Defendants' First Amendment rights to freedom of commercial speech.[36]

Plaintiff argues that defendants' motion to amend should be denied because it is untimely and futile.[37]

---

[36]Defendants' Motion to Amend, Docket Entry No. 121, p. 1. __See also__ Defendants' Amended Answer and Affirmative Defenses, Docket Entry No. 121-1, pp. 20-27; and Defendants' Memorandum in Support of Their Motion to Amend Revised Docket Control Order to Grant Them Leave to File Amended Answer Adding Affirmative Defenses ("Defendants' Memorandum in Support of Motion to Amend"), Docket Entry No. 122, p. 1).

[37]Plaintiff's Response in Opposition to Defendants' Motion for Leave to File an Amended Answer ("Plaintiff's Opposition to Defendants' Motion to Amend"), Docket Entry No. 129, p. 1.

-12-

Defendants reply that (1) the CFTC ignores the question of whether the two defenses are assertable without special pleading; (2) the CFTC ignores the long COVID 19 suspension of proceedings and its stonewalling in discovery; (3) futility must be viewed under the standards of sufficiency without resort to materials outside the proffered pleading; (4) the CFTC ignores and misstates facts; (5) the CFTC fails no justify its attempt to punish truthful commercial speech; (6) the CFTC's factual arguments violate Defendants' Seventh Amendment Right to a Jury Trial; and (7) the CFTC fails to assert prejudice.[38]

## A.    Standard of Review

If a scheduling order has been entered establishing a deadline for amendments to pleadings, Federal Rule of Civil Procedure 15(a) provides the standard for requests to amend that are filed before the scheduling order's deadline has expired.  If, however, the deadline for amending the pleadings has expired, the movant must establish good cause for modifying the scheduling order as required by Rule 16(b) before the court will apply Rule 15(a)'s more liberal standard to the motion to amend.  S&W Enterprises, L.L.C. v. SouthTrust Bank of Alabama, NA, 315 F.3d 533, 536 (5th Cir. 2003).

---

[38]Defendants' Reply on Their Motion to Amend Revised Docket Control Order to Grant Them Leave to File Amended Answer Adding Affirmative Defenses ("Defendants' Reply in Support of Motion to Amend"), Docket Entry No. 132, pp. 2-11.

If a movant establishes good cause to extend the scheduling order, courts analyze the motion to amend under Rule 15(a).  Id.  Because a scheduling order (i.e., a Docket Control Order) was entered on September 27, 2019 (Docket Entry No. 76), a Second Amended Docket Control Order (Docket Entry No. 98), was entered on May 18, 2020, and a Revised Docket Control Order (Docket Entry No. 102) was entered on June 16, 2020, and because all of the scheduling orders entered in this case stated that no amendments were to be filed, Defendants must establish good cause to modify the scheduling order pursuant to Rule 16(b) before the court will apply Rule 15(a)'s standard to their motion to amend.

**B.   Defendants Have Established Good Cause Under Rule 16(b)**

Defendants argue that they have the "good cause" required by Rule 16(b) to amend the Revised Docket Control Order to add two affirmative defenses, one for as-applied lack of due process notice, and one for violation of their rights to freedom of commercial speech, because

> (1)  their request to add [these] Defense[s] is timely: Defendants have been diligently pursuing discovery about it that the CFTC has stonewalled; (2) the requested amendment is important: it is a Constitutional Due Process defense that, if granted, would likely be dispositive of the fraud charges of Counts I and II; (3) the CFTC will not be unduly prejudiced: it will have ample opportunity to oppose the Defenses without any

complicated proceedings or further discovery; and (4) the addition of the Defense[s] will not delay this case.[39]

To determine whether the moving party has established good cause, courts consider four factors:  "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." S&W Enterprises, 315 F.3d at 536.

1.   Defendants Have No Reasonable Explanation for Delay

Asserting that they "have been trying without success to investigate the CFTC's lack of warning or announcement that it would claim that disclosure of counterparty information in block trades constitutes a fraud under Section 6(c)(1), 155.4(b)(1) & 180.1(a),"[40] that they filed a motion to compel requiring the disclosure of that information,[41] and that "the CFTC also refused to disclose this information in response to Defendants' FOIA

---

[39]Defendants' Memorandum in Support of Motion to Amend, Docket Entry No. 122, p. 3.  See also id. at 34 ("Given the CFTC's stonewalling, Defendants have not unduly delayed.  In any event, there is more than ample time left in discovery and other stages of this case to deal with these affirmative defenses, and the CFTC will suffer no undue prejudice of any kind in responding to them. There has been no failure to cure deficiencies at all.  And the Affirmative Defenses are certainly not futile.").

[40]Id. at 33-34.

[41]Id. at 34.

[r]equests,"[42] Defendants argue that "[i]t is entirely reasonable that [they] investigate the grounds for their affirmative defense before asserting it[, a]nd, they have been diligent in doing so."[43]

Asserting that "Defendants unduly delayed raising their two new affirmative defenses,"[44] Plaintiff argues that the affirmative defenses Defendants seek to add "should have been apparent from the outset of this case if they had been credible defenses."[45] Plaintiff argues that

> [t]hese constitutional defenses are not the type that require discovery in order to assert. Defendants knew what notice they received regarding the conduct that was prohibited and what rights they have under the First Amendment. There is no legitimate excuse for Defendants' decision to wait years before seeking leave to assert these affirmative defenses.
>
> Finally, Defendants do not explain what changed between the time they moved to enter a docket control order barring motions to amend the pleadings (Dkt. 101-1), and the filing of this motion. Presumably, no explanation is forthcoming because nothing has changed, except that Defendants have finally gotten around to considering what defenses they wish to raise.
>
> Because there is no legitimate excuse for Defendants' lengthy delay in raising these affirmative defenses, the motion should be denied.[46]

---

[42]Id.

[43]Id.

[44]Plaintiff's Opposition to Defendants' Motion to Amend, Docket Entry No. 129, p. 4.

[45]Id.

[46]Id. at 4-5.

Defendants reply that "in view of the COVID 19 stays of proceedings, the CFTC's discovery stonewalling, the Motion to Amend is timely."[47]

Plaintiff filed its first and only Complaint (Docket Entry No. 1) on September 28, 2018. One year later, on September 27, 2019, after Defendants' motion to dismiss and first motion for summary judgment was briefed and denied,[48] the court entered a Docket Control Order, setting deadlines and stating that no motions to amend the pleadings would be allowed.[49] Approximately two weeks later on October 10, 2019, Defendants filed an Answer to Plaintiff's Complaint.[50] The affirmative defenses that Defendants seek leave to assert are based on facts and arguments that were available and could have been asserted on October 10, 2019, when Defendants answered Plaintiff's Complaint. Defendants could have sought leave to amend to assert the two affirmative defenses in the spring of 2020 when the COVID 19 pandemic prompted them to file a motion to vacate the original scheduling order and seek several extensions of time.[51] Defendants could also have sought leave to

---

[47]Defendants' Reply in Support of Motion to Amend, Docket Entry No. 132, p. 1.

[48]See Memorandum Opinion and Order, Docket Entry No. 74, entered on September 26, 2019.

[49]Docket Control Order, Docket Entry No. 76.

[50]Answer, Docket Entry No. 77.

[51]See Unopposed Motion to Vacate 76 Scheduling Order, Docket
(continued...)

amend to assert the two affirmative defenses on June 15, 2020, when the parties filed an agreed motion to amend the Docket Control Order,[52] and jointly submitted a Revised Docket Control Order stating that no amendments to the pleadings would be allowed.[53]

Defendants have neither argued nor cited any evidence from which the court could conclude that they were not aware of the facts on which their proposed amendments are based before they answered Plaintiff's Complaint or before the parties jointly submitted the Revised Docket Control Order, which the court entered on June 16, 2020.  Because Defendants have failed to offer a reasonable explanation for delay in seeking leave to amend, this factor weighs against granting their motion to amend.  <u>Southwestern Bell Telephone Co. v. City of El Paso</u>, 346 F.3d 541, 547 (5th Cir. 2003) (denying leave to amend because "[movant] was aware of the contract that forms the basis of its proposed amendment months in advance of the deadline and does not offer a satisfactory explanation for its delay in seeking leave to amend").

---

[51] (...continued)
Entry No. 90, and Order granting Unopposed Motion to Vacate, Docket Entry No. 91; Motion for Extension of Time — Suspension of Docket Control Order, Docket Entry No. 94; Order granting Motion for Extension of Time, Docket Entry No. 95; and Motion for Extension of Time, Docket Entry No. 97.  <u>See also</u> Second Amended Docket Control Order, Docket Entry No. 98, entered on May 18, 2020.

[52] Docket Entry No. 101.

[53] Docket Entry No. 101-1.

2.  <u>The Proposed Amendments Are Important, Will Not Prejudice
    Plaintiff, and Will Not Delay the Case</u>

Defendants argue that the proposed amendments are important because they raise Constitutional issues that could be dispositive of the claims asserted in Counts I and II of Plaintiff's Complaint, that the proposed amendments have no potential for prejudice because Plaintiff will be able to oppose the defenses without complicated proceedings or further discovery, and that granting their request to amend will not delay resolution of the case.[54] Defendants address the two proposed affirmative defenses in the brief that they filed opposing Plaintiff's MSJ.[55] Plaintiff does not dispute Defendants' contentions that their proposed amendments are important, that Plaintiff will be able to respond to the defenses without additional discovery, and that granting the motion will not delay resolution of the case. Instead, Plaintiff argues that Defendants' Motion to Amend should be denied because it would be futile,[56] which is one of the issues considered under Rule 15(a) only once Rule 16(b)'s good cause standard has been satisfied.

---

[54]Defendants' Memorandum in Support of Motion to Amend, Docket Entry No. 122, p. 3. <u>See also</u> <u>id.</u> at 26-31 (arguing that neither § 6(c)(1) nor Regulations 155.4(b)(1) and 180.1(a) provided the Constitutionally required notice of application to block trades); and 31-32 arguing that this prosecution violates Defendants' rights to freedom of commercial speech)). Defendants' Reply in Support of Motion to Amend, Docket Entry No. 132, p. 1 (asserting that the proposed defenses "rely almost entirely on uncontestable facts and legal principles").

[55]Defendants' Opposition to Plaintiff's MSJ, Docket Entry No. 167-1, p. 32 ("Defendants stand on their First and Fifth Amendment Constitutional defenses.").

[56]Plaintiff's Opposition to Defendants' Motion to Amend, Docket Entry No. 129, pp. 5-10.

Because the affirmative defenses that Defendants seek leave to add raise Constitutional issues that could be dispositive of the claims asserted in Counts I and II, and because a comprehensive opinion dealing with all of the issues could benefit the public since this action appears to raise issues of first impression, the court concludes that the proposed amendments are important. Because Plaintiff does not dispute Defendants' assertion that addition of the two proposed affirmative defenses will not require additional discovery, because both parties have briefed the merits of the two defenses in the papers that they have filed in support of and opposition to Defendants' Motion to Amend, and because Defendants have asserted both of the proposed defenses in opposition to Plaintiff's MSJ, the court concludes that allowing the requested amendments will neither prejudice Plaintiff nor require a continuance that would delay resolution of the case. Thus, the three Rule 16(b) factors other than delay all weigh in favor of granting Defendants' motion.

### 3. Conclusions

Although Defendants have failed to offer a reasonable explanation for delay in seeking leave to amend, and this factor weighs against granting their motion, because the three remaining factors all weigh in favor of granting their motion, the court concludes that Defendants have established good cause to modify the scheduling order as required by Rule 16(b) to allow the court to apply Rule 15(a)'s more liberal standard in considering Defendants' Motion to Amend.

**C.    Plaintiff Has Failed to Establish that the Proposed Amendments Would Be Futile**

Federal Rule of Civil Procedure 15(a)(2) states that "[t]he court should freely give leave [to amend] when justice so requires." "A decision to grant leave is within the discretion of the court, although if the court 'lacks a "substantial reason" to deny leave, its discretion "is not broad enough to permit denial."'" State of Louisiana v. Litton Mortgage Co., 50 F.3d 1298, 1302-03 (5th Cir. 1995) (per curiam) (citation omitted). Rule 15(a) provides "a strong presumption in favor of granting leave to amend." Financial Acquisition Partners LP v. Blackwell, 440 F.3d 278, 291 (5th Cir. 2006). "Denial of leave to amend may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of a proposed amendment." United States ex rel. Steury v. Cardinal Health, Inc., 625 F.3d 262, 270 (5th Cir. 2010) (citing Foman v. Davis, 83 S.Ct. 227, 230 (1962)).

Citing Rule 15(a), Defendants argue that

they should have the benefit of the presumption of this Rule in favor of freely granting amendments when justice so requires. Given that this is an important case of first impression affecting not just Defendants but a critical sector of the energy investment community, an extremely important component of the nation's financial infrastructure and economy, justice does so require.[57]

---

[57]Defendants' Memorandum in Support of Motion to Amend, Docket Entry No. 122, p. 3.

Citing <u>Maynard v. Cartwright</u>, 108 S. Ct. 1853 (1988), and statements made by Gizienski and Loya, Plaintiff argues that Defendants' affirmative defenses are futile because they knew that their actions were prohibited.[58]   In <u>Maynard</u> the Supreme Court said:

> Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.   Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is adjudged on an as-applied basis.

<u>Id.</u> at 1857-58 (citing <u>inter alia</u> <u>United States v. National Dairy Products Corp.</u>, 83 S. Ct. 594, 598 (1963) ("Void for vagueness simply means that . . . responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." (citation omitted)).

In determining whether to grant leave to amend, futility means that "the amended complaint would fail to state a claim upon which relief could be granted."   <u>Stripling v. Jordan Production Co., LLC</u>, 234 F.3d 863, 873 (5th Cir. 2000).   "An affirmative defense is subject to the same pleading requirements as is the complaint."   <u>Woodfield v. Bowman</u>, 193 F.3d 354, 362 (5th Cir. 1999).   Like the complaint, an affirmative defense need only contain "a short and

---

[58]Plaintiff's Opposition to Defendants' Motion to Amend, Docket Entry No. 129, pp. 7-8 (citing IFUS Interview of Andrew Gizienski, p. 24, Exhibit 40 to Plaintiff's SOF, Docket Entry No. 152-41, p. 25; August 14, 2013, Email from Javier Loya to All Choice Envir Employees, Exhibit 3, Docket Entry No. 129-1, p. 27, and Exhibit 70 to Plaintiff's SOF, Docket Entry No. 152-71).

plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In <u>Woodfield</u> the Fifth Circuit held that a defendant "must plead an affirmative defense with enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced." 193 F.3d at 362.  <u>Woodfield</u>'s fair-notice pleading standard requires Defendants to "sufficiently articulate[] the defense so that the plaintiff [is] not a victim of unfair surprise."  <u>Id.</u>

Since <u>Woodfield</u>, the Supreme Court has clarified that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007)).  The Fifth Circuit has not yet addressed whether the plausible pleading standard articulated in <u>Twombly</u> and <u>Iqbal</u> applies to affirmative defenses.  While district courts in the Fifth Circuit are split on this issue, <u>see</u> <u>Bush v. Wells Fargo Bank, N.A.</u>, 911 F. Supp.2d 445, 484 (S.D. Tex. 2012) (collecting cases), this court has continued to apply the fair-notice standard to motions to amend affirmative defenses.  <u>See</u> <u>Sprint Solutions, Inc. v. Precise Wireless International, Inc.</u>, Civil Action No. H-15-0032, 2015 WL 2359519, at *2 (S.D. Tex. May 15, 2015).

Plaintiff's argument that the proposed amendments would be futile because the evidence does not support their proposed

-23-

defenses is not based on the sufficiency of the Defendants'
pleadings, but, instead, on the sufficiency of evidence outside of
the pleadings.  Because Rule 12(b)(6) precludes consideration of
evidence outside the pleadings, Plaintiff has failed to show that
Defendants' proposed defenses are futile.  See Lachney v. O'Reilly
Automotive Stores, Inc., No. 1:16-CV-00478, 2017 WL 5178773, at * 5
(W.D. La. November 6, 2017) ("[A] court must determine whether a
proposed amendment is 'legally insufficient on its face' — not
whether a defendant has, at the pleading state, already carried the
ultimate burden of establishing an affirmative defense.") (citing
Edison Global Circuits, LLC v. Ingenium Technologies, Corp., No. H-
11-1207, 2012 WL 1884083, at *2 (S.D. Tex. May 22, 2012)).  Because
Plaintiff has failed to show that the affirmative defenses
Defendants seek leave to add are futile under this standard, and
because review of Defendants' proposed Amended Answer persuades the
court that the defenses are pleaded with enough factual
particularity to satisfy both the fair-notice and the plausibility
pleading standards,[59] Defendants' Motion to Amend will be granted.

---

[59]See Defendants' Amended Answer and Affirmative Defenses,
Docket Entry No. 121-1, pp. 20-26 (Second Affirmative Defense to
Counts I and II Lack of Notice of Illegality in Violation of the
Due Process Clause of the Fifth Amendment to the United States
Constitution), and pp. 26-27 (Third Affirmative Defense to Counts
I and II Violation of Defendants' Right of Freedom of Speech in
Violation of the First Amendment to the United States
Constitution).

### III. **Defendants' Motion to Strike**

Defendants move to strike two declarations submitted by Plaintiff in support of its motion for summary judgment: (1) the Declaration of Duan Forester ("Forester Declaration") (labeled by Plaintiff as the "PSEG Declaration"), Exhibit 26 to Plaintiff's MSJ;[60] and (2) the Declaration of Heather Dasso ("Dasso Declaration"), Exhibit 31 to Plaintiff's MSJ.[61] Defendants urge the court to strike both declarations because they are "sham affidavits" not based on personal knowledge.[62] Defendants also argue that the Dasso Declaration is subject to being stricken because "it is an expert report that was not timely disclosed."[63]

Plaintiff argues that Defendants' Motion to Strike should be denied because both the PSEG and Dasso declarations are admissible evidence, and neither is a "sham affidavit."[64]

---

[60]Exhibit 26 to Plaintiff's MSJ, Docket Entry No. 152-27.

[61]Exhibit 31 to Plaintiff's MSJ, Docket Entry No. 152-32.

[62]Defendants' Motion to Strike, Docket Entry No. 171, p. 1. See also Memorandum in Support of Defendants' Motion to Strike Improper Declarations Submitted by Plaintiff in Support of Its Motion for Summary Judgment ("Defendants' Memorandum in Support of Motion to Strike"), Docket Entry No. 172, pp. 4 and 15.

[63]Defendants' Motion to Strike, Docket Entry No. 171, p. 1. See also Defendants' Memorandum in Support of Motion to Strike, Docket Entry No. 172, pp. 4-5.

[64]Plaintiff's Response in Opposition to Defendants' Motion to Strike Declarations, Docket Entry No. 175, p. 5.

## A.    Applicable Law

"[A] declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  See Obregon v. United States, 791 F. App'x 458, 461 (5th Cir. 2019)(per curiam)("Our precedent dictates that 'statements in affidavits . . . be based on personal knowledge and not based on information and belief.'") (quoting Bolen v. Dengel, 340 F.3d 300, 313 (5th Cir. 2003), cert. denied, 124 S. Ct. 1714 (2004) (emphasis added)).  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The sham affidavit doctrine prohibits a party from raising a fact issue in the face of summary judgment by submitting an affidavit that contradicts prior sworn testimony without explanation.  See S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996).  See also Cleveland v. Policy Management Systems Corp., 119 S. Ct. 1597, 1603 (1999) ("[Lower federal courts] have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn testimony (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity").

**B.    Application of the Law to the Forester Declaration**

Defendants argue that the Forester or PSEG Declaration should

be stricken because it

> is a "sham affidavit" not based on personal knowledge
> that contradicts his prior Certification and his
> deposition that no one at PSEG has knowledge of the
> commercial relationship between PSEG and its trader, on
> the one hand, and Defendants EOX and Andrew Gizienski, on
> the other.[65]

Asserting that PSEG, which stands for PSEG Energy Resources & Trade

LLC, is one of the EOX customers (Customer B) involved in this

case, and that Edward Mazzacano was the PSEG employee who traded

for PSEG in 2013-2014 when the events at issue occurred,[66]

Defendants argue that

> [l]ate last year, [they] subpoenaed PSEG for documents
> and a deposition. . .
>
> Instead of a deposition, PSEG provided a November
> 18, 2020[,] Certification under penalty of perjury from
> Daun Forester, a PSEG employee. . . [which] certified in
> part:
>
> > In regard to the Deposition Subpoena, the
> > Company is not aware of any current employee
> > who has personal knowledge about: . . . any
> > commercial relationship in 2012-2014 between a
> > Company employee and Andrew Gizienski
> > referenced in Topic 3. . .[67]

---

[65]Defendants' Motion to Strike, Docket Entry No. 171, p. 1.
See also Defendants' Memorandum in Support of Motion to Strike,
Docket Entry No. 172, p. 4.

[66]Defendants' Memorandum in Support of Motion to Strike, Docket
Entry No. 172, p. 5 & n. 2 (citing Forester Certification, Exhibit
19 to Defendants' Counter SOF, Docket Entry No. 168-3, p. 23 ¶ 2).

[67]Id. at 5 (citing D. Forester Certification, Exhibit 19 to
(continued...)

Defendants argue that

> [o]n the morning of January 6, 2021, [they] deposed
> Mr. Mazzacano, the former PSEG trader who had traded with
> Defendants in 2013-2014.  He testified that he was always
> happy with Andrew Gizienski's services, that the prices
> he got were in the range that Mazzacano wanted to be
> executed at, and that, as far as he knew, nothing Andrew
> Gizienski or EOX did caused PSEG any damage. . .

> That afternoon, four hours after the Mazzacano
> deposition ended, Plaintiff produced the December 22,
> 2020[,] Declaration from Mr. Forester that is the subject
> of this Motion.  Plaintiff had been withholding it for
> two weeks. . .

> That new Forester Declaration asserted that PSEG had
> received inferior prices in a number of transactions that
> Mazzacano had ordered.  It did not mention Forester's
> prior Certification or explain the obvious inconsistency
> of how he came to this knowledge in the face of his
> previous Certification that PSEG "is not aware of any
> current employee who has personal knowledge about: . . .
> any commercial relationship in 2012-2014 between a
> Company employee and Andrew Gizienski."

> Defendants then subpoenaed Mr. Forester for his
> deposition.  Under oath, he reaffirmed as true his
> November 18, 2020[,] Certification that PSEG "is not
> aware of any current employee who has personal knowledge
> about: .  . . any commercial relationship in 2012-2014
> between a Company employee and Andrew Gizienski." . .

> Unfazed, Plaintiff submitted the 12/22/20 Forester
> Declaration (calling it the "PSEG Declaration") as an
> exhibit to its Summary Judgment Motion in support of
> Statements of Fact **49, 51, 63, 69, 85 & 94**.[68]

Asserting that "the PSEG Declaration is based upon the

declarant's stated personal knowledge regarding PSEG's ordinary

---

[67](...continued)
Defendants' MSJ, Docket Entry No. 168-3, p. 23).

[68]Id. at 5-6 (citing Mazzacano Deposition, p. 72, Exhibit 10
to Defendants' MSJ, Docket Entry No. 160-2, pp. 95-113).

business practices,"[69] Plaintiff argues that "it is admissible evidence and should not be stricken."[70]  Plaintiff also argues that the sham affidavit doctrine does not apply to the Forester Declaration because (1) it has been submitted in support of Plaintiff's MSJ and not in opposition to Defendants' MSJ, (2) it was submitted on January 6, 2021, before — not after — Forester was deposed on January 28, 2021, and (3) it does not contradict any prior testimony.[71] Asserting that the PSEG Declaration was provided to Defendants as soon as it was ready for production, Plaintiff argues that the timing of Defendants' receipt of the PSEG Declaration neither impacts its admissibility, nor prejudices the Defendants.[72]

Defendants reply that the Forester Declaration should be stricken because the assertion that it is based on Forester's personal knowledge contradicts without explanation both Forester's November 18, 2020, Certification that "the Company is not aware of any current employee who has personal knowledge about: . . . any commercial relationship in 2012-2014 between a Company employee and Andrew Gizienski referenced in Topic 3,"[73] and and his January 28,

---

[69]Plaintiff's Response in Opposition to Defendants' Motion to Strike Declarations, Docket Entry No. 175, p. 5.  See also id. at 7-10.

[70]Id.

[71]Id. at 6-7 & n. 1.

[72]Id. at 10.

[73]Defendants' Reply in Support of Their Motion to Strike
(continued...)

2021, deposition testimony, which affirmed his Certification.[74]
Arguing that Plaintiff's production of the Forester Declaration was
both untimely and prejudicial, Defendants contend that

> Plaintiff's Rule 26(a) Initial Disclosures . . .
> identified Mr. Mazzacano as the only PSEG witness; no one
> else, certainly not Mr. Forester, was identified.
> Plaintiff's answer to Defendants' Interrogatory regarding
> any trading losses and all relevant documents contained
> the same omission. . . Under Rules 26(a) and (e),
> Plaintiff was required to produce the Declaration long
> before it did and certainly before the Mazzacano
> deposition. And it is most telling that Plaintiff fails
> to explain to this Court why it delayed in producing the
> Declaration.
>
> Defendants were most assuredly prejudiced by
> Plaintiff's withholding of the sham Forester/"PSEG
> Declaration" for two weeks — from December 22, 2020,
> until January 6, 2021[,] at 4:18 p.m. — after Defendants
> had just concluded their deposition of PSEG trader Edward
> Mazzacano. Simply stated, with only three weeks left in
> discovery, it prevented Defendants from asking
> Mr. Mazzacano, the only PSEG employee involved in the
> underlying events, about the various subjects of that
> sham Declaration. Under Rule 30(a)(2)(A)(ii), he could
> not be recalled as a witness without cumbersome two-
> district proceedings — before this Court and then the
> District Court of New Jersey where he lives — to compel
> a second appearance, likely over his strong objection.[75]

---

[73](...continued)
Improper Declarations Submitted by Plaintiff in Support of Its
Motion for Summary Judgment ("Defendants' Reply in Support of Their
Motion to Strike"), Docket Entry No. 177, p. 5.

[74]<u>Id.</u> at 6-7 (citing Deposition of Duan Henry Forester
("Forester Deposition"), p. 80:15-17, Exhibit A to Plaintiff's
Response in Opposition to Defendants' Motion to Strike
Declarations, Docket Entry No. 175-1, p. 9 ("So, I don't know
anything -- didn't know anything in general. I certainly didn't
know anything specific.")

[75]<u>Id.</u> at 9 (citing Federal Rule of Civil Procedure 26(a)
(continued...)

In his November 18, 2020, Certification, Forester states that he is "an authorized representative of PSEG, ER&T, LLC (the "Company"),"[76] he is "VP Trading and Origination for PSEG Power LLC . . . responsible for the long-term hedging of . . . power generation assets in three northeastern regional transmission organizations,"[77] that he has held his current position for 11 months but has been employed by PSEG Power LLC since December of 2007,[78] and that PSEG, which was a customer of EOX in 2012-2014, is a subsidiary of his employer.[79]  Forester then describes a number of PSEG's businesses practices, e.g., "[PSEG] does not authorize its brokers to disclose its identity to other traders or market participants not involved in the negotiation of a specific block trade,"[80] "[PSEG] does not authorize its brokers to disclose its trading activity to other traders or market participants involved in the negotiation of a specific block trade,"[81] and "[PSEG] expects

---

[75](...continued)
Initial Disclosures, Exhibit O to Defendants' Reply in Support of Their Motion to Strike, Docket Entry No. 177-2, pp. 3-17).

[76]Forester Certification, Exhibit 19 to Defendants' Counter SOF, Docket Entry No. 168-3, p. 23.

[77]Forester Declaration, Exhibit 26 to Plaintiff's MSJ, Docket Entry No. 152-27, p. 2 § 1.

[78]Id. ¶ 2.

[79]Id. ¶ 3.

[80]Id. at 3 ¶ 5.

[81]Id. ¶ 6.

that its brokers fill its trades at the best price available to the broker in the market at the time of the trade."[82]   Plaintiff argues that the Forester Declaration is admissible because it describes PSEG's ordinary business practices.

Although qualified by the phrase, "[b]ased on the facts currently available," Forester makes a number of statements that are specifically related to PSEG's relationship with Gizienski and EOX, e.g., "[PSEG] was not aware that Andrew Gizienski was exercising discretionary trading authority on behalf of another EOX customer from August 2013 - May 2014,"[83] and "[PSEG] was not aware that Andrew Gizienski was exercising discretionary trading authority by taking the opposite side of [PSEG] trades."[84]   Forester also describes three trades that Gizienski brokered for PSEG: (1) a trade on January 15, 2014, in which PSEG bought five contracts and would have preferred to pay less than it paid; (2) a trade on March 4, 2014, in which PSEG sold five contracts and would have preferred to receive at a higher price than it received; and (3) a trade on May 14, 2014, in which PSEG bought five contracts and would have preferred to pay less than it paid.[85]   Plaintiff's argument that the Forester Declaration is admissible because it merely describes

--------

[82]Id. at 4 ¶ 22.

[83]Id. ¶ 20.

[84]Id. ¶ 21.

[85]Id. at 5-6 ¶¶ 30-38.

PSEG's general business practices is thus belied by the many statements qualified by the phrase "[b]ased on the currently available facts," and by the statements that specifically reference Gizienski and three trades that he brokered for PSEG on January 15, 2014, March 4, 2014, and May 14, 2014.

Because Fifth Circuit "precedent dictates that 'statements in affidavits . . . be based on personal knowledge and <u>not based on information and belief</u>,'" <u>Obregon</u>, 791 F. App'x at 461 (quoting <u>Bolen</u>, 340 F.3d at 313), the court will only consider those parts of the Forester Declaration that reflect his personal knowledge, <u>e.g.</u>, affirmative statements about PSEG's business practices.  The court will not consider those parts of the Forester Declaration that do not reflect his personal knowledge.   Statements that do not reflect Forester's personal knowledge include statements prefaced by the phrase, "[b]ased on the facts currently available," which the court reads as analogous to statements "based on information and belief," and statements that specifically reference Gizienski and the three trades that he brokered for PSEG on January 15, 2014, March 4, 2014, and May 14, 2014.

Although Forester asserts that the contents of the Declaration are "based on my personal knowledge,"[86] and  courts generally accept assertions of personal knowledge at face value, the court need not do so when — as here — the accompanying declaration lacks indicia

---

[86]Id. at 2.

that the declarant could reasonably be expected to have personal knowledge of the facts stated, that those facts would be admissible in evidence, or that the declarant is competent to testify to those facts.  The Forester Declaration does not include any facts describing the source of his asserted personal knowledge of any of the statements that specifically reference Gizienski and the three trades that Gizienski brokered for PSEG on January 15, 2014, March 4, 2014, and May 14, 2014.  Moreover, the record before the court contains uncontradicted evidence to the contrary.  On November 18, 2020, Forester certified that his company was "not aware of any current employee who has personal knowledge about: . . . any commercial relationship in 2012-2014 between a Company employee and Andrew Gizienski."  And on January 28, 2021, Forester testified at his deposition that he does not know anything about the commercial relationship between his company and Gizienski.  Also missing from either the Forester Declaration or the record before the court is any evidence that PSEG maintains records of trades brokered by Gizienski, that Forester is either a custodian of such records or has knowledge of them by virtue of his position, or that Forester is otherwise competent to testify to the facts stated in the declaration that specifically reference Gizienski and any of the trades that he brokered for PSEG on January 15, 2014, March 4, 2014, and May 14, 2014.  Because the Forester Declaration does not contain facts from which the court could reasonably conclude that

Forester has personal knowledge of the facts stated in reference to Gizienski and the three trades that Gizienski brokered for PSEG on January 15, 2014, March 4, 2014, and May 14, 2014, that those facts would be admissible in evidence, or that Forester is competent to testify to those facts, the court is not persuaded that the statements in Forester's Declaration about the three trades that Gizienski brokered for PSEG on January 15, 2014, March 4, 2014, and May 14, 2014, satisfy Rule 56(e)'s requirements for declarations submitted to support or oppose a motion for summary judgment. Accordingly, Defendants' Motion to Strike the Forester Declaration will be granted as to ¶¶ 8-10, 17-18, 20-21, 23, 25, 27-38, and denied as to the remaining paragraphs of the declaration.

Moreover, since Forester signed the declaration on December 22, 2020, but Plaintiff did not provide it to Defendants until January 6, 2021, and then, only hours after completion of the Mazzacano deposition, the court will not consider any statements in the Forester Declaration that contradict Mazzacano's testimony. Plaintiff's contention that Defendants were not prejudiced by Plaintiff's failure to provide the Forester Declaration to them until hours after completion of Mazzacano's deposition is not persuasive and, frankly, strains credulity.

## C.   Application of the Law to the Dasso Declaration

Defendants argue that the Dasso Declaration should be stricken because it is

> a "sham affidavit" . . . by Plaintiff's investigator, made without adequate personal knowledge based on prior Supplemental Discovery Responses that were prepared by one of Plaintiff's lawyers, not Ms. Dasso.  It does not support the Statements of Fact that cite it and shows that the Declarant does not have the personal knowledge to support its statements.[87]

Defendants also argue that the Dasso Declaration should be stricken because "it is an expert report that was not timely disclosed."[88] In support of their motion to strike, Defendants cite Dasso's deposition testimony that she verified Supplementary Discovery Responses dealing with damages that were prepared by Plaintiff's attorney, Douglas Snodgrass,[89] that she has a degree in accounting, and that a duty of her job is to provide expert testimony.[90]

---

[87]Defendants' Motion to Strike, Docket Entry No. 171, p. 1. See also Defendants' Memorandum in Support of Motion to Strike, Docket Entry No. 172, pp. 4 and 16.

[88]Defendants' Motion to Strike, Docket Entry No. 171, p. 1. See also Defendants' Memorandum in Support of Motion to Strike, Docket Entry No. 172, p. 5.

[89]Defendants' Memorandum in Support of Motion to Strike, Docket Entry No. 172, pp. 9-12 (quoting Deposition of Heather Dasso ("Dasso Deposition"), pp. 138-40 and 146-47, but failing to include these pages in the Excerpts of 12/11/20 Deposition of Heather Dasso, Exhibit L to Defendants' Memorandum in Support of Motion to Strike, Docket Entry No. 172-4).  But see Dasso Deposition, p. 39, Exhibit C to Plaintiff's Response in Opposition to Defendants' Motion to Strike Declarations, Docket Entry No. 175-1, p. 23.

[90]Defendants' Memorandum in Support of Motion to Strike, Docket
(continued...)

Defendants also cite the Revised Docket Control Order (Docket Entry
No. 102) that set October 29, 2020, as the date for submitting
expert reports by the party with the burden of proof.[91]

    Asserting that "the information in the [Dasso D]eclaration is
clearly within Dasso's personal knowledge and the declaration
plainly does not include any opinion, expert or lay,"[92] Plaintiff
argues that "[t]he Dasso Declaration is [p]roper and [s]hould [n]ot
[b]e [s]tricken."[93]   Plaintiff argues that

>    [t]he first four paragraphs of the declaration introduce
>    Ms. Dasso and explain the work she has performed in the
>    investigation and litigation involving Defendants. Dasso
>    Decl. (ECF 152-32) at ¶ 1-4.   Paragraph 5 explains how
>    trade data exhibits (Ex. 30, 32, and 33) to the CFTC's
>    motion for summary judgment were created.   Id. at ¶ 5.
>    Paragraph 6 explains Dasso's personal knowledge about the
>    meaning of the column headings in those trade data
>    exhibits, and paragraphs 7-27 explain the meanings of
>    each column heading.   Id. ¶¶ 6-27.   None of this
>    constitutes an opinion, much less an expert opinion.[94]

Plaintiff argues that

>    Defendants' specific criticisms of the Dasso declaration
>    are factually and legally frivolous.   Defendants claim
>    that the declaration does not support the facts
>    describing trades by the Gizienski [for the Managed]

---

        [90] (...continued)
Entry No. 172, pp. 8-9 (citing Dasso Deposition, pp. 31:3-23,
70:10-19, Docket Entry No. 172-4, pp. 57 and 63).

        [91] Id. at 8-15.

        [92] Plaintiff's Response in Opposition to Defendants' Motion to
Strike Declarations, Docket Entry No. 175, pp. 10-11.

        [93] Id. at 10.

        [94] Id. at 11.

Account for which it is cited. (ECF 172 at 11). But the
trade data exhibits support those facts, and the Dasso
declaration simply explains the provenance and headings
in the trade data exhibits. Next, Dasso explains where
the trade data comes from — it was produced to the CFTC
by IFUS, the exchange on which Gizienski traded (which
keeps records of trades executed on the exchange). That
is information within her personal knowledge. And Dasso
explains that her knowledge of the trade data headings
comes from both documents produced by IFUS and her
experience reviewing similar data. This is also
information within her personal knowledge. And finally,
the fact that Dasso may provide expert opinions in other
cases and circumstances does not render her every
utterance an expert opinion.[95]

Plaintiff also argues that "the Dasso declaration is not even
strictly necessary to interpret the trade data exhibits because the
column headings are self-explanatory."[96]

Citing Federal Rule of Evidence 702, Defendants reply that
"Ms. Dasso is most assuredly an expert. Her Declaration is clearly
meant as expert testimony. . ."[97] Asserting that "[t]he CFTC
admits that the Dasso Declaration is expert evidence by admitting
that it 'explains the **provenance** and headings in the trade data
exhibits,'"[98] and "[t]hat is sufficient grounds to strike the
report."[99]

---

[95]Id. at 12.

[96]Id. at 13.

[97]Defendants' Reply in Support of Their Motion to Strike,
Docket Entry No. 177, p. 10.

[98]Id. at 10-11.

[99]Id. at 12.

Dasso states in her declaration that she is a Senior Futures Trading Investigator in the Division of Enforcement for the CFTC who has participated in the CFTC's investigation of EOX and Gizienski since April of 2017.[100]   Dasso states that she has reviewed data produced by IFUS, including trading activity by Gizienski and AC Power, as well as block trades submitted to IFUS by brokers assigned to EOX's North East Power Desk.[101]   Dasso states that Plaintiff's MSJ cites to three exhibits made up of trade data that the CFTC received from IFUS,[102] and that she is familiar with the meaning of the column headings used in these three exhibits from "various information received from IFUS during the course of the investigation," and from her "experience in reviewing trade data as part of [her] responsibilities at the CFTC."[103]   The remainder of the declaration sets forth Dasso's opinion as to the meaning of the column headings on the three exhibits.[104]

Rule 26(a) requires a party planning to use an expert witness who does not need to provide a written report to disclose the identity of the expert, the subject matter which the expert is

---

[100]Dasso Declaration, Exhibit 31 to Plaintiff's MSJ, Docket Entry No. 152-32, p. 2 ¶¶ 2-3.

[101]<u>Id.</u> at 3 ¶ 4.

[102]<u>Id.</u> ¶ 5.

[103]<u>Id.</u> ¶ 6.

[104]<u>Id.</u> at 3-5 ¶¶ 8-27.

expected to present, and a summary of the facts and opinions to which the expert is expected to testify.   Fed. R. Civ. P. 26(a)(2)(C).   Failure to properly disclose expert evidence requires the exclusion of the evidence, unless the non-disclosure was substantially justified or harmless.   Fed. R. Civ. P. 37(c)(1). See Texas A&M Research Foundation v. Magna Transportation, Inc., 338 F.3d 394, 402-03 (5th Cir. 2003) (noting four factors in determining whether a violation of Rule 26 was harmless: (1) the importance of the evidence; (2) the prejudice to the opposing party; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose).

Federal Rule of Evidence 701 states that

[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a)   rationally based on the witness's perception;

(b)   helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c)   not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The Fifth Circuit has said that "[t]he distinction between lay and expert testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'"   United States v. Ebron, 683 F.3d 105, 136-37 (5th Cir. 2012), cert. denied, 134 S. Ct. 512 (2013)

-40-

(quoting <u>United States v. Yanez Sosa</u>, 513 F.3d 194, 200 (5th Cir. 2008) (quoting Advisory Committee Notes to 2000 Amendments)).

Dasso's declaration has all the indicia of an expert report: it describes her qualifications, records that she received, and opinions she formed based on her review of those records.   The court concludes that Dasso's declaration constitutes an expert report that was not disclosed as required by Rule 26.   Plaintiff's failure to timely disclose Dasso's identity and a summary of the facts and opinions to which she is expected to testify as required by Fed. R. Civ. P. 26(a)(2)(C) is neither substantially justified by Plaintiff's contention that Dasso is not testifying as an expert, nor harmless.   Because the Revised Docket Control Order (Docket Entry No. 102) set October 29, 2020, as the date for submitting expert reports by the party with the burden of proof,[105] and because the Dasso Declaration was not executed until February 23, 2021, and not disclosed to Defendants until Plaintiff filed its MSJ on February 26, 2021, Plaintiff's late disclosure of the Dasso Declaration precluded Defendants from meeting the December 15, 2020, deadline for disclosing rebuttal expert reports. Accordingly, Defendants' motion to strike the Dasso Declaration will be granted.[106]

---

[105]<u>Id.</u> at 8-15.

[106]Defendants object to two of the three trade data exhibits referenced in the Dasso Declaration, <u>i.e.</u>, Exhibits 30 and 33 to

(continued...)

[106](...continued)
Plaintiff's MSJ, as unauthenticated, but have not moved to strike them. See e.g., Defendants' Counter SOF, Docket Entry No. 168, p. 2 (asserting that "Exhibit 30, the spreadsheet of trades supposedly from ICE is unauthenticated and unexplained, and if prepared by ICE as part of its investigation, cannot be deemed a business record since it was prepared solely for the purposes of litigation. Exhibit 31, the Declaration of Heather Dasso, does not supply that authentication. She is the CFTC Investigator assigned to this case, and this Declaration does not establish that she has personal knowledge sufficient to authenticate Exhibit 30."). See also id. at 40 (asserting that "[t]he spreadsheet identified as Exhibit 33 is unauthenticated."). Although Defendants argue that the Dasso Declaration purports to authenticate the three trade data exhibits, "[a]t the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form." Maurer v. Independence Town, 870 F.3d 380, 384 (5th Cir. 2017) (citing Fed. R. Civ. P. 56(c); Lee v. Offshore Logistical & Transport, L.L.C., 859 F.3d 353, 355 (5th Cir. 2017); LSR Consulting, LLC v. Wells Fargo Bank, N.A., 835 F.3d 530, 534 (5th Cir. 2016)). The Fifth Circuit explained that "[a]fter a 2010 revision to Rule 56, 'materials cited to support or dispute a fact need only be capable of being "presented in a form that would be admissible in evidence."'" Id. (quoting LSR Consulting, 835 F.3d at 534 (quoting Fed. R. Civ. P. 56(c)(2)). The court explained that "[t]his flexibility allows the court to consider the evidence that would likely be admitted at trial — as summary judgment is trying to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant — without imposing on parties the time and expense it takes to authenticate everything in the record." Id. (citing Fed. R. Civ. P. 56(c)(1)(A)). Because trade data that the IFUS is charged with maintaining is the type of evidence that would likely be capable of being presented in a form that would be admissible in evidence at trial, Defendants' objections to the two trade data exhibits will be overruled. But see United States Commodity Futures Trading Commission v. Dizona, 594 F.3d 408, 415-16 & n. 6 (5th Cir. 2010) (holding that CFTC investigator was not a qualified witness pursuant to Federal Rule of Evidence 803(6) for the purpose of laying a foundation to admit spreadsheets of disputed commodity trades because the investigator was not able to explain the record keeping system of the organization that prepared the spreadsheets and vouch that the requirements of Rule 803(6) had been satisfied).

## IV. <u>The Cross Motions for Summary Judgment</u>

Plaintiff seeks summary judgment on all counts.  Defendants seek summary judgment on Counts I and II regarding the allegations of fraud asserted against Gizienski and EOX as Gizienski's employer, and partial summary judgment on Counts III and IV for record-keeping and supervision violations asserted against EOX.[107]

## A.    **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Disputes about material facts are genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2511 (1986).  "The party moving for summary judgment must 'demonstrate the absence of a genuine issue of material fact,' but need not <u>negate</u> the elements of the nonmovant's case."  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>) (per curiam) (quoting <u>Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2553 (1986)).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."  <u>Id.</u>  If, however, the moving party meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts

---

[107]Defendants' MSJ, Docket Entry No. 160, p. 1.

showing that there is a genuine issue for trial." Id.  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Id.  The court will not, "in the absence of any proof, assume that the nonnmoving party could or would prove the necessary facts." Id. (emphasis in original).  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000).

"When parties file cross-motions for summary judgment, [courts] review 'each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'" Cooley v. Housing Authority of the City of Slidell, 747 F.3d 295, 298 (5th Cir. 2014) (quoting Ford Motor Co. v. Texas Department of Transportation, 264 F.3d 493, 498 (5th Cir. 2001)).  See also Shaw Constructors v. ICF Kaiser Engineers, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004), cert. denied sub nom. PCS Nitrogen Fertilizer, L.P. v. Shaw Constructors, Inc., 126 S. Ct. 342 (2005) ("Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.").  If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving

party "must come forward with evidence which would 'entitle it to
a directed verdict if the evidence went uncontroverted at trial.'"
International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257,
1264-65 (5th Cir. 1991), cert. denied, 112 S. Ct. 936 (1992).  The
nonmoving party can then defeat the motion either by countering
with sufficient evidence of its own, or by "showing that the moving
party's evidence is so sheer that it may not persuade the
reasonable fact-finder to return a verdict in favor of the moving
party."  Id. at 1265.  "The standard [for granting summary
judgment] mirrors the standard for a directed verdict under Federal
Rule of Civil Procedure 50(a)."  Anderson, 106 S. Ct. at 2511.  If
the dispositive issue is one on which the nonmoving party will bear
the burden of proof at trial, the moving party may satisfy its
burden by merely pointing out that the evidence in the record is
insufficient with respect to an essential element of the nonmoving
party's claim.  See Celotex, 106 S. Ct. at 2552-53.  The burden
then shifts to the nonmoving party, who must, by submitting or
referring to evidence, set out specific facts showing that a
genuine issue exists.  Id. at 2553.  The nonmovant may not rest
upon the pleadings, but must identify specific facts that establish
a genuine issue for trial.  Id.  See also Little, 37 F.3d at 1075.

**B.   Analysis**

1.   Count I

Count I of Plaintiff's Complaint alleges that

[d]uring the relevant period, Gizienski violated 7 U.S.C.
§ 9(1) and 17 C.F.R. § 180.1(a) by, in connection with
swaps, contracts of sale of commodities in interstate
commerce, or contracts for future delivery on or subject
to the rules of any registered entity: (i) intentionally
or recklessly trading on the basis of material, nonpublic
information in breach of a pre-existing duty owed to EOX
customers; (ii) intentionally or recklessly tipping
material, nonpublic information about EOX customers to
Customer A in breach of a pre-existing duty owed to EOX
customers; and/or (iii) intentionally or recklessly
engaging, or attempting to engage, in acts, practices, or
a course of business which operated or would operate as
a fraud or deceit upon other persons.[108]

Asserting that Gizienski committed the alleged acts within the

scope of his employment,[109] plaintiff alleges that EOX is liable for

Gizienski's violations,[110] and that a violation occurred each time

Gizienski traded on the basis of material, nonpublic information or

tipped material, nonpublic information to Customer A.[111]

(a)   Applicable Law

Title 7 U.S.C. § 9(1), § 6(c)(1) of the CEA, makes it

unlawful for any person, directly or indirectly, to use
or employ, or attempt to use or employ, in connection

---

[108]Plaintiff's Complaint, Docket Entry No. 1, p. 17 ¶ 78.

[109]Id. ¶ 79.

[110]Id.

[111]Id. ¶ 80.

with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010, provided no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect.

Rule 180.1(a), promulgated thereunder provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; . . .

17 C.F.R. 180.1(a).

The parties do not cite and the court has not found a case in which a broker has been held liable for misappropriating material, nonpublic information in violation of 7 U.S.C. § 9(1) and Rule 180.1.[112]   It is undisputed, however, that 7 U.S.C. § 9(1),

_____

[112]Plaintiff has cited a number of administrative enforcement actions that have been brought and settled under 17 C.F.R. § 180.1
(continued...)

-47-

§ 6(c)(1) of the CEA, and Rule 180.1 are modeled on § 10(b) of the Securities Exchange Act ("Exchange Act") and Securities Exchange Commission ("SEC") Rule 10b-5, and that misappropriation of material, non-public information in breach of a pre-existing duty violates § 10(b) and Rule 10b-5.

In adopting Rule 180.1, the CFTC stated:

> The language of CEA [§] 6(c)(1), particularly the operative phrase "manipulative or deceptive device or contrivance," is virtually identical to the terms used in [§] 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"). The Supreme Court has interpreted these words to "clearly connot[e] intentional misconduct." The Supreme Court has also stated that the statute was "designed as a catchall clause to prevent fraudulent practices."

> Based on the language in Exchange Act [§] 10(b), the [SEC] promulgated SEC Rule 10b-5 . . .

> Given the similarities between CEA [§] 6(c)(1) and Exchange Act [§] 10(b), the Commission deems it appropriate and in the public interest to model final Rule 180.1 on SEC Rule 10b-5. To account for the differences between the securities markets and the

---

[112](...continued) against respondents who allegedly misappropriated and tipped or traded upon material non-public information in breach of a pre-existing duty. See Plaintiff's CFTC's Memorandum of law in Support of Motion for Summary Judgment ("Plaintiff's Memorandum in Support of MSJ"), Docket Entry No. 151, pp. 22-23 (citing In re Schultz, CFTC No. 20-76, 2020 WL 5876731 (September 30, 2020) (Respondent improperly disclosed confidential block trade order information to other market participants); In re Classic Energy, CFTC No. 19-50, 2019 WL 4915492 (September 30, 2019) (Respondent block trade broker improperly traded against customers while in possession of their material non-public information); In re Motazida, CFTC No. 16-02, 2015 WL 7880066 (December 2, 2015) (Respondent gasoline trader improperly used his employer's trading information to trade for his own benefit), Exhibits A-C, respectively to Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151-1).

> derivatives markets, the Commission will be guided, but
> not controlled, by the substantial body of judicial
> precedent applying the comparable language of SEC Rule
> 10b-5. . .
>
> Final Rule 180.1 prohibits fraud and fraud-based
> manipulations, and attempts: (1) By any person (2) acting
> intentionally or recklessly (3) in connection with
> (4) any swap, or contract of sale of any commodity in
> interstate commerce, or contract for future delivery on
> or subject to the rules of any registered entity (as
> defined in the CEA).   CEA [§] 6(c)(1) and final Rule
> 180.1, like Exchange Act [§] 10(b) and SEC Rule 10b-5
> upon which they are modeled, focus on conduct involving
> manipulation and deception.

Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation [Action: Final Rules], 76 Fed. Reg. 41,398, 41,399-400 (July 14, 2011) (citations omitted).   Acknowledging that it received comments regarding trading on the basis of material, nonpublic information, and that those comments used the label "insider trading," which can mean different things in different contexts, the CFTC recognized

> that unlike securities markets, derivatives markets have
> long operated in a way that allows for market
> participants to trade on the basis of lawfully obtained
> material nonpublic information.  This final Rule does not
> prohibit trading on the basis of material nonpublic
> information except as provided in the following paragraph
> or otherwise prohibited by law.  Further, the Commission
> reiterates that the final Rule does not create an
> affirmative duty of disclosure (except, as provided by
> [§] 6(c)(1), "as necessary to make any statement made to
> the other person in or in connection with the transaction
> not misleading in any material respect").
>
> Depending on the facts and circumstances, a person
> who engages in deceptive or manipulative conduct in
> connection with any swap, or contract of sale of any

commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, for example by trading on the basis of material nonpublic information in breach of a pre-existing duty (established by another law or rule, or agreement, understanding, or some other source), or by trading on the basis of material nonpublic information that was obtained through fraud or deception, may be in violation of final Rule 180.1.  The Commission believes that this application of the final Rule would be consistent with our responsibility to protect market participants and promote market integrity and with our statement in the [Notice of Proposed Rulemaking] that [§] 6(c)(1) is a broad catch-all provision, reaching any manipulative or deceptive device or contrivance.

Id. at 41,403 (citations omitted).[113]

---

[113]The Notice of Proposed Rulemaking states:

Section 6(c)(1)

The text of CEA section (c)(1) is patterned after [§] 10(b) of the Securities Exchange Act of 1934 ("Exchange Act").  Exchange Act section 10(b) has been interpreted as a broad, "catch-all" prohibition on fraud and manipulation.  Likewise, the Commission proposes to interpret CEA section 6(c)(1) as a broad, catch-all provision reaching fraud in all its forms — that is, intentional or reckless conduct that deceives or defrauds market participants.  Subsection (c)(1) is also similar to the anti-manipulation authority granted to the Federal Energy Regulatory Commission ("FERC") in sections 315 and 1283 of the Energy Policy Act of 2005, amending the Natural Gas Act and the Federal Power Act, respectively, and the Federal Trade Commission ("FTC") in sections 811 and 812 of the Energy Independence and Security Act of 2007.

The SEC promulgated Rule 10b-5 to implement section 10(b) of the Exchange Act.  The FERC and the FTC have promulgated rules based on SEC Rule 10b-5 to implement their respective statutory anti-manipulation authority, but have modified SEC Rule 10b-5 as appropriate to reflect their distinct regulatory missions and responsibilities.

(continued...)

Plaintiff alleges that Gizienski violated 7 U.S.C. § 9(1) and Rule 180.1 by misappropriating EOX customers' order information that "he learned in his capacity as a broker for EOX in two ways: (1) by trading against customers' orders through the [Managed] Account; and (2) by tipping, _i.e._, passing the information along to, Vaccaro."[114]   The misappropriation theory developed under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder "holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."   United States v. O'Hagan, 117 S. Ct. 2199, 2207 (1997).

O'Hagan involved an appeal of a criminal conviction for insider trading.  A lawyer named O'Hagan traded the securities of a company his client was targeting for a takeover.  Although O'Hagan could not be held liable under the classical theory of

---

[113](...continued)
   Guided by [§] 6(c)(1)'s similarity to Exchange Act [§] 10(b), the Commission proposes an implementing rule that is also modeled on SEC Rule 10b-5, with modification to reflect the CFTC's distinct regulatory mission and responsibilities.

Prohibition of Market Manipulation [Action: Notice of Proposed Rulemaking], 75 Fed. Reg. 67,657, 67,658 (November 3, 2010) (citations omitted).

[114]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, p. 24.

insider trading because he owed no duty to the shareholders of the target company, the Court nevertheless held that he had violated § 10(b). The Court held that in trading the target company's securities, O'Hagan misappropriated confidential information regarding the planned corporate takeover, breaching "a duty of trust and confidence" that he owed both to his law firm and client. Id. at 2208. The Court held that the deception requirement of § 10(b) was satisfied by the misappropriator's "feigning fidelity to the source of [the confidential] information." Id. at 2209. The Court explained that "[a] company's confidential information . . . qualifies as property to which the company has a right of exclusive use" and "[t]he undisclosed misappropriation of such information, in violation of a fiduciary duty . . . constitutes fraud akin to embezzlement — the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another." Id. at 2208 (citing Carpenter v. United States, 108 S. Ct. 316, 317 (1987)). However, the Court also held that if the fiduciary discloses to the source of the confidential information his or her intent to trade based on the information, there is no "deceptive device" constituting a violation of § 10(b). Id. at 2209.

The O'Hagan Court held that § 10(b)'s requirement that the deception be "in connection with the purchase or sale of any security" was satisfied because "the fiduciary's fraud is consummated, not when the fiduciary gains the confidential

information, but when, without disclosure to his principal, he uses the information to purchase or sell securities.  The securities transaction and the breach of duty thus coincide." Id.  The Court explained that information targeted by the misappropriation theory is "information of a sort that misappropriators ordinarily capitalize upon to gain no-risk profits through the purchase or sale of securities," id., i.e., information that "ordinarily" "derives its value . . . from its utility in securities trading." Id. at 2210.

Thus, to succeed on either of its two theories of liability for Count I, Plaintiff must establish that Gizienski (1) misappropriated confidential information in breach of a pre-existing duty of trust and confidence to the source of the information; (2) intentionally or recklessly, i.e., with scienter; (3) in connection with a contract for sale or purchase of a commodity in interstate commerce; (4) for personal benefit. See 7 U.S.C. § 9(1), 17 C.F.R. § 180.1(a). See also O'Hagan, 117 S. Ct. at 2207-08; Securities and Exchange Commission v. Cuban, 634 F.Supp.2d 713, 723-25 (N.D. Tex. 2009) ("Cuban I"), vacated on other grounds, Securities and Exchange Commission v. Cuban, 620 F.3d 551 (5th Cir. 2010) ("Cuban II") (stating elements of misappropriation with respect to the securities laws); Securities and Exchange Commission v. Obus, 693 F.3d 276, 284 (2d Cir. 2001) ("[M]isappropriation[] targets persons who are not corporate

-53-

insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market.").

> (b)   Defendants Fail to Establish that They are Entitled to Summary Judgment on Count I

Asserting that they "were fully disclosed dual agents, acting as brokers for Customers B-F, on the one hand, and matching them with other of their customers,"[115] Defendants argue that they are entitled to summary judgment on Count I because they did not breach any duty of confidentiality and because EOX's customers agreed to Defendants' brokering for other traders, even their competitors.[116]

---

[115]Defendants' Corrected Memorandum in Support of Their Motion for Summary Judgment on Counts I & II, and for Partial Summary Judgment on Counts III & IV ("Defendants' Memorandum in Support of MSJ"), Docket Entry No. 179, p. 20.

[116]Id. at 20-23.  Defendants also argue that Plaintiff should be barred from advancing argument about the twenty unspecified instances alleged in ¶ 53 of the Complaint because Plaintiff has refused to reveal its contentions about what confidential information was disclosed in the twenty instances.  Id. at 14-15, 21-22.  Defendants expressly complain about Plaintiff's disclosure of instant message transcripts that that they argue Plaintiff should not be able to use in summary judgment.  Reply in Support of Their Motion for Summary Judgment on Counts I & II, and for Partial Summary Judgment on Counts III & IV ("Defendants' Reply in Support of MSJ"), Docket Entry No. 174, pp. 13-16.  Because the court has been able to resolve the pending motions without relying to any of the instant messages transcripts about which Defendants complain or the SOFs for which Plaintiff cites those instant message transcripts, this argument is moot.

**(1)  Whether Defendants Owed Duties of Trust and Confidence to EOX Customers Raise Fact Issues**

Defendants argue that "now that discovery has concluded, it is clear that the CFTC . . . has no proof of any duty of confidentiality or violation of any such duty."[117]  Defendants argue "[t]here is no need for an exegesis on the law of duty in this context.  That law is fulsomely described in the Court's [prior Memorandum Opinion and Order denying Defendants' motion to dismiss.]"[118]  Asserting that EOX had BSAs with four customers that explicitly allowed them to disclose information and had no BSAs with the other two customers and, therefore, no confidentiality agreements with them, and that IFUS Rule 4.02 prohibits pre-execution communications but does not impose any duty of trust and confidentiality, Defendants argue that "[t]he CFTC has no evidence of any duty of confidentiality . . . with Customers B-F."[119]

Plaintiff responds that the allegations in Count I "are supported by overwhelming and undisputed evidence that Gizienski misused his customers' confidential block trading orders and information and that he traded against his customers without their

_____

[117]Defendants' Memorandum in Support of MSJ, Docket Entry No. 179, p. 21.

[118]<u>Id.</u>

[119]<u>Id.</u>  <u>See also</u> Defendants' Reply in Support of MSJ, Docket Entry No. 174, pp. 8-11.

-55-

consent."[120]   Plaintiff argues that "Defendants' contention that there is 'no evidence of any duty of confidentiality' is easily disproven by law, rule, agreement, and understanding,"[121] i.e., by 17 C.F.R. § 155.4(b)(2); by IFUS Rule 4.02(i); by the BSAs that EOX had with DTE, PSEG, Geosol, and Constellation, and by understanding.[122]

Defendants' argument that "[t]here is no need for an exegesis on the law of duty in this context,"[123] fails to recognize that courts have been struggling with this precise issue for some time. See e.g., Cuban I, 634 F. Supp. 2d at 720-27 (addressing what relationship of trust and confidence is sufficient to create a duty, breach of which could support liability for misappropriation, citing cases from other circuits, and concluding that the relationship need not bear all the hallmarks of a traditional fiduciary relationship); (Cuban II, 620 F.3d at 555 (recognizing that "O'Hagan did not set the contours of a relationship of 'trust and confidence' giving rise to the duty to disclose or abstain and misappropriation liability."). See also Securities and Exchange Commission v. Kornman, 391 F. Supp.2d 477, 488-89 (N.D. Tex.

---

[120]Plaintiff's Response in Opposition to Defendants' Second Motion for Partial Summary Judgment ("Plaintiff's Response to Defendants' MSJ"), Docket Entry No. 166, p. 8.

[121]Id.

[122]Id. at 8-12.

[123]Id.

2005)("consider[ing] the indicia giving rise to a fiduciary or fiduciary-like relationship in the arena of securities fraud"). However, since, as explained in O'Hagan, and recognized in Cuban I, 634 F. Supp. 2d at 729, and Cuban II, 620 F.3d at 554-555, the undisclosed use of confidential information, in breach of a duty not to use it for personal benefit, is what makes conduct deceptive under § 10(b) and Rule 10b-5, the court concludes that a duty of trust and confidence sufficient to support Plaintiff's claims for misappropriation under 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) is a duty not to use confidential information for personal benefit. Whether such a duty exists is a question of fact for the jury.  See Securities and Exchange Commission v. Cuban (Cuban III), No. 3:08-CV-2050-D, 2013 WL 791405, at *4-*6 (N.D. Tex. March 5, 2013).  See also United States Securities and Exchange Commission v. Northern, 598 F.Supp.2d 167, 173-74 (D. Mass. 2009) ("The existence of such a similar relationship is a question for the jury.").

> (i)  17 C.F.R. § 155.4(b) Imposes a Legal
>       Duty of Trust and Confidentiality

As the legal source for a duty of trust and confidentiality that Defendants owed to EOX customers Plaintiff cites 17 C.F.R. § 155.4(b),[124] which states in relevant part, that

[n]o introducing broker or any of its affiliated persons shall:

---

[124]Plaintiff's Complaint, Docket Entry No. 1, p. 6 ¶¶ 23-25.

(1)   Disclose that an order of another person is being held by the introducing broker or any of its affiliated persons, unless such disclosure is necessary to the effective execution of such order . . .; or

(2)   (i) Knowingly take, directly or indirectly, the other side of any order of another person revealed to the introducing broker or any of its affiliated persons by reason of their relationship to such person, except with the other person's prior consent and in conformity with contract market rules approved by or certified to the Commission.

Defendants do not dispute that 17 C.F.R. § 155.4(b) applies to them since EOX is an Introducing Broker and Gizienski was an EOX Affiliated Person.[125]   Nor do Defendants dispute that § 155.4(b) imposes on them a duty of trust and confidentiality not to use customer order information "unless such disclosure is necessary to the effective execution of such order," and not to take the other side of any order "except with the other person's prior consent." See Cuban I, 634 F.Supp.2d at 722 (recognizing that an agency regulation promulgated under authority conferred by Congress can impose a duty of trust and confidentiality).   Because 17 C.F.R. § 155.4(b)(i) imposes legal duties on Defendants not to "[d]isclose that an order of another person is being held by the introducing broker or any of its affiliated persons, unless such disclosure is necessary to the effective execution of such order," and "not to take, directly or indirectly, the other side of any order of

---

[125]Plaintiff's SOF, Docket Entry No. 152, pp. 1-2 ¶¶ 2 and 8; Defendants' Counter SOF, Docket Entry No. 168, pp. 2-3 ¶¶ 2 and 8.

another person revealed to the introducing broker or any of its affiliated persons by reason of their relationship to such person, except with the other person's prior consent," the court concludes that 17 C.F.R. § 155.4 imposes duties on Defendants not to disclose or use EOX customers' confidential information for personal benefit that are both applicable to Defendants and sufficient to support the claim of misappropriation asserted in Count I of Plaintiff's Complaint.

>                    (ii) IFUS Rule 4.02 Imposes a Duty of
>                         Trust and Confidentiality

As a rule that imposes a duty of trust and confidentiality that Defendants owed to EOX customers Plaintiff cites IFUS Rule 4.02(i).[126]  Without disputing that IFUS Rule 4.02(i) applies to them, Defendants argue that Plaintiff's reliance on Rule 4.02(i) "fails for want of argument or explanation, but in any event is wrong."[127] Defendants argue that Plaintiff's interpretation of IFUS Rule 4.02(i) is wrong because "[a]ll [Rule 4.02] prohibits is disclosure of 'pre-execution communications.'"[128] Plaintiff replies

---

[126]Plaintiff's Complaint, Docket Entry No. 1, p. 6 ¶¶ 26-27.

[127]Defendants' Opposition to Plaintiff's MSJ, Docket Entry No. 167-1, p. 14 (citing Defendants' summary judgment memorandum).

[128]Defendants' Memorandum in Support of MSJ, Docket Entry No. 179, p. 21.  See also Defendants' Memorandum in Support of Their Motion for Summary Judgment on Counts I & II, and for Partial Summary Judgment on Counts III & IV ("Defendants' First Memorandum
>                                        (continued...)

that Defendants are mistaken because Rule 4.02(i) prohibits all disclosures of customer order information unless the disclosures meet one of three exceptions none of which apply to the facts of this case.[129]

In pertinent part IFUS Rule 4.02 states that

[i]n connection with the placement of any order or execution of any Transaction, it shall be a violation of the Rules for any Person to:

. . .

(i) Disclose or divulge the buy or sell order of another Person except (1) in furtherance of executing the order, (2) at the request of an authorized representative of the CFTC or (3) pursuant to sub-paragraph (k) of this Rule regarding certain pre-execution communications.

. . .

(k) Engage in pre-execution communications, except in accordance with the following procedures:

(1) For the purposes of this Chapter, pre-execution communications shall mean communications between two (2) market participants for the purpose of discerning interest in the execution of a Transaction prior to the terms of an order being entered on the ETS and visible to all market participants on the electronic trading screen.

(2) A market participant may engage in pre-execution communications with regard to Transactions executed on ETS where a

---

[128](...continued)
in Support of MSJ"), Docket Entry No. 160-1, p. 21 (citing Rule 4.7 instead of Rule 4.02).

[129]Plaintiff's Response to Defendants' MSJ, Docket Entry No. 166, p. 10.

> market participant wishes to be assured
> that another market participant will take
> the opposite side of an order under the
> following circumstances:
>
> (A)   If a Customer is involved, the
>       Customer has previously consented to
>       such communications being made on
>       its behalf;
>
> (B)   A    party    to    pre-execution
>       communications shall not disclose
>       the details of such communications
>       to any Person who is not a party to
>       the communications;
>
> (C)   A    party    to    pre-execution
>       communications shall not enter an
>       order   to   take   advantage   of
>       information   conveyed   during   such
>       communications, except in accordance
>       with this Rule; . . .

IFUS Rule 4.02(i) and (k).

Defendants' contend that "[a]ll [Rule 4.02(i)] prohibits is 'disclosure of 'pre-execution communications,'" but fail to identify any part of the rule that limits the prohibition of disclosures to pre-execution communications. To the contrary, Rule 4.02(k) expressly prohibits "pre-execution communications," except in accordance with a number of defined procedures. Moreover, Defendants neither argue nor show that any of the exceptions in Rule 4.02 apply to the disclosures at issue.

Because Rule 4.02(i) and (k) impose duties on Defendants not to use their customers' confidential order information unless such use is necessary to the effective execution of such order, and because Rule 4.02(k)(2)(C) prohibits a party to pre-execution

communications from entering an order to take advantage of
information conveyed during such communications, except in
accordance with the procedures identified therein, the court
concludes that IFUS Rule 4.02 imposes duties on Defendants not to
use EXO customers' confidential information for personal benefit
that are both applicable to Defendants and sufficient to support
the claim of misappropriation asserted in Count I of Plaintiff's
Complaint.

                    (iii)        Agreements May Impose Duties of
                                 Trust and Confidentiality

As additional sources for a duty of trust and confidentiality
that Defendants owed to EOX customers Plaintiff cites the BSAs that
EOX executed with its customers that "prohibited EOX from using or
disclosing confidential customer information, such as the
customer's trading activity, except as necessary for the
facilitation of block trades with third parties."[130]

Asserting that "[i]t is difficult to understand why and how
Plaintiff can allege a conflict of interest and lack of disclosure
to the four Customers whose [BSAs] explicitly contained a consent
to Defendants' brokering for other traders, including
competitors,"[131] Defendants argue that "[a]s a matter of fact and

_____

[130]Plaintiff's Complaint, Docket Entry No. 1, p. 6 ¶ 21.

[131]Defendants' Memorandum in Support of  MSJ, Docket Entry
No. 179, pp. 22-23.

law, there can be no conflict of interest since the Customers consented to this dual representation with knowledge that Defendants would receive compensation from both sides of the transactions."[132]  Defendants argue that "[a] contrary ruling by this Court will destroy the block brokerage business in which traders and brokers know and agree that brokers will be representing other traders in varying capacities.  A contrary ruling will prohibit that entirely legitimate business."[133]

Asserting that Gizienski did not share EOX customers' confidential order information with Vaccaro to facilitate trades but, instead, "simply to provide him 'market color,'"[134] Plaintiff responds that "[c]ontrary to Defendants' assertions, none of EOX's [BSAs] allowed EOX brokers to disclose customer order information and intentions to Vaccaro in order to provide him valuable market color."[135]  As evidence that the BSAs that EOX executed with its customers prohibited Defendants from using customers' confidential information, Plaintiff quotes EOX's BSAs with PSEG, Geosol, Constellation, and DTE, but only attach the BSAs with PSEG, Geosol, and DTE to its motion for summary judgment.[136]

---

[132]Id. at 23.

[133]Id.

[134]Plaintiff's Response to Defendants' MSJ, Docket Entry No. 166, p. 10.

[135]Id.

[136]See Exhibits 59, 60, and 61  attached to Plaintiff's SOF,
(continued...)

The confidentiality paragraph in the DTE BSA states:

The parties agree that all information exchanged by them shall be confidential and shall not be disclosed to any Third Party (nor shall any public announcement relating to this Agreement be made by either Party), except for such information (i) as may become generally available to the public, (ii) as required (a) in response to any summons, subpoena, or otherwise in connection with any litigation or regulatory proceeding or (b) to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard, (iii) as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the non-disclosing Party in making such disclosure, or (iv) as may be furnished to each of such person's auditors, attorneys, affiliates, advisors, rating agencies or lenders which are required to keep the information that is disclosed in confidence. . . .[137]

The DTE BSA also states that it "shall be interpreted in accordance with the laws of the State of New York . . ."[138]

The confidentiality paragraph in the Geosol BSA states:

Choice specifically agrees that it shall not at any time divulge, disclose, or communicate to any person, firm, or corporation in any manner whatsoever any information of which Choice has knowledge by virtue of its performing Choice Services hereunder concerning any matters related to the purchase or sale activities of Counterparty including, but not limited to, the names of Counterparty's potential or actual buyers or sellers, the prices at which Counterparty obtains or has obtained or sells or has sold Products, or any other information regarding Counterparty Product Transactions or negotiations for Counterparty Product Transactions;

---

[136](...continued)
Docket Entry Nos. 152-60 (DTE BSA); 152-61 (Geosol BSA); 152-62 (PSEG BSA).

[137]Brokerage Services Agreement, Exhibit 59 to Plaintiff's SOF, Docket Entry No. 152-60, p. 3 ¶ 6.

[138]Id. at 4 ¶ 11.

> provided however, nothing herein shall prevent Choice
> from communicating information to potential Product(s)
> buyers or sellers which is necessary or appropriate to
> perform Choice Services hereunder.[139]

The Geosol BSA also states that it "shall be interpreted in accordance with the laws of the State of Texas. . ."[140] Plaintiff asserts and Defendants do not dispute that the Constellation BSA contains the same relevant language.[141]

> The PSEG BSA states:
>
> All information and data provided to Broker by Client or
> created by Broker for Client under this Agreement,
> including Transaction information such as price, quantity
> and dates, shall become and remain confidential
> information of Client. Broker and its personnel shall
> keep all such confidential information strictly
> confidential and shall not disclose or use such
> confidential information for the benefit of Broker or any
> other third parties except to a Third Party as defined
> herein, to the appropriate clearing agency if applicable
> (e.g. NYMEX Clearport), or to a court or governmental
> agency as required by law. If requested by Client,
> Broker shall execute and deliver a separate
> confidentiality agreement in a reasonable form required
> by Client and approved by Client.[142]

The PSEG BSA also states that it "shall be governed and construed in accordance with the laws of the State of New York."[143]

---

[139]Brokerage Services Agreement, Exhibit 60 to Plaintiff's SOF, Docket Entry No. 152-61, p. 3 ¶ 5.

[140]Id. at 4 ¶ 10.

[141]Plaintiff's Response to Defendants' MSJ, Docket Entry No. 166, p. 11. See Constellation BSA, Exhibit 4 to Defendants' MSJ, Docket Entry No. 160-2, pp. 24-28 ¶¶ 5 and 10 are identical to the paragraphs in the Geosol BSA.

[142]Broker Agreement, Exhibit 61 to Plaintiff's SOF, Docket Entry No. 152-62, p. 5 ¶ 6.1.

[143]Id. at 6 ¶ 7.6.

In <u>Cuban</u> the court held that

> to establish liability under the misappropriation theory
> of insider trading in the absence of another legal duty
> to refrain from trading on or otherwise using material,
> nonpublic information for personal benefit (such as a
> duty arising from a fiduciary relationship), the SEC
> could rely on an express or implied agreement.

<u>Cuban III</u>, 2013 WL 791405, at *1 (citing <u>Cuban I</u>, 634 F. Supp. 2d
at 725) (recognizing that an agreement based on state contract law
imposing duties of nondisclosure and non-use can support liability
under the misappropriation theory).

In <u>Cuban I</u> the court considered "whether, under the Supreme
Court's precedents, breach of a legal duty arising by agreement can
be the basis for misappropriation theory liability, and, if so,
what are the essential components of the agreement."  634 F.Supp.2d
at 722.   The court held that "a duty sufficient to support
liability under the misappropriation theory can arise by agreement
absent a preexisting fiduciary or fiduciary-like relationship."
<u>Id.</u> at 725.  The court also held, however, that the agreement "must
consist of more than an express or implied promise merely to keep
information confidential.   It must also impose on the party who
receives the information the legal duty to refrain from trading on
or otherwise using the information for personal gain."   <u>Id.</u>  The
court explained that

> [a]bsent a duty not to use the information for personal
> benefit, there is no deception in doing so.  As in the
> fiduciary context, the deception occurs when a person
> secretly trades on confidential information in violation

-66-

of the source's legitimate and justifiable expectation
that the recipient will not do so.

Id. (citing O'Hagan, 117 S. Ct. at 2208 ("Deception through
nondisclosure is central to [this] theory of liability.")).  The
court explained further that

> [t]he expectation is not unilateral, arising merely from
> the source's subjective belief that the recipient will
> not trade on the information.  It rests on the
> recipient's undertaking of a duty to refrain from doing
> so as well.  Cf. United States v. Chestman, 947 F.2d 551,
> 567 (2d Cir. 1991) (noting, in context of insider trading
> suit, that "a fiduciary duty cannot be imposed
> unilaterally by entrusting a person with confidential
> information"); . . . For the recipient then to exploit
> the information's value in the securities markets,
> without disclosing to the source his intent to do so,
> violates the source's legitimate and justifiable
> expectation and deceives him.  In short, the recipient's
> agreement not to use the source's information for
> personal benefit, combined with his subsequent
> undisclosed use of the information for securities trading
> purposes, makes his conduct deceptive under § 10(b) and
> Rule 10b-5.

Id. at 725-26.  Observing that no other court appeared to have
analyzed the nature of an agreement that can give rise to
misappropriation liability, id. at 726, the court noted that
"[c]ases decided both before and after O'Hagan have recognized that
a duty sufficient to support misappropriation theory liability may
arise by agreement."  Id. n. 7 (citing e.g., Securities and
Exchange Commission v. Yun, 327 F.3d 1263, 1273 (11th Cir. 2003);
United States v. Falcone, 257 F.3d 226, 234 (2d Cir. 2001); and
Chestman, 947 F.2d at 567-68).

In reaching its conclusion that an agreement sufficient to support liability for misappropriation must consist of more than an express or implied promise merely to keep information confidential, and that it must also impose on the party who receives the information the legal duty to refrain from trading on or otherwise using the information for personal benefit, the <u>Cuban</u> court declined to follow <u>United States v. Kim</u>, 184 F.Supp.2d 1006, 1011 (N.D. Cal. 2002) (holding that "a similar relationship of trust and confidence must be characterized by superiority, dominance, and control").  The court reasoned that

> if an agreement has the elements necessary to conform to the principles of the misappropriation theory liability recognized in <u>O'Hagan</u>, it should not be determinative whether the agreement creates a relationship in which one party is superior to, or exercises control or dominance over, the other.

<u>Cuban I</u>, 634 F. Supp. 2d at 727.  The court also observed that

> [t]he goal of protecting the integrity of the securities markets and promoting investor confidence would be achieved just as effectively by enforcing duties of nondisclosure and non-use that arise by agreement as by enforcing duties that flow from the nature of the relationship between the information source and the misappropriator.

<u>Id.</u>

Plaintiff argues that EOX executed BSAs with four of its customers — DTE, Geosol, Constellation, and PSEG, and that all of the BSAs characterized information exchanged between the parties as confidential and prohibited disclosure of confidential information to any Third Party except in exceptional circumstances, which

-68-

Plaintiff argues are not present here.[144]  Plaintiff argues that the BSAs prohibited the disclosure of confidential information to any Third Party, but does not explicitly argue that any of the BSAs precluded EOX or Gizienski from using their customers' order information for trades or personal benefit.  Under Cuban for the BSAs to constitute agreements sufficient to support liability for misappropriation, they must reflect agreements both not to disclose and not to use the customer's confidential information.

Because the PSEG BSA states that "Broker and its personnel shall keep all such confidential information strictly confidential and shall not disclose or use such confidential information for the benefit of Broker or any other third parties except to a Third Party as defined herein,"[145] the court has no trouble in concluding that the PSEG BSA imposes duties on Defendants not to use PSEG's confidential information for personal benefit that are both applicable to Defendants and sufficient to support the claim of misappropriation asserted in Count I of Plaintiff's Complaint. Whether the DTE, Geosol, and Constellation BSAs impose such duties is a closer question because while they prohibit Defendants from disclosing DTE's, Geosol's, and Constellation's information, they

---

[144]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, p. 25 (citing Plaintiff's SOF 121, Docket Entry No. 152, p.25 (quoting Exhibit 59, EOX Agreement with DTE, ¶ 6, Docket Entry No. 152-60, p. 3)).

[145]Broker Agreement, Exhibit 61 to Plaintiff's SOF, Docket Entry No. 152-62, p. 5 ¶ 6.1.

do not expressly prohibit Defendants from using DTE's, Geosol's, and Constellation's information for personal benefit as does the PSEG BSA.  Nevertheless, because the parties' agreements may also be evidenced by the manner in which the agreements were performed, and because Gizienski understood that EOX owed a duty of confidentiality to its customers,[146] the court concludes that whether the agreements EOX had with DTE, Geosol, and Constellation imposed duties of trust and confidentially on Defendants sufficient to support Plaintiff's misappropriation claims raise genuine issues of material fact for trial.[147]  See Yun, 327 F.3d at 1273 ("[A] breach of an agreement to maintain business confidences would also suffice [for purposes of misappropriation theory]"); Securities and Exchange Commission v. Talbot, 430 F.Supp.2d 1029, 1055 (C.D. Cal. 2006), rev'd on other grounds, 530 F.3d 1085 (9th Cir. 2008) ("The existence of an express confidentiality agreement covering the information at issue is persuasive evidence that the parties had a relationship of trust and confidence.").

---

[146]Plaintiff's Response to Defendants' MSJ, Docket Entry No. 166, p. 12 (citing Answer, Docket Entry No. 77, pp. 6-7 ¶ 28). See also Gizeinski IFUS Interview, Exhibit 40 to Plaintiff's SOF, p. 24, Docket Entry No. 152-41, p. 25.

[147]See Defendants' Opposition to Plaintiff's MSJ, Docket Entry No. 167-1, p. 13 (citing Cuban II, 620 F.3d at 558, for recognizing that there is a "paucity of jurisprudence on the question of what constitutes a relationship of 'trust and confidence'" and that determining whether such a duty exists is and "inherently fact-bound" endeavor).

(iv) Understandings Alone Do Not Impose
Duties of Trust and Confidentiality

In support of its argument that a duty of trust and
confidentiality was imposed by understanding, Plaintiff argues that

[e]very witness in this case — including Gizienski —
understood that EOX owed a duty of confidentiality to its
customers. Gizienski was forthcoming in testimony about
the existence of the duty of confidentiality, saying,
"You can't give up that information. There is a
confidentiality agreement between the broker and trader,
and . . . you know . . . no information I receive from
one client goes to another. . . I mean that's industry
policy . . ."[148]

Plaintiff also cites the depositions of two EOX brokers who
testified that they understood they were not to share the
identities of customers placing orders with others in the market,[149]
and depositions of representatives of three EOX customers — Geosol,
DTE, and PSEG — all of whom testified that traders for their
companies did not permit EOX or Gizienski to disclose their
identities to other market participants.[150]  But Plaintiff neither

---

[148]Plaintiff's Response to Defendants' MSJ, Docket Entry
No. 166, p. 12 (citing Answer, Docket Entry No. 77, pp. 6-7 ¶ 28).
See also Gizienski IFUS Interview, Exhibit 40 to Plaintiff's SOF,
p. 24, Docket Entry No. 152-41, p. 25.

[149]Id. (citing Plaintiff's SOF ¶ 92, Docket Entry No. 152,
p. 18 (citing Exhibit 28, Deposition of Michael Derrett ("Derrett
Deposition"), pp. 23:6-24:5 Docket Entry No. 152-29, pp. 7-8; and
Exhibit 37, Deposition of John Klosek ("Klosek Deposition"), p.
29:5-8, Docket Entry No. 152-38, p. 5).

[150]Id. (citing Plaintiff's SOF ¶ 94, Docket Entry No. 152, p.
19 (citing Exhibit 25, Deposition of Alexander N. Elsik ("Elsik
Deposition"), p. 58:6-17, Docket Entry No. 152-26, p. 4 (testifying
about Geosol); Exhibit 7,  Deposition of Peter Grimes ("Grimes
(continued...)

-71-

cites any authority in support of its argument that a duty of trust and confidentiality can arise merely from an understanding, nor distinguishes the understanding it contends gives rise to a duty of trust and confidentiality sufficient to support misappropriation claims from the agreements that it contends do the same.  Because the only evidence that Plaintiff cites in support of understandings held by EOX's customers comes from Geosol, DTE, and PSEG, customers with whom EOX had BSAs,[151] _i.e._, written agreements that Plaintiff argues imposed duties of trust and confidentiality on Defendants, the court concludes that Plaintiff's argument that a duty of trust and confidentiality was imposed on Defendants by an understanding is not an independent source for a duty of trust and understanding sufficient to support misappropriation claims but, instead, is simply a restatement of its argument that agreements EOX had with its customers imposed duties of trust and confidentiality on the Defendants.

---

[150](...continued)
Deposition"), pp. 106:18-109:20, Docket Entry No. 152-8, pp. 7-10 (testifying about DTE); Exhibit 8, Deposition of Edward Mazzacano ("Mazzacano Deposition"), pp. 83:24-84:9, Docket Entry No. 152-9, pp. 4-5 (testifying about PSEG)).

[151]See Exhibits 59-60 to Plaintiff's SOF, BSAs between EOX and DTE, Geosol, and PSEG, Docket Entry Nos. 152-60-62, respectively.

>              **(2)   Whether Defendants Breached Duties of Trust
>                     and Confidentiality Owed to EOX Customers
>                     Raises Fact Issues**

Asserting that they did not breach any duty of confidentiality, Defendants argue that they were "fully disclosed dual agents, acting as brokers for Customers B-F . . . and matching them with other of their customers."[152]  Defendants argue that BSAs that EOX executed with four of its customers (DTE, Geosol, PSEG, and Constellation) explicitly allowed them to make the disclosures at issue, that Defendants did not owe the other two customers a duty of trust and confidentiality because they had no written contracts, and that IFUS Rule 4.02 did not create a duty of confidence because "all it prohibits is disclosure of 'pre-execution communications.'"[153]  Asserting that 17 C.F.R. § 155.4(b)(2) and IFUS Rule 4.02(i) prohibit only disclosure of information related to an order, Defendants also argue that Plaintiff "has no proof that the information allegedly disclosed by Mr. Gizienski is related to orders, . . . [and that w]ithout that elemental proof, Plaintiff cannot impose any duty of confidentiality on Defendants."[154]  Defendants argue that Plaintiff

---

[152]Defendants' Memorandum in Support of  MSJ, Docket Entry No. 179, p. 20.

[153]Id. at 21.

[154]Defendants' Reply in Support of MSJ, Docket Entry No. 174, p. 9.

compounds that failure of proof by ignoring the consent provision of ICE Rule 4.02(k)(2)(A), the provisions of the four contracts by which Defendants' customers consented to the disclosure of information, and the uncontroverted testimony of traders Elsik and Grimes that the contracts and industry practice permitted Defendants' disclosure of the information the CFTC attacks.[155]

For the reasons stated in § IV.B.1(b)(1)(i)-(ii), the court has already concluded that 17 C.F.R. § 155.4(b) and IFUS Rule 4.02(i) impose on Defendants duties of trust and confidentiality sufficient to support the misappropriation claims asserted in Count I of Plaintiff's Complaint. Accordingly, for those same reasons Defendants have failed to establish that they are entitled to summary judgment on Count I based on their arguments that IFUS Rule 4.02 did not create a duty of trust and confidentiality, and that they did not owe duties of trust and confidentiality to the two EOX customers who did not have BSAs. Defendants' argument that they are entitled to summary judgment on Count I because the BSAs that EOX executed with four of its customers (DTE, Geosol, PSEG, and Constellation) explicitly allowed them to make the disclosures at issue fairs no better because whether the BSAs permitted the disclosures at issue raise genuine issues of material fact for trial.

The summary judgment record contains undisputed evidence that Gizienski disclosed to Vaccaro non-public information relating to the identities, positions, orders, and trading interests of EOX

---

[155]Id.

customers, and that Gizienski disclosed that information to Vaccaro not for the purpose of executing trades for any of EOX's customers, but to "giv[e Vaccaro] market color."[156]   Asserting that EOX's brokerage services "included providing market intelligence and market color to its customers,"[157] Defendants argue that the EOX's BSAs "granted the[m] legal right to make disclosures as they deemed 'necessary and appropriate' or 'to a third party' in rendering their brokerage services."[158] But missing from Defendants' briefing are citations to provisions in any of the BSAs in which DTE, Geosol, Constellation, or PSEG granted Defendants consent to disclose their nonpublic information to other customers for purposes of providing them "market intelligence" or "market color." Instead, the BSAs granted Defendants consent to disclose a customer's confidential information "as they deemed 'necessary and appropriate'" or "'to a third party' in rendering their brokerage services."  Whether the disclosures about which Plaintiff complains were "necessary and appropriate" or otherwise made in accordance

---

[156]Plaintiff's SOF, Docket Entry No. 152, p. 24, ¶ 118 (quoting Gizienski Investigative Testimony, p. 132:19, and citing <u>id.</u> at 132:17–134:2, Exhibit 5 to Plaintiff's MSJ, Docket Entry No. 152-6, pp. 26–28; and Gizienski Response to RFA, Exhibit 38 to Plaintiff's MSJ, Docket Entry No. 152-39, pp. 8 ¶ 21, 11 ¶ 32, 14 ¶ 46, 16 ¶ 56, 18 ¶ 68); Defendants' Counter SOF, Docket Entry No. 168, p. 84 ¶ 118.

[157]Defendants' Reply in Support of MSJ, Docket Entry No. 174, p. 10.

[158]<u>Id.</u> at 9–10.

with a BSA necessarily raise genuine issues of material fact as to whether Defendants breached duties of trust and confidence owed to EOX customers other than Vaccaro that must be addressed on a case by case basis at trial.

Moreover, even if, as Defendants argue, all of EOX's customers knowingly agreed to dual representation, i.e., knowingly agreed that Defendants would broker for others, undisputed evidence shows that Gizienski did not merely broker for Vaccaro, but instead, exercised discretionary authority over the Managed Account, which not only allowed Gizienski to execute trades for AC Power without speaking to Vaccaro about the specific trade, but also allowed Gizienski to determine the quantity, price, and timing of the trades that he made for AC Power.[159]  Undisputed evidence also shows that neither EOX nor Gizienski disclosed to their other customers that Gizienski exercised discretionary authority over the Managed Account to execute trades for AC Power in the same markets that he acted as a broker for their other customers,[160] and that neither EOX

---

[159]Plaintiff's SOF, Docket Entry No. 152, pp. 8-9 ¶¶ 54, 58 (citing Gizienski Investigative Testimony, pp. 39:2-5, and 60:4-9, Exhibit 5 to Plaintiff's MSJ, Docket Entry No. 152-6, pp. 11 and 17; and Gizienski Deposition, pp. 102:20-104:2, 181:9-182:9), Exhibit 6 to Plaintiff's MSJ, Docket Entry No. 152-7, pp. 20-22, 25-26); Defendants' Counter SOF, Docket Entry No. 168, pp. 26 and 29 ¶¶ 54, 58.

[160]Plaintiff's SOF, Docket Entry No. 152, pp. 8 ¶ 49 and 10 ¶¶ 63-64 (citing inter alia Gizienski Investigative Testimony, pp. 59:15-60:13, Exhibit 5 to Plaintiff's MSJ, Docket Entry No. 152-6, pp. 16-17); Defendants' Counter SOF, Docket Entry No.
(continued...)

nor Gizienski obtained consent from their other customers to represent them in trades for which Gizienski took the opposite side of their orders by exercising discretionary authority over the Managed Account for AC Power.[161]  The evidence of Gizienski's undisclosed exercise of discretionary authority over the Managed Account to trade against EOX's other customers raises genuine issues of material fact as to whether Defendants breached duties of trust and confidence owed to EOX customers other than Vaccaro that must be addressed on a case by case basis at trial.

> (c)  Plaintiff Fails to Establish that It is Entitled to Summary Judgment on Count I

Asserting that Gizienski misappropriated customer information by tipping confidential customer information for his own personal benefit, and by deliberately causing EOX customers to transact at prices that were inferior to prices that he knew to be available in the market,[162] Plaintiff seeks summary judgment on the following issues related to Count I:

---

[160](...continued)
168, pp. 19-21 ¶ 49.

[161]Plaintiff's SOF, Docket Entry No. 152, pp. 8 ¶ 50 and 10 ¶¶ 62 and 65 (citing Defendant EOX Holding LLC's Responses to Plaintiff CFTC's First Set of Requests for Admissions ("EOX's Responses to Plaintiff's RFA"), Exhibit 27 to Plaintiff's MSJ, Docket Entry No. 152-28, p. 10 ¶ 37); Defendants' Counter SOF, Docket Entry No. 168, p. 22 ¶ 50.

[162]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, pp. 21-33.

- Gizienski repeatedly misappropriated confidential customer order information and used it to his own benefit (and to his customers' disadvantage), in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(2).

- On at least 11 separate occasions Gizienski fraudulently caused his customers to trade at inferior prices, causing them to suffer damages, in order to obtain instant, riskless profits for a preferred customer, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

- Because Gizienski's conduct occurred within the scope of his employment, office, or agency with Defendant EOX . . ., EOX is liable for each of the above-mentioned violations pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.[163]

Defendants argue that Plaintiff is not entitled to summary judgment on Count I because they did not owe a duty of trust and confidentiality to their customers, because Plaintiff's inferior price argument is wrong as a matter of fact and law, and because there are issues of fact regarding scienter.[164]  For the reasons stated in § IV.B.1(b)(1)-(2), the court has already concluded that Defendants have failed to establish that they did not owe duties of trust and confidence to EOX customers, and that Plaintiff has cited evidence sufficient to raise fact issues for trial as to whether Defendants owed duties of trust and confidentiality to EOX customers, and, if so, whether Defendants breached those duties.

---

[163]Plaintiff's MSJ, Docket Entry No. 150, p. 1.

[164]Defendants' Opposition to Plaintiff's MSJ, Docket Entry No. 167-1, pp. 10-17.

> (1) Whether Defendants Violated the CEA and
> § 180.1 by Misappropriating Confidential
> Information Raises Fact Issues for Trial

Plaintiff argues that it is entitled to summary judgment that Defendants violated the § 6(c)(1) of CEA and § 180.1 by misappropriating EOX customers' confidential information in breach of a pre-existing duty of trust and confidentiality because undisputed evidence establishes that Gizienski (1) traded against customers' orders through the Managed Account and passed customer information to Vaccaro, (2) that Gizienski cannot credibly deny that he acted intentionally, and (3) that Gizienski acted for his personal benefit.[165]  Plaintiff asserts that

> on multiple occasions Gizienski disclosed DTE's order
> information to Vaccaro while Vaccaro was competing with
> DTE to trade on the same side of the same product.  SOF
> ¶¶ 100, 102, 107, 108, 112-14, 117.  On one particular
> occasion, Gizienski told Vaccaro that DTE had offered to
> sell certain put options at a particular price and that
> another customer was buying them.  SOF ¶ 117.  Vaccaro
> responded "start selling thing man," which was an
> instruction from Vaccaro to sell those same options.  SOF
> 117.  Gizienski admits that he did not disclose DTE's
> trading activity for the purposes of executing a trade
> for DTE, but rather to provide "market color" to Vaccaro.
> SOF ¶ 118.  Gizienski's disclosure of DTE's orders and
> trades clearly violated the DTE brokerage services
> agreement.[166]

Although Plaintiff treats all of its SOFs as undisputed, Defendants deny and dispute each of the SOFs cited in the above quoted passage

---

[165]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, pp. 24-25.

[166]Id. at 26.

from Plaintiff's brief.[167]  The cited SOFs refer to disclosures made

on different dates, and fail to provide any discernible evidentiary

support for Plaintiff's assertions that the disclosures were made

while Vaccaro was competing with DTE to trade on the same side of

the same product.  And although Gizienski admitted that he has

testified that the disclosures made on one of these dates — April

30, 2014 — were made to give Vaccaro "market color," he argues that

he also testified that

> I'm just giving him market color because you have to
> inform people, you know, when they're an offer if people
> are joining that offer.  You relay that as a voice
> broker.  You have company on your offer.  You're being
> joined.  There's now two sellers with you.  It's showing
> them the stack and how much volume is also joining,
> interest to sell the same level they are. May cause them
> to increase their — to sell better, to transact.  It's
> just — and I'm also doing the same thing for the other
> two guys, telling them — you know, they know they're
> joining an offer.  They're not the first.  So if someone
> was to come in and buy it, that they'd have to wait their
> turn or maybe we can, you know, split it up or figure out
> the best way to handle it.[168]

Moreover, Defendants cite evidence that, if believed, could

establish that "[t]his transmission of information was part of

[their] services of providing market intelligence and market color

---

[167]Defendants' Counter SOF, Docket Entry No. 168, pp. 67-68
(SOF 100), p. 69 (¶ 102 referencing disclosures made on November 6,
2013), pp. 73-75 (¶¶ 107-108 referencing disclosures made on
December 9, 2013), pp. 78-81 (¶¶ 112-114 referencing, disclosures
made on February 10, 24, and 27 2014, respectively), and p. 83
(¶ 117 referencing disclosures made on April 30, 2014).

[168]Id. at 84 (referencing SOF 118, and citing Gizienski
Investigative Testimony, pp. 132:19-133:10, Exhibit 5 to
Plaintiff's SOF, Docket Entry No. 152-6, pp. 26-27).

to its customers, as permitted by the BSA with Geosol and custom and practice in the industry."[169]

Plaintiff asserts similar arguments with respect to Geosol by stating that

> EOX's brokerage services agreement with Geosol stated that EOX shall not at any time disclose to anyone any information that EOX learned as a result of its brokerage activities for Geosol including its identity and the prices at which it had sold or wished to sell, provided that nothing prevented EOX "from communicating information to potential Product(s) buyers or sellers which is necessary or appropriate to perform" brokerage services.  SOF ¶ 122 (emphasis added).  But again, on multiple occasions Gizienski disclosed Geosol's order information to Vaccaro while Vaccaro was competing with Geosol to trade on the same side of the same product. SOF ¶¶ 104, 115.  On one occasion in particular, Gizienski told Vaccaro that Geosol was "covering" options and Vaccaro responded by instructing Gizienski to also cover options for his own account.  SOF ¶ 115.  Gizienski admits that he did not disclose Geosol's identity and trade activity for the purpose of executing a trade for Geosol, but rather to provide "market color" to Vaccaro. SOF 118.  Such disclosure obviously was not "necessary or appropriate" under the Geosol brokerage services agreement.[170]

Defendants deny and dispute Plaintiff's SOF 115 referencing disclosures made on February 27, 2014, cited in the above quoted passage from Plaintiff's brief in support of its motion for summary judgment,[171] and Plaintiff again fails to provide any discernible

---

[169]_Id._ (citing Rule 30(b)(6) Deposition of Javier Loya ("Loya Rule 30(b)(6) Deposition"), pp. 201-204, Exhibit 3 to Defendants' Counter SOF, Docket Entry No. 168-2, pp. 42-45).

[170]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, p. 26.

[171]Defendants' Counter SOF, Docket Entry No. 168, pp. 81-82
(continued...)

evidentiary support for its assertions that the disclosures were made while Vaccaro was competing with Geosol to trade on the same side of the same product.  Although Defendants admit that Gizienski did not disclose Geosol's identity or trade activity for the purpose of executing a trade for Geosol, but, instead, to provide Vaccaro "market color,"[172] Defendants cite evidence, which if believed, is capable of establishing that these disclosures were permitted pursuant to both to the BSA that EOX had with Geosol,[173] and to custom and practice in the industry.[174]

> (2)   Whether Defendants Violated the CEA and § 180.1 by Causing EOX Customers to Trade at Inferior Prices Raises Fact Issues for Trial

Plaintiff argues that it is also entitled to summary judgment that Defendants violated the CEA and § 180.1 by misappropriating EOX customers' confidential information in breach of a pre-existing duty of trust and confidentiality because undisputed evidence establishes that Gizienski

---

[171](...continued)
(SOF 115 referencing disclosures made on February 27, 2014).

[172]Id. at 82-83 (SOF 116).

[173]Id. at 86 (SOF 122).

[174]Id. at 70-71 (SOF 104 but referencing disclosures made on November 18, 2013), and p. 84 (SOF 118 (citing Gizienski Investigative Testimony, pp. 132:19-133:10, Exhibit 5 to Plaintiff's SOF, Docket Entry No. 152-6, pp. 26-27)).

deceptively caused] his customers to trade at inferior prices opposite Vaccaro in order to obtain instant, riskless profits for Vaccaro through the [Managed] Account. Gizienski did this by quoting prices that were inferior to the best price he knew to be available in the market (*i.e.*, by quoting offers at prices higher than the lowest offer he knew to be available and/or quoting bids at prices lower than the highest bid he knew to be available.). Then, if a customer agreed to transact at the inferior price, Gizienski would use the [Managed] Trading Account to take a position at the superior market price and simultaneously trade with the EOX customer at the inferior price the customer had already agreed to, collecting the difference in profits.[175]

Plaintiff argues that

[t]here are 11 separate documented instances in which Gizienski used the [Managed] Account to buy (or sell) from an EOX customer at one price and almost simultaneously exit the position by selling (or buying) that same product at a more favorable price. SOF ¶¶ 70-82. In each of those instances, Gizienski bought low and sold high to obtain an instant profit. Indeed, he had a 100% success rate generating profits under this scheme.[176]

Plaintiff argues that "[w]hen done by market participants, this process of searching for price discrepancies in the market to attempt to buy a product and immediately re-sell it at a higher price is called arbitrage. When done by a broker to one of his customers, though, it has another name: fraud."[177] Much of the

---

[175]Plaintiff's Memorandum in Support of MSJ, DE No. 151, pp. 29-30.

[176]Id. at 31. See also id. at 13 (citing Plaintiff's SOF 70-82 and asserting that on at least 11 occasions, Gizienski executed block trades opposite EOX customers at one price while almost simultaneously exiting the position by trading on the IFUS screen or in a block trade against another EOX customer at a better price).

[177]Id.

evidence cited in support of this theory of liability comes from two of the three trade data exhibits (Exs. 30 and 33 attached to Plaintiff's MSJ) referenced in the Dasso Declaration to which Defendants object.[178]

Assuming without deciding that the arbitrage method by which Plaintiff alleges Gizienski misled his customers constitutes fraud, Plaintiff is nevertheless not entitled to summary judgment on this theory because the evidence that Plaintiff cites in support of this theory does not show as a matter of law either that the timing of the transactions occurred as Plaintiff alleges, or that the transactions were done against Gizienski's — or even EOX's — own customers.   Nor is the evidence on which Plaintiff relies necessarily admissible.  Although "[a]t the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form," Maurer, 870 F.3d at 384 (citing Fed. R. Civ. P. 56(c)), and need only be capable of being "presented in a form that would be admissible in evidence," id., in light of the court's

_____

[178]Defendants' Counter SOF, Docket Entry No. 168, p. 32 (asserting that "Exhibit 30, the spreadsheet of trades supposedly from ICE is unauthenticated and unexplained, and if prepared by ICE as part of its investigation, cannot be deemed a business record since it was prepared solely for the purposes of litigation."). Defendants argue, and the court agrees, that "Exhibit 31, the Declaration of Heather Dasso, does not supply that authentication. [Dasso] is the CFTC Investigator assigned to this case, and this Declaration does not establish that she has personal knowledge sufficient to authenticate Exhibit 30."). See also id. at 40 (asserting that "[t]he spreadsheet identified as Exhibit 33 is unauthenticated.").

conclusion in § III.C, that the Dasso Declaration should be stricken as an untimely disclosed expert report, whether the trade data exhibits are capable of being admitted at trial remains to be seen. See Dizona, 594 F.3d at 416 & n. 6 (holding that CFTC investigator was not a qualified witness pursuant to Federal Rule of Evidence 803(6) able to lay a foundation for admitting spreadsheets of disputed commodity trades because the investigator was not able to explain the record keeping system and vouch that the requirements of Rule 803(6) had been satisfied).

2.   Count II

Count II of Plaintiff's Complaint alleges that

> [d]uring the relevant period, Gizienski violated 17 C.F.R. § 155.4(b) by: (i) disclosing to Customer A the orders of other customers held by EOX or any of its affiliated persons, when such disclosures were not necessary to the effective execution of the customer orders; and (ii) knowingly taking the other side of customer orders revealed to EOX or any of its affiliated persons without the customers' prior consent.[179]

Plaintiff also alleges that "[t]he foregoing acts, omissions, and failures of Gizienski occurred within the scope of his employment, office, or agency with EOX,"[180] that pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, EOX is liable for Gizienski's violations of 17 C.F.R. § 155.4(b),[181] and that "[e]ach instance in

---

[179]Plaintiff's Complaint, Docket Entry No. 1, p. 18 ¶ 83.

[180]Id. ¶ 84.

[181]Id.

-85-

which Gizienski unlawfully disclosed a customer order or traded against an EOX customer without the customer's consent is alleged as a separate and distinct violation of 17 C.F.R. § 155.4(b)."[182]

(a) Applicable Law

Section 155.4(b) provides, in relevant part:

No introducing broker or any of its affiliated persons shall:

(1) Disclose that an order of another person is being held by the introducing broker or any of its affiliated persons, unless such disclosure is necessary to the effective execution of such order . . ., or

(2) (i) Knowingly take, directly or indirectly, the other side of any order of another person revealed to the introducing broker or any of its affiliated persons by reason of their relationship to such other person, except with such other person's prior consent and in conformity with contract market rules approved by or certified to the Commission.

17 C.F.R. § 155.4(b). Section 155.4(b) is intended to deter practices such as "frontrunning," "trading ahead," "bucketing," and the improper disclosure of customer orders. See Rules Relating to Intermediaries of Commodity Interest Transactions [Action: Final Rules], 66 Fed. Reg. 53510, 53513-14 (October 23, 2001). As a registered introducing broker and affiliated person, EOX and Gizienski are subject to § 155.4. See 17 C.F.R. 155.1 ("the term affiliated person . . . of an introducing broker means . . . associated person or employee . . . of the introducing broker").

---

[182] Id. ¶ 85.

-86-

> (b)   Defendants are Not Entitled to Summary Judgment on
>       Count II

Defendants argue that they are entitled to summary judgment on Count II for the same reasons they argue that they are entitled to summary judgment on Count I,[183] and for two additional reasons: (1) Plaintiff has no evidence that Gizienski engaged in "front running;" and (2) Plaintiff has no evidence that Gizienski took the opposite side of his customer's orders.  For the reasons stated in § IV.B.1(b) the court has already concluded that Defendants are not entitled to summary judgment on Count I.  Defendants' motion for summary judgment on Count II therefore fails for the same reasons.

### (1)   Defendants Are Not Being Sued for Front Running

Asserting that frontrunning is "trading ahead of a customer, entering a trade in one's own account before an imminent trade by that customer,"[184] Defendants argue that Plaintiff "has no proof of front running.  It never adduced such evidence from any customers about the time sequence of the supposed disclosure and their own trading, the linchpin a front running claim.  As a result, it has no evidence of front running."[185]  Plaintiff responds that Defendants have not been charged with front running.[186]

----

[183]Defendants' Memorandum in Support of  MSJ, Docket Entry No. 179, pp. 20-23.

[184]Id. at 23.

[185]Id. at 24.

[186]Plaintiff's Response to Defendants' MSJ, Docket Entry
(continued...)

> **(2)   Defendants Have Failed to Establish that They Cannot Be Held Liable for Taking the Other Side in Transactions with EOX Customers**

Asserting that they "respectfully persist in their argument that as brokers with no interest in the account of AC Power (Customer A),"[187] Defendants argue that they "cannot be held liable under Regulation 155.4(b) for taking the opposite side of the transaction."[188]   Asserting that this is an issue of first impression that has grave consequences for the investment community, especially the energy trading and brokerage segments,"[189] and that they were acting as dual agents, Defendants argue that

> the law is clear that absent fraud, the knowledge of the dual agent and each of its principals is imputed to the other principal.   The Court [previously] declined to consider this argument and the Valji Declaration in part because it did not deal with the specific transactions involved in this case.   That supposed omission has now been eliminated by discovery that proves that Defendants were dual agents, known to all traders and all counterparties, and their knowledge about all facts underlying the dual agency is to be imputed to each principal.[190]

Asserting that the Plaintiff's "fraud theories of this case make no sense,"[191] Defendants argue that

---

[186](...continued)
No. 166, p. 15.

[187]Defendants' Memorandum in Support of  MSJ"), Docket Entry No. 179, p. 24

[188]Id.

[189]Id.

[190]Id.

[191]Id. at 25.

> [o]n the one hand, Count I and part of Count II allege fraud because of certain disclosures made to Jason Vaccaro, the trader for AC Power. On the other hand, the second part of Count II alleges fraud because Defendants did not disclose to Customers B-F the fact that Defendant Gizienski held discretionary trading authority over the AC Power account. This is a startling[ly] invalid Catch-22 assertion of government power, not supported by any prior precedent, and inimical to the custom and practices of the energy and energy trading community.[192]

Finally, Defendants argue that Plaintiff

> has admitted that it has no proof that anyone suffered any loss or other damage. While we may assume that this absence of proof is not fatal to the CFTC's [case], this incontrovertible evidence circumstantially supports the conclusion that Defendants did nothing wrong. How can there be fraud if no one is defrauded?[193]

Section 155.4(b)(2) states that no introducing broker, _i.e._, EOX, or any of its APs, _i.e._, Gizienski, shall "[k]nowingly take, directly or indirectly, the other side of any order of another person revealed to the introducing broker or any of its affiliated persons by reason of their relationship to such other person, except with such other person's prior consent and in conformity with contract market rules approved by or certified to the Commission." 17 C.F.R. § 155.4(b)(2). Defendants neither argue nor offer any evidence capable of proving that Gizienski did not execute discretionary trades against EOX customers without their consent through the Managed Account. For reasons stated in the Memorandum Opinion and Order issued on September 9, 2019, the court

---

[192]_Id._

[193]_Id._ at 26.

has already rejected Defendants' arguments that they had no duty to keep customer order information confidential because they acted as dual agents for EOX customers, and that § 155.4(b)(2) applies only to principals.  See CFTC v. EOX Holdings LLC, 405 F.Supp.3d 697, 712-14 and 718 (S.D. Tex. 2019).  Defendants' contention that the completion of discovery has altered the basis of the court's reasoning on this issues is not persuasive because neither party has addressed the specific transactions involved in this case in a comprehensive or, frankly, coherent manner.  Defendant's argument that Plaintiff's theory of fraud makes no sense and imposes inconsistent requirements on brokers that threaten grave consequences for the investment community are similarly unpersuasive because § 155.4(b) simply requires brokers to keep customer orders confidential, and to obtain consent before trading opposite a customer.  Because a broker can comply with § 155.4(b) by disclosing that he or she is taking the opposite side of a customer's order without disclosing the counterparty's identity or other confidential order information, the court is not persuaded that § 155.4(b) is either internally inconsistent or a "startling[ly] invalid Catch-22 assertion of government power." Accordingly, the court concludes that Defendants have failed to establish that they are entitled to summary judgment on Count II.

>     (c)  Plaintiff is Not Entitled to Summary Judgment on
>          Count II

Plaintiff seeks summary judgment in its favor on Count II with respect the following issues:

- On at least 19 separate occasions Defendant Andrew Gizienski . . . disclosed his customers' confidential order information to a preferred customer without consent, in violation of 17 C.F.R. § 155.4(b)(1).

- On at least 107 separate occasions Gizienski took the other side of customer orders revealed to him in his capacity as a broker without consent, in violation of 17 C.F.R. § 155.4(b)(2).

                              . . .

- Because Gizienski's conduct occurred within the scope of his employment, office, or agency with Defendant EOX . . ., EOX is liable for each of the above-mentioned violations pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.[194]

Plaintiff argues that it is entitled to summary judgment on Count II that Defendants violated 17 C.F.R. § 155.4(b) for essentially the same reasons that Plaintiff argues that it is entitled to summary judgment on Count I.[195]  For the same reasons that the court has already concluded that Plaintiff is not entitled to summary judgment on Count I, the court concludes that Plaintiff is not entitled to summary judgment on Count II.  Plaintiff, without a trial, seeks a final award of unspecified damages and a wide-ranging permanent injunction based on rather ill-defined and

---

[194]Plaintiff's MSJ, Docket Entry No. 150, p. 1.

[195]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, pp. 16-21.

uncertain activities of Defendants.  The summary judgments that Plaintiff seeks require extensive and detailed fact-finding with respect to the range and scope of Defendants' activities and Gizienski's state of mind with respect to each of the transactions at issue, all of which occurred in a complicated trading environment.  Resolution of Plaintiff's claims necessarily requires consideration of each transaction on a case-by-case basis at trial.

### 3.  Count III

Count III of Plaintiff's Complaint alleges that

> [s]ince at least August 2013, EOX has violated 7 U.S.C. § 6g(a) and 17 C.F.R. §§ 1.31 and 1.35(a)(1) by: (i) failing to keep all pre-trade communications with customers; and (ii) failing to prepare and keep adequate written records of customer orders.[196]

Plaintiff also alleges that "[e]ach day that EOX failed to comply with its record keeping obligations is alleged as a separate and distinct violation of 17 C.F.R. §§ 1.31 and 1.35(a)(1)(iii) and (b)(1)(2013)."[197]  Count III alleges that EOX violated its record keeping obligations from the Relevant Period to the present by (1) failing to prepare and maintain written order tickets; and (2) failing to maintain certain written and oral pre-trade communications.[198]

---

[196]Plaintiff's Complaint, Docket Entry No. 1, p. 20 ¶ 91.

[197]Id. ¶ 92.

[198]See Plaintiff's Response to Defendants' MSJ, Docket Entry
(continued...)

(a)   Applicable Law

In pertinent part 7 U.S.C. § 6g(a) states that

[e]very person registered hereunder as . . . [an]
introducing broker . . . shall make such reports as are
required by the Commission regarding the transactions and
positions of each person, and the transactions and
positions of the customer thereof, in commodities for
future delivery on any board of trade in the United
States or elsewhere . . .; shall keep books and records
pertaining to such transactions and positions in such
form and manner and for such period as may be required by
the Commission; and shall keep such books and records
open to inspection by any representative of the
Commission or the United States Department of Justice.

7 U.S.C. § 6g(a).

During the Relevant Period, 17 C.F.R. § 1.31(a)(1) stated that

[a]ll books and records required to be kept by the Act or
by these regulations shall be kept in their original form
(for paper records) or native file format (for electronic
records) for a period of five years from the date thereof
and shall be readily accessible during the first 2 years
of the 5-year period. . . Records of oral communications
kept pursuant to §§ 1.35(a) . . . of this chapter shall
be kept for a period of one year.  All such books and
records shall be open to inspection by any representative
of the Commission, or the United States Department of
Justice.  For purposes of this section, native file
format means an electronic file that exists in the format
in which it was original created.

17 C.F.R. § 1.31(a)(1)(2012).[199]

In pertinent part the version of  17 C.F.R. § 1.35(a)(1) in

effect during the Relevant Period stated that

_____

[198](...continued)
No. 166, p. 21.

[199]See 77 Fed. Reg. 75523, 75541 (December 21, 2012), Exhibit
5 to Plaintiff's Response to Defendants' MSJ, Docket Entry No. 166-
5, p. 20.

> Each . . . introducing broker . . . shall keep full, complete, and systematic records, which include all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity interests and related cash or forward transactions. Included among such records shall be all orders (filled, unfilled, or canceled), . . . copies of confirmations, copies of statements of purchase and sale, and all other records, which have been prepared in the course of its business of dealing in commodity interests and related cash or forward transactions. . . Also included among the records required to be kept by this paragraph are all oral and written communications provided or received concerning quotes, solicitations, bids, offers, instructions, trading, and prices that lead to the execution of a transaction in a commodity interest and related cash or forward transactions, whether communicated by telephone, voicemail, facsimile, instant messaging, chat rooms, electronic mail, mobile device, or other digital or electronic media; Provided, however, the requirement in this paragraph (a)(1) to record oral communications shall not apply to:
>
> . . .
>
> (iii)    An introducing broker that has generated over the preceding three years $5 million or less in aggregate gross revenues from its activities as an introducing broker; . . .

17 C.F.R. 1.35(a)(2013).[200]  Section 1.35(b)(1) stated that

> (b)  [I]ntroducing brokers . . .:  Recording of customers' orders.
>
> (1)  . . . [E]ach introducing broker . . . receiving a customer's order that cannot immediately be entered into a trade matching engine shall immediately upon receipt thereof prepare a written record of the order including the account identification, except as provided in paragraph (b)(5) of this section, and order number, and shall record thereon, by timestamp or other timing device,

---

[200]Id. at 75541-42, Exhibit 5 to Plaintiff's Response to Defendants' MSJ, Docket Entry No. 166-5, pp. 20-21.

> the date and time, to the nearest minute, the
> order is received, and in addition, for
> commodity option orders, the time, to the
> nearest minute, the order is transmitted for
> execution.

17 C.F.R. 1.35(b)(2013).[201]

      (b)   Defendants Are Entitled to Partial Summary Judgment
            on Count III

Defendants argue that they are entitled to partial summary judgment on Count III because (1) compliance with the oral recording keeping mandated by § 1.35(a) was not required until the compliance date of December 21, 2013; and (2) EOX was exempt from satisfying § 1.35(a)'s record keeping requirements for 2013 and 2014 because its gross revenues for the three years preceding both January 1, 2013, and January 1, 2014, were less than five million dollars.[202]

      **(1)   Defendants Are Entitled to Summary Judgment
            that EOX was Not Required to Comply with the
            Oral Record Keeping Mandate until the
            Compliance Date of December 21, 2013**

EOX argues that it was not required to comply with the oral record keeping mandate during 2013 and 2014 because "by the explicit terms of the Federal Register release adopting the oral

---

[201]See 77 Fed. Reg. 66288, 66325 (November 2, 2012).

[202]Defendants' Memorandum in Support of MSJ, Docket Entry No. 179, p. 27.

recording mandate, compliance was not required until December 21, 2013.  77 FR 75524 (Dec. 21, 2012)."[203]

Plaintiff responds that

[i]t is undisputed that Regulation 1.35's oral communications record keeping requirement went into effect on February 19, 2013 — six months before the beginning of the Relevant Period. 76 Fed. Reg. 75523 at 75524 (Ex. 5) (listing effective date of February 19, 2013).  It is also undisputed that the Regulation directed affected entities to be in full compliance with the Regulation by December 21, 2013. Id. (listing a compliance date of December 21, 2013).  EOX argues that it was not required to abide by the Regulation's effective date and was only required to maintain oral communications after December 21, 2013.  EOX's argument must fail because it would render meaningless the Regulation's effective date of February 19, 2013. . . .

The separate dates for effectiveness and compliance in the Regulation provide a "safe harbor" for market participants who could not comply by the effective date. So long as market participants complied by the later compliance date, they would not be penalized for failing to meet the earlier effective date.  But if a market participant failed to comply even by the later compliance date, it would be liable for the entire period that the regulation was in effect.[204]

Asserting that "[i]t is undisputed that EOX failed to come into compliance with the Regulation before December 21, 2013,"[205] Plaintiff argues that "EOX's violations of the Regulation date back to the effective date."[206]

---

[203]Id.  See also Defendants' Reply in Support of MSJ, Docket Entry No. 174, p. 21.

[204]Plaintiff's Response to Defendants' MSJ, Docket Entry No. 166, p. 25.

[205]Id. (citing Exhibit 67 to Plaintiff's MSJ, Docket Entry No. 152-68, Tabs 2, 13, 19-22).

[206]Id.

Missing from Plaintiff's briefing is a cite to any authority in support of its argument that EOX can be held liable for failing to comply with the recording keeping requirements pertaining to oral communications imposed by 17 C.F.R. § 1.35(a) before the stated compliance date.  Moreover, neither the regulation nor the Federal Register entry states that regulated entities failing to comply by the compliance date could be held liable from the effective date.  Plaintiff's contention that Defendants can be held liable for failing to comply with the regulation before the expressly stated compliance date contradicts the plain language of the regulation.  The court concludes therefore that Defendants are entitled to summary judgment that EOX was not required to comply with the oral record keeping mandate until the compliance date of December 21, 2013.  See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 104 S.Ct. 2778, 2781-83 (1984).  See also Silverman v. Eastrich Multiple Investor Fund, L.P., 51 F.3d 28, 31 (3d Cir. 1995) (recognizing that effective and compliance dates have distinct meanings by stating that "[t]he mandatory compliance date should not be misconstrued as the effective date of the revisions"); Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency, 683 F.2d 752, 761-62 (3d Cir. 1982) ("In general, an effective date is 'part of an agency statement of general or particular applicability and of future effect.'  It is an essential part of any rule: without an effective

-97-

date, the 'agency statement' could have no 'future effect,' and
could not serve to 'implement, interpret, or prescribe law or
policy.'  In short, without an effective date a rule would be a
nullity because it would never require adherence.").

> **(2)  Defendants Are Not Entitled to Summary
> Judgment that EOX's Gross Revenues Exempted It
> from the Record Keeping Mandate**

EOX argues that it was not required to record oral
communications during 2013 and 2014 because "the gross revenue of
EOX for the three years preceding 2013 & 2014 fell below the $5
Million threshold, thus exempting EOX from the oral recording
requirement for those two years."[207]  As evidence that it was exempt
from the recording requirement for 2013 and 2014, EOX asserts that
"in July 2014, EOX was audited by the National Futures Association
(NFA) which determined that EOX was exempt from the recording
requirement."[208]  Asserting that the "NFA is the futures industry's
self-regulatory organization, so designated by the CFTC and
authorized to monitor and regulate industry participants' financial
affairs,"[209] Defendants cite financial records that EOX filed with

---

[207]Defendants' Memorandum in Support of  MSJ, Docket Entry
No. 179, p. 27.  See also Defendants' Reply in Support of MSJ,
Docket Entry No. 174, pp. 20-21.

[208]Defendants' Memorandum in Support of  MSJ, Docket Entry
No. 179, p. 28.

[209]Id.

the NFA,[210] and argue that "[p]ursuant to Regulation 1.12(n), 17 C.F.R. 1.12(n), these reports are 'deemed for all purposes filed with, and to be the official record of, the [CFTC]."[211]

Plaintiff responds that "[t]o make this argument, EOX conceals from the Court — much as it did from the [NFA] — the brokerage revenues earned by affiliates who use EOX's IB registration."[212] Citing Stipulations executed by counsel for the parties to this action, Plaintiff argues that "it is undisputed that Affiliate revenue exceeds the five-million-dollar threshold."[213]   The Stipulations state that

1.   The entities that brokered investments through the Introducing Broker registration at NFA of EOX Holdings LLC generated, in total, more than $5 million in aggregate gross revenues from their activities as an introducing broker between January 1, 2010 and December 31, 2012.

2.   The entities that brokered investments through the Introducing Broker registration at NFA of EOX Holdings LLC generated, in total, more than $5 million in aggregate gross revenues from their activities as an introducing broker between January 1, 2011 and December 31, 2013.[214]

---

[210]Id. (citing Loya Declaration, ¶ 14, Exhibit 1 to Defendants' MSJ, Docket Entry No. 160-2, p. 5; and Copies of Financial Reports known as "1-FR-IBs" that EOX filed with the NFA, Exhibits 20-22, Docket Entry No. 160-2, pp. 254-86).

[211]Id.

[212]Plaintiff's Response to Defendants' MSJ, Docket Entry No. 166, p. 21.

[213]ID. at 24.

[214]Stipulations, Exhibit 65 to Plaintiff's MSJ, Docket Entry
                                             (continued...)

Because undisputed evidence establishes that for each of the three year periods preceding January 1, 2013, and January 1, 2014, the gross revenues for entities that brokered investments through EOX's IB registration at NFA exceeded five million dollars, the court concludes that EOX is not entitled to summary judgment that its was exempted from § 1.35(a)'s record keeping requirements pursuant to § 1.35(a)(1)(iii), which exempted an "[a]n introducing broker that has generated over the preceding three years $5 million or less in aggregate gross revenues from its activities as an introducing broker." 17 C.F.R. § 1.35(a)(1)(iii). The fact that the NFA concluded that EOX was exempt from §1.35(a)'s record keeping requirements does not preclude the court from reaching a contrary conclusion.

         (c)  Plaintiff is Not Entitled to Summary Judgment on Count III

Asserting that "the undisputed facts establish that EOX failed to prepare and maintain (1) written order tickets and (2) certain pre-trade communications (from 2013 to the present) in violation of the Act and its Regulations,"[215] Plaintiff seeks summary judgment on the following issues related to Count III:

---

[214](...continued)
No. 152-66, p. 2.

[215]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, p. 40.

- EOX failed to maintain written order tickets of customer trades, in violation of 7 U.S.C. § 6g(a) and 17 C.F.R. § 1.35(b)(1);

- EOX failed to maintain certain pre-trade communications, in violation of 17 C.F.R. § 1.35(a)(1); and

- EOX failed to maintain pre-trade communications that occurred via mobile phone in, violation of 17 C.F.R. § 1.35(a)(1).[216]

### (1) Plaintiff Is Not Entitled to Summary Judgment that EOX Failed to Prepare and Maintain Written Order Tickets of Customer Trades

Asserting that as an IB, EOX is "required to prepare and maintain order tickets or other written records of orders that it receives from customers,"[217] and that "EOX is required to comply with 17 C.F.R. § 1.35(b)(1),"[218] Plaintiff argues that "[t]here is no genuine issue of material fact: EOX does not have the order tickets required by the Act and its Regulations for the Relevant Period,"[219] and "EOX admitted that after making 'reasonable inquiry' it simply does not know whether it prepared the required written

---

[216]Plaintiff's MSJ, Docket Entry No. 150, p. 2.

[217]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, p. 41.

[218]Id. (citing Plaintiff's SOF 162, Docket Entry No. 152, p. 31).

[219]Id. (citing Plaintiff's SOF 163, Docket Entry No. 152, p. 31).

customer orders from the Relevant Period."[220]   Asserting that
"[e]ven more troubling, EOX admitted that it also does not know if
it has prepared and maintained written order tickets from the
Relevant Period to the present,"[221] and that "EOX was not able to
produce to the Commission for inspection upon request written order
tickets that comply with Section 1.35(b)(1)'s requirements,"[222]
Plaintiff argues that "EOX violated the Regulation and this Court
should grant judgment on Count III of the Complaint."[223]

Although Defendants admit that as an IB, EOX is required to
comply with 17 C.F.R. § 1.35(b)(1),[224] Plaintiff treats all of its
SOFs as undisputed even though Defendants deny and dispute all but
one of the SOFs that Plaintiff cites in support of its argument
that it is entitled to summary judgment that EOX failed to prepare
and maintain written order tickets of customer trades.[225]
Defendants dispute Plaintiff's argument by asserting that the
Plaintiff's SOFs are not supported by the materials that Plaintiff

---

[220]Id. (citing Plaintiff's SOF 164, Docket Entry No. 152,
p. 31).

[221]Id. at 41-42 (citing Plaintiff's SOF 165, Docket Entry
No. 152, p. 31).

[222]Id. at 42 (citing Plaintiff's SOF 166, Docket Entry No. 152,
p. 31).

[223]Id.

[224]Defendants' Counter SOF 162, Docket Entry No. 168, p. 105.

[225]Id. at p. 99 (SOF 163), pp. 99-100 (SOF 164), pp. 100-01
(SOF 165), p. 101 (SOF 166).

cites, and that "[a]ll transactions at issue in this case were immediately entered into the ICE Block trade matching engine . . . [t]herefore, no other written records were required."[226]

Asserting that § 1.35(b)(1) has never said anything about written order tickets, Defendants argue that written records have only been required for orders "that cannot immediately be entered into a trade matching engine."[227]   Citing the Supplemental Loya Declaration, Defendants argue that

> [b]y the time Dodd-Frank and the CFTC brought block trading into exchange clearing, written trade tickets were obsolete or almost so, except for the smallest and least sophisticated traders.  By August 2013, all EOX-brokered block trades were and always since have been immediately entered into ICE Block, the ICE exchange and clearing system.[228]

In light of Loya's testimony that "[a]ll block trades in this case were and always have been immediately entered into BlockICE, the ICE trade matching engine," the court concludes that whether EOX's lack of written records for orders received during the Relevant Period constitutes a violation of 17 C.F.R. § 1.35(b) is a fact issue for trial.

---

[226]Defendants' Opposition to Plaintiff's MSJ, Docket Entry No. 167-1, p. 25.

[227]Id. (citing 17 C.F.R. § 1.35(b)(1)).

[228]Id. at 25 (citing Loya Supplemental Declaration, Exhibit 1 to Defendants' Counter SOF, Docket Entry No. 168-2, p. 5 ¶ 17 (". . . All block trades in this case were and always have been immediately entered into BlockICE, the ICE trade matching engine.").

> **(2)   Plaintiff Is Not Entitled to Summary Judgment that EOX Failed to Maintain Certain Pre-Trade Communications from 2013 to the Present**

Asserting that "[i]t is undisputed that EOX failed to keep all required pre-trade communications during the Relevant Period,"[229] Plaintiff argues that

> [i]n particular, (1) EOX failed to prepare and maintain at least thirteen pre-trade communications for trades executed out of the [Managed] Account, and (2) EOX brokers conducted broker business over their mobile telephones and those records were not maintained.[230]

> **(i)   Managed Account Pre-Trade Communications**

Asserting that "[a]t the request of IFUS, EOX created a spreadsheet identifying, among other things, the available pre-trade communications for 123 of Gizienski's trades from the [Managed] Account,"[231]  Plaintiff argues that

> [b]y EOX's own analysis, it has no pre-trade communications for at least <u>one side</u> of the transaction for four trades, SOF ¶ 174, and it has no pre-trade communications for <u>both sides</u> of the transaction for three trades[,] SOF ¶ 175, and for six other trades, EOX provided instant message conversations that purport to be the pre-trade communications, but the relevant portion of the communications — the customer's actual order including any negotiations on price — is absent.  SOF ¶ 176.  Of course, these 13 instances of missing pre-

---

[229]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, p. 43 (citing Plaintiff's SOF, Docket Entry No. 152, p. 32 ¶ 169 (citing Request for Admissions, No. 3, Exhibit 27, Docket Entry No. 152-28, p. 3; and Amended Request for Admissions, No. 1, Exhibit 66, Docket Entry No. 152-67, p. 1)).

[230]<u>Id.</u> (citing Plaintiff's SOF, Docket Entry No. 152, p. 32 ¶ 172).

[231]<u>Id.</u> (citing Plaintiff's SOF, Docket Entry No. 152, p. 32 ¶ 173).

trade communications represent only a <u>subset</u> of trades for <u>one broker</u> over an eight-month period of time. SOF ¶ 177. Of the 123 trades analyzed, 13 (10.6%) are missing pre-trade communications. It is likely that EOX failed to maintain pre-trade communications at a similar rate for the thousands of other trades it brokered.[232]

Although Plaintiff treats all of its SOFs as undisputed, Defendants deny and dispute each of the SOFs cited in the above quoted passage from Plaintiff's brief, in part because the spreadsheet(s) on which Plaintiff relies, <u>i.e.</u>, Plaintiff's Exhibits 67-69, do not include any reference to pre-trade communications.[233] Although EOX admits that at the request of IFUS, it created a spreadsheet identifying, among other things, the available pre-trade communications for 123 of Gizeinski's trades from the Managed Account,[234] Plaintiff fails to provide any discernible evidentiary support for its contention that Exhibits 67-69 cited in its SOFs 174-177 actually show that EOX failed to prepare and maintain at least thirteen pre-trade communications for trades executed out of the Managed Account. Moreover, since for the reasons stated in § IV.B.3(b)(1), the court has already concluded that EOX is entitled to summary judgment that it was not

---

[232]<u>Id.</u> at 43-44.

[233]Defendants' Counter SOF, Docket Entry No. 168, p. 105 (SOF 174), p. 106 (¶ 175), pp. 106-07 (¶¶ 176-77). <u>See also</u> Exhibits 67-69 to Plaintiff's SOF, Docket Entry Nos. 152-68, 152-69, 152-70).

[234]Defendants' Counter SOF, Docket Entry No. 168, p. 105 (SOF 173).

required to maintain recordings of oral pre-trade communications until the compliance date of December 21, 2013, EOX cannot be held liable for failing to record oral pre-trade communications for transactions that occurred before December 21, 2013.

(ii) Mobile Telephone Pre-Trade Communications

Asserting it is undisputed that during the Relevant Period, EOX brokers used their mobile telephones to broker trades, that EOX did not capture pre-trade communications that occurred when brokers used their mobile telephones, and that EOX did not have any policy regarding brokers' use of mobile telephones, Plaintiff argues that "[t]his Court should grant summary judgment on Count III of the Complaint because EOX failed to maintain written order tickets and pre-trade communications during and after the Relevant Period."[235] Defendants admit that during the Relevant Period EOX brokers used their mobile telephones to broker trades, and that EOX did not capture pre-trade communications that occurred when brokers used their mobile telephones, but argue that EOX was not required to make or maintain recordings of oral pre-trade communications until December 21, 2013, and was exempt from the requirement for 2013 and 2014 because its revenue fell below the required threshold for

---

[235]Plaintiff's Memorandum in Support of MSJ, Docket Entry No. 151, p. 44 (citing Plaintiff's SOF, Docket Entry No. 152, p. 33 ¶¶ 178-80).

capturing such communications.[236]   For the reasons stated in
§ IV.B.3(b), the court has already concluded that Defendants are
entitled to summary judgment that EOX was not required to make or
maintain recordings of oral pre-trade communications before the
compliance date of December 21, 2013, but that EOX was not exempt
from doing so after that date because the parties have stipulated
that the entities that brokered investments through the EOX's IB
registration at NFA generated more than five million dollars in
aggregate gross revenues for the three-year periods preceding
January 1, 2013, and January 1, 2014.  Nevertheless, Plaintiff has
failed to establish that it is entitled to summary judgment on
Count III because Plaintiff has failed to identify any trades that
Gizienski — or any other EOX AP — brokered by mobile phone for the
part of the Relevant Period after the December 21, 2013, compliance
date, i.e., from December 21, 2013, to May 2014.


    4.  Count IV

    Count IV of Plaintiff's Complaint alleges that

    EOX violated 17 C.F.R. § 166.3 by, among other things:
    (i) failing to establish, implement, and enforce policies
    or procedures to detect or prevent Gizienski's misuse of
    confidential customer information; (ii) failing to review
    Gizienski's discretionary trading, his communications
    with Customer A, or the brokerage services he provided to
    Customer A; and (iii) failing to establish, implement, or
    enforce policies or procedures governing its brokers'

---

    [236]Defendants' Counter SOF, Docket Entry No. 168, pp. 107-08
(SOF 178-80).

handling of customer orders, the preparation and retention of required records, and the protection of confidential customer information.[237]

Plaintiff also alleges that

[t]he forgoing acts, omissions, and failures of EOX employees and principals relating to insufficient supervision occurred within the scope of their employment, office, or agency with EOX. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, EOX is liable for the acts, omissions, and failures constituting violations of 17 C.F.R. § 166.3,[238]

and that "[e]ach failure to supervise, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 166.3."[239]

(a)   Applicable Law

In pertinent part the version of  17 C.F.R. § 166.3 in effect during the Relevant Period stated that

[e]ach Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying similar status or performing a similar function) relating to its business as a Commission registrant.

---

[237]Plaintiff's Complaint, Docket Entry No. 1, p. 20 ¶ 95.

[238]Id. at 20-21 ¶ 96.

[239]Id. at 21 ¶ 97.

17 C.F.R. § 166.3.[240]  Regulation 166.3 imposes on registrants like EOX "a duty to develop procedures for the 'detection and deterrence of possible wrongdoing by its agents.'"  Commodity Futures Trading Commission v. Trinity Financial Group, Inc., No. 92-6832-CIV, 1997 WL 820970, at *29 (S.D. Fla. Sept. 29, 1997), aff'd in relevant part, vacated in part sub nom. Commodity Futures Trading Commission v. Sidoti, 178 F.3d 1132, 1137 (11th Cir. 1999).  In evaluating a claim for failure to supervise courts first determine whether there was a program of supervision designed to detect violations; and secondly, whether the relevant policies and procedures were followed.  See Commodity Futures Trading Commission v. Carnegie Trading Group, Ltd., 450 F. Supp. 2d 788, 805 (N.D. Ohio 2006). See also Crothers v. Commodity Futures Trading Commission, 33 F.3d 405, 411 (4th Cir. 1994) (failure to adhere to internal policies supports a finding of liability under § 166.3).

> (b) Defendants are Not Entitled to Partial Summary Judgment on Count IV

Defendants argue that they are entitled to partial summary judgment on Count IV because Plaintiff's allegations are "wildly incorrect.  EOX has had detailed procedures in place [since] soon after Dodd-Frank 'futurized' block trading in late 2012. . .

---

[240]Rule 166.3 was part of a series of rules and rule changes promulgated by the CFTC in 1977 which were "designed to protect, in various respects, members of the public who deal with commodity trading professionals."  42 Fed. Reg. 44,742 (CFTC 1977).

Summary judgment should be granted on that part of Count IV."[241]   In support of this argument, EOX cites the Loya Declaration, a 2013 Compliance Manual, and the Declaration of Sneha Bagri, Chief Compliance Officer of OTC Global Holdings LP (OTC), parent company of EOX Holdings LLC and compliance documents attached thereto.[242]

Plaintiff responds that EOX's motion for summary judgment on Count IV should be denied because Defendants fail to address any of the Complaint's allegations regarding EOX's failure to supervise Gizienski during the Relevant Period,[243] because EOX admits that it did not maintain records pursuant to its own policies during the Relevant Period,[244] and because, after conducting a "reasonable

---

[241]Defendants' Memorandum in Support of  MSJ, Docket Entry No. 179, p. 29.

[242]Id. at 17-18 (citing Loya Declaration, ¶¶ 16-17, Exhibit 1, Docket Entry No. 160-2, p. 5; EOX Holdings LLC Procedures Manual, Exhibit 24 to Defendants' MSJ, Docket Entry No. 160-2, pp. 293-99; Declaration of Sneha Bagri Agarwal, Exhibit 25 to Defendants' MSJ, Docket Entry No. 160-2, pp. 301-02 and Exhibits 1-3 attached thereto).

[243]Plaintiff's Response to Defendants' MSJ, Docket Entry No. 166, p. 26.

[244]Id. n. 12 (citing Defendant EOX Holding LLC's Responses to Plaintiff CFTC's First Set of Requests for Admissions, No. 7, Exhibit 27 to Plaintiff's SOF, Docket Entry No. 152-28, p. 4 ("Admit that EOX does not have all books and records required to be kept by the Act and its Regulations for the Relevant Period. Defendant's Response: Admitted, subject to the qualification that EOX has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to identify or quantify the books and records that were not retained.").

inquiry," EOX does not know if it is following its own policy to maintain records in accordance with the Act and Regulations.[245]

Asserting that "the supposed failure to follow internal compliance procedures is not a violation of the [CEA] whatever the period,"[246] Defendants reply that

> the only factual dispute left on Count IV is a very narrow one: Did EOX's Houston Office Branch Manager Mike Nemer review the trading in the discretionary [i.e., Managed] account.  His testimony is all over the block on that.  He testified in deposition that he did not, but also admitted that he had told EOX's outside compliance auditor the precise opposite that he did review the trading on a daily basis.[247]

Defendants also reply that "Plaintiff offers no proof whatsoever to contradict EOX's evidence about its robust compliance procedures from before and after February 2015 when it hired Sneha Bagri as its new Vice President of Compliance."[248]

Although EOX contends that it has had robust compliance and supervision policies and procedures in place since 2013, EOX's admissions that it is unable to produce requested records raises fact issues regarding the nature and extent of its compliance with

---

[245]Id. (citing EOX Holding LLC's Responses to Plaintiff CFTC's First Set of Requests for Admissions, Nos. 4 and 6, Exhibit 27 to Plaintiff's SOF, Docket Entry No. 152-28, pp. 3-4).

[246]Defendants' Reply in Support of Their MSJ, Docket Entry No. 174, p. 22.

[247]Id. at (citing Defendants' Counter SOFs ¶ 40, 47, 150, 161, Docket Entry No. 168, pp. 14-15 (¶ 40), 18-19 (¶ 47), 95-96 (¶ 150) and 112 (¶ 161)).

[248]Id. (citing Defendants' Memorandum in Support of Their Motion for Summary Judgment on Counts I & II, and for Partial Summary Judgment on Counts III & IV, Docket Entry No. 160, pp. 17-18).

the record keeping requirements imposed on registrants.  Moreover,
since, Defendants acknowledge the existence of fact issues
pertaining to whether EOX diligently supervised Gizienski, the
court concludes that Defendants have failed to establish that they
are entitled to partial summary judgment on Count IV.

> (c)  Plaintiff is Not Entitled to Summary Judgment on
>      Count IV

Asserting that EOX had no compliance structure, EOX failed to
follow its own policies and procedures, and failed to perform its
supervisory duties diligently, Plaintiff seeks summary judgment on
the following issues related to Count IV:

- EOX failed to maintain adequate compliance
  infrastructure, in violation of 17 C.F.R. § 1.66.3;

- EOX failed to follow policies and procedures that
  it did have in place, in violation of 17 C.F.R.
  § 1.66.3; [and]

- EOX failed to diligently supervise Gizienski's
  discretionary trading on behalf of the preferred
  customer, leading to Gizienski's misconduct, in
  violation of 17 C.F.R. § 166.3.[249]

Defendants respond that Plaintiff is not entitled to summary
judgment on Count IV because their

> evidence is that they had robust internal procedures
> during the Relevant Period that were enforced and applied
> by an extremely experienced and knowledgeable broker
> force including Mr. Gizienski that was trained on the
> trading desk on an on-the-job basis.  Defendants'
> evidence is that there was nothing wrong with
> Mr. Gizienski's work on the discretionary account which
> he did under narrow parameters imposed by Vaccaro, and
> subject to the daily review by Mike Nemer, EOX's Houston

---

[249]Plaintiff's MSJ, Docket Entry No. 150, p. 2.

> Office Branch Manager, who was the EOX officer who set up
> the account in consultation with the compliance and
> administrative personnel of ICE and the two FCMs (FC
> Stone & BAM).[250]

Defendants also argue that

> [t]here is ample evidence that Mr. Gizienski's brokering
> in the discretionary account was monitored daily by the
> Branch Manager Nemer and that when a complaint about the
> account was made, the highest management of EOX
> intervened and determined that there were no
> irregularities, causing the person who raised the
> complaint to withdraw it and apologize. There was no
> need to monitor Mr. Gizienski's IMs or calls with any
> customer, because there was nothing wrong with them. All
> this was confirmed by the repeated NFA audits that never
> raised any issues with those accounts or the supervision
> and compliance procedures.[251]

Plaintiff argues that it is entitled to summary judgment on

Count IV because EOX failed to maintain adequate compliance

infrastructure, EOX failed to follow policies and procedures that

it did have in place, and EOX failed to diligently supervise

Gizienski's discretionary trading on behalf of the favored

customer, i.e., Vaccaro. But Defendants have attached to their MSJ

EOX Holdings LLC 2013 Procedures Manual,[252] and Defendants have

presented at least some evidence that Mike Nemer, the Branch

---

[250]Defendants' Reply in Support of Their MSJ, Docket Entry
No. 174, p. 27 (citing Defendants' Responses to Plaintiff's SOFs
39-42, 45-48, 63, 128, 148-52, 157-58, 161, Docket Entry No. 168,
pp. 14-16 (SOF 39-42), 17-19 (SOF 45-48), 33-34 (SOF 63), 89 (SOF
128), 94-96 (SOF 148-52), 97 (SOF 157-58), 98 (SOF 161)).

[251]Id. at 28 (citing Defendants' Responses to Plaintiff's SOF
46, Docket Entry No. 168, pp. 17-18).

[252]Exhibit 24 to Defendants' MSJ, Docket Entry No. 160-2,
pp. 293-99.

Manager of EOX's Houston office was responsible for and did, in fact, monitor Gizienski's trading in the Managed Account.[253] Whether EOX violated § 166.3 by failing to establish, implement, or enforce policies or procedures to detect or prevent misuse of confidential customer information, failing to review Gizienski's discretionary trading, or failing to establish, implement, or enforce policies or procedures governing its brokers' handling of customer orders, the preparation and retention of required records, and the protection of confidential customer information raise fact issues for trial.  Because Plaintiff has failed to cite undisputed evidence establishing that it is entitled to judgment as a matter of law that EOX violated 17 C.F.R. § 166.3, Plaintiff is not entitled to summary judgment on Count IV.

            5.    <u>Defendants are Not Entitled to Summary Judgment on Their
                  Affirmative Defenses Based on Either the First or the
                  Fifth Amendment to the United States Constitution</u>

        Defendants argue that the laws and regulations being applied to them are unconstitutionally vague (under the Fifth Amendment) as applied to their activities, and that the First Amendment shields

---

[253]Plaintiff's SOF, Docket Entry No. 152, p. 7 ¶ 47 (citing Nemer Deposition, pp. 31:22-32:20, Exhibit 11 to Plaintiff's MSJ, Docket Entry No. 152-12, pp. 12-13; Deposition of Javier Loya ("Loya Deposition"), p. 136:11-138:24, Exhibit 24 to Plaintiff's MSJ, Docket Entry No. 152-25, pp. 22-24); Defendants' Counter SOF, Docket Entry No. 168, pp. 14-15 ¶¶ 40 (citing Loya Supplemental Declaration, Exhibit 1 to Defendants' Counter SOF, Docket Entry No. 168-2, p. 6 ¶ 22 (asserting that Nemer was responsible for monitoring the account daily).

their conduct from regulation.[254] Plaintiff responds that Defendants' vagueness defense fails because they had actual knowledge that their actions were prohibited, and that their First Amendment defense fails because the commercial speech doctrine does not apply to commodities regulations.[255]

(a)  Fifth Amendment Due Process: Vagueness

Defendants argue that the laws and regulations being enforced by the CFTC are unconstitutionally vague as applied to them because the laws and regulations at issue did not provide them Constitutionally required notice of their application to block trades.[256]  "The vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'"  United States v. Lanier, 117 S. Ct. 1219, 1225 (1997) (quoting Conally v. General Construction Co., 46 S. Ct. 126, 127 (1926)).  A law is not impermissibly vague if a reasonable person would have known that his conduct was at risk.  Maynard, 108 S. Ct. at 1857-58 (citing

---

[254]See Defendants' Memorandum in Support of Motion to Amend, Docket Entry No. 122, pp. 26-32. See also Defendants' Reply in Support of Their MSJ, Docket Entry No. 174, 32.

[255]Plaintiff's Response in Opposition to Defendants' Motion for Leave to Amend, Docket Entry No. 129, pp. 5-10.

[256]See Defendants' Memorandum in Support of Motion to Amend, Docket Entry No. 122, pp. 26-31.

*inter alia* <u>National Dairy Products</u>, 83 S. Ct. at 598 ("Void for
vagueness simply means that . . . responsibility should not attach
where one could not reasonably understand that his contemplated
conduct is proscribed.").

Defendants argue that

> [f]or years the CFTC opposed insider trading regulation
> saying that insider trading could not occur in this
> industry and that such prohibitions should not be
> injected into the regulatory structure.  After Congress
> changed that policy in Dodd-Frank, the CFTC floundered
> around trying to get the regulatory structure in place,
> leaving the industry in suspended animation, indeed
> turmoil.  It never gave any notice that it would seek to
> apply this 10b-5 remedy to block trading where the
> practices attacked had long been legal and are still
> followed even today in certain investment areas.  Eight
> years after enactment of Dodd-Frank, seven years after
> adoption of Regulation 180.1, and long after the events
> at issue the CFTC went back and cherry-picked [] twenty
> transactions out of more than 117,000 in the same period,
> and alleged that they were fraudulent, all as part of its
> "Insider Trading Task Force," essentially a secret unit
> of some kind that even today it seeks to keep hidden from
> discovery.
>
> Furthermore, the CFTC's reliance on Regulation
> 155.4(b)(1) is remarkably off base.
>
> That Regulation prohibits the disclosure [that] "an
> order of another person is being held by the [IB] or any
> of its affiliated persons. . ." 17 C.F.R. § 155.4(b)(1).
> But . . . because block trades are privately negotiated,
> an IB must necessarily disclose to both counterparties
> that it is holding an order from the other.  The CFTC's
> application of that Regulation is completely nonsensical.
>
> This is all profoundly unfair and constitutes a
> grievous Due Process Notice violation of the Fifth
> Amendment.[257]

---

[257]<u>Id.</u> at 28-29.

Defendants provide a lengthy discussion of the CFTC's history with respect to insider trading in an attempt to persuade the court that they lacked notice that insider trading in commodities was prohibited. However, this argument is belied both by their own understanding of Dodd-Frank and the regulations promulgated thereunder, which show that essentially the same argument they now make was raised and rejected during the rule making process, and by undisputed evidence of their knowledge.[258] Under questioning from IFUS, the entity that runs the exchange on which he executed the transactions at issue, Gizienski admitted that brokers could not disclose the orders of their customers:

> Q:   What if a counterparty asked you who the other side of a deal was?
>
> A:   You can't give up that information. There is a confidentiality agreement between the broker and the traders, and . . . you know . . . no information I receive from one client goes to another. That's just ah . . . I mean that's industry policy . . . I don't even want to say that's EOX policy . . . that is series 3 compliance. That is an industry compliance policy. As a general rule 101 of being a broker you cannot disclose, unless you are brokering a physical market which I do not[,] I broker futures, and you can pass information when everything is cleared, you are not passing tangible names . . . just cleared.[259]

---

[258]<u>Id.</u> at 6-15.

[259]IFUS Interview of Andrew Gizienski, p. 24, Exhibit 40 to Plaintiff's SOF, Docket Entry No. 152-41, p. 25.

EOX's CEO, Loya, made a similar acknowledgment in an August 14, 2013, email that he sent to all Choice employees by stating, "[o]bviously the futures markets impose regulations prohibiting . . . trading on material non-public information and similar abuses."[260]

Defendants provide no case law to suggest that either the statutory provision or the regulations that the CFTC is seeking to enforce in this case are improperly vague, or that they impermissibly left Defendants in doubt as to whether their activities were subject to regulation and enforcement actions. Moreover, since Defendants cannot be held liable for the violations alleged in this case absent proof of scienter, Defendants' vagueness concerns are not persuasive. See McFadden v. United States, 135 S. Ct. 2298, 2307 (2015) ("a scienter requirement in a statute alleviate[s] vagueness concerns"). See also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 102 S. Ct. 1186, 1193 (1982) ("[T]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."). The court is therefore not persuaded that Defendants's Fifth Amendment arguments entitled them to summary judgment on Counts I or II.

---

[260]August 14, 2013, Email from Javier Loya to All Choice Envir Employees, Exhibit 3, Docket Entry No. 129-1, p. 27, and Exhibit 70 to Plaintiff's SOF, Docket Entry No. 152-71.

(b)   First Amendment: Freedom of Commercial Speech

Defendants argue that the laws the CFTC are suing under violate their rights to freedom of commercial speech protected by the First Amendment.  Citing Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 105 S. Ct. 2265 (1986), Defendants argue that Plaintiff is seeking to hold them liable for truthful disclosures of information to one of their clients that they were duty-bound to disclose.[261]

Plaintiff's claims are rooted in its theory that Gizienski's failure to disclose to EOX's customers that he was using the Managed Account to trade for AC Power, that he was taking the other side of their transactions on behalf of the Managed Account, and that he was disclosing to Vaccaro confidential information obtained from them without their consent were acts of fraud.  Defendants' First Amendment argument is therefore unavailing because "the First Amendment does not shield fraud." Illinois, ex. rel. Madigan v. Telemarketing Associates, Inc., 123 S. Ct. 1829, 1836 (2003) (citing Donaldson v. Read Magazine, Inc., 68 S. Ct. 591, 598 (1948)(the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established")).  See also United States v. Alvarez, 132 S. Ct. 2537, 2547 (2012)  ("[F]raudulent speech generally falls outside

---

[261]See Defendants' Memorandum in Support of Motion to Amend, Docket Entry No. 122, p. 31.

the protections of the First Amendment.") (citing <u>Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.</u>, 96 S. Ct. 1817, 1830 & n. 24 (1976) (recognizing that it may be appropriate to require that a commercial message include additional information as necessary to prevent its being deceptive)).  Both the statute and the regulations on which Counts I and II are based require scienter and prohibit fraud in commodities transactions. "Explicit antifraud measures such as these do not violate the First Amendment."  <u>Commodity Trend Service, Inc. v. Commodity Futures Trading Commission</u>, 233 F.3d 981, 993 (7th Cir. 2000) (holding that other anti-fraud provisions of the CEA, 7 U.S.C. § 6o(1) and 17 C.F.R. 4.41(a), do not violate the First Amendment).

Moreover, Defendants' argument presumes that the section of CEA and the regulations that the CFTC is seeking to enforce in this action target speech — that is, the confidential information that Gizienski is alleged to have disclosed without consent.  But neither the statute nor the regulations are directed at speech; they are instead directed at the conduct of a person using speech, <u>i.e.</u>, disclosing and using order information in violation of duties of trust and confidentiality.  "[I]t has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  <u>Ohralik v. Ohio State Bar Association</u>, 98 S.

Ct. 1912, 1918 (1978) (quoting <u>Giboney v. Empire Storage & Ice Co.</u>, 69 S. Ct. 684, 691 (1949)).  Stated another way, the government "does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." <u>Id.</u> at 1919 (citing as examples, the exchange of information about securities, <u>S.E.C. v. Texas Gulf Sulphur Co.</u>, 401 F.2d 833 (2d Cir. 1968), <u>cert. denied</u>, 89 S. Ct. 1454 (1970), and the exchange of price and production information among competitors, <u>American Column & Lumber Co. v. United States</u>, 42 S. Ct. 114 (1921)).  Defendants' First Amendment arguments are not persuasive, and the court concludes that they do not entitled Defendants to summary judgment on Counts I and II.

### V. <u>Conclusions and Order</u>

For the reasons stated in § II, the court concludes that Defendants have established good cause to amend their answer to include two affirmative defenses, and Plaintiff has failed to establish that the proposed amendments would be futile. Accordingly, Defendants' Motion to Amend Revised Docket Control Order to Grant Them Leave to File Amended Answer Adding Affirmative Defenses, Docket Entry No. 121, is **GRANTED**.

For the reasons stated in § III.B, Defendants' Motion to Strike the Forester Declaration is granted as to ¶¶ 8-10, 17-18, 20-21, 23, 25, 27-38, and denied as to the remaining paragraphs of

the declaration.  For the reasons stated in § III.C, Defendants'
Motion to Strike the Dasso Declaration is granted.  Accordingly,
Defendants' Motion to Strike Improper Declarations Submitted by
Plaintiff in Support of Its Motion for Summary Judgment, Docket
Entry No. 171, is **GRANTED in PART and DENIED in PART**.

For the reasons stated in § IV.B.1, the court concludes that
neither Plaintiff nor Defendants are entitled to summary judgment
on Count I.  For the reasons stated in § IV.B.2, the court
concludes that neither Plaintiff nor Defendants are entitled to
summary judgment on Count II.  For the reasons stated in
§ IV.B.3(b)(1), the court concludes that Defendants are entitled to
summary judgment that EOX was not required to comply with the oral
record keeping mandate until the compliance date of December 21,
2013.  For the reasons stated in § IV.B.4, the court concludes that
neither Plaintiff nor Defendants are entitled to summary judgment
on Count IV.  For the reasons stated in § IV.B.5 the court
concludes that Defendants are not entitled to summary judgment on
Counts I or II based on the affirmative defenses that they have
asserted under First and Fifth Amendments to the United States
Constitution.  Accordingly, Plaintiff's Motion for Summary
Judgment, Docket Entry No. 150, is **DENIED**, and Defendants' Motion
for Summary Judgment on Counts I & II and for Partial Summary
Judgment on Counts III & IV, Docket Entry No. 160, is **GRANTED in
PART** and **DENIED in PART**.

The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research in order to be as fully informed as possible when addressing the parties' arguments. Therefore no motions for reconsideration or other pretrial motions will be allowed. Likewise, the court will not entertain motions in limine. The court is familiar with the issues in the case and will rule on objections to evidence at trial.

The joint pretrial order will be filed by November 2, 2021, and Docket call will be held on November 12, 2021, at 3:00 p.m. in Courtroom 9-B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.

**SIGNED** at Houston, Texas, on this 30th day of September, 2021.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE